UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

————————————————————x

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| WASHINGTON MUTUAL, INC., *et al.* | : | Case No. 08-12229 (MFW) |
| | : | |
| Debtors[1] | : | Jointly Administered |

————————————————————

WASHINGTON MUTUAL, INC. AND :
WMI INVESTMENT CORP.,          :     Adv. Pro. No. 09-50934 (MFW)

Plaintiffs,          :

v.          :     **Oral Argument Requested**

JPMORGAN CHASE BANK,          :
NATIONAL ASSOCIATION          :

Defendant.          :

————————————————————x

**APPENDIX IN SUPPORT OF DEFENDANT JPMORGAN
CHASE BANK, NATIONAL ASSOCIATION'S MOTION
TO DISMISS ADVERSARY PROCEEDING**

Adam G. Landis (I.D. 3407)
Matthew B. McGuire (I.D. 4366)
LANDIS RATH & COBB LLP
919 Market Street Suite 1800
Wilmington, DE 19899
Tel: (302) 467-4400

*Counsel for JPMorgan Chase Bank,
National Association*

May 13, 2009

---

[1]     The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are : (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395). The Debtors continue to share the principal offices with the employees of JPMorgan Chase located at 1301 Second Avenue, Seattle, Washington 98101.

## **TABLE OF CONTENTS**

Page(s)

Objection of the WMB Noteholder Group to Motion of Debtors
Pursuant to Sections 105(a), 361, 362 and 542(b) of Bankruptcy Code
Seeking Approval of Stipulation and Agreement Concerning Deposit
Accounts at JPMorgan Chase Bank, National Association,
*In re Washington Mutual Inc.*, Case No. 08-12229 (MFW)
(Bankr. D. Del. Oct. 20, 2008), D.I. 100. .................................................. A1-A13

FDIC's Statement, Response and Limited Objection to Motion of Debtors
Pursuant to Sections 105(A), 361, 362 and 542(B) of the Bankruptcy
Code Seeking Approval of a Stipulation and Agreement Concerning
Deposit Accounts at JPMorgan Chase Bank, National Association,
*In re Washington Mutual Inc.*, Case No. 08-12229 (MFW)
(Bankr. D. Del. Oct. 20, 2008), D.I. 104. ................................................ A14-A20

Complaint, *Washington Mutual, Inc. et al.* v. *FDIC*,
No. 1:09-cv-0533 (D.D.C. Mar. 20, 2009). ............................................ A21-A59

Complaint, *JPMorgan Chase Bank, N.A.* v. *Washington Mutual Inc., et al.*
*(In re Washington Mutual, Inc.)*, Adv. No. 09-50551 (MFW)
(Bankr. D. Del. Mar. 24, 2009), D.I. 1. .................................................. A60-A170

Memorandum of Points and Authorities in Support of JPMorgan Chase
Bank, N.A.'s Motion to Intervene as Defendant, *Washington
Mutual, Inc. et al.* v. *FDIC*, No. 1:09-cv-0533
(D.D.C. Mar. 30, 2009). ...................................................................... A171-A186

Proof of Claim of FDIC, Claim No. 2140,
*In re Washington Mutual Inc.*, Case No. 08-12229 (MFW)
(Bankr. D. Del. Mar. 30, 2009). .......................................................... A187-A219

Proof of Claim of Bank Bondholders, Claim No. 3071,
*In re Washington Mutual Inc.*, Case No. 08-12229 (MFW)
(Bankr. D. Del. Mar. 31, 2009). .......................................................... A220-A257

Response of Defendant FDIC-Receiver in Support of Motion to
Intervene of JPMorgan Chase Bank, N.A.,
*Washington Mutual, Inc. et al.* v. *FDIC*, No. 1:09-cv-0533
(D.D.C. Apr. 30, 2009). ...................................................................... A258-A260

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al. | ) | |
| | ) | Case No. 08-12229 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | Related Docket Item 74 |
| | ) | Objection Deadline: October 20, 2008 |

**OBJECTION OF THE WMB NOTEHOLDER GROUP TO MOTION OF DEBTORS
PURSUANT TO SECTIONS 105(a), 361, 362 AND 542(b) OF BANKRUPTCY CODE
SEEKING APPROVAL OF A STIPULATION AND AGREEMENT CONCERNING
DEPOSIT ACCOUNTS AT JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

No bank would ever let someone walk up to a teller window and withdraw even one

dollar from an account without confirming that the account was actually established and that the

account actually belonged to the customer. Yet the Debtors propose, on shortened notice, to

withdraw approximately $4.4 billion from Accounts (defined below) as to which they cannot

locate, with limited exceptions, "any deposit account agreements establishing the Accounts, any

other agreements regarding the maintenance of or withdrawals from the Accounts or any

signature cards or other specification of any authorized signatories with respect to the Accounts."

And, pursuant to the Motion of Debtors Pursuant to Sections 105(a), 361, 362 and 542(b) of the

Bankruptcy Code Seeking Approval of a Stipulation and Agreement Concerning Deposit

Accounts at JPMorgan Chase Bank, National Association [D.I. 74] (the "Motion to Approve"),

they propose to do this free and clear of all potential rights and interests in the Accounts save

those of the bank where the Accounts are currently maintained.

**A1**

The WMB Noteholder Group,[1] by and through its undersigned counsel,[2] hereby objects to the Motion to Approve because it will irreparably harm the potential rights and interests of the WMB Group Participants in the Accounts before those rights and interests can be investigated and pursued.

## BACKGROUND

1.       WMB, a federal savings and loan association that is a subsidiary of the debtor Washington Mutual, Inc. ("WMI"), was placed into receivership (the "Receivership") by the Office of Thrift Supervision (the "OTS") on September 25, 2008.[3] Although it has been termed the largest thrift "failure" in United States history, WMB had capital in excess of the regulatory

---

[1] The participants ("the WMB Group Participants") in the WMB Noteholder Group include more than 30 insurance companies, institutional fund managers, investment banks and private investment funds who are the legal or beneficial holders of, or have control or discretionary investment authority with respect to, approximately $2 billion in aggregate principal amount outstanding of Senior Notes and Subordinated Notes issued by Washington Mutual Bank ("WMB"). The WMB Noteholder Group is still in the formation process and counsel is still in the process of obtaining the precise legal name of each WMB Group Participant and/or its relevant affiliates, funds and/or managed accounts. At the hearing on the Motion to Approve, counsel will identify the current WMB Group Participants.

The WMB Group Participants participate in the WMB Noteholder Group as a matter of convenience and fee sharing only and each WMB Group Participant does not act for, or purport to represent or speak on behalf of, any other WMB Group Participant or any other holder of WMB Senior or Subordinated Notes. WMB Group Participants are free to join or drop out of the WMB Noteholder Group at any time, and, accordingly, counsel will provide an update as to the WMB Group Participants from time to time.

[2] The sole client of counsel is the WMB Noteholder Group as a whole, and counsel does not purport to represent individual WMB Group Participants in any manner other than in respect of the expression of their consensus views through the vehicle of the WMB Noteholder Group.

[3] The WMB Noteholder Group has standing to raise this objection because they are parties in interest with a practical and economic stake in the outcome of these proceedings. Secondarily, the WMB Noteholder Group has standing because the holders of the Notes constitute the largest constituency in the Receivership, entitling them to the bulk of distributions from the Receivership including any amounts owed to the Receivership by the Debtors.

standards for "well capitalized" institutions and was unquestionably solvent on a fair valuation

basis when the OTS pulled the plug. Even more remarkably, WMI had access to very substantial

capital at the time and yet it stood idly by when WMB experienced tightening liquidity. Without

WMI's assistance, the OTS was apparently concerned that WMB depositors might not be totally

protected if liquidity tightened further, leading to the sudden initiation of the Receivership in

order to minimize the possibility that the Federal Deposit Insurance Corporation (the "FDIC")

would be required to cover the insured portion of customer deposits.

2.      At the time of the Receivership, WMB had outstanding approximately $7 billion

in Senior Notes and approximately $7 billion in Subordinated Notes (together, the "Notes").[4] On

the same day as the initiation of the Receivership, the FDIC, in its capacity as statutory receiver

(the "Receiver"), entered into a purchase and assumption contract with JPMorgan Chase Bank,

National Association ("JPMorgan Chase"), whereby JPMorgan Chase acquired substantially all

of the assets of WMB, including the stock of its subsidiary, Washington Mutual Bank fsb

("WMBfsb"), and assumed substantially all of the liabilities of WMB (the "P&A Agreement").

"Substantially all" of the liabilities, that is, except for the Notes. As a result, what had been

highly-rated debt securities of a leading thrift that was solvent on both a regulatory and a fair

value basis were stripped of all sources of repayment other than (i) the $1.9 billion purchase

price paid by JPMorgan Chase, (ii) the entitlement to a likely substantial tax refund at the

conclusion of WMB's tax year (and potentially other tax assets and claims), (iii) potential claims

---

[4] Because there are no public "schedules of assets and liabilities" available at the commencement
of a Receivership and there are no indenture trustees for the more than 280 issuances of Senior
and Subordinated Notes made by WMB over the years, the precise amount of Notes outstanding
is just one of the many questions about WMB that remain to be answered. The numbers
referenced herein are sourced from the WMI 2007 10-K, available at
http://www.sec.gov/Archives/edgar/data/933136/000104746908002083/a2182890z10-k.htm,
minus estimated maturities after the 10-K.

3

**A3**

and causes of action in respect of the events leading up to the Receivership, and (iv) potential rights and interests in respect of the Accounts.

3.      According to the Motion to Approve (at ¶ 8), among the liabilities assumed by JPMorgan Chase were various deposit accounts (the "Accounts") with WMB and WMBfsb in excess of $4.4 billion (and possibly in excess of $5 billion).[5] It is those Accounts that are the subject of the Motion to Approve and of this Objection.

4.      Specifically, on shortened notice, the Debtors seek this Court's approval of a Stipulation by and Between Debtors and JPMorgan Chase Bank, N.A. Concerning Certain Accounts (the "Stipulation") that would declare that the Accounts conclusively belong to the Debtors and would require JPMorgan Chase to transfer the funds in the Accounts (the "Funds") to the Debtors "as the Debtors, in their sole and absolute discretion, may direct." Stipulation at ¶ 2. While the Stipulation preserves any rights that JPMorgan Chase may have in the Funds, there is no protection at all for the potential rights of all other parties in the Funds, including the Receiver, the holders of the Notes, and any and all other creditors of the Receivership. Not only that, no rights are preserved in respect of the Task Force created by the United States Attorney's Office for the Western District of Washington (WMB is headquartered in Seattle), which is working with the FBI, the SEC, the IRS and the FDIC, to investigate the circumstances leading to the closure of WMB. See Statement by United States Attorney Jeffrey C. Sullivan Regarding Washington Mutual (Oct. 15, 2008), available at

---

[5] A bank account is an asset of the depositor and a liability of the bank where the account is maintained. By assuming all of the accounts of WMB and acquiring the stock of WMBfsb, JPMorgan Chase is liable for the stated amount of the Accounts. In the Motion to Approve, WMI asserts that it is the sole person to whom JPMorgan Chase is liable in respect of the Accounts.

4

**A4**

http://www.usdoj.gov/usao/waw/press/2008/oct/washingtonmutual.html. That investigation could conceivably lead to recoveries under the "fair funds provisions" for holders of the Notes and other parties. In addition, even as to the preserved rights of JPMorgan Chase, the Stipulation appears to contemplate that the Debtors will have full control of and access to the Funds to pay the administrative expenses of the Debtors and any other Court-approved obligations.

## **OBJECTION**

5.    What emergency can possibly exist that would justify, on shortened notice, the payment of more than $4.4 billion in Funds to the Debtors, free and clear of all potential claims and interests other than those of JPMorgan Chase? The Debtors' Motion to Approve should be denied because the Stipulation prematurely and categorically determines that the Debtors lay sole claim to the Funds and can spend them freely, without the benefit of complete due diligence and consideration of the potential rights and claims of numerous other parties in interest, including the WMB Group Participants.

6.    Regardless of whether, at the end of the day, it is the Debtors, the WMB Group Participants, or any other party who will be able to establish rightful claims to the Funds, we are only at the beginning of the day and the Debtors simply cannot assert with any degree of certainty that they hold the only, or even the primary, interest in the Funds. From the perspective of the WMB Noteholder Group, the Funds could prove to be the single largest asset of the Receivership in a situation where, even assuming 100% of the Funds are eventually turned over to the Receiver, the holders of billions of dollars of Notes in a regulated, solvent thrift will still receive only a fraction of their claims. The Debtors, however, throwing all caution and prudence

to the wind, press on with the hope of securing all of the Funds for themselves before other parties have time to catch up.

7.       Simply put, the Debtors' request is premature and will cause potentially irreparable harm and prejudice to the holders of the Notes, including the WMB Group Participants.  Conversely, the Debtors will not be harmed by a preservation of the status quo as they have no possible emergency need to establish their purported interest in the Funds.  The Debtors cannot pay their unsecured creditors prior to confirmation of a plan and they have substantial other resources to fund the administrative expenses of the Chapter 11 estates in the interim.

## I.  "The Fog": Too Many Questions Abound to Permit Approval of the Stipulation

### A.  Account Ownership

8.       The Debtors admit in the Motion to Approve that there is a "fog of uncertainty surrounding the Deposits" and that approval of the Stipulation "will bring to conclusion recovery of the Debtors' largest assets without delay or costly litigation."  Motion to Approve at ¶ 17.  But surely this puts the $4.4 billion cart before the horse.  In fact, there will very likely be substantial litigation over the Funds and the desire of the Debtors to avoid the costs of that litigation cannot possibly trump the interests of the other parties potentially asserting an interest in the Funds.

9.       Even the Debtors themselves concede that, with a few limited exceptions, no one has yet been able even to locate "any deposit account agreements establishing the Accounts, any other agreements regarding the maintenance of or withdrawals from the Accounts or any signature cards or other specification of any authorized signatories with respect to the Accounts."

6

**A6**

Stipulation at 2. Further, "[t]he aggregate amounts described in the Stipulation and herein are based on information provided by JPMorgan Chase and are subject to further review by the Debtors." Motion to Approve at ¶ 8, n.2. Without solid documentation as to the status of the Accounts, the Debtors entered into the Stipulation and asked the Court to approve it on shortened notice. If the Debtors are uncertain even as to how much money is in the Accounts, they cannot possibly be certain as to whom the Accounts rightfully belong.

10.     If the Court approves the Stipulation and the Funds are later found to rightfully belong to another entity, that entity may have no recourse to recover the full value of its assets. Too many questions abound to permit approval of the Stipulation, which, as drafted, would determine a question of upmost importance to the Debtors and the WMB Noteholder Group while causing irreparable harm in the process. Moreover, a categorical determination of the entitlement to the Funds, without due process and proper due diligence, would turn on its head the very paradigm under which United States banking institutions operate. See infra, Part II (discussing the public policy concerns of the bank investment industry).

B.  Reservation of Rights Against the Accounts

11.     In addition to the lack of documentation as to who owns the Accounts, the Debtors have no information as to the rights of other parties with respect to the Accounts. Further, JPMorgan Chase concedes that "it has not had the opportunity to fully evaluate the extent of the rights, if any, [it] may have." Stipulation at 3. Because JPMorgan Chase needs more time to evaluate its rights, it expressly reserved those rights in the Stipulation. Id. at ¶ 3. If the party who now has possession of all of the books and records of WMB cannot make a proper determination as to the Accounts, it would be manifestly unfair to deny all other parties the right

7

**A7**

to review the books and records, considering the pre-Receivership conduct of WMI in failing to support WMB and to conduct appropriate discovery into all of the circumstances to determine the extent of their rights in the Accounts. JPMorgan Chase, at least, had the leverage to preserve its rights in exchange for paying the disputed Funds to the Debtors, but nobody else's rights are preserved at all.

## II. Public Policy Dictates That the Motion to Approve Must Be Denied

12.     WMB, like so many other thrifts and commercial banks, was forced to write down its assets substantially due to the mortgage crisis and the credit crunch. These write-downs led to substantial losses, which in turn led the OTS to initiate a series of regulatory actions beginning in January of 2007, including requiring WMI and WMB to enter into a still-undisclosed memoranda of understanding in early September 2008.[6] All of this begs the questions of (i) whether the so-called Accounts were, in fact, intended as capital injections or liquidity backstops and (ii) even if not expressly intended as such, whether the Accounts should have been used to bolster the capital and liquidity positions of WMB prior to the declaration of receivership. For example, the Motion to Approve notes that one of the assets that JPMorgan Chase bought was the stock of WMBfsb, which was a solvent subsidiary of WMB. Substantial investigation is

---

[6] The OTS reported that, on February 27, 2008, an overall composite downgrade was issued in respect of WMB and the thrift entered into a Board resolution in response to supervisory action. See Office of Thrift Supervision Fact Sheet on Washington Mutual Bank, September 25, 2008, available at http://files.ots.treas.gov/730021.pdf. The OTS also reported that on June 30, 2008, it initiated further discussions with WMI and WMB and, on September 7, 2008, such discussion resulted in the OTS, WMI and WMB entered into Memoranda of Understanding (the "MOU"). The MOU is not yet publicly available and accordingly the obligations, if any, of WMI under the MOU are unknown at this time. On September 18, 2008, the OTS issued an overall ratings downgrade in respect of WMB.

8

**A8**

required to determine whether, in fact, the Accounts properly belonged to WMB as the parent of WMBfsb, rather than to WMI as the parent of the parent of WMBfsb.

13.    In addition, even if it is ultimately determined that the Accounts belong to WMI, it is entirely possible that WMI's pre-Receivership conduct entitles WMB to substantial damages that can be offset against the Funds.  As promulgated by the Board of Governors of the Federal Reserve System, Regulation Y[7] establishes that a "bank holding company shall serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner."[8] The policy behind the Federal Reserve Board's "source of strength" doctrine is the underlying safety and soundness of a holding company and its subsidiary financial institutions.

14.    While the regulations of the OTS do not explicitly provide for a "source of strength" doctrine comparable to that provided for in Regulation Y, the underlying premise holds true and the requirement is no less sound when applied to savings and loan holding companies and their insured depository subsidiaries. Even without the authority of that same source of strength provision, the OTS bases its enforcement power on the same policy grounds—the safety and soundness of the institutions subject to its authority.

15.    A holding company that has the ability and the means to inject much needed capital into a banking subsidiary but refuses to do so is not exercising safe and sound banking practices.  In the matter sub judice, the policy behind the "source of strength" doctrine ought to

---

[7] 12 C.F.R. §§ 225.1-177 & 225.200.

[8] Id. at § 225.4(a)(1).

9

apply, and the Debtors owed this obligation to WMB, the WMB Group Participants, and the other holders of the Notes, potentially entitling those parties to billions of dollars in damages.

16.     In the instant case, WMI raised over $7 billion in capital for the expressed purpose of maintaining the capital of WMB at appropriate levels, through the injection of most of that capital into WMB.[9] The specific language used in WMI's SEC filing is as follows:

> On April 8, 2008, we announced that we had entered into
> definitive agreements to raise an aggregate of approximately $7
> billion through the direct sale of equity securities to affiliates of
> TPG Capital and to other institutional investors. With the proceeds
> of this offering, our capital ratios are expected to remain well
> above our targeted levels during the period of elevated credit costs
> in our loan portfolios in 2008 and 2009. At the same time, we
> believe this strengthened capital base will permit us to continue
> growing our leading national banking franchise.

17.     However, despite its stated purpose of maintaining capital levels well above targeted levels and growing its national banking franchise, it now appears that WMI may have deposited a significant portion of those funds into deposit accounts at WMB and WMBfsb for WMI's own account.

18.     Additionally, WMI itself reported in its bankruptcy petition $32.9 billion in assets and only $8.2 billion in debt.[10] Not only is this further evidence that WMI should have injected more capital into WMB before the Receivership to stem the depositor run on WMB, it also shows that allowing WMI to receive the Funds would result in a windfall to WMI at the expense of WMB's creditors, including the WMB Group Participants. Failing to enforce a "source of

---

[9] Washington Mutual, Inc., Proxy Statement (Schedule 14A) (May 22, 2008).

[10] Debtor's Voluntary Petition, In re Washington Mutual, Inc., Case 08-12229-MFW (Bankr. Del. Sept. 26, 2008) [D.I. 1].

**A10**

strength"-type doctrine in the instant situation could also create precedent for future receiverships in which deposit insurance funds are at risk, an outcome that would turn the banking industry on its head. In the alternative, failing to preserve rights in Accounts as against which billions of dollars in damages could be offset would be a gross miscarriage of justice.

## III. Necessary Protections: The Stipulation, as Written, Eviscerates the Rights of Others

19.    In the event the Court decides to grant the Motion to Approve, the Stipulation should not be approved as written. Instead, the Court should require the Debtors to place the Funds in escrow to allow interested parties, including the WMB Noteholder Group, to determine what rights they have in the Funds either by way of ownership, equitable claims, or damage offset rights. By preventing the Debtors from disbursing the Funds, the Court can potentially prevent irreparable harm and ensure that the rightful claims of interested parties are protected from depletion.

20.    In response to this Objection, the Debtors will undoubtedly assert that the WMB Noteholder Group's arguments are mere allegations and speculations. But, if anything, this simply proves the point. Far more is unknown than is known at this point. The Debtors themselves don't even know how much is in the Accounts Accounts (they are relying on JPMorgan Chase for dollar amounts, even though JPMorgan cannot yet find most of the paperwork for the Accounts)—and whether the Debtors, the WMB Noteholder Group or anyone else can ultimately turn their allegations into proven facts, they all should be given an equal opportunity to do so and the status quo needs to be preserved in the interim.

11

**A11**

WHEREFORE, for the reasons set forth above, WMB Noteholder Group respectfully requests that the Debtors' Motion to Approve be denied. In the alternative, the WMB Noteholder Group respectfully requests that the Stipulation be modified as discussed above prior to approval.

POTTER ANDERSON & CORROON LLP

By: _____

Laurie Selber Silverstein (Bar No. 2396)
Theresa V. Brown-Edwards (Bar No. 4225)
Hercules Plaza, 6th Floor
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
(302) 984-6000

- And -

BRACEWELL & GIULIANI LLP
Evan D. Flaschen
Renée M. Dailey
Mark E. Dendinger
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut 06103
(860) 256-8537

- And -

BRACEWELL & GIULIANI LLP
Robert L. Clarke
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
(713) 223-2300

- And -

BRACEWELL & GIULIANI LLP
Sanford M. Brown
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202-2711
(214) 468-3800

12

A12

- And -

BRACEWELL & GIULIANI LLP
Marc L. Mukasey
1177 Avenue of the Americas, 19th Floor
New York, New York 10036-2714
(212) 508-6100

*Attorneys for the WMB Noteholder Group*

Dated: October 20, 2008

PAC 887672v.4

**A13**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| WASHINGTON MUTUAL, INC., <u>et al.</u>[1] | : | Case No. 08-12229 (MFW) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | | Ref. Docket No. 74 |

**FDIC'S STATEMENT, RESPONSE AND LIMITED OBJECTION
TO MOTION OF DEBTORS PURSUANT TO SECTIONS 105(A), 361, 362
AND 542(B) OF THE BANKRUPTCY CODE SEEKING APPROVAL OF A
STIPULATION AND AGREEMENT CONCERNING DEPOSIT ACCOUNTS AT
<u>JPMORGAN CHASE BANK, NATIONAL ASSOCIATION</u>**

The Federal Depository Insurance Corporation (the "<u>FDIC</u>"), by its attorneys

DLA Piper LLP (US) and Young Conaway Stargatt & Taylor, LLP, files this statement, response

and limited objection (the "<u>Response</u>")[2] to the Motion of the Debtors Pursuant to Sections

105(a), 361, 362 and 542(b) of the Bankruptcy Code Seeking Approval of a Stipulation and

Agreement Concerning Deposit Accounts at JPMorgan Chase Bank, National Association (the

"<u>Motion</u>") filed by the above-referenced debtors and debtors in possession (the "<u>Debtors</u>")

seeking approval of the stipulation (the "<u>Stipulation</u>") between the Debtors and JPMorgan Chase,

N.A. ("<u>JPMC</u>").  In support of this Response, the FDIC respectfully states:

---

[1]     The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax
identification numbers are: (a) Washington Mutual, Inc. (3725); and (b) WMI Investment Corp. (5395).  The
Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

[2]     The submission of this Response shall in no way constitute a submission by the FDIC to the jurisdiction or
authority of the Bankruptcy Court for the resolution of this, or any other regulatory matter involving the Debtors and
the FDIC.  Nor is this Response an admission that this Court is the appropriate forum for disputes related to the
FDIC or the deposit accounts which are the subject of the Motion.

A14

## PRELIMINARY STATEMENT

The Debtors are seeking, through shortened notice, authorization to effect the transfer of some $4.4 billion in funds. There are several potential bases for the FDIC, as regulator and receiver, to have an interest in the funds which are the subject of the Motion. The FDIC does not seek to interfere with the administration of these cases. Nor, at this point, does it make a claim to the funds which are the subject of the Motion. However, all the facts related to the Debtors' and their subsidiaries have not yet been established and, once these facts are determined, the FDIC may have significant claims against the Debtors and to the funds.

In light of the FDIC's statutory authority, the seriousness of the issues, the amount of the funds to be transferred and the fact that the Debtors have no need to use the funds at this time, there is no need to disturb the status quo. The Debtors cannot pay their unsecured creditors prior to confirmation of a plan and they have substantial other resources to fund the administrative expenses of their chapter 11 cases.

Accordingly, any rights the FDIC has to the funds should be protected and the approval of the Stipulation should not affect the FDIC's rights in any fashion. To accomplish this end, at minimum, the FDIC should be granted the same protections afforded to JPMC under the Stipulation.

This Response is intended to reserve all rights on behalf of the FDIC with respect to the Motion and Stipulation in the event a satisfactory stipulation with the Debtors is not reached in advance of the hearing.

DB02:7486153.1                                    -2-                                    900002.0001

**A15**

## BACKGROUND

1.      On September 26, 2008 (the "Petition Date"), Washington Mutual, Inc. ("WMI") and Washington Mutual Investment Corp. ("WMI Investment", and together with WMI, the "Debtors") each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2.      The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      On October 3, 2008, the Court entered an order, pursuant to 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the joint administration of the Debtors' chapter 11 cases.

4.      WMI is a holding company incorporated in the State of Washington. WMI is the direct parent of WMI Investment, which serves as an investment vehicle for WMI and holds a variety of securities. WMI Investment is incorporated in the State of Delaware.

5.      Prior to the Petition Date, WMI was a savings and loan holding company that owned Washington Mutual Bank ("WMB") and such bank's subsidiaries, including Washington Mutual Bank fsb ("WMBfsb"). WMI also has certain non-banking, non-debtor subsidiaries. Like all savings and loan holding companies, WMI was subject to regulation by the Office of Thrift Supervision (the "OTC").

6.    WMB and WMBfsb, in turn, like all depository institutions with federal thrift charters, were subject to regulation and examination by the OTS. In addition, WMI's banking and nonbanking subsidiaries were regulated by various federal and state authorities, including the FDIC.

7.    On September 25, 2008, the Director of the OTS, by order number 2008-36, appointed the FDIC as receiver for WMB and advised that the receiver was immediately taking possession of WMB (the "Receivership"). Immediately after its appointment as receiver, the FDIC sold substantially all the assets of WMB (the "Sale"), including the stock of WMBfsb, to JPMC pursuant to that certain Purchase and Assumption Agreement, dated as of September 25, 2008 (the "Purchase Agreement"). The FDIC, as receiver, retained certain interests and assets under the Purchase Agreement.

8.    The Debtors allege that they and certain of WMI's nondebtor subsidiaries allegedly had funds on deposit at WMB in the approximate amount of $707,000,000 (the "WMB Funds"). In addition, WMI allegedly had funds on deposit at WMBfsb in the approximate amount of $3,668,000,000 (the "WMBfsb Funds", and together with the WMB Funds, the "Funds").

9.    Neither the Debtors nor JPMC have been able, except as to a limited number of accounts, to locate "any deposit account agreements establishing the Accounts, any other agreements regarding the maintenance of or withdrawals from the Accounts or any signature cards or other specification of any authorized signatories with respect to the Accounts." Stipulation at 2. In addition, "[t]he aggregate amounts described in the Stipulation and herein are based on information provided by [JPMC] and are subject to further review by the Debtors." Motion, ¶ 8, n.2.

10.     On October 14, 2008, the Debtors filed the Motion seeking the Court's approval of the Stipulation.

### THE FDIC'S STATUTORY POWERS AND RESPONSIBILITIES

11.     One of the primary functions of the FDIC is to dispose of a failed institution's assets in a way that "maximizes the net present value return from the sale or other disposition" of assets under its control. Id.; 12 U.S.C. § 1441a(b)(3)(C)(i); IBJ Schroder Bank & Trust Co. v. RTC, 26 F.3d 370, 1994 WL 262009, at * 1 (2d Cir. 1994).  Congress expressly granted the FDIC, as conservator or receiver, the power to transfer a failed institution's assets "without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II).

12.     Thus, to the extent the FDIC, in any of its capacities, has any interest in the Funds, the disposition of the Funds falls squarely within the powers and functions of the FDIC.  As of this date, the FDIC has been unable to determine whether all or any part of the Funds are property of the Debtors, WMB or WMBfsb or whether the Debtors have any obligation to WMB or WMBfsb which would give rise to a right of setoff by the FDIC against the Funds.

13.     The FDIC[3] has broad discretion in discharging their statutory responsibilities. Mosseri v. FDIC, 2001 U.S. Dist. LEXIS 18899 (S.D.N.Y. Nov. 19, 2001); see e.g., 12 U.S.C. § 1821(d)(2)(J)(ii) (permitting the FDIC to take "any action" that "the [RTC] determines is in the best interests of the depository institution, its depositors, or the [RTC]"); see also, 12 U.S.C. §§ 1821(c)(13)(B)(ii), 1821(d)(2)(G)(i)(II), 1823(d)(4).

---

[3]     In 1995, the powers of the Resolution Trust Corporation ("RTC") were transferred to the FDIC. Accordingly, the case citations referring to the RTC apply to the FDIC.

DB02:7486153.1                    - 5 -                    900002.0001

**A18**

14.    Further, this broad discretion is subject to very limited interference from the courts. "[N]o court may take any action . . . to restrain or affect the exercise of powers or functions of the [RTC] as a conservator or receiver." Mosseri v. FDIC, 2001 U.S. Dist. LEXIS 18899 (S.D.N.Y. Nov. 19, 2001)(citing 12 U.S.C §1821(d)(2)(J)); see also, Calise Beauty Sch. v. Riley, 941 F. Supp. 425, 429 (S.D.N.Y. 1996)(determining that a court may only issue an order affecting exercise of power under FIDA where the [RTC] was attempting the exercise of a function or power that is clearly outside the statutory authority (citing Volges v. Resolution Trust Corporation, 32 F.3d 50 (2d Cir. 1994)); Ward v. Resolution Trust Corporation, 996 F.2d 99, 103 (5th Cir. 1993) (per curiam).

15.    This anti-injunction provision "is but part of a broader scheme enacted to allow the FDIC expeditiously to wind up the affairs of defunct savings and loan institutions without judicial interference." Volges v. Resolution Trust Corp., 32 F.3d 50, 52 (2d Cir. 1994); see, e.g., 12 U.S.C. § 1821(d)(13)(C) (prohibiting courts from attaching or executing upon [RTC] assets); id. § 1825(b)(2) (prohibiting involuntary sale, foreclosure, or placement of liens upon RTC property); see also RTC v. Diamond, 18 F.3d 111, 113 (2d Cir. 1994), petition for cert. filed, 62 U.S.L.W. 3757 (May 5, 1994); Telematics Int'l, Inc. v. NEMLC Leasing Corp., 967 F.2d 703, 705-06 (1st Cir. 1992). "Consistent with that purpose, the anti-injunction provision is a direct manifestation of Congress's intent to prevent courts from interfering with the [RTC] in the exercise of [their] statutory powers." Volges v. Resolution Trust Corp., 32 F.3d 50, 52 (2d Cir. N.Y. 1994).

A19

16.     The FDIC has been in negotiations with the Debtors in connection with the Motion. The FDIC believes it will enter into a satisfactory stipulation with the Debtors that provides the FDIC the same protections afforded to JPMC under the Stipulation, thus preserving the status quo while the FDIC continues to fulfill its statutory duties.

17.     This Response is intended to reserve all rights on behalf of the FDIC with respect to the Motion and Stipulation in the event the appropriate stipulation is not reached.

Date:   October 20, 2008
        Wilmington, Delaware

                                        YOUNG CONAWAY STARGATT &
                                        TAYLOR, LLP

                                        Robert S. Brady (No. 2847)
                                        M. Blake Cleary (No. 3614)
                                        The Brandywine Building
                                        1000 West Street, 17th Floor
                                        Wilmington, DE 19801
                                        Telephone:    (302) 571-6600
                                        Facsimile:    (302) 517-1253

                                                  and

                                        DLA PIPER US LLP
                                        Thomas R. Califano
                                        Jeremy R. Johnson
                                        1251 Avenue of the Americas
                                        New York, New York  10020
                                        Telephone:    (212) 335-4500
                                        Facsimile:    (212) 335-4501

                                        Counsel for the Federal Depository
                                        Insurance Corporation

A20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WASHINGTON MUTUAL, INC.,
1301 Second Avenue
Seattle, Washington 98101,

and

WMI INVESTMENT CORP.,
1301 Second Avenue
Seattle, Washington 98101,
                              Plaintiffs,

        v.

FEDERAL DEPOSIT INSURANCE
CORPORATION,
550 17th Street, NW
Washington, DC 20429,
in its capacity as receiver for Washington Mutual
Bank, and in its corporate capacity,

                              Defendant.

Case: 1:09-cv-00533
Assigned To : Collyer, Rosemary M.
Assign. Date : 3/20/2009
Description: General Civil

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment" and together with WMI, the "Plaintiffs"), by their undersigned counsel alleges as follows:

## PARTIES

1.    Washington Mutual Bank, Henderson, Nevada ("WMB") was a federal savings bank chartered pursuant to the Home Owners' Loan Act, 12 U.S.C. §§ 1461-70.

2.    Defendant Federal Deposit Insurance Corporation ("FDIC") is the agency charged by law with, among other duties, administering the Federal Deposit Insurance Act and the federal bank deposit insurance system.    The FDIC is sued in its corporate capacity ("FDIC-

DC1:\272987\13\5%MZ13!.DOC\79831.0003

**A21**

Corporate") and in its capacity as the Receiver of WMB ("<u>FDIC-Receiver</u>").    This Complaint uses "FDIC" to refer to FDIC-Receiver and FDIC-Corporate collectively.

       3.    WMI is a holding company incorporated in the State of Washington with its principal place of business at 1301 Second Avenue, Seattle, Washington 98101.    Prior to the Receivership Date and the Bankruptcy Petition Date (both as defined below), WMI was a savings and loan holding company that owned WMB, and indirectly owned WMB's subsidiaries, including Washington Mutual Bank fsb ("<u>WMBfsb</u>" and together with WMB and their respective banking subsidiaries, the "<u>Banking Subsidiaries</u>").

       4.    WMI Investment is a corporation organized under the laws of Delaware, with its principal place of business at 1301 Second Avenue, Seattle, Washington 98101, and is a wholly-owned subsidiary of WMI.

## JURISDICTION AND VENUE

       5.    This action arises under the Constitution and laws of the United States, including, without limitation, the Federal Deposit Insurance Act ("<u>FDI Act</u>"), 12 U.S.C. § 1811 <u>et seq.</u>, as amended, the Fifth Amendment to the United States Constitution, and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80.    This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6), and 28 U.S.C. § 1331.

       6.    Venue is proper in this Court under 12 U.S.C. § 1821(d)(6) and 28 U.S.C. § 1391(e).

**A22**

## BACKGROUND

7.    On September 25, 2008 (the "Receivership Date"), the Director of the Office of Thrift Supervision ("OTS"), by order number 2008-36, appointed FDIC-Receiver as receiver for WMB and advised that FDIC-Receiver was immediately taking possession of WMB.

8.    Immediately after its appointment as receiver, FDIC-Receiver,  together with FDIC-Corporate, sold substantially all the assets of WMB, including the stock of WMBfsb, to JPMorgan Chase Bank, National Association ("JPMorgan Chase") pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated as of September 25, 2008 (the "Purchase and Assumption Agreement").

9.    On September 26, 2008 (the "Bankruptcy Petition Date"), the Plaintiffs each commenced a voluntary case (the "WMI Bankruptcy Proceeding") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").   The automatic stay in the Plaintiffs' chapter 11 cases prohibits any entity, including the FDIC and JPMorgan Chase, from, among other things, taking any action to obtain possession of property of the Plaintiffs' estates or to exercise control over such property.

## THE PROOF OF CLAIM

10.    Pursuant to section 11(d) of the FDI Act, 12 U.S.C. § 1821(d), FDIC-Receiver set December 30, 2008, as the last day to file claims against the Receivership.   As described in detail below, Plaintiffs asserted claims against the Receivership (each a "Claim") by filing a proof of claim on December 30, 2008 (the "Proof of Claim").

11.    Plaintiffs reserved all rights to amend and/or supplement the Proof of Claim at any time and in any respect and to assert any and all other claims of whatever kind or

nature that they have, or may have, against WMB.  (This includes, but is not limited to, the reservation of rights set forth in paragraphs 60-65 of the Proof of Claim.)    Plaintiffs likewise reserve all rights to amend and/or supplement this Complaint under the Federal Rules of Civil Procedure.

12.    The Claims are unsecured, unless otherwise noted, and except to the extent that WMB asserts claims against the Plaintiffs.    To the extent of any such claims asserted by WMB, Plaintiffs assert that the claims asserted hereunder are secured.

13.    On the Receivership Date, many of the Plaintiffs' books and records were seized by the FDIC and transferred to the custody of JPMorgan Chase.    As a result, the Proof of Claim was prepared, and this Complaint has been prepared, using the information available to the Plaintiffs, which was, in certain instances, only summary information set forth in the Plaintiffs' books and records.    Plaintiffs endeavored to support the Claims with documentation in the Proof of Claim, where such documentation was reasonably available to the Plaintiffs. However, Plaintiffs did not attach supporting documentation where it would have been too voluminous but rather stated that such supporting documentation may be made available upon the FDIC's request.

A.    **Intercompany Loans**

14.    As of the Receivership Date, WMB was indebted to WMI, or to one of its subsidiaries identified below, for the outstanding principal, accrued interest, and other amounts due under the following promissory notes (the "Promissory Notes"):

- $82,048,081 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Corporation, as lender.   H.S. Loan Corporation is a subsidiary of WMI, in which WMB owns 1.5748%.

- $73,670,153 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Partners, as lender. H.S. Loan Partners is an indirect, wholly-owned subsidiary of WMI.

- $7,781,240 under that certain Revolving Master Note, dated as of February 11, 2005, by and between WMB, as borrower, and WMHFA Delaware Holdings LLC, as lender. WMHFA Delaware Holdings LLC is an indirect, wholly-owned subsidiary of WMI.

- $13,576,245 under that certain Registered Security, Note A, dated as of December 17, 2004, by and between University Street, Inc., as payor and predecessor in interest to WMB, and WMRP Delaware Holdings LLC, as payee, and predecessor in interest to PCA Asset Holdings LLC. This Promissory Note is recorded on WMI's books and records as an obligation owed to PCA Asset Holdings LLC, an indirect subsidiary of WMI, by WMB.

15.    Accordingly, WMI asserts a claim in the aggregate amount of $177,075,719 on account of the outstanding principal and accrued interest due under the Promissory Notes, plus a liquidated, unsecured claim for all other amounts due under the Promissory Notes, as described in paragraphs 8-9 of the Proof of Claim and Exhibit A to the Proof of Claim.

**B.    Intercompany Receivables**

16.    Prior to the Receivership Date, Plaintiffs incurred expenses on behalf of WMB, which expenses resulted in intercompany receivables owed by WMB to the respective Plaintiff and are reflected as such in the books and records of Plaintiffs and WMB (the "Intercompany Receivable Claims").

17.    In particular, WMI has Intercompany Receivable Claims against WMB and WaMu Capital Corp., a subsidiary of WMB, for $22,528,014, relating principally to WMI's issuance of stock-based compensation to certain WMB and WaMu Capital Corp. employees. A summary of the amounts owed to WMI and the corresponding intercompany account numbers is as follows:

DC1:\272987\13\5%MZ13!.DOC\79831.0003                5

**A25**

| Account Debtor | WMI Account Receivable Number | Amount |
|---|---|---|
| WMB | 28101 | $9,298,479 |
| WMB | 28120 | $13,200,977 |
| WaMu Capital Corp. | 28025 | $28,558 |

18.    In addition, as of the Receivership Date, pursuant to certain servicing agreements and pursuant to that certain Administrative Services Agreement (collectively, the "Servicing Agreements"), WMB or one of the Banking Subsidiaries serviced certain mortgage loans held by WMI or its subsidiaries.    Pursuant to the Servicing Agreements, WMB, as servicer, collected amounts due under the mortgage loans and, at pre-determined intervals, remitted such amounts to WMI or its subsidiaries, as the holders of such mortgage loans.    As of the Receivership Date, WMB had failed to remit certain amounts due to Plaintiffs in the aggregate approximate amount of $184,849 on account of the mortgage loans.    A summary of the amounts owed to WMI and certain of its subsidiaries on account of such Servicing Agreements is as follows:

| Account Debtor | Obligee | Amount |
|---|---|---|
| WMB | H.S. Loan Corp. | $17,477 |
| WMB | Ahmanson Obligation Co. | $143,657 |
| WMB | Sutter Bay Corp. | $11,129 |
| WMB | Flower Street Corp. | $10,396 |
| WMB | H.S. Loan Partners LLC | $2,190 |

19.    Accordingly, Plaintiffs assert Claims for each of these amounts owed, as described in paragraphs 10-14 of the Proof of Claim and Exhibit B to the Proof of Claim.

C.    **Taxes**

20.    WMI, WMB, WMBfsb, and certain other direct and indirect subsidiaries of WMI and WMB are parties to that certain Tax Sharing Agreement, dated as of August 31, 1999.    Pursuant to the Tax Sharing Agreement, all federal income taxes were paid directly by WMI on behalf of the consolidated tax group, which includes WMB and its subsidiaries.    A

copy of the Tax Sharing Agreement is set forth at Exhibit C to the Proof of Claim.    Historically, in accordance with the Tax Sharing Agreement, each subsidiary member to the Tax Sharing Agreement made federal-tax related payments to WMI in respect of the hypothetical, separate federal income tax liabilities of such member and its subsidiaries.    Prior to the Receivership Date, pursuant to the Tax Sharing Agreement, WMI paid federal taxes due and owing by the consolidated tax group, including amounts due and owing by WMB and/or its subsidiaries. However, as of the Receivership Date, WMB and its subsidiaries had not paid WMI all federal-tax related amounts under the Tax Sharing Agreement.    Accordingly, WMI asserts an unliquidated claim against WMB on account of any and all federal taxes paid on behalf of WMB and/or its subsidiaries and WMI reserved all rights to assert any and all such claims against WMB and its subsidiaries, including any claims arising from any ongoing federal tax audits, as described in paragraph 15 of the Proof of Claim.

21.    In addition, WMI has certain claims against WMB and its subsidiaries on account of state, local and possibly foreign taxes paid on behalf of WMB and its subsidiaries and WMI reserved all rights to assert any and all such claims against WMB and its subsidiaries, as described in paragraph 16 of the Proof of Claim.

22.    Further, on account of WMI's payment of federal, state and local taxes for the consolidated or combined tax group, WMI is, or will be, entitled to tax refunds currently estimated to be approximately $3 billion (the "Tax Refunds").    Pursuant to the Tax Sharing Agreement, all refunds for federal taxes are payable to WMI, regardless of whether such refunds are on account of federal taxes paid in respect of WMB or its subsidiaries or any of WMI's other subsidiaries.    In addition, certain state and local tax refunds are payable to WMI in respect of group tax filings that included WMB or its subsidiaries.    In anticipation of the receipt of certain

Tax Refunds in respect of which certain amounts would be payable by WMI to WMB pursuant to or in furtherance of the Tax Sharing Agreement, WMI paid such amounts to WMB prior to the Receivership Date by crediting such amounts against tax payments otherwise due from WMB at such time.    WMI therefore asserts a claim against WMB for the amounts so paid by WMI.    In addition, in the event that FDIC-Receiver asserts a claim to and obtains any portion of the Tax Refunds directly or indirectly from the Internal Revenue Service, WMI asserts a claim against WMB and/or its subsidiaries on account of such refunded amounts.    WMI may also have claims against WMB and its subsidiaries in respect of all or a portion of state, local and foreign tax refunds received by WMB and its subsidiaries and asserts a claim against WMB and its subsidiaries for any and all such claims, as described in paragraph 17 of the Proof of Claim.

23.    WMI is currently undergoing several federal, state, local and foreign tax audits.    To the extent that any federal, state, local or foreign taxing authority, including, without limitation, those taxing authorities that are currently auditing WMI, assesses additional taxes against WMI, WMI expressly reserves all rights to supplement and/or amend the Proof of Claim to include any amounts attributable to WMB or its subsidiaries.

24.    In the event FDIC-Receiver seeks to repudiate the Tax Sharing Agreement in accordance with section 1821(e) of title 12 of the United States Code, Plaintiffs assert a claim for any and all damages or claims that arise from such repudiation (and Plaintiffs expressly reserve all rights to oppose any such attempt to repudiate the Tax Sharing Agreement).

D.    **Capital Contribution Claims**

25.    From December, 2007, through April, 2008, WMI raised approximately $10 billion in the capital markets.    During that period, WMI's principal assets consisted of cash, the stock of WMB, and the stock of the other Plaintiff and other WMI subsidiaries.    Throughout 2008, WMI's debt obligations approximated $7 billion.    In 2007 and 2008, WMI made $6.5

billion of capital contributions to WMB in the amounts and on the dates specified below (the "Capital Contributions"):

| Date | Amount |
|------|--------|
| December 1, 2007 | $1,000,000,000.00 |
| April 18, 2008 | $3,000,000,000.00 |
| July 21, 2008 | $2,000,000,000.00 |
| September 10, 2008 | $500,000,000.00 |

The Capital Contributions are more fully described in paragraph 20 of the Proof of Claim and Exhibit D to the Proof of Claim.

26.   At the time of each of the Capital Contributions, WMB had public debt obligations of approximately $22 billion.[1]   WMI or WMB may have been insolvent at the time that the Capital Contributions were made.   If, at the time of each Capital Contribution, WMB was insolvent, had unreasonably small capital, and/or was unable to pay its own debt obligations as they matured, WMI did not receive any value in exchange for the Capital Contributions.   In addition, the Capital Contributions may have (i) been made while WMI was insolvent or rendered WMI insolvent, (ii) been made while WMI had unreasonably small capital for its business operations, and/or (iii) left WMI unable to repay its own obligations as they matured.

27.   Moreover, upon information and belief, the FDIC or the OTS induced WMI to make one or more of the Capital Contributions at a time when such agencies knew or should have known that appointment of the FDIC as receiver for WMB was imminent.

28.   Accordingly, if WMI was insolvent at the time any of the Capital Contributions were made, WMI asserts a fraudulent transfer claim pursuant to sections 544 and

---

[1] Due to some debt repurchases, the principal balance outstanding is approximately $21.3 billion.

DC1:\272987\13\5%MZ13!.DOC\79831.0003        9

**A29**

548 of the Bankruptcy Code in an amount up to $6.5 billion, and for all other claims or causes of action, under any theory, applicable to the Capital Contributions.

**E.    Trust Preferred Securities Claims**

29.    In February 2006, Washington Mutual Preferred Funding LLC ("WMPF"), a Delaware limited liability company, was formed to facilitate capital-raising transactions through the issuance of preferred securities to investors (such preferred securities are referred to herein collectively as "Trust Preferred Securities") by certain special purpose entities (the "SPEs"). These securities were offered solely to "qualified institutional buyers" or "qualified purchasers." The Trust Preferred Securities have an aggregate liquidation preference of $4 billion.

30.    WMPF's assets were limited to direct or indirect interests in mortgages or mortgage-related assets, cash and other permitted assets. These assets were held in certain Delaware statutory trusts (the "Asset Trusts"). WMPF issued preferred securities (the "WMPF Preferred Securities"), which were held by and were the sole asset of the SPEs and which were senior in priority to WMB's indirect common equity interest in WMPF. Thus, the Trust Preferred Securities issued by the SPEs (which had no material creditors) represented an interest in the WMPF Preferred Securities and, in turn, an indirect interest in the assets held by the Asset Trusts. Immediately before the Receivership Date, WMPF was an indirect subsidiary of WMB and as a result, WMB held an indirect interest in the assets held in the Asset Trusts, subordinate to the liquidation preference of the Trust Preferred Securities.

31.    The Trust Preferred Securities were sold to investors subject to a "conditional exchange" feature. This feature provided that if the OTS so directed, upon (i) WMB becoming undercapitalized, (ii) WMB being placed into receivership or conservatorship or (iii) the OTS anticipating, in its sole discretion, WMB becoming undercapitalized in the near

term or taking a supervisory action that limited the payment of dividends by WMB, then the Trust Preferred Securities were required to be exchanged into shares of preferred stock of WMI (or depositary shares representing an interest in preferred stock of WMI). The OTS notified WMI on the Receivership Date that an "exchange event" occurred, as such term is defined in the documentation governing the Trust Preferred Securities. According to the terms of the Trust Preferred Securities, the exchange of the Trust Preferred Securities for preferred stock of WMI (or depositary shares representing an interest in preferred stock of WMI) is deemed to occur automatically following the issuance by WMI of a press release announcing the exchange event. WMI issued such a press release and the conditional exchange became effective at 8:00 a.m. ET on September 26, 2008.

32. In addition, WMI purportedly executed an assignment as of September 25, 2008, in which it purported to assign to WMB all its right, title, and interest in and to any and all of the Trust Preferred Securities or preferred securities issued by WMPF, as the case may be, in its possession or coming into its possession (the "Assignment Agreement"). Assuming arguendo that the terms of the Trust Preferred Securities (and the documents and agreements related to the issuance of such securities) and the Assignment Agreement are legally effective and enforceable, and that there are no defenses to the enforceability of such agreements under the Bankruptcy Code or other applicable law, all of which defenses and claims WMI expressly reserves and hereby asserts, the effect of these transactions was to cause the Trust Preferred Securities to be owned by WMI and then purportedly transferred to WMB immediately before the commencement of WMI's chapter 11 bankruptcy case on September 26, 2008.

33. On information and belief, the Trust Preferred Securities have a value of as much as $4 billion. WMI may not have received any value for the purported transfer of the

Trust Preferred Securities to WMB because, at the time of such purported transfer, WMB may have been insolvent, may have had unreasonably small capital, and/or may have been unable to pay its own debt obligations as they matured. With respect to the purported transfer of the Trust Preferred Securities, WMI asserts fraudulent transfer claims against WMB pursuant to sections 544 and 548 of the Bankruptcy Code in connection with the transfer of the Trust Preferred Securities.

34. Furthermore, if WMI was insolvent at the time of such purported transfer and the Trust Preferred Securities were transferred to WMB on account of an antecedent debt owed to WMB, WMI also asserts a claim to recover such securities as a voidable preference pursuant to sections 544 and 547 of the Bankruptcy Code.

35. In addition, if the Trust Preferred Securities were wrongfully transferred to WMB, WMI asserts a claim for such wrongful transfer and the return of such assets. In the alternative, WMI asserts that the purported transfer of the Trust Preferred Securities was not properly executed, and, therefore, ineffectual. Accordingly, WMI asserts that it is the owner of the Trust Preferred Securities. Finally, as a result of the FDIC's actions purporting to transfer the Trust Preferred Securities from WMI to WMB, and then to JPMorgan Chase or any other party, WMI has been deprived of the use of the Trust Preferred Securities and their proceeds from the Receivership Date onward and asserts a claim with respect thereto against WMB. WMI reserves all other claims or causes of action, under any theory, with respect to the Trust Preferred Securities, as set forth in paragraphs 24-30 of the Proof of Claim.

F.    **Preference Claims**

36. On or before the Receivership Date, on numerous occasions, WMI transferred property to, or caused its property (or an interest in its property) to be transferred to, WMB or to certain third parties for the benefit of WMB (the "Transfers") on account of

DCI:\27298\71\31S%MZ131.DOC\79831.0003                    12

**A32**

antecedent obligations of WMI to WMB.   The approximate amount of the Transfers occurring during the one-year period before the Bankruptcy Petition Date is $151,934,564.   A list of such Transfers is attached hereto as Exhibit 1.[2]

        37.      At the time of the Transfers, WMB was (i) an "insider" of WMI as that term is defined in the Bankruptcy Code or under applicable non-bankruptcy law and (ii) a "creditor" of WMI, as that term is defined in the Bankruptcy Code or under applicable non-bankruptcy law.

        38.      If WMI was insolvent at the time the Transfers were made to WMB, the Transfers may be voidable pursuant to, among other applicable law, (i) sections 544 (applying applicable non-bankruptcy law) and 547 of the Bankruptcy Code and (ii) applicable non-bankruptcy law.

        39.      Specifically, if WMI was insolvent at the time such Transfers were made, WMI seeks to recover each Transfer from WMB as a voidable preference on the grounds that such Transfer (i) was to or for the benefit of a creditor, (ii) was to or on account of an antecedent debt of WMI, (iii) was made while WMI was insolvent, (iv) was made within one year or less from the date that WMI's bankruptcy case was commenced, and (v) would permit WMB to receive more than it would receive in a case under chapter 7 of the Bankruptcy Code if such Transfer had not been made.

        40.      Accordingly, Plaintiffs assert a claim for all transactions constituting a voidable preference, as described in paragraphs 31-35 of the Proof of Claim.

---

[2] Exhibit 1 may not be an exhaustive list of all Transfers.   Accordingly, Plaintiffs reserve their rights to amend and/or supplement Exhibit 1 and the corresponding aggregate amount of the Transfers.

DC1:\272987\13\5%MZ13!.DOC\79831.0003      13

**A33**

**G.    Vendor Contract Claims**

41.    WMI is party to numerous agreements with vendors (the "Vendors") who lease property, perform services, deliver goods, or license software that primarily benefit the banking operations formerly owned by WMB (the "Vendor Contracts").    Typically, prior to the Receivership, WMB, as the primary beneficiary, paid Vendors for goods and services received pursuant to the Vendor Contracts.    After the Receivership Date, JPMorgan Chase paid certain Vendors for outstanding pre- and post-Receivership obligations incurred in connection with the Vendor Contracts.    Notwithstanding these payments, there continue to be unpaid obligations outstanding in connection with certain of the Vendor Contracts.    Accordingly, as a party to the Vendor Contracts, WMI asserts a claim against WMB for any and all outstanding liabilities on account of goods or services provided to WMB.    Similarly, to the extent Vendors assert claims against WMI for WMI's rejection of any of the Vendor Contracts in its bankruptcy cases, WMI asserts a claim against WMB for any and all such Vendor claims.

**H.    Subrogation Claims**

42.    Predecessors in interest to WMB issued the debt securities identified below (the "WMB Predecessor Notes") pursuant to the indentures listed opposite such WMB Predecessor Notes below (the "Indentures").    The WMB Predecessor Notes were issued to evidence loans made to WMB's predecessors in interest of the proceeds from the issuance by certain statutory trusts (the "CCB Capital Trusts") of preferred and common beneficial interests in the assets of such trusts:

- 10.18% Junior Subordinated Deferrable Interest Debentures due 2031 issued pursuant to that certain Indenture by and between Hawthorne Financial Corporation, as Issuer, and Wilmington Trust Company, as Debenture Trustee, dated as of March 28, 2001, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2033 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as

Issuer, and Wilmington Trust Company, as Trustee, dated as of September 25, 2003, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issues pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of December 19, 2003, as amended from time to time.

- Floating Rate Junior Subordinated Notes due 2034 issued pursuant to that certain Junior Subordinated Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Deutsche Bank Trust Company Americas, as Trustee, dated as of March 31, 2004, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of May 27, 2004, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of June 22, 2004, as amended from time to time.

- Junior Subordinated Notes due 2035 issued pursuant to that certain Junior Subordinated Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Deutsche Bank Trust Company Americas, as Trustee, dated as of February 2, 2005, as amended from time to time.

43.    By supplemental indentures or other agreements relating to each of the Indentures, dated as of November 1, 2007, WMB assumed all obligations of the issuers pursuant to the Indentures.    Pursuant to the terms of certain Indenture Guarantees, dated as of November 1, 2007, WMI guaranteed WMB's obligations under the WMB Predecessor Notes.

44.    WMI asserts a subrogation claim against WMB for any amount it is obligated to pay pursuant to the Indenture Guarantees or any other guarantee of WMB's obligations, as described in paragraphs 37-39 of the Proof of Claim and Exhibit F to the Proof of Claim.

## I.    Improper Asset Sales

45.    On the Receivership Date, the FDIC may have taken possession and control of certain property (including, but not limited to, furniture, fixtures, equipment, and other tangible and intangible assets) owned by Plaintiffs or for which transfer of such property from Plaintiffs' ownership was improper or subject to avoidance and recovery.   To date, the FDIC has neither accounted for nor compensated the Plaintiffs for this property.   The FDIC, may have converted Plaintiffs' property by purporting to transfer an ownership interest in some or all of such property to JPMorgan Chase.   Plaintiffs thus assert a claim against WMB for recovery of such property or payment, in full, for such transferred property, to the extent applicable, in an amount to be determined.

46.    Plaintiffs expressly reserve their rights to make additional claims against WMB for reasonable payment for the use-value of such property, plus interest, until such time as the property is returned to Plaintiff's use.

## J.    Deposit Claim

47.    On the Receivership Date, WMI and its subsidiaries maintained twenty-eight separate demand deposit accounts with WMB (the "WMB Deposits Accounts") and a twenty ninth account with WMBfsb (the "FSB Deposit Account").   Of the accounts owned by non-debtor subsidiaries of WMI, as of the date of the Proof of Claim and this Complaint, twenty of the accounts (the "Non-Debtor Deposit Accounts") have been moved to other financial institutions and three (3) accounts remain on deposit with JPMorgan Chase (the "Non-Debtor WMB Deposit Accounts").   Furthermore, as of the date of the Proof of Claim and this Complaint, six (6) accounts owned by WMI or WMI Investment (the "Debtor Deposit Accounts") also remain on deposit with JPMorgan Chase.

**A36**

48.     On information and belief, each of the WMB Deposit Accounts was transferred to JPMorgan Chase pursuant to the Purchase and Assumption Agreement and JPMorgan Chase assumed all liability to WMI as a depositor with respect to the WMB Deposit Accounts.    On information and belief, JPMorgan Chase acquired the stock of WMBfsb pursuant to the Purchase and Assumption Agreement and subsequently merged WBMfsb into JPMorgan Chase, thereby assuming all liability to WMI as a depositor with respect to the FSB Deposit Account.

49.     Although WMI believes that it now is a depositor of JPMorgan Chase with respect to the Debtor Deposit Accounts and the Non-Debtor WMB Deposit Accounts and a depositor of an unrelated financial institution with respect to the Non-Debtor Deposit Accounts, on information and belief the FDIC and JPMorgan Chase continue to reserve certain rights with respect to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, and/or the Non-Debtor Deposit Accounts, including rights under the Purchase and Assumption Agreement. If Plaintiffs' rights to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit Accounts are in any way compromised or modified, WMI asserts a claim against WMB for any lost value or other consequential damages.    Without prejudice to WMI's position that it is a depositor of JPMorgan Chase, Plaintiffs asserted a protective claim for the outstanding balance on each of the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, and the Non-Debtor Deposit accounts in the event FDIC exercises any rights it may have under the Purchase and Assumption Agreement, or otherwise, with respect to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit Accounts, as described in paragraphs 43-45 of the Proof of Claim.    This claim is entitled to priority pursuant to 12 U.S.C. § 1821(d)(11)(a)(ii).    Furthermore, the FDIC does not have any

right of setoff with respect to either the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit Accounts on account of any claims it may assert against WMI or the other Plaintiffs.

50.    In addition, by reason of the Receivership and the subsequent sale of substantially all of WMB's assets to JPMorgan Chase, Plaintiffs have been denied access to, control, and use of the WMB Deposit Accounts and the FSB Deposit Account by JPMorgan Chase and were unable to, among other things, invest the funds in the WMB Deposit Accounts and the FSB Deposit Account, move the funds to another institution, or transfer the funds to interest-bearing accounts.    Accordingly, Plaintiffs hereby assert a claim against WMB for damages, including interest, for the lost use of the funds in the WMB Deposit Accounts and the FSB Deposit Account from September 25, 2008, until such time as Plaintiffs are able to transfer such funds to interest bearing accounts at other institutions.

### K.    Administrative Claims

51.    In certain instances, WMI may have paid or become liable for costs and/or expenses that inured to the benefit of WMB subsequent to the Receivership Date.    These amounts may include, without limitation, liability incurred by WMI as a result of JPMorgan Chase's decision to exclude certain contracts from the Purchase and Assumption Agreement and expenses incurred by WMI that may have benefited WMB.    WMI asserts claims against WMB for all such costs and expenses, as described in paragraph 47 of the Proof of Claim.

### L.    Employee/Employer Related Costs and Insurance Claims

52.    Prior to the Receivership, WMI was the sponsor of all employee benefit plans, including, among others, the Washington Mutual, Inc. Cash Balance Pension Plan, the Washington Mutual, Inc. Savings Plan, and the Washington Mutual, Inc. Flexible Benefits Plan (the "Benefit Plans").    These plans covered all of WMI's employees, as well as employees of

DC1:\272987\13\59%MZ13!.DOC\79831.0003                            18

WMB.  WMI may transfer sponsorship of certain of the Benefit Plans to JPMorgan Chase; however, WMI reserves all rights to assert a claim against WMB on account of all amounts paid by WMI on account of such plans for the benefit of WMB employees for which WMI was not reimbursed, as described in paragraph 48 of the Proof of Claim.

53.    In addition, prior to the Receivership, WMI sponsored certain deferred compensation plans.   To the extent that WMI is or becomes liable for amounts due under such deferred compensation plans, WMI asserts a claim for amounts due on account of past and/or present WMB employees and directors.

54.    In addition, with respect to the Cash Balance Pension Plan (the "Pension Plan"), if it is determined that the Pension Plan is underfunded, WMI asserts a claim against WMB for the amount of such underfunding that is attributable to WMB and any other costs, expenses or liabilities associated therewith.

55.    WMI also reserves all rights to assert claims against WMB for any and all other employee or employer related costs incurred by WMI on behalf of WMB and its employees, which may include, without limitation, payroll, severance and related taxes, as described in paragraphs 48-51 of the Proof of Claim.

56.    In addition, WMI is the owner of certain bank-owned and corporation-owned life insurance policies (the "BOLI-COLI Policies").   In certain instances, as reflected in WMI's Schedules, WMI's ownership interest in the BOLI-COLI Policies is reflected on its books and records and in certain other instances, WMI may have an ownership interest in BOLI-COLI Policies reflected on WMB's books and records.   WMI asserts a claim against WMB for any and all premiums and other charges paid by WMI on account of BOLI-COLI Policies owned by WMB.   WMI also reserves all rights to assert a claim against WMB for the value and

proceeds of any BOLI-COLI Policies owned by WMI, but reflected on the books and records of WMB, as described in paragraph 52 of the Proof of Claim.

57.    WMI also has an ownership interest in a variety of insurance policies. Certain of WMI's insurance policies name WMI and its subsidiaries, including WMB and its subsidiaries as insured persons. To the extent that WMB asserts claims to proceeds of such insurance policies, WMI asserts a claim against WMB for such amounts, as described in paragraph 53 of the Proof of Claim.

**M.    Indemnification Claims**

58.    WMI's bylaws provide for the indemnification of all WMI directors and officers. Prior to the Bankruptcy Petition Date, approximately sixty employees of WMB were officers of WMI. To the extent that such officers (or any directors, officers, or employees of WMB) assert indemnification or contribution claims against WMI, WMI asserts claims for reimbursement of such claims against WMB.

59.    In addition, after the Bankruptcy Petition Date, WMI purchased an extension of the coverage period for its directors' and officers' liability insurance policy. To the extent that this extended insurance coverage benefits officers of WMB, WMI asserts a claim against WMB and/or its subsidiaries for their share of the cost of procuring the extended coverage.

**N.    Other Claims**

60.    Out of an abundance of caution, Plaintiffs assert contingent, unliquidated claims against WMB to the extent any of Plaintiffs are obligated, or become obligated, on account of WMB, including, but not limited to, on account of claims arising from WMB's mortgage loan origination business, as described in paragraph 53 of the Proof of Claim.

DC1:\272987\13\5%MZ13!.DOC\79831.0003

20

**A40**

61.    Plaintiffs further assert a claim for any other amounts due to Plaintiffs described in the Proof of Claim, including, but not limited to the amounts more fully described in paragraphs 57-59 of the Proof of Claim that are due to Plaintiffs for fees, costs, and expenses, for interest, and pursuant to WMI's equity interest in WMB.

### THE FDIC'S DENIAL OF PLAINTIFFS' PROOF OF CLAIM

62.    As alleged more fully above, Plaintiffs filed their proof of claim with FDIC-Receiver on December 30, 2008.

63.    In a letter dated January 23, 2009, FDIC-Receiver provided WMI notice that Plaintiffs' claims had been disallowed.    A copy of the FDIC-Receiver's notice is attached as Exhibit 2.

64.    The FDIC-Receiver's notice stated that Plaintiffs' claims were disallowed because:

> The claims presented are unproven to the satisfaction of the Receiver since they lack sufficient documentation or specificity, they fail to state claims against the receivership, they appear to assert claims against a third party or there is no legal basis for the claims.   Equity claims are paid in accordance with 12 U.S.C. sec. 1821(d)(11).

65.    The notice provides no additional detail or explanation regarding the FDIC-Receiver's decision.

66.    On information and belief, it is the FDIC-Receiver's practice to request further information from claimants if the FDIC-Receiver requires further information to determine whether a claim and/or the amount of such claim is valid.   See, e.g., ALLTEL Info. Servs., Inc. v. FDIC, 970 F. Supp. 775, 776 (C.D. Cal. 1997) ("In response to a request by an FDIC claims representative, ALLTEL provided the FDIC a letter . . . which provided calculations in support of both Proofs of Claims.")

67.     FDIC-Receiver did not request any further information from Plaintiffs or their counsel regarding the Proof of Claim.

68.     On information and belief, FDIC-Receiver typically issues receivership certificates when it allows a claim, but has not yet determined the amount (if any) that the claimant will receive when the proceeds of the receivership estate are distributed.

69.     FDIC-Receiver did not provide Plaintiffs with any receivership certificates, but rather disallowed their Claims outright.

70.     Section 11(d)(2)(H) of the FDI Act states that FDIC-Receiver "shall pay all valid obligations of the insured depository institution in accordance with the prescriptions and limitations of this chapter."   12 U.S.C. § 1821(d)(2)(H).

71.     FDIC-Receiver's refusal to consider Plaintiffs' Claims and cryptic disallowance of those Claims violated the FDIC-Receiver's statutory duty to pay all valid claims in accordance with the FDI Act.

72.     Section 11(d)(5)(B) of the FDI Act further obligates FDIC-Receiver to "allow any claim received on or before the date specified in the notice published under paragraph (3)(B)(i) by the receiver from any claimant which is proved to the satisfaction of the receiver." 12 U.S.C. § 1821(d)(5)(B).

73.     FDIC-Receiver provided no grounds regarding why Plaintiffs' claims were not proven to its satisfaction.   The FDIC-Receiver's failure to do so is a violation of its statutory duties.

74.     The FDI Act provides that, when FDIC Receiver has disallowed a claim, the claimant may "request administrative review of the claim" or "file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial

court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."  12 U.S.C. § 1821(d)(6)(A).

75.    The FDI Act further provides that, "[i]f any claimant requests review under this subparagraph in lieu of filing or continuing any action under paragraph (6) and the Corporation agrees to such request, the Corporation shall consider the claim after opportunity for a hearing on the record."  12 U.S.C. § 1821(d)(7)(A).   "The Corporation shall also establish such alternative dispute resolution processes as may be appropriate for the resolution of claims . . . ."  12 U.S.C. § 1821(d)(7)(B)(i).

76.    Notwithstanding these statutory directives, the FDIC-Receiver's notice sets forth no administrative review process in which Plaintiffs could seek a hearing regarding their claims.   Nor does it appear that the FDIC has established any alternative dispute resolution mechanism to resolve proof of claim disputes.

77.    Rather, FDIC-Receiver's notice directs Plaintiffs to file a lawsuit if Plaintiffs disagree with the disallowance of their claims.   Accordingly, Plaintiffs filed this action.

## CLAIMS FOR RELIEF

### Count I
### Determination of Plaintiffs' Proof of Claim

78.    Plaintiffs incorporate the allegations and averments contained in paragraphs 5 through 77 as if set forth fully herein.

79.    Under 12 U.S.C. § 1821(d)(6)(A), the Court has de novo jurisdiction to consider Plaintiffs' Claims set forth in the Proof of Claim.   See, e.g. Freeman v. FDIC, 56 F. 3d 1394, 1400 (D.C. Cir. 1995) ("[U]nder section 1821(d)(6) [claimant] had recourse to de novo

judicial review of the FDIC's denial of [their] claim."); <u>Benjamin Franklin Shareholders Litig.</u>
<u>Fund v. FDIC</u>, 501 F. Supp. 2d 103, 106 (D.D.C. 2007) ("[T]his Court reviews de novo claims
filed with, and processed by the FDIC under its administrative claims process.") (citing <u>Freeman</u>
<u>v. FDIC</u>, 56 F. 3d 1394, 1400 (D.C. Cir. 1995)).

80.     Each Claim is a valid and proven claim against the Receivership and
FDIC-Receiver is obligated to pay such Claims (subject to, and in accordance with, 12 U.S.C.
§ 1821(d)(11)).

**Count II**
**Dissipation of WMB's Assets**

81.     Plaintiffs incorporate the allegations and averments contained in
paragraphs 5 through 80 as if set forth fully herein.

82.     According to the OTS's press release announcing the FDIC's appointment
as receiver for WMB, the OTS stated that WMB had "insufficient liquidity to meet its
obligations" and thus "was in an unsafe and unsound condition to transact business."   A fact
sheet accompanying that press release further stated that "[s]ignificant deposit outflows began on
September 15, 2008" and that "[g]iven the Bank's limited sources of funds and significant
deposit outflows, it was highly likely to be unable to pay its obligations and meet its operating
liquidity needs."   (Copies of the press release and fact sheet are attached as Exhibit 3.)
Accordingly, on information and belief, the OTS's rationale for placing WMB into receivership
was illiquidity, rather than insolvency.

83.     According to the OTS fact sheet (<u>see</u> Exhibit 3), the OTS stated that WMB
qualified as "well-capitalized" under the OTS's regulatory capital regulations through the
Receivership Date.

**A44**

84.    Notwithstanding this, the FDIC has indicated that it "does not anticipate that subordinated debt holders of the bank will receive any recovery on their claims."[3]    On information and belief, general creditors of WMB are unlikely to be paid in full as well.

85.    Rather than a straight liquidation of WMB's assets, the FDIC entered into the Purchase and Assumption Agreement with JPMorgan Chase, described more fully above, for the purchase price of $1.9 billion.

86.    On information and belief, the assets of WMB sold, less the liabilities assumed, were worth more than $1.9 billion, had such assets been liquidated in a prudent and reasonable manner.

87.    On information and belief, Plaintiffs will not receive payments from the Receivership for their Claims that would be equal to or greater than the payments for that Plaintiffs would have received had the FDIC conducted a straight liquidation of WMB's assets and liabilities (and had the FDIC not improperly disallowed Plaintiffs' Claims).

88.    The FDI Act requires "the Corporation [to] conduct its operations in a manner which . . . maximizes the net present value return from the sale or disposition of such assets . . . ." 12 U.S.C. § 1821(d)(13)(E)(i).

89.    By failing to liquidate WMB in a manner allowing WMB's creditors and other claimants to recover what they would have recovered in a straight liquidation, the FDIC breached its statutory duty to maximize the net present value of WMB's assets.

90.    The FDI Act further provides that "[t]he maximum liability of the [FDIC], acting as receiver or in any other capacity, to any person having a claim against the receiver or

---

[3] FDIC, Information for Washington Mutual Bank, Henderson, NV and Washington Mutual Bank, FSB, Park City, UT, *available at* http://www.fdic.gov/bank/individual/failed/wamu.html

the insured depository institution for which such receiver is appointed shall equal the amount

such claimant would have received if the [FDIC] had liquidated the assets and liabilities of such

institution . . . ." 12 U.S.C. § 1821(i)(2). Pursuant to this provision, the FDIC is obligated to

pay damages to Plaintiffs equal to the difference between what Plaintiffs would have received in

a straight liquidation of WMB and what they actually received.

### Count III
### Taking of Plaintiffs' Property Without Just Compensation

91.    Plaintiffs incorporate the allegations and averments contained in

paragraphs 5 through 90 as if set forth fully herein.

92.    The FDIC's wasting of WMB's assets and failure to compensate Plaintiffs

for their claims against WMB equivalent to what Plaintiffs would have received for such claims

in a straight liquidation of WMB's assets constitutes a taking of Plaintiffs' property without just

compensation in violation of the Fifth Amendment to the United States Constitution.

### Count IV
### Conversion of Plaintiffs' Property

93.    Plaintiffs incorporate the allegations and averments contained in

paragraphs 5 through 90 as if set forth fully herein.

94.    The FDIC's refusal to compensate Plaintiffs for property taken into the

Receivership that (a) belonged to Plaintiffs rather than WMB, (b) was improperly transferred to

WMB, and/or (c) is property that otherwise should be returned to Plaintiffs under applicable law,

constitutes conversion of Plaintiffs' property.

95.    The FDIC's conversion of Plaintiffs' property is actionable under the

Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671-80).

DCI:\272987\13\3%MZ131.DOC\79831.0003                    26

**A46**

Case 09-50934-MFW    Doc 10    Filed 05/13/09    Page 49 of 56

## <u>Count V</u>
### Declaration That the FDIC-Receiver's Disallowance Is Void

96.   Plaintiffs incorporate the allegations and averments contained in paragraphs 5 through 90 as if set forth fully herein.

97.   FDIC-Receiver's failure to consider Plaintiffs' Proof of Claim and the FDIC-Receiver's summary disallowance of the Proof of Claim without any meaningful explanation is an abrogation of FDIC-Receiver's statutory duties.   Therefore, FDIC-Receiver's disallowance should be declared void and FDIC-Receiver should be required to reconsider Plaintiffs' Proof of Claim as if FDIC-Receiver's January 23rd disallowance never occurred.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request the Court to grant the following relief:

1.  An order declaring Plaintiffs' Claims to be valid and proven against the Receivership;

2.  An order directing FDIC-Receiver to pay the Claims from the assets of the Receivership in accordance with 12 U.S.C. § 1821(d)(11);

3.  An order directing FDIC-Receiver to provide Plaintiffs with an accounting of the disposition of the assets of the Receivership if any Claim is not satisfied in full;

4.  An order directing FDIC-Receiver to provide Plaintiffs with an accounting of all property transferred from Plaintiffs in connection with the Receivership;

5.  Enter a judgment against FDIC-Corporate and FDIC-Receiver for damages, in an amount to be determined, equal to the amount of money Plaintiffs would have received in a straight liquidation of WMB's assets and liabilities less any amounts actually received from the Receivership;

6.  Enter a judgment against FDIC-Corporate and FDIC-Receiver for damages, in an amount to be determined, equal to the value of Plaintiffs' property converted by the FDIC;

7.  An order declaring that the FDIC's January 23, 2009 disallowance to be void, and that the parties should proceed as if such disallowance never occurred;

8.  Award Plaintiffs costs and attorneys fees as may be permitted by law; and

DC1:\272987\13\5%MZ13!.DOC\79831.0003                    27

A47

9.  Award Plaintiffs such other relief as may be just.

### DEMAND FOR JURY TRIAL

Plaintiffs, by and through their attorneys, hereby demand a trial by jury on all claims otherwise triable by jury asserted in the complaint.

Dated: Washington, D.C.
      March 20, 2009

David R. Berz, Esq. (D.C. Bar No. 182105)
Adam P. Strochak, Esq. (D.C. Bar No. 439308)
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 682-7001
Facsimile: (202) 857-0939

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
Michael F. Walsh, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Plaintiffs WMI and WMI Investment

A48

# EXHIBIT 1

### Exhibit 1
### (Payments to WMB)

| Date Paid | Amount Paid to WMB |
|---|---|
| 10/11/2007 | 857,230.47 |
| 10/18/2007 | 3,446,107.42 |
| 11/8/2007 | 1,189.73 |
| 11/15/2007 | 254,364.42 |
| 12/13/2007 | 186,438.82 |
| 1/10/2008 | 6,863,343.95 |
| 1/17/2008 | 2,190.72 |
| 2/7/2008 | 2,319,329.88 |
| 3/6/2008 | 7,948.56 |
| 3/13/2008 | 773,837.68 |
| 3/31/2008 | 14,030,414.67 |
| 4/10/2008 | 4,488,747.40 |
| 4/24/2008 | 3,759,043.02 |
| 5/8/2008 | 2,598,863.39 |
| 5/30/2008 | 1,240.005.70 |
| 6/19/2008 | 170.28 |
| 6/26/2008 | 10,520,771.72 |
| 7/24/2008 | 581,788.51 |
| 8/14/2008 | 1,431,922.60 |
| 8/21/2008 | 4,194,820.96 |
| 9/11/2008 | 112,923.51 |
| 9/25/2008 | 4,101,278.69 |
| 10/18/2007 | 175,635.71 |
| 10/25/2007 | 305,110.56 |
| 10/31/2007 | 1,434,522.37 |
| 11/8/2007 | 4,966,409.90 |
| 11/15/2007 | 725,599.67 |
| 12/13/2007 | 8,865,013.39 |
| 12/31/2007 | 6,205.49 |
| 1/10/2008 | 6,362,822.58 |
| 1/17/2008 | 914,011.32 |
| 1/31/2008 | 12,447,072.22 |
| 2/7/2008 | 3,377,908.39 |
| 2/14/2008 | 292,691.98 |
| 2/21/2008 | 671,242.69 |
| 2/29/2008 | 750,288.31 |
| 3/13/2008 | 3,256,230.57 |
| 3/20/2008 | 1,096,451.96 |

| Date Paid | Amount Paid to WMB |
|-----------|---------------------|
| 4/10/2008 | 3,429,936.11 |
| 5/15/2008 | 1,956,466.25 |
| 5/22/2008 | 3,062,583.76 |
| 6/19/2008 | 1,422,177.59 |
| 6/30/2008 | 5,284,659.08 |
| 7/10/2008 | 2,598,631.45 |
| 7/24/2008 | 2,879,785.16 |
| 8/7/2008 | 1,805,099.83 |
| 8/14/2008 | 2,573,609.62 |
| 9/11/2008 | 614,326.45 |
| 9/18/2008 | 17,205,753.61 |
| 9/25/2008 | 1,681,646.07 |
| **Total:** | 151,934,564.19 |

2

**A51**

# EXHIBIT 2


**FDIC**
**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201                                   Division of Resolutions and Receiverships

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
7008 1830 0000 8032 2550

January 23, 2009

Washington Mutual, Inc.
ATTN: John Marciel
1301 Second Avenue, WMC3501
Seattle, WA 98101

SUBJECT:    10015–Washington Mutual Bank
            Henderson, NV – In Receivership
            NOTICE OF DISALLOWANCE OF CLAIM

Dear Claimant:

The Receiver of Washington Mutual Bank has reviewed your claim against the receivership.  After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s) :

> The claims presented are unproven to the satisfaction of the Receiver since they lack sufficient documentation or specificity, they fail to state claims against the receivership, they appear to assert claims against a third party or there is no legal basis for the claims. Equity claims are paid in accordance with 12 U.S.C. sec. 1821(d)(11).

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT (or continue any lawsuit commenced before the appointment of the Receiver) BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM.  12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer.  An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-8049.

Sincerely,

*Donald Grieser*

Donald Grieser
Claims Department

RECEIVED
FEB 02 2009
LEGAL DEPARTMENT
SEATTLE

RLS7218

A53

# EXHIBIT 3