## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
```
*In re*                                                  :   Chapter 11
                                                         :
WASHINGTON MUTUAL, INC., *et al.*[1]                      :   Case No. 08-12229 (MFW)
                                                         :
                 Debtors.      :   Jointly Administered
```
------------------------------------------------------- x
```
WASHINGTON MUTUAL, INC. AND                              :
WMI INVESTMENT CORP.,                                    :
                                                         :   Adv. Proc. No. 09-50934
               Plaintiffs,  :
                                                         :
          v.                              :
                                                         :
JPMORGAN CHASE BANK, NATIONAL                            :
ASSOCIATION,                                             :
                                                         :
              Defendant.   x
```
-------------------------------------------------------
```

## BRIEF IN SUPPORT OF THE MOTION OF PLAINTIFFS
## FOR SUMMARY JUDGMENT

Plaintiffs Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment," and with WMI, "Plaintiffs" or "Debtors"), submit this brief in support of their Motion for Summary Judgment under Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056.

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF ARGUMENT .......................................................................................... 2

BACKGROUND .................................................................................................................. 4

    A.    The Deposit Accounts ........................................................................................... 4

    B.    WMI Transfers Funds Between Deposit Accounts ............................................ 5

    C.    JPMC's Acquisition of WMB and Assumption of the Deposit Liabilities ............. 7

    D.    JPMC Has Repeatedly Refused To Release The Debtors' Funds ......................... 8

ARGUMENT ....................................................................................................................... 9

POINT I .............................................................................................................................. 10

THE ACCOUNTS ARE DEPOSIT ACCOUNTS .................................................... 10

    A.    The Accounts Are Deposit Accounts Belonging To WMI .................................... 11

    B.    There Is No Factual or Legal Basis for JPMC to Claim That the Deposit
           Into Account 4234 Was Intended as a Capital Contribution ................................. 13

    1.    JPMC Itself Continues to Characterize Account 4234 As A Deposit
           Account ................................................................................................................. 14

    2.    It Would Have Been Inconsistent with WMI Policy and Forms to Direct
           the $3.674 Billion Transfer as a Capital Contribution .......................................... 16

POINT II ............................................................................................................................. 18

THERE IS NO BASIS FOR JPMC TO SETOFF THE AMOUNTS IN THE
DEPOSIT ACCOUNTS AGAINST ANY CLAIMS THAT IT SUPPOSEDLY
HOLDS AGAINST PLAINTIFFS ................................................................................ 18

    A.    JPMC Holds No Claims Against the Debtors' Estates .......................................... 19

    B.    Any Claims That JPMC Seeks to Assert Were Acquired While Debtors
           Were Insolvent Within 90 Days of the Petition Date .......................................... 20

    C.    Setoff Is Unavailable Because There Is a Lack of Mutuality ................................ 22

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*In re Bevill, Bresler & Schulman Asset Management Corp.*,
    896 F.2d 54 (3d Cir. 1990) ...................................................................................................... 18

*In re Buffington*,
    100 B.R. 448 (N.D. Iowa 1987) ............................................................................................... 10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................................ 13

*Citizens Bank of Maryland v. Strumpf*,
    516 U.S. 16 (1995) ...................................................................................................... 10, 18, 19

*Depositors Trust Co. of Augusta v. Frati Enterprises, Inc.*,
    590 F.2d 377 (1st Cir. 1979)................................................................................................... 23

*FDIC v. Fedders Air Conditioning*,
    35 F.3d 18 (1st Cir. 1994)....................................................................................................... 18

*In re First Interregional Advisors Corp.*,
    271 B.R. 463 (Bankr. D.N.J. 2001) .......................................................................................... 9

*In re Garden Ridge Corp.*,
    338 B.R. 627 (Bankr. D. Del. 2006).................................................................... 18, 19, 22, 23

*In re Lang Machinery Corp.*,
    Nos. 86-415, 87-347, 87-346, 1988 WL 110429 (Bankr. W.D. Pa. Oct. 19, 1988)................ 21

*Levy v. Sterling Holding Co., LLC*,
    544 F.3d 493 (3d Cir. 2008) ...................................................................................................... 9

*In re Meadows*,
    396 B.R. 485 (B.A.P. 6th Cir. 2008) ....................................................................................... 10

*In re Mills*,
    167 B.R. 663 (Bankr. D. Kan. 1994)........................................................................................ 10

*In re Passafiume*,
    242 B.R. 630 (Bankr. W.D. Ky. 1999)..................................................................................... 19

*In re Radnor Holdings Corp.*,
    353 B.R. 820 (Bankr. D. Del. 2006)......................................................................................... 11

*In re Rock Rubber & Supply of CT, Inc.*,
    345 B.R. 37 (Bankr. D. Conn. 2006)........................................................................................ 10

*In re SemCrude, L.P.*,
    399 B.R. 388 (Bankr. D. Del. 2009).............................................................................. 22, 23, 24

ii

*Sentinel Products Corp.*,
   192 B.R. at 46 ...................................................................................................22

*In re Tarbuck*,
   318 B.R. 78 (Bankr. W.D. Pa. 2004)...............................................................10

*In re Tops Appliance City, Inc.*,
   372 F.3d 510 (3d Cir. 2004) ............................................................................13

*In re U.S. Aeroteam, Inc.*,
   327 B.R. 852 (Bankr. S.D. Ohio 2005) ...........................................................20

*In re USN Communications, Inc.*,
   280 B.R. 573 (Bankr. D. Del. 2002).................................................................21

*Wade Cook Financial Corp. v. Carey*,
   375 B.R. 580 (9th Cir. 2007) ...........................................................................23

*Westinghouse*,
   278 F.3d 138 (2d Cir. 2002) .............................................................................22

*In re Wood*,
   87 B.R. 170 (Bankr. D. Kan. 1988) ..................................................................22

*Zombeck v. Amada America, Inc.*,
   No. 06-953, 2009 WL 229775 (W.D. Pa. Jan. 27, 2009) ..................................14

## Statutes

11 U.S.C. § 541(a) .................................................................................................10
11 U.S.C. § 542 ...................................................................................................2, 10
11 U.S.C. § 542(b) .................................................................................................10
11 U.S.C. § 547 ......................................................................................................21
11 U.S.C. § 547(b) .................................................................................................21
11 U.S.C. § 547(f) ..................................................................................................21

11 U.S.C. § 553 ...............................................................................10, 18, 20, 22, 24
11 U.S.C. § 553(a) ..................................................................................................22
11 U.S.C. § 553(a)(2)(B)...........................................................................3, 19, 21, 22
11 U.S.C. § 553(a)(2)(B)(i) .....................................................................................21
11 U.S.C. § 553(a)(2)(B)(ii) ....................................................................................21
11 U.S.C. § 553(c) ..................................................................................................22

Fed. R. Civ. P. 56(a)(1) ............................................................................................9
Fed. R. Civ. P. 56(c) .................................................................................................9
Fed. R. Civ. P. 7056..................................................................................................9

Fed. R. Evid. 104(a)................................................................................................14
Fed. R. Evid. 801(d)(2)(D) ......................................................................................14
Fed. R. Evid. 803(7) ................................................................................................17

## PRELIMINARY STATEMENT

JPMorgan Chase Bank, N.A. ("JPMC") has refused to pay the Debtors more than $4 billion in deposits that belong to the Debtors, thereby depriving the bankruptcy estates of one of their most valuable assets. As there is no factual or legal justification for JPMC's refusal to pay, it appears that JPMC is holding onto these deposits for as long as possible so that it can unjustly profit from the use of the capital. This is a palpably improper basis for depriving the Debtors (and their creditors) of more than $4 billion that rightfully belongs to their estates, and Plaintiffs have therefore brought this action in order to secure the prompt return of these funds. Moreover, because the specific issue of the Debtors' rights to these monies is clear and indisputable, the Debtors respectfully move for summary judgment to obtain an Order requiring JPMC immediately to turn over those monies to the Debtors so that they can be returned to the estates and be distributed in connection with a chapter 11 plan.

On May 13, 2009, JPMC filed its motion to dismiss this action or, in the alternative, to consolidate it with JPMC's earlier-filed adversary proceeding. As the Debtors will demonstrate in their opposition to that motion, which is due to be filed with the Court on May 27, JPMC's arguments are without merit. Furthermore, even if JPMC were correct that the deposit accounts cannot be addressed through a turnover action, all of the arguments herein would apply equally as a basis for a grant of partial summary judgment in favor of the Debtors in the pending adversary proceeding. Thus, whether through these proceedings or through the pending adversary proceeding, the Debtors are plainly entitled to their deposits, and JPMC, despite all of its various court filings, has yet to assert any legitimate claim to those funds.

## SUMMARY OF ARGUMENT

JPMC is holding in excess of $4 billion of cash in deposit accounts that WMI and WMI Investment held at the Debtors' former subsidiary banks, Washington Mutual Bank ("WMB") and Washington Mutual Bank fsb ("WMB fsb," and collectively with WMB "the Banks"). The fact that those accounts are deposit accounts, and therefore estate property, is beyond any genuine dispute based on extensive indisputable evidence including, among other things, the Banks' books and records (both before and after JPMC's purchase of certain of WMB's assets), the account statements that JPMC continues to issue in the name of WMI and WMI Investment, and JPMC's own representations subsequent to the filing of the Debtors' bankruptcy cases. The testimonial evidence is equally compelling in establishing that the monies at issue at all times have been held in demand deposit accounts for the benefit of the Debtors. Because the indisputable evidence, as detailed below, demonstrates clearly that there are no genuine issues of material fact, the Debtors are entitled to the funds that they have on deposit with JPMC, and JMPC is required under the turnover provision of the Bankruptcy Code, 11 U.S.C. § 542, to pay these liabilities, along with pre-judgment interest, to the Debtors without delay.

JPMC attempts to justify withholding the Debtors' funds with the contrived claim that WMI's transfer of $3.674 billion from a deposit account at WMB to a deposit account at WMB fsb somehow constitutes a capital contribution. This argument is utterly meritless. The very form that personnel used to initiate this transaction is used solely for the purpose of opening new on-us deposit accounts, and it is therefore impossible that the transfer was a capital contribution. Moreover, had WMI actually made a capital contribution to WMB fsb, such a transaction would have involved entirely different accounting entries and procedures and would have required an assortment of internal approvals that were not obtained. Additionally, JPMC itself has repeatedly represented to

2

WMI, and even to its own federal regulators, that the funds in the WMB fsb account constitute deposit liabilities.

Recognizing that it has no genuine basis to challenge the Debtors' ownership of the funds on deposit, JPMC has invoked putative "setoff" rights as a pretext to retain the Debtors' $4 billion. JPMC contends that it supposedly is permitted to do so in satisfaction of claims that it allegedly has against WMI based on its acquisition of WMB's assets pursuant to the certain Purchase and Assumption Agreement Whole Bank, dated September 25, 2008 ("P&A Agreement"), entered into between JPMC and the Federal Deposit Insurance Corporation ("FDIC"). For several reasons, however, this argument fails.

First, the plain language of the P&A Agreement specifically provides that JPMC acquired no claims against WMB's "shareholders" or "holding company," both terms squarely describing WMI. Accordingly, JPMC has acquired no claim against which to assert a right of setoff. Second, assuming *arguendo* that JPMC acquired claims against WMI, it would have done so one day before the Debtors' bankruptcy petitions were filed, while WMI was presumptively (and in fact) insolvent. Any claim of setoff, therefore, is expressly barred by a straightforward application of 11 U.S.C. § 553(a)(2)(B), which precludes setoff where a party acquires claims against an insolvent entity within 90 days of the bankruptcy filing.

Furthermore, JPMC cannot invoke any alleged setoff right because there is no mutuality between claims, which must exist before setoff is even theoretically available. For example, a portion of the funds that JPMC is withholding belongs to WMI Investment, but the putative claims that JPMC allegedly holds are against WMI. Thus, JPMC is seeking setoff against monies belonging, at least partially, to WMI Investment for a claim that it allegedly has against a different company. Similarly, JPMC is seeking to withhold $3.674 billion in a WMB fsb account to offset

3

claims that it supposedly acquired from WMB – again, a separate entity. These are classic "triangular" setoffs, which are prohibited by the Bankruptcy Code.

In sum, the Debtors placed billions of dollars on deposit that are essential assets of the estates. JPMC should not be permitted to stall and to frustrate further the Debtors' chapter 11 process by withholding those funds without any legitimate factual or legal basis. The billions of dollars at issue should be immediately turned over to the Debtors so that the estates can make those funds available to creditors. Plaintiffs therefore respectfully request that the Court grant this Motion for Summary Judgment and direct JPMC to turn over the Debtors' deposits so that the Debtors can move forward with the critical work of administering their estates.

## BACKGROUND

### A.     The Deposit Accounts

On September 25, 2008, the Debtors had cash on deposit with WMB and WMB fsb in excess of $3.8 billion, consisting of more than $135 million in five demand deposit accounts at WMB (the "WMB Accounts") and approximately $3.668 billion in a single demand deposit account at WMB fsb (the "WMB fsb Account," and with the WMB Accounts the "Accounts").[2] One of the WMB Accounts, holding approximately $53 million ("Account 4704"), is owned by WMI Investment (*see* A-22—34), and the remaining Accounts are held by WMI. All of the Accounts were listed on the Debtors' Schedules of Assets and Liabilities filed with this Court.

The Debtors established and maintained each of the Accounts in accordance with their internal policies and procedure governing "On-Us," or intra-corporate, deposit accounts, as set forth

---

[2] These figures are confirmed by the September 2008 "Washington Mutual Internal Checking Detail Information" forms which report monthly balance and transactions for the Accounts (the "Account Statements"). The Account Statements are attached as Exhibit A to the Affidavit submitted in support of this Motion by Doreen Logan ("Logan Aff."). (A-22—34.)

in the Debtors' "GL Administration Policy." (Logan Aff., A-5 at ¶ 11.) That document "communicate[s] policies for the establishment and usage of 'On-Us' bank accounts for all Washington Mutual entities and departments," and separately defines "'On-Us' accounts" as "corporately owned Demand Deposit Account (DDA) accounts." (A-42—45.) Each of the Accounts was accounted for in the books and records of WMB or WMB fsb as demand deposit accounts with deposit liabilities owing to either WMI or WMI Investment, as appropriate. (Logan Aff., A-5 at ¶ 12.)

### B.  WMI Transfers Funds Between Deposit Accounts

WMI's long-time primary checking account at WMB ("Account 0667") was used by WMI to service its outstanding debt, to pay dividends on its preferred and common equity, and to disburse payments on account of tax obligations and myriad other operating expenses. (Logan Aff., A-4 at ¶ 10.) Account 0667 was WMI's primary non-interest bearing checking account and, therefore, was very active and typically had approximately 10 to 15 transactions per day. (*e.g.*, A-22—34.) On or about September 18, 2008, WMI determined that it would transfer its primary checking account from its direct wholly-owned subsidiary, WMB, to its indirect subsidiary, WMB fsb. (Logan Aff., A-5 at ¶ 13.) Ms. Doreen Logan, whose affidavit is attached, served as a First Vice President and transaction manager in WMB's Treasury Department during this period and played a central role in that transaction. (Logan Aff., A-2 at ¶ 2; A-5 at ¶ 13 through A-10 at ¶ 26.)

As was customary with any transfer to a newly-established deposit account, this transfer was to be effectuated by submitting a "New Account Request Form," utilized to open a new demand deposit account at either Bank, and by completing a "Journal Entry Request Form" and "Journal Entry Posting Form" to account for the transfer of deposits from Account 0667 to a new account at WMB fsb. (Logan Aff., A-6 at ¶ 16.) Although the New Account Request Form properly indicated

that a new account was to be opened at WMB fsb (designated on the form as "Company 40"), an administrative processing error caused a new account to be opened at WMB (Account No. xxx-xxx421-8, "Account 4218"). (Logan Aff., A-8 at ¶ 20; A-77—81.) Thus, $3.674 billion in deposits, rather than being transferred directly to an account at WMB fsb as planned, apparently was initially transferred to Account 4218 and remained at WMB.

On September 22, 2008, a revised New Account Request Form was created and the mistake was corrected, retroactively to September 19, 2008, with the creation of Account 4234 at WMB fsb. (Logan Aff., A-9 at ¶ 22.) Thus, $3.674 billion in deposits, as initially intended, was transferred from Account 0667, a WMB deposit account, to Account 4234, a WMB fsb deposit account.[3] This is reflected in the September 2008 Account Statement for Account 0667, which shows an opening balance of $4.541 billion with four debits on September 19, 2008 in an aggregate amount of $3.674 billion. (A-22—34.) The September 2008 Account Statement for Account 4234 at WMB fsb shows four corresponding deposits, effective September 19, 2008, in an aggregate amount of $3.674 billion. (A-22—34.)

The transfer of WMI's deposits from WMB to WMB fsb did not change the nature of those deposits. The Initial and Revised Account Request Forms prepared to establish Account 4218 and Account 4234, respectively, state expressly that the new account was to be an "On-Us" corporate checking account to be assigned a product code of "B3." (A-77—81; A-92—95.) The GL Administration Policy provides that "B3's are non-interest bearing DDA accounts," and makes clear that "DDA" is an abbreviation that signals a Demand Deposit Account. (A-42—45.) The GL Administration Policy likewise provides that "On-Us" accounts are "Demand Deposit Accounts." (Id.) Moreover, the Journal Entry Posting Forms used to account for the transfer of funds from

---

[3]  Account 4218 was closed while Account 0667 remains an account at WMB.

Account 4218 to Account 4234 denote that Account 4234 was to be a "DDA" account. (A-92—95.) In addition, the September 2008 Account Statement for Account 4234, issued by JPMC and evincing the $3.674 billion transfer, properly reflects such amounts as "Customer Deposits." (A-22—34.)

    C.    <u>JPMC's Acquisition of WMB and Assumption of the Deposit Liabilities</u>

On September 25, 2008, substantially all the assets of WMB, including the stock of its subsidiary WMB fsb, were sold to JPMC for the purchase price of $1.88 billion, pursuant to the P&A Agreement (A-163—205 ("P&A Agreement"), § 3.1). Pursuant to Section 2.1 of the P&A Agreement, JPMC "expressly assumes . . . and agrees to pay, perform, and discharge, all of the liabilities of [WMB] . . . including the Assumed Deposits . . . ." (P&A Agreement § 2.1). According to the P&A Agreement, "Assumed Deposits" is defined to mean "Deposits" which would, of course, include any WMB Deposits, subject only to two inapplicable exceptions. (P&A Agreement, Article I, Definitions.) Further, under section 5.1 of the P&A Agreement, JPMC agreed to "pay all properly drawn checks, drafts and withdrawal orders of depositors . . . to the extent that the Deposit balances to the credit of the respective makers or drawers . . . are sufficient to permit payment thereof . . . ." (P&A Agreement § 5.1). Thus, the P&A Agreement is clear that JPMC unambiguously assumed liability for all deposits, including the deposits in the WMB Accounts.[4]

Since consummation of the P&A Transaction, JPMC continues to issue Account Statements to the Debtors for all six Accounts with the following disclosure at the top of each page: "Deposit accounts now held by JPMorgan Chase Bank, N.A." (A-34—41.) It also appears that JPMC continues both to report the deposits in the Accounts as deposit liabilities to the Office of

---

[4]    Under the P&A Agreement, WMB fsb became the wholly-owned subsidiary of JPMC. (P&A Agreement § 3.1). As a result of the subsequent merger of JPMC and WMB fsb, JPMC purportedly assumed all deposit liabilities of WMB fsb, including with respect to WMI as depositor of the WMB fsb Account (*i.e.*, Account 4234).

Comptroller of Currency ("OCC") and to pay to the FDIC federal deposit insurance premiums in respect of these deposits (as it does for all of its deposit liabilities). (Logan Aff., A-19 at ¶ 46; A-20 at ¶ 47.) Furthermore, in a proof of claim filed in the Chapter 11 Cases concerning certain federal tax refunds that the IRS wired to one of the Accounts post-petition, JPMC stated that "[o]n September 30, 2008, the IRS wired the [tax refunds] *to WMI.*" The fact that these funds were wired "to WMI," as JPMC acknowledges, of course means that the Account belongs to WMI. (March 30, 2009, Proof of Claim by JPMC, at 17 (emphasis added).)

The P&A Transaction was extremely profitable for JPMC. In January 2009, JPMC announced that it had realized a $1.3 billion after tax extraordinary gain from "merger-related items" in connection with the P&A Transaction. (JPMC Press Release, *JPMorgan Chase Reports Full-Year 2008 Net Income of $5.6 Billion, or $1.37 per Share, on Revenue of $67.3 Billion; Fourth-Quarter 2008 Net Income of $702 Million, or $0.07 per Share*, Jan 15, 2009). In April 2009, JPMC announced that its acquisition of WMB contributed to (i) net income in JPMC's Retail Financial Services division of "$474 million, compared with a net loss of $311 million in the prior year," (ii) net income in JPMC's Commercial Banking division of "$338 million, an increase of $46 million, or 16%, from the prior year," and (iii) "[n]et interest income [at JPMC of] $15.5 billion, up by $6.1 billion, or 65%." (*See* JPMC Press Release, *JPMorgan Chase Reports First-Quarter 2009 Net Income of $2.1 Billion, or $0.40 per Share,* April 16, 2009.) Having acquired WMB and WMB fsb at fire-sale prices, JPMC has achieved "record firm-wide revenue" in first quarter 2009 (*id.*), and it is now seeking to increase its windfall by misappropriating $4 billion that belongs to the Debtors.

D.    JPMC Has Repeatedly Refused To Release The Debtors' Funds

On numerous occasions, the Debtors have requested that JPMC turn over control of the Accounts to the Debtors, but JPMC has refused to do so, or has imposed unreasonable conditions on doing so, thereby denying the Debtors' estates use of their deposits. On October 14, 2008, JPMC

8

entered into a stipulation acknowledging that the accounts are deposit accounts under the Debtors' control, but this was ultimately withdrawn, on January 26, 2009, when JPMC would not agree to a form of order approving it. On December 19, 2008, after several weeks of negotiations, JPMC agreed to allow interest to accrue on the deposits, but only at a nominal rate. Thus, every day that JPMC continues to withhold the deposits, realizing an economic advantage while enjoying increased liquidity, the Debtors' estates suffer further damage because their deposits are earning interest at a significant discount to a market rate and the estates' assets are not being maximized.

## ARGUMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding under Rule 7056 of the Federal Rules of Bankruptcy Procedure, a claimant may file for summary judgment "at any time after [] 20 days have passed from commencement of the action." Fed. R. Civ. P. 56(a)(1); *see also In re First Interregional Advisors Corp.*, 271 B.R. 463, 468-69 (Bankr. D.N.J. 2001) ("The purpose of summary judgment is to avoid a trial which is unnecessary and results in delay and expense, by promptly disposing of any actions in which there is no genuine issue of material fact."). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Levy v. Sterling Holding Co.*, LLC, 544 F.3d 493, 501 (3d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)); *see also In re Tops Appliance City, Inc.*, 372 F.3d 510, 513 (3d Cir. 2004).

## POINT I

## THE ACCOUNTS ARE DEPOSIT ACCOUNTS
## BELONGING TO THE DEBTORS

Section 542 of the Bankruptcy Code provides that any entity that "owes a debt that is property of the estate . . . . shall pay such debt" to the trustee except to the extent that such debt "may be offset under section 553." 11 U.S.C. § 542(b). A debtor's bank deposits, which constitute a debt owed by the bank to the debtor, constitute estate property. *See In re Meadows,*396 B.R. 485, 490 (B.A.P. 6th Cir. 2008) ("[T]he Debtor's checking account and all monies contained therein became 'property of the estate' once her bankruptcy case was commenced."*); In re Rock Rubber & Supply of CT, Inc.*, 345 B.R. 37, 40 (Bankr. D. Conn. 2006) ("The court concludes that the trustee's letter correctly asserted that the [deposit] accounts were property of the bankruptcy estate."); *In re Tarbuck*, 318 B.R. 78 (Bankr. W.D. Pa. 2004) (holding that money that Chapter 7 debtor had placed into depository account was "property of the estate"); *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) (observing that a bank account "consists of nothing more or less than a promise to pay, from the bank to the depositor"). Accordingly, absent a legitimate claim of setoff, amounts held by a debtor in a deposit account are subject to turnover under section 542.[5] *See In re Mills*, 167 B.R. 663, 664 (Bankr. D. Kan. 1994) ("When the debtor filed his bankruptcy petition, his credit union deposit account became property of the estate pursuant to § 541(a), and the credit union became obliged to turn the account balance over to the trustee pursuant to § 542."); *see also In re Buffington*, 100 B.R. 448, 450 (N.D. Iowa 1987) ("This account must be treated like any other

---

[5]   As set forth at Point II, *infra*, JPMC cannot meet the requirements for asserting setoff under section 553.

deposit account the Debtor may have had at a bank . . . . As property of the estate, these funds shall be turned over to the Trustee.").

JPMC has sought to avoid this result and retain the Debtors' funds by making the meritless suggestion that the $3.674 billion transferred by WMI into Account 4234 at WMB fsb was a capital contribution, rather than a transfer from one deposit account to another. As set forth below, however, this argument fails. It is crystal clear and beyond genuine dispute that all of the accounts, including Account 4234, are deposit accounts.

A.     The Accounts Are Deposit Accounts Belonging To WMI

The only account that JMPC has attempted to call into question is Account 4234.[6]  The indisputable evidence, however, confirms that this Account is in fact a deposit account. This is clear from the procedure used to transfer the $3.674 billion into Account 4234; from the books and records maintained by not only WMB fsb, but also by JPMC itself; and from the correspondence by the personnel directly involved in creating Account 4234. *See In re Radnor Holdings Corp.*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (holding that disputed loans were "true debt instruments" based on "the terms of the documents themselves, the facts and circumstances surrounding the making of the loans, the reasonable inferences to be drawn therefrom, as well as the economic reality of the circumstances").

On September 18, 2008, in order to address concerns regarding WMB's liquidity, WMI senior management directed treasury personnel to transfer the maximum available funds from Account 0667, a long standing deposit account maintained by WMI at WMB, "to a demand deposit

---

[6]  The attached affidavit and accompanying exhibits, including account statements for all six accounts, confirm that all were maintained at WMI and WMI Investment as deposit accounts. (Logan Aff., A-4 at ¶ 10; A-22—34; A-35—41.)  The discussion in text is addressed to the one account as to which JPMC has raised an issue, Account 4234.

account at WMB fsb." (Logan Aff., A-13 at ¶ 13.) The instruction that the funds should be placed in a demand deposit account was clear and unambiguous. (*Id.*) The paperwork that WMI used to carry out this clear and unambiguous instruction demonstrates unequivocally that Account 4234 is a demand deposit account. The transfer from Account 0667 at WMB to Account 4234 at WMB fsb was effected through the use of New Account Request Forms, which can only be used to open deposit accounts, and cannot effectuate capital contributions. (Logan Aff., A-7 at ¶ 18.) Both the initial New Account Request form that was completed on Friday, September 19, 2008, as well as a subsequent New Account Request form completed three days later to correct an initial processing error, expressly classified the new account as an "On-Us" corporate checking account to be assigned a product code of "B3."[7] (A-77—81; A-92—95.) The GL Administration Policy states that "B3's are non-interest bearing DDA [Demand Deposit Account] accounts," and further provides that "On-Us" accounts are "Demand Deposit Accounts." (A-42—45.) Also, the September account statements that JPMC issued shortly after Account 4234 was created attribute that account to WMI and characterize the funds as "customer deposits." (A-22—35.)

The correspondence between the personnel responsible for opening Account 4234 confirms once again that it is a deposit account. In an email on September 19, 2008, for instance, Rosa Cox, WMB's Assistant Vice President, wrote to Tawnya Ryason, WMB's Assistant Vice President, with a "cc" to Ms. Logan, reporting to Ms. Ryason that Ms. Logan needed a "'Due From FSB' account to use this month for a new deposit account." (A-82—84.) After the funds from Account 0667 were initially transferred instead into a new deposit account at WMB as a result of a processing error, WMI personnel addressed the need to complete the transfer into a deposit account at WMB fsb. An

---

[7] Although the New Account Request Form properly indicated that the deposit account was to be opened at WMB fsb, a processing error caused a new account ending in number 4218 to be opened not at WMB fsb, but rather at WMB. (Logan Aff., A-8 at ¶ 20; A-77—81.)

email from Ms. Ryason to Ms. Logan on September 22, 2008 states that the "DDA [Demand Deposit Account] was opened on Co 1 [WMB] and not on Co 40 [WMB fsb]. Was this an oversight?" (A-82—84.) Ms. Noblezada responded "Yes, we are fixing this right now. We will be closing the DDA [Demand Deposit Account] on Co 1 and will open one on Co 40 . . . ." (A-82—84.) On the same day, a revised New Account Request Form and supporting Journal Posting Form were created and the mistake was corrected, retroactively to September 19, 2008, with the creation of a demand deposit account at WMB fsb ending in numbers 4234. (Logan Aff., A-9 at ¶ 22; A-92—95.) Both of those forms classified the new account as "DDA [Demand Deposit Account]."[8] (Id.)

In sum, it is beyond any genuine dispute that the Accounts, including Account 4234, at all times have been demand deposit accounts belonging to WMI and WMI Investment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also In re Tops Appliance City, Inc.*, 372 F.3d 510, 513 (3d Cir. 2004) (summary judgment is appropriate where there is no genuine issue of material fact).

B.    There Is No Factual or Legal Basis for JPMC to Claim That the Deposit Into Account 4234 Was Intended as a Capital Contribution

Any suggestion by JPMC that there can be a genuine dispute as to whether Account 4234 is a deposit account is also foreclosed by JPMC's own post-petition oral and written representations.[9]

---

[8]    WMI not only created Account 4234 as a deposit account, it used Account 4234 as a deposit account. On September 24 and 25, 2008, WMI paid two invoices, totaling more than $6 million, that had been billed directly to WMI using a portion of the $3.674 billion in account 4234. (Logan Aff., A-14 at ¶ 37; A-111—113.)

[9]    JPMC's suggestion that the monies on deposit in Account 4234 constitute a capital contribution is fundamentally flawed because WMI was not a shareholder of WMB fsb as WMB fsb was an indirect, wholly-owned subsidiary of WMB. Hence, because WMI did not directly own equity in WMB fsb, by definition, it could not have contributed capital to WMB fsb. Black's Law Dictionary defines "capital contribution" as "[v]arious means by which a shareholder makes (footnote continued)

1.   JPMC Itself Continues to Characterize Account 4234 As A Deposit Account

Perhaps most telling is the fact that JPMC itself has represented for months following the

P&A Transaction that all of the Accounts, including Account 4234, are deposit accounts.  For

example, the Account Statements that JPMC has issued to WMI and WMI Investment beginning in

September 2008 and continuing to the present, including for Account 4234, have each included the

following heading: "Deposit accounts now held by JPMorgan Chase Bank, N.A." (A-22—34; A-

35—41.) These same Account Statements have also reported that the "Deposits are FDIC Insured."

(*Id.*) Thus, despite its position in this litigation, JPMC has issued numerous Account Statements that

unequivocally (and correctly) classify the Accounts as deposit accounts belonging to the Debtors.[10]

Furthermore, JPMC has repeatedly acknowledged through its own personnel that the

Accounts are in fact deposit accounts owed to the Debtors.  *See* Fed. R. Evid. 801(d)(2)(D)

(providing that statements by party representatives are excluded from the definition of hearsay and

therefore admissible as evidence against the party); *see also Zombeck v. Amada America, Inc.*, No.

06-953, 2009 WL 229775, at *3 (W.D. Pa. Jan. 27, 2009) ("Under the Federal Rules of Evidence, a

trial court must evaluate evidence for admissibility before considering that evidence in deciding a

motion for summary judgment.") (citing Fed. R. Evid. 104(a)).  For example, JPMC personnel

familiar with Account 4234 have advised JPMC that the $3.674 billion transfer between deposit

accounts was not a capital contribution.  (Logan Aff., A-18 at ¶ 44.)  In fact, despite its efforts to

---

additional funds available to the corporation without the receipt of additional stock.") Black's Law
Dictionary 201 (7th ed. 1999) (emphasis added).

[10]   In a letter dated April 1, 2009, JPMC reported that it would continue to issue account
statements while this litigation is pending, "without prejudice and with full reservation of all rights
and remedies." JPMC's recent effort to reserve rights going forward cannot undo the fact that it has
already issued a series of monthly account statements, beginning in September 2008, in which it
represented without reservation that the funds are deposits belonging to WMI and WMI Investment.
(*e.g.*, A-22—34; A-35—41.)

label those funds as something else for purposes of this litigation, JPMC accounts for the $3.674 billion as a deposit in its books and records. (Logan Aff., A-19 at ¶ 45.)

JMPC also characterizes Account 4234 as a deposit account in its dealings with federal regulators. JPMC inquired recently whether WMI planned to move the $3.674 billion out of Account 4234, explaining that, under proposed rules for calculating federal deposit insurance premiums, JPMC's federal deposit insurance premiums would soon increase by about 10 basis points on the $3.674 billion deposit. (Logan Aff., A-19 at ¶ 46.) The fact that JPMC asked whether WMI intended to remove these funds is a clear acknowledgement by JPMC that Account 4234 is in fact a deposit account belonging to WMI. It is also significant that JPMC has been reporting Account 4234 as a deposit liability to the OCC and paying federal deposit insurance premiums on the deposits in that account. JPMC is taking a dubious and self-serving position in this case that is simply at odds with its treatment of the Accounts for all other purposes.

JPMC has acknowledged even in the pending bankruptcy proceedings that the Accounts are deposit accounts belonging to the Debtors. JPMC filed a proof of claim in the Chapter 11 cases concerning federal tax refunds that the IRS wired to one of the Accounts in which JPMC stated that "[o]n September 30, 2008, the IRS wired the [tax refunds] *to WMI.*" (March 30, 2009, Proof of Claim by JPMC, at 17 (emphasis added).) Furthermore, JPMC entered into an account stipulation with the Debtors, on October 14, 2008, in which JPMC agreed that, upon receipt of this Court's approval, it would transfer the Deposits "as the Debtors, in their sole and absolute discretion, may direct." (Calamari Decl., A-209 at ¶ 2.) Although the Account Stipulation was ultimately withdrawn, JPMC cannot escape its acknowledgment that the Accounts are deposit accounts available to the Debtors at their discretion. JPMC nevertheless refuses to turn over $4 billion of the Debtors' money.

2.      It Would Have Been Inconsistent with WMI Policy and Forms to Direct the
        $3.674 Billion Transfer as a Capital Contribution

Despite its repeated acknowledgements that the Accounts are deposit accounts, JPMC hints

in its complaint that the $3.674 billion transfer into Account 4234 at WMB fsb was a capital

contribution, apparently based on a journal entry with a notation referring to a "contribut[ion]

to fsb." This is nothing more than a red herring. The indisputable facts demonstrate that this entry in

no way changes the character of the Debtors' funds or somehow transforms Account 4234 into

something other than a deposit account.

First, the stray journal entry was an obvious clerical error, and, in fact, it would have been

inconsistent with many of WMI's internal corporate policies for a capital contribution to have been

made in such a manner.[11] (Logan Aff., A-16 at ¶ 40.) As set forth on the "WMI and Banking

Affiliates General Standards: Authorized Individuals for Intercompany Transactions" and as

reflected on the "Washington Mutual REQUEST FOR CONTRIBUTION" form (A-96—101), a

capital contribution cannot be made without the approval of the CFO, Treasurer or Corporate

Controller. (Logan Aff., A-11 at ¶ 28.) To make a capital contribution, moreover, a "REQUEST

FOR CONTRIBUTION" form must be completed, and a reasonably detailed explanation of the

nature and purpose of the proposed capital contribution must be included. As reflected in the

"Approvals Required" section of the form, the completed form is to be presented via email to

representatives of each of the following four departments for approval: Legal, Tax, Controllers, and

Treasury. (A-96—101.) Per Washington Mutual policy, all of these steps would have been required

before processing a capital contribution, but they were not. (Logan Aff., A-12 at ¶ 31.) This further

---

[11]    The "contributes" language was apparently left-over on a computer template that had
been used weeks earlier by WMI to make a contribution to WMB. (Logan Aff., A-16 at ¶ 40; A-17
at n.5.)

refutes any possible suggestion that the $3.674 billion deposit was undertaken as a capital contribution. *See* Fed. R. Evid. 803(7) (describing hearsay exception permitting evidence of an "absence of entry in records . . . to prove the nonoccurrence or nonexistence of the matter").

A capital contribution also would have violated the "WMI Liquidity Management Standard," which requires that cash be maintained at a minimum daily balance of $150 million, and that net short term position (liquid assets / short term liabilities) be maintained at 100% or greater. (Logan Aff., A-13 at ¶ 34.) Before the $3.674 billion transfer into Account 4234, WMI's cash position was $3.724 billion. The net short term position was 236% in September, 234% in October, 230% in November and 229% in December (as shown in the cash position work sheets). (A-108—110.) Had the $3.674 billion been a capital contribution and not a transfer into a deposit account, cash would have fallen to about $50 million – well below the $250 million early earning and the minimum of $150 million – and net short term position would have fallen to 17% in September, 15% in October, 12% in November and 10% in December. (Logan Aff., A-14 at ¶ 35.) This would have been well below the minimum of 100%. Thus, it is clear that WMI did not transfer funds into Account 4234 as a capital contribution. WMI did not follow the procedures that would have applied for such a transaction, and such a contribution could not have been made consistent with WMI's internal policies.[12]

---

[12] In its adversary complaint, JPMC repeatedly emphasizes that no funds were actually transferred between the Accounts, and that the transaction was "on paper" only. It is not clear whether JPMC means to suggest that this somehow indicates that WMI did not create a bona fide deposit account, but there would be no basis for any such claim. A bank account "consists of nothing more or less than a promise to pay, from the bank to the depositor," and any suggestion that an account only exists where there are funds physically on hand is simply incorrect. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. at 21. Furthermore, any insinuation that the form of the transfer here was somehow suspect is wrong. In fact, pursuant to a Revolving Master Note (A-122—126), WMB fsb typically lent billions of dollars to WMB each day. Thus, rather than wire the $3.674 billion from WMB to WMB fsb, WMB increased the receivable from WMB by (footnote continued)

## POINT II

## THERE IS NO BASIS FOR JPMC TO SETOFF THE AMOUNTS IN THE DEPOSIT ACCOUNTS AGAINST ANY CLAIMS THAT IT SUPPOSEDLY HOLDS AGAINST PLAINTIFFS

In apparent recognition that it has no sound basis to characterize the Accounts as anything other than deposit accounts owing to the Debtors, JPMC has asserted that it is entitled to withhold the funds, even upon a finding that they are owed to the Debtors, on the basis of setoff. Setoff is addressed in section 553 of the Bankruptcy Code. 11 U.S.C. § 553. That provision does not create rights of setoff, but rather preserves such rights as they might otherwise exist at state law, subject to certain bankruptcy-implemented exceptions.[13] *See Citizens Bank of Maryland*, 516 U.S. at 18. Setoff rights are narrowly construed, however, since it is recognized that "setoff is at odds with a fundamental policy of bankruptcy, equality among creditors, because it permits a creditor to obtain full satisfaction of a claim by extinguishing an equal amount of the creditor's obligation to the debtor[.]" *In re Bevill, Bresler & Schulman Asset Management Corp.*, 896 F.2d 54, 57 (3d Cir. 1990) (internal quotations omitted); *see also In re Garden Ridge Corp.*, 399 B.R. 135, 139 (D. Del. 2008); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 183-84 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News, p. 6144-45 ("setoff in the reorganization context makes reorganization more

---

$3.674 billion. In essence, the funds were transferred and immediately lent back to WMB by WMB fsb. This does not change the fact that WMB fsb was then the obligor for $3.674 billion on deposit. *See FDIC v. Fedders Air Conditioning*, 35 F.3d 18, 22 (1st Cir. 1994) ("The fact that Fedders paid no money to the bank means nothing; Liberty gave the bank a note, readily described as 'the equivalent' of money, to cover a loan by the bank to Liberty, $250,000 of which the bank promised to retain as an escrow deposit for Fedders. Thus, the equivalent of money was 'received' and a deposit account was created.).

[13]   The Debtors are not arguing that there is no right of setoff generally available to banks under relevant state law, but do not waive this argument. Rather, as set forth in text, summary judgment is now appropriate, among other reasons, because JPMC has no claim against which to assert such a right (even assuming that it would otherwise exist), and because a specific exclusion under Section 553 directly applies.

difficult, because it deprives the debtor of the use of its cash on deposit with banks"). Furthermore, the burden is on the depository institution, JPMC in this case, to establish that it has a basis to assert setoff rights. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006).

As set forth below, JPMC cannot assert setoff rights for three separate reasons – i) it has no claim against the Debtors against which to assert such rights (even assuming that it might otherwise possess such rights under state law), ii) any claims that JPMC purports to have against the Debtors were obtained within ninety days prior to the petition date while WMI was insolvent, and setoff is therefore barred under Section 553(a)(2)(B), and iii) there is no mutuality between and among the entities against which, and on behalf of which, JPMC purports to assert claims.

A.    JPMC Holds No Claims Against the Debtors' Estates

Setoff "allows entities that owe each other money to apply their mutual debts against each other . . .'" *Citizens Bank of Maryland*, 516 U.S. at 18 (citations omitted). At the most elementary level, then, a party cannot assert a right of setoff against another party without first demonstrating that it possesses a claim against that other party. *Id.*; *see also In re Garden Ridge*, 338 B.R. at 633 (identifying as a condition of set-off that "[t]he creditor hold[] a 'claim' against the debtor that arose before commencement of the case"); *In re Passafiume*, 242 B.R. 630, 634 (Bankr. W.D. Ky. 1999) ("to assert set-off in bankruptcy, the claim or debt at issue must have been *absolutely owing* – that is, a definite liability must have already accrued – at the time of the commencement of the bankruptcy proceeding"). JPMC cannot make this threshold showing.

The claims as to which JPMC purports to assert a right of setoff are claims that it supposedly acquired from WMB pursuant to the P&A Transaction.[14] The plain language of the P&A Agreement

_____

[14]    JPMC has never purported to have acquired claims from WMB fsb. *Id.* Rather, in its pending adversary proceeding complaint filed in this Court and in its 38 proofs of claim, JPMC has (footnote continued)

makes clear, however, that JPMC did not actually acquire any claims against the Debtors' estate from WMB. Section 3.1 of the P&A Agreement, which concerns the purchase of WMB's assets by JPMC, is expressly made subject to Section 3.5. (P&A Agreement § 3.1.) That provision, in turn, is captioned "Certain Assets Not Purchased" and incorporates Schedule 3.5. (P&A Agreement § 3.5.) Of direct significance here, Schedule 3.5 excludes from any purchased assets, among other things, "any interest, right, action, *claim*, or judgment against . . . *any shareholder or holding company of [WMB]* . . . ." (P&A Agreement, Schedule 3.5 (emphasis added).) Thus, according to the plain terms of the P&A Agreement, JPMC did not acquire any claim against WMI, WMB's former sole shareholder and holding company, and JPMC therefore holds no interest against which to apply any right of setoff as against WMI.

B.    Any Claims That JPMC Seeks to Assert Were Acquired While Debtors Were Insolvent Within 90 Days of the Petition Date

Under section 553, setoff is not available with respect to any claim transferred to a creditor, "by an entity other than the debtor . . . (B)(i) after 90 days before the date of the filing of the petition; and (ii) while the debtor was insolvent." 11 U.S.C. § 553(a)(2)(B). "Without such a restriction, creditors indebted to a debtor would have an incentive to purchase claims at a discount following the bankruptcy filing, or during the ninety days prior, in order to reduce their indebtedness through the exercise of acquired setoff rights." *In re U.S. Aeroteam, Inc.*, 327 B.R. 852, 866 (Bankr. S.D. Ohio 2005) (citing 5 Collier on Bankruptcy, ¶ 553.03[5][a][i] (15th ed. Rev. 2004)). Furthermore, "[f]or

_____

sought to assert a series of claims that it supposedly acquired from WMB pursuant to the P&A Transaction. Ms. Logan confirms in her affidavit, moreover, that WMB fsb never in fact held any claims against WMI or WMI Investment. (Logan Aff., A-3 at ¶ 7.) Thus, the claims that JPMC purports to have are claims that allegedly originate with WMB, but, as discussed in text, JPMC is barred by the P&A Agreement from asserting such claims. Furthermore, as discussed in Section II.C, *infra*, JPMC would be barred in any event by the "mutuality" requirement from withholding funds in the WMB fsb account to setoff those claims that it supposedly acquired from WMB.

the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 553(c).

Applying section 553(a)(2)(B), JPMC would be ineligible to assert setoff rights even if it had acquired claims against WMI in connection with its P&A Transaction with the FDIC. JPMC entered into the P&A Agreement with the FDIC, "an entity other than the debtor," one day before the petition was filed in this case (well within the 90-day window under statute). 11 U.S.C. § 553(a)(2)(B)(i). Also, with one of its primary banking assets, WMB, having already been placed in receivership as of that time, WMI was plainly insolvent. 11 U.S.C. § 553(a)(2)(B)(ii). On WMI's schedule of assets and liabilities filed with this Court, in fact, WMI listed assets of $4.48 billion and liabilities of $7.83 billion. The Debtors are also protected by a statutory presumption of insolvency under Section 553(c), which further supports the Debtors' application for summary judgment. *Cf. In re USN Communications, Inc.*, 280 B.R. 573, 583 (Bankr. D. Del. 2002) (applying Section 547: "Plaintiff is afforded the benefit of the presumption contained in § 547(f) which provides that '[f]or the purposes of [§ 547], the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.' . . . Therefore, unless Defendant introduces some evidence showing that Debtor was solvent at the time the Alleged Transfers took place, Plaintiff's burden has been met and the Alleged Transfers will be avoidable under § 547(b).").

In sum, the requirements of section 553(a)(2)(B) are plainly satisfied – it is beyond dispute that JPMC acquired its supposed claims from a third party within ninety days of the bankruptcy filing while the Debtors were insolvent. JPMC is therefore barred from retaining the Debtors' funds. *See In re Lang Machinery Corp.*, Nos. 86-415, 87-347, 87-346, 1988 WL 110429, at *4 (Bankr. W.D. Pa. Oct. 19, 1988) ("Because the judgment was confessed and assigned within 90 days before the filing of the bankruptcy petition and the presumption of insolvency of the Debtor was not

rebutted, 11 U.S.C. § 553(c), LMCI is prohibited from making a setoff under § 553(a)(2)"); *In re Wood*, 87 B.R. 170, 172 (Bankr. D. Kan. 1988) ("this Court is cognizant of the fact that a bankruptcy court's broad equitable powers do not allow it to override explicit mandates of other sections of the Code. In this case, section 553(a)(2)(B) of the Code explicitly mandates that the Court disallow the claim for setoff. The section, therefore, leaves no room for equitable consideration.").

C.   Setoff Is Unavailable Because There Is a Lack of Mutuality

It is well settled that rights of setoff are available only where debts are "mutual," *i.e.*, when "they are due to and from the same persons in the same capacity." *See, e.g., Westinghouse*, 278 F.3d 138, 149 (2d Cir. 2002); *Garden Ridge*, 338 B.R. at 633 ("To establish its right to setoff under Section 553 of the Bankruptcy Code, the creditor must show mutuality of obligation"). "It is also widely accepted that 'mutuality is strictly construed against the party seeking setoff.'" *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009); *see also Garden Ridge*, 338 B.R. at 634 ("For setoff purposes, the mutuality requirement is strictly construed"). This Court recently explained the mutuality requirements in the context of related corporate entities,

> Because of the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy. Moreover, because each corporation is a separate entity from its sister corporations absent a piercing of the corporate veil, 'a subsidiary's debt may not be set off against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances.' *Sentinel Products Corp.*, 192 B.R. at 46 ( citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n. 2 (2d Cir.1989)). Allowing a creditor to offset a debt it owes to one corporation against funds owed to it by another corporation-*even a wholly-owned subsidiary*- would thus constitute an improper triangular setoff under the Code.

*In re SemCrude, L.P.*, 399 B.R. at 393 (emphasis added) (citations omitted); *see also In re Garden Ridge*, 338 B.R. at 635.

Any effort by JPMC to assert setoff would amount to an improper "triangular setoff" in at least two respects. First, JPMC is withholding approximately $53 million of deposits in Account 4704, to offset its supposed claims against WMI. As set forth on the face of its March 2009 statement, however, Account 4704 is maintained by WMI Investment, an entity separate and distinct from WMI. (A-34—41.) Thus, JPMC is seeking to use deposits belonging to one entity as a setoff for claims supposedly held against a different entity. This is plainly not permitted, and, as JPMC has asserted no claims against WMI Investment, JPMC has no legitimate basis to withhold the $53 million in a WMI Investment Account. *See In re SemCrude, L.P.*, 399 B.R. at 393; *see also In re Garden Ridge*, 338 B.R. at 635 ("It is settled law that a triangular setoff exists even where the parties are related subsidiaries.") (citing authority).

Second, JPMC purports to hold claims against WMI in JPMC's capacity as successor to WMB by operation of the P&A Agreement. Of the $4.3 billion that JPMC proposes to retain as a setoff, however, the lion's share, $3.674 billion, is held in an account that it maintains as successor to WMB fsb, a distinct corporate entity from WMB. As discussed, mutuality requirements are strictly construed, and JPMC therefore cannot offset funds that it holds as successor to one corporate entity in satisfaction of claims that it possesses as successor to another distinct entity. *In re Garden Ridge*, 338 B.R. at 635. It does not affect this analysis, moreover, that JPMC has now apparently absorbed both WMB and WMB fsb within one larger entity. Mutuality must exist at the time the competing debts and claims are incurred, and any subsequent restructuring cannot be employed as a device for avoiding or circumventing the bar against triangular setoff. *See Wade Cook Financial Corp. v. Carey*, 375 B.R. 580, 598 (9th Cir. 2007) (holding that the consolidation of debtors' chapter 11 cases did not mean that a tax debt owed by one debtor could be offset against a tax refund due another); *see also Depositors Trust Co. of Augusta v. Frati Enterprises, Inc.*, 590 F.2d 377, 379 (1st

Cir. 1979) ("It is well established that one subsidiary may not set off a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary. Thus, although Bangor and Augusta are basically the same bank, we cannot treat them as such, in the absence of an agreement by the bankrupt to treat the two banks as one."). As the Court recently observed in *Semcrude*, "[b]y allowing parties to contract around the mutuality requirement of section 553, one creditor or a handful of creditors could unfairly obtain payment from a debtor at the expense of the debtor's other creditors, thereby upsetting the priority scheme of the Code and reducing the amount available for distribution to all creditors." *Semcrude*, 399 B.R. at 399.

## CONCLUSION

For the reasons discussed, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment and direct that JPMC turnover approximately $4 billion in deposits belonging to the Estate, along with appropriate interest.

Dated: May 19, 2009
      Wilmington, Delaware

**ELLIOTT GREENLEAF**

_____
Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Neil R. Lapinski (DE Bar No. 3645)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
E-mail: rxza@elliottgreenleaf.com
E-mail: nrl@elliottgreenleaf.com
E-mail: sak@elliottgreenleaf.com

-and-

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
Peter E. Calamari
Michael B. Carlinsky
Susheel Kirpalani
David Elsberg
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

_Proposed Special Litigation and Conflicts Co-Counsel to Washington Mutual, Inc. and WMI Investment Corp_