# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
|  |  |
|---|---|
| *In re* | : Chapter 11 |
| | : |
| WASHINGTON MUTUAL, INC., et al.[1] | : Case No. 08-12229 (MFW) |
| | : |
| Debtors. | : Jointly Administered |

------------------------------------------------------- x

|  |  |
|---|---|
| WASHINGTON MUTUAL, INC. AND WMI INVESTMENT CORP., | : |
| | : |
| Plaintiffs, | : Adv. Proc. No. 09-50934 |
| | : |
| v. | : |
| | : |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, | : |
| | : |
| Defendant. | : **Re: Docket Nos. 29 & 31** |

------------------------------------------------------- x

## DEBTORS' OPPOSITION TO (I) THE MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") TO INTERVENE, (II) THE MOTION OF THE FDIC TO STAY ADVERSARY PROCEEDINGS, AND (III) THE MOTION OF JPMORGAN CHASE BANK, NATIONAL ASSOCIATION FOR STAY OF DEBTORS' ADVERSARY PROCEEDING

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Neil R. Lapinski (DE Bar No. 3645)
Shelley A. Kinsella (DE Bar No. 4023)
ELLIOTT GREENLEAF
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399

(Additional Counsel Listed on Signature Page)

*Special Litigation and Conflicts Counsel to*
*Washington Mutual, Inc. and WMI Investment Corp*

June 15, 2009

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).

------------------------------------------------------- x
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION
                Plaintiff

      - against -

WASHINGTON MUTUAL, INC. AND WMI
INVESTMENT CORP.,

         Defendants for all claims,

      - and-

FEDERAL DEPOSIT INSURANCE
CORPORATION,

        Additional Defendant for
        Interpleader claim.

Adv. Proc. No. 09-50551

Re: Docket No. 25

# DEBTORS' OPPOSITION TO THE MOTION OF
# THE FDIC TO STAY ADVERSARY PROCEEDINGS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

SUMMARY OF ARGUMENT ..............................................................................................2

BACKGROUND ......................................................................................................................5

    A.    The FDI Act Claims Procedure..............................................................................5

    B.    The Bankruptcy Proceedings .................................................................................6

    C.    Debtors' Deposits Are Essential Estate Assets Administered Before This
           Court .......................................................................................................................7

ARGUMENT ...........................................................................................................................8

II.    THE FDIC DOES NOT HAVE A BASIS TO INTERVENE IN THE
       TURNOVER ACTION..................................................................................................8

    A.    The Turnover Action Does Not Implicate FIRREA ...............................................8

           1.    The Turnover Action Does Not Involve a Claim for Assets of
                 WMB.....................................................................................................9

           2.    The Turnover Action Does Not Relate to the Acts of the FDIC as
                 Receiver ...............................................................................................16

           3.    This Court Should Exercise Its Exclusive Jurisdiction To Evaluate
                 Debtors' Claim to Their Deposits...........................................................21

    B.    The FDIC Also Fails to Meet the Remaining Requirements for
           Intervention as of Right ........................................................................................24

III.    THERE IS NO BASIS TO STAY THE TURNOVER ACTION....................................26

    A.    The Turnover Action Is Not Subject to a Jurisdictional Bar Under
           FIRREA .................................................................................................................27

    B.    The Turnover Action Is Not "On All Fours" With the DC Action and the
           First-Filed Rule Therefore Does Not Apply .........................................................27

IV.    THERE IS NO BASIS TO STAY THE JPMC ADVERSARY PROCEEDING..............30

CONCLUSION......................................................................................................................33

**Cases**

*Acceptance Indem. Ins. Co. v. Southeastern Forge, Inc.*,
    209 F.R.D. 697 (M.D. Ga. 2002) .........................................................................26

*All Season's Kitchen, Inc. v. FDIC*,
    145 B.R. 391 (D. Vt. 1992).................................................................21, 22, 23, 31

*Auction Co. v. FDIC*,
    141 F.3d 1198 (D.C. Cir. 1998) ........................................................................18

*In re Best Prods. Co., Inc.*,
    Nos. 93 Civ. 1115, 93 Civ. 1149,
    1994 WL 141970 (S.D.N.Y. Apr. 20, 1994).....................................................15

*In re Buffington*,
    100 B.R. 448 (N.D. Iowa 1987).........................................................................14

*Carpenter v. FDIC*,
    205 B.R. 600 (9th Cir. 1997) ............................................................................15

*In re Cont'l Airlines*,
    138 B.R. 442 (D. Del. 1992)........................................................................23, 32

*Cont'l Fin. Res., Inc. v. FDIC (In re Cont'l Fin. Res., Inc.)*,
    149 B.R. 260 (Bankr. D. Mass.), *aff'd*, 154 B.R. 385 (D. Mass. 1993)..................15

*EEOC v. Univ. of Pa.*,
    850 F.2d 969 (3d Cir. 1988)........................................................................28, 29

*FDIC v. McFarland*,
    243 F.3d 876 (5th Cir. 2001) ......................................................................13, 31

*First Assured Warranty Corp.*,
    383 B.R. 502 (Bankr. D. Colo. 2007) ................................................................14

*In re Gemini Bay Corp.*,
    145 B.R. 350 (Bankr. M.D. Fla. 1992) ..............................................................22

*Grider v. Keystone Health Plan Cent., Inc.*,
    500 F.3d 322 (3d Cir. 2007)..............................................................................28

*Henrichs v. Valley View Dev.*,
    474 F.3d 609 (9th Cir.), *cert. denied*, 128 S. Ct. 647 (2007). .........................13, 31

*In re Husco, Inc.*,
    268 B.R. 441 (Bankr. W.D. Pa. 2001) ..........................................................27, 28

*Isaacs v. Hobbs Tie & Timber Co.*,
  282 U.S. 734 (1931)....................................................................................8, 14

*John R. Sand & Gravel Co. v. U.S.*,
  59 Fed. Cl. 645 (Fed. Cl. 2004) ...............................................................26

*Langenkamp v. Culp*,
  498 U.S. 42 (1990)......................................................................................15

*Liberty Mut. Ins. v. Treesdale, Inc.*,
  419 F.3d 216 (3d Cir. 2005)...........................................................8, 25, 26

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
  474 U.S. 494 (1986)....................................................................................23

*Mills Invs. Inc. v. Broks Woolen Co., Inc.*,
  797 F. Supp. 49 (D. Me. 1992) ...............................................................13

*Mills Invs. Inc. v. Broks Woolen Co., Inc.*,
  167 B.R. 663 (Bankr. D. Kan. 1994) ........................................................14

*In Re Miraj & Sons, Inc.*,
  192 B.R. 297 (Bankr. D. Mass. 1996) ......................................................24

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*,
  72 F.3d 361 (3d Cir. 1995).........................................................................24

*National Union Fire Insurance Co. v. City Savings F.S.B.*,
  28 F.3d 376 (3d Cir. 1994).........................................................................18

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*,
  101 F.3d 1492 (3d Cir. 1996).............................................................12, 13

*Parker N. Am. Corp. v. RTC (In re Parker N. Am. Corp.)*,
  24 F.3d 1145 (9th Cir. 1994)..............................................................21, 24

*Rare, LLC v. Marciano (In re Rare, LLC)*,
  298 B.R. 762 (Bankr. D. Colo. 2003) .......................................................14

*Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*,
  725 F.2d 871 (2d Cir. 1984)......................................................................26

*Rosa v. R.T.C.*,
  938 F.2d 383 (3d Cir. 1991)..............................................................passim

*In Re Scott*,
  157 B.R. 297 (Bankr. W.D. Tex. 1993),
  *vacated, op. withdrawn to facilitate settlement*,
  162 B.R. 1004 (Bankr. W.D. Tex. 1994) ..................................................22

*Team Bank v. Barfield*,
  145 F.R.D. 69 (N.D. Tex. 1992) ........................................................13, 24

iii

*U.S. v. Schroeder,*
   86 F.3d 114 (8th Cir. 1996) ...............................................................................19

*Village of Oakwood v. State Bank & Trust Co.,*
   39 F.3d 373 (6th Cir. 2008) ........................................................................19, 20

*In re Washington Bancorp.,*
   No. 95-1340, 1996 WL 148533 (D.D.C. Mar. 19, 1996) ......................................24

*In re Williams,*
   244 B.R. 858 (Bankr. S.D. Ga. 2000) .................................................................23

## Rules/Statutes

11 U.S.C. § 542 .........................................................................................................2, 7

11 U.S.C. § 1121(d) .......................................................................................................30

12 U.S.C. § 1441a(l)(1) ..................................................................................................12

12 U.S.C. § 1821(d)) .......................................................................................................5

12 U.S.C. § 1821(d)(5) .............................................................................................13, 16

12 U.S.C. § 1821(d)(5)(A)(i) ............................................................................................6

12 U.S.C. § 1821(d)(6)(A) ................................................................................................6

12 U.S.C. § 1821(d)(6)(A)(i) ...........................................................................................19

12 U.S.C. § 1821(d)(11) ..................................................................................................19

12 U.S.C. § 1821(d)(13)(D)……………………………………………………passim

28 U.S.C. § 1334 ............................................................................................................15

28 U.S.C. § 1334(e)(1) ................................................................................................2, 14

28 U.S.C. § 1367 ............................................................................................................13

## PRELIMINARY STATEMENT[2]

The Federal Deposit Insurance Corporation ("FDIC") has filed two motions seeking to strip this Court of its exclusive jurisdiction to resolve two bankruptcy matters, both of which are essential to the administration of the estates of Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment," and together with WMI, "Debtors"). First, Debtors have asserted a claim pursuant to the turnover provision of the Bankruptcy Code (the "Turnover Action") seeking to recover their property—over $4 billion in demand deposits made in Debtors' names (the "Deposits")—which JPMorgan Chase Bank, National Association ("JPMC") refuses, without justification, to release for the benefit of the estates' creditors. Second, JPMC has brought an adversary proceeding, laying claim to various of Debtors' assets and in which Debtors have asserted counterclaims (the "JPMC Adversary Proceeding" and, together with the Turnover Action, the "Actions"). Even though the determination of the assets of the estates is, by statute, at the core of this Court's original and exclusive jurisdiction, the FDIC has filed a Motion to Intervene in the Turnover Action, and a Motion to Stay in both Actions (collectively, the "Motions"), baldly asserting that the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") strips this Court of its core jurisdiction over property of the estate held, not by the FDIC, but by a third

---

[2]   The FDIC has presented the Court with two briefs – one brief in support of the Motion to Intervene in the Turnover Action [Adversary Proceeding No. 09-50934, Docket No. 28], and one brief that it has included both as an exhibit to its proposed Motion to Stay in the Turnover Action and as a stand-alone filing in support of its Motion to Stay the JPMC Adversary Proceeding [Adversary Proceeding No. 09-50934, Docket No. 29, Exhibit A; Adversary Proceeding No. 09-50551, Docket No. 26]. JPMC has also filed a motion to stay the Turnover Action [Adversary Proceeding No. 09-50934, Docket No. 31]. The FDIC's arguments in support of its Motion to Stay are the same as to both adversary proceedings, and overlap substantially with its arguments in support of its Motion to Intervene and with JPMC's motion. Debtors have therefore prepared this single opposition, which it is filing in both adversary proceedings, responding to both of the FDIC's motions and to JPMC's motion.

party. The Third Circuit has already rejected the FDIC's position, *see Rosa v. R.T.C.*, 938 F.2d 383 (3d Cir. 1991), and there is no basis upon which FIRREA can or should be applied to sweep aside this Court's exclusive jurisdiction. Indeed, notwithstanding the FDIC's arguments to the contrary, it is well-settled that FIRREA only applies to claims against the FDIC for assets in receivership, which, as the FDIC has previously acknowledged, does not describe Debtors' claims before this Court. Thus, FIRREA does not apply to the Turnover Action or the JPMC Adversary Proceeding, and the FDIC's Motions should therefore be denied.

The FDIC's misguided effort to invoke FIRREA as a bar to Debtors' claims threatens to impose tremendous and pointless obstacles upon Debtors as they work to administer the assets of the estates. Debtors initiated their Turnover Action and asserted their counterclaims in the JPMC Adversary Proceeding to recover assets, including $4 billion in deposits, that rightfully belong in the estates. This Court has exclusive jurisdiction over Debtors' claims against JPMC, and it is best situated to decide the pending Actions. If the FDIC successfully stalls these proceedings and puts off Debtors' recovery, the only result will be continued delay and further harm to the estates' creditors.

## SUMMARY OF ARGUMENT

Control over property of a debtor's estate is the most fundamental and important jurisdictional power of the bankruptcy court. By statute, this Court has "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate . . . ." 28 U.S.C. § 1334(e)(1). Furthermore, the Court is expressly authorized under 11 U.S.C. § 542 to decide the Turnover Action, which Debtors filed to recover approximately $4 billion in deposits that are essential to the administration of their estates. JPMC has enjoyed the use of the Deposits for nearly nine months and continues to withhold them without justification. The FDIC, whose interests are not implicated by the Turnover Action, nevertheless seeks to insert itself into

these proceedings, and to stay the Turnover Action, arguing that this Court's exclusive jurisdiction over Debtors' property is somehow revoked by FIRREA. It is not—FIRREA only governs claims against the FDIC for assets in receivership, and it is abundantly clear that Debtors are not asserting such claims here.

Nevertheless, the FDIC states repeatedly that Debtors are asserting claims to the assets of Washington Mutual Bank ("WMB"), and argues that the Turnover Action and the JPMC Adversary Proceeding are therefore governed by FIRREA. The entire premise for the FDIC's position is wrong. The Turnover Action does not involve assets of WMB, and it does not involve a claim against the FDIC or the receivership. Rather, Debtors simply seek to withdraw their funds on deposit at JPMC. Similarly, the JPMC Adversary Proceeding calls on this Court to exercise its jurisdiction to determine the ownership of assets as between Debtors and JPMC. Indeed, none of Debtors' counterclaims in that action are directed to assets that are in receivership and Debtors do not seek relief against the FDIC. Accordingly, neither of the pending Actions implicate the jurisdictional limitations of FIRREA, and both instead fall within the exclusive jurisdiction of this Court.

In addition to mischaracterizing Debtors' claims, the FDIC asks this Court to apply FIRREA in a manner that the Third Circuit has specifically rejected, *see Rosa v. R.T.C.*, 938 F.2d 383 (3d Cir.), *cert. denied*, 502 U.S. 981 (1991), and in a manner that the FDIC has itself rejected in briefing before the Supreme Court, *see FDIC Opp'n to Pet. for Writ of Cert. in Henrichs v. Valley View Dev.*, 474 F.3d 609 (9th Cir.), *cert. denied,* 128 S. Ct. 647 (2007). (*See* B5, Declaration of Peter Calamari ("Calamari Decl."), Ex. A ("*Henrichs* Brief").). The Court of Appeals for the Third Circuit in *Rosa* held that FIRREA's jurisdictional limitations do not apply to claims asserted against a successor bank concerning assets that it acquired from the FDIC. Debtors' Turnover Action is exactly such a

claim—namely, Plaintiffs seek to withdraw their Deposits at JPMC, which assumed liability for Debtors' accounts as successor to WMB and WMB's subsidiary bank, Washington Mutual Bank fsb ("WMB fsb"). Furthermore, the FDIC previously acknowledged that JPMC, not the FDIC, holds Debtors' assets. Indeed, the FDIC disallowed an administrative claim by Debtors concerning their Deposits on the specific basis that such claim does not involve receivership assets and can only be pursued against a "third party." (*See* B24, FDIC Notice of Disallowance of Claim, Calamari Decl., Ex. B ("Notice of Disallowance").). Now that Debtors are pursuing that claim against the appropriate third party, just as the FDIC previously directed, the FDIC has shifted its position and seeks to stay these proceedings. The FDIC seeks to have it both ways, but *Rosa* does not permit such a perverse result.

The FDIC also invokes the "first-filed" rule as a basis to stay both Actions in deference to Debtors' pending action against the FDIC in the District Court for the District of Columbia (the "DC Action"). The first-filed rule, however, applies only where two cases are between the same parties and "on all fours." But Debtors in the Actions before this Court seek different recoveries than in the DC Action and seek relief from different parties. Debtors filed the DC Action, as specifically required by statute, in order to challenge the FDIC's disallowance of claims in connection with the WMB receivership. The Debtors have not asserted claims to recover estate assets in those proceedings—and, indeed, it is within this Court's jurisdiction to grant such relief—but instead seek damages against the FDIC as authorized by statute. Thus, if the Actions here were stayed, the Debtors would be deprived of any forum in which to assert their claims to recover essential estate assets for the ultimate benefit of their creditors.

The FDIC's position is contrary to the bankruptcy and FIRREA statutory schemes, and to Third Circuit precedent, and would do great injustice to Debtors and their creditors if adopted by this

Court. Debtors would be hindered in their legitimate efforts to recover, administer, and ultimately distribute, among other assets, approximately $4 billion in Deposits that are indisputably property of the estates. It is critical to the efficient administration of the estates and prompt plan confirmation that Debtors' claim not be sidetracked, particularly on the basis of an argument by the FDIC that is both inconsistent with its own prior position, and, more importantly, with the law of the Third Circuit. FIRREA simply does not apply to Debtors' claims against a successor bank for assets that are not in receivership, and there is no reason for this Court to abstain from these proceedings. To the contrary, Debtors have advanced traditional bankruptcy causes of action, supported by overwhelming evidence, and it is time for Debtors' claims to be resolved on the merits, instead of being put off indefinitely through a maze of misguided procedural arguments.

## BACKGROUND

### A.     The FDI Act Claims Procedure

On September 25, 2008, WMB was closed and placed into receivership by the FDIC. On the same day, the FDIC sold substantially all of WMB's assets, including the stock of its subsidiary WMB fsb, to JPMC for $1.88 billion, pursuant to the Purchase and Assumption Agreement Whole Bank, dated September 25, 2008 (the "P&A Agreement"). WMB fsb, which was never in receivership, was subsequently merged into JPMC. As required by section 11(d) of the Federal Deposit Insurance Act (12 U.S.C. § 1821(d)), which was enacted in pertinent part by FIRREA, the FDIC set December 30, 2008, as the last day to file claims against WMB or the FDIC in its capacity as receiver. On December 30, 2008, Debtors filed a series of claims against WMB in receivership, seeking damages resulting from any wrongful transfers to JPMC. On January 23, 2009, the FDIC disallowed Debtors' claims in a one-page boilerplate Notice of Disallowance.

Because FIRREA required Debtors to challenge the disallowance of claims within 60 days, Debtors filed a Complaint in the District Court for the District of Columbia, on March 20, 2009,

challenging the FDIC's disallowance of claims.[3] There has been only limited activity in the DC Action. The FDIC filed its Answer and Motion to Dismiss only last week. Also, while both JPMC and a group of WMB Bondholders have sought to intervene in the DC Action, Debtors have opposed both interventions on the same basis—namely, the DC Action is limited to claims against the FDIC, and all other claims involving estate assets held by third parties (including Debtors' Deposits at JPMC) belong in this Court.

## B. The Bankruptcy Proceedings

On September 26, 2008, WMI and WMI Investment each commenced a voluntary case pursuant to chapter 11 of the Bankruptcy Code in this Court. In contrast to the DC Action, there have been extensive proceedings in this Court thus far. On March 30, 2009, JPMC filed over 40 proofs of claim with this Court. JPMC filed its Adversary Proceeding on March 24, 2009, asserting claims to the same assets at issue in its proofs of claim, all of which it allegedly purchased pursuant to the P&A Agreement. On May 22, 2009, Debtors filed an Answer and Counterclaims asserting, among other things, affirmative claims under the Bankruptcy Code's avoidance powers and under state law for the avoidance of potentially more than $10 billion in Debtors' assets fraudulently or preferentially transferred to JPMC prior to the commencement of the Debtors' chapter 11 cases pending before this Court (the "Counterclaims").

Debtors also filed their Turnover Action, on April 27, 2009, asserting an "unquestionable right to their deposits" and demanding the return of those funds pursuant to the turnover provision of

---

[3]    Once a creditor files a claim with the agency, the FDIC has 180 days to either allow or disallow it. 12 U.S.C. § 1821(d)(5)(A)(i). A claimant who is dissatisfied with the agency's determination then has 60 days either to request administrative review or to file suit on the claim. 12 U.S.C. § 1821(d)(6)(A). The claimant is authorized to bring suit either in "the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia." *Id.*

the Bankruptcy Code, 11 U.S.C. § 542. As Debtors detailed in their complaint, JPMC has withheld approximately $4 billion in Debtors' deposits, including approximately $3.67 billion in an account that JPMC administers as successor to WMB fsb, an entity that was never in receivership. JPMC filed its Motion to Dismiss on May 13, 2009, arguing primarily that turnover is unavailable on grounds that there is a genuine dispute as to ownership of the Deposits. On May 19, 2009, Debtors filed their Motion for Summary Judgment, demonstrating with affidavits and exhibits that it is beyond genuine dispute that Debtors own the accounts, and requesting, on that basis, that the Court direct JPMC to remit the deposits to Debtors.[4] Both motions are pending before this Court.

## C.     Debtors' Deposits Are Essential Estate Assets Administered Before This Court

The Deposits are significant, liquid estate assets critical to Debtors' contemplated chapter 11 plan and to prospects for creditors' recoveries. Debtors' latest monthly operating report, filed with this Court for the month of April (the "April MOR"), evidences the relative import of such funds, indicating a cash balance of $4.8 billion, 82% of which being the Deposits that JPMC is wrongfully withholding from Debtors. Debtors have scheduled more than $7.8 billion of creditor claims in their chapter 11 cases, and the Deposits will be a substantial source of recoveries. Further, the Debtors' chapter 11 cases are accruing administrative expenses that must be paid as the various professionals work towards crafting a feasible chapter 11 plan to administer the assets of the estate. The April MOR reported in excess of $10 million in administrative expenses paid in April 2009. Thus, a prolonged stay of these proceedings would cause additional costs to accumulate unnecessarily while also delaying Debtors in their efforts to recover their Deposits for the benefit of estate creditors.

---

[4]     Debtors also filed a Motion for 2004 Examination of JPMC ("Rule 2004 Motion"), on May 1, 2009, in the core bankruptcy proceeding. Oral argument on the Rule 2004 Motion was heard on May 20, 2009, and the Court's decision is pending.

## ARGUMENT

## II. THE FDIC DOES NOT HAVE A BASIS TO INTERVENE IN THE TURNOVER ACTION

As the FDIC recognizes, intervention as of right is available only where a movant satisfies four criteria. Specifically, the FDIC must establish "1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests." *Liberty Mut. Ins. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005). The FDIC's asserted "interest" in the Turnover Action is to ensure uniform application of FIRREA, but, as set forth in Section I.A., *infra*, the Turnover Action does not implicate FIRREA and, thus, no such interest exists. Furthermore, as set forth in Section I.B., *infra*, the FDIC fails to satisfy the remaining requirements for intervention, and its Motion should be denied on that basis as well.

### A. The Turnover Action Does Not Implicate FIRREA

It is of course long settled that "the bankruptcy court has exclusive jurisdiction to deal with the property of the bankruptcy estate." *Isaacs v. Hobbs Tie & Timber Co.*, 282 U.S. 734, 737 (1931). Indeed, section 1334(a) of title 11 confers "original and exclusive jurisdiction for all cases under title 11" on the district court (here, the United States District Court for the District of Delaware (the "District Court")), which, in turn, has referred all bankruptcy matters to this Court. Section 1334(e) also provides the District Court, and, therefore, pursuant to standing order of reference, this Court, with "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." Under these provisions, this Court has exclusive jurisdiction to resolve Debtors' claim to estate assets in this Turnover Action. This conclusion is buttressed, moreover, by consideration of the core bankruptcy jurisdiction of this

Court.  Section 157(b)(1) of Title 28 provides that bankruptcy judges may hear and determine "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . ."  Section 157(b)(2), in turn, defines "core proceedings" with a non-exclusive list that clearly encompasses the Turnover Action in multiple respects: "(A) matters concerning the administration of the estate; (B) allowance or disallowance of claims against the estate . . . (E) order to turn over property of the estate; [and] (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship . . . ."  Indeed, Debtors' Turnover Action is specifically authorized under section 542 of the Bankruptcy Code.

In disregard of this Court's exclusive jurisdiction over this action, the FDIC argues that it is entitled to intervene in and stay these proceedings "because the Debtors' claims against JPMC in [the Turnover Action] implicate the jurisdictional bar set forth in [FIRREA]."  (Mem. in Supp. Mot. to Intervene at 8.)  (Docket No. 28.)  That is wrong.  Section 1821(d) of FIRREA, which the FDIC invokes, sets forth a review process that applies only to claims asserted "against a depository institution for which [the FDIC] is receiver."  12 U.S.C. § 1821(d)(6)(A).  That is not this case.  Debtors are not asserting a claim against WMB for assets in receivership.  Rather, Debtors are asserting a claim against JPMC with respect to Debtors' own estate assets.  Such an action does not implicate the claims procedures of FIRREA, but is instead a classic bankruptcy cause of action pursuant to chapter 5 of the Bankruptcy Code that falls within the exclusive jurisdiction of this Court.

### 1.    The Turnover Action Does Not Involve a Claim for Assets of WMB

The specific FIRREA provision that the FDIC relies upon as a supposed "jurisdictional bar" to this action is Section 1821(d)(13)(D)(i), which, by its express terms, applies only to claims for "the assets of [a] depository institution for which the [FDIC] has been appointed receiver."  The FDIC's effort to wedge the Turnover Action into that language rests on its repeated

mischaracterization that Debtors "unquestionably seek[] 'a determination of rights with respect to the assets' of a failed depository institution, namely, WMB." (Mem. in Supp. Mot. to Intervene at 2.) That is clearly wrong. In fact, the Turnover Action has nothing whatsoever to do with the assets of WMB. First, prior to the receivership of WMB, the great majority of the Deposits were in an account at WMB fsb, a bank that was not seized by the FDIC and whose assets were never part of the receivership estate. Second, any Deposits that were in receivership, no longer are. That is why Debtors are asserting claims against JPMC, and not against the FDIC, seeking to recover estate assets on behalf of WMI and WMI Investment. Indeed, with JPMC having assumed all deposit liabilities under the P&A Agreement, it is clear that Debtors' claim is to recover estate assets held by JPMC. Accordingly, this is not a case involving "the assets of [a] depository institution" in receivership, and Section 1821(d)(13)(D)(i) therefore, according to its plain terms, does not apply.

The fact that the Turnover Action does not involve a claim for the assets of WMB could not be more clear based on Debtors' Complaint, which alleges repeatedly that the deposit liabilities were assumed by JPMC and are "unquestionabl[y]" estate assets belonging to Debtors. (Compl. ¶ 5.) (Docket No. 1.) Likewise, Debtors have presented overwhelming evidence in support of their Motion for Summary Judgment demonstrating that they are in fact owed the Deposits by JPMC and that the Deposits are estate assets. Furthermore, the FDIC itself acknowledges that JPMC assumed "all deposit . . . liabilities of WMB" under the P&A Agreement—a concession that renders its argument nonsensical.[5] (Mem. in Supp. Mot. to Intervene at 2). Indeed, the entire premise for the FDIC's proposed intervention—that Debtors are asserting claims to "WMB assets" and that the

---

[5] It simply makes no sense for the FDIC to stake its position on the notion that FIRREA prevents this Court from asserting jurisdiction over assets "in with the [FDIC] . . . claims an ownership interest." (Mem. in Supp. Mot. to Intervene at 9.) The FDIC specifically disavows any ownership interest in the Deposits, and its own description of the pertinent legal standard therefore dictates a result in Debtors' favor.

Turnover Action is therefore barred by FIRREA—is simply wrong. *See Rosa*, 938 F.2d at 394 (refusing to apply FIRREA's jurisdictional bar to claims for monetary relief against successor institution that acquired certain of the failed bank's assets and liabilities because the claims "seek neither payment from nor a determination of rights with respect to the assets of a depository institution for which RTC [or FDIC] has been appointed receiver").

In *Rosa*, the Third Circuit held that section 1821(d)(13)(D) does not bar an action against a successor bank concerning assets that it obtained out of receivership pursuant to a P&A Agreement. Specifically, the Court of Appeals for the Third Circuit in *Rosa* was faced with determining whether the district court had subject matter jurisdiction over claims of plaintiffs who were participants in, and beneficiaries of, pension plans of a failed bank, City Federal Savings Bank ("City Federal") that was placed into receivership with the Resolution Trust Corporation (the "RTC"). *Rosa*, 938 F.2d at 388. After the OTS placed City Federal into receivership, certain of its assets and liabilities were transferred to City Savings Bank, F.S.B. ("City Savings Bank") pursuant to a purchase and assumption agreement between the RTC as receiver for City Federal and City Savings Bank. *Id.* Subsequently, City Savings Bank too was closed, with the RTC being appointed receiver, and certain of its assets and liabilities were transferred to a new bank, City Savings, F.S.B. ("City Savings") pursuant to a second purchase and assumption agreement between the RTC as receiver for City Savings Bank and City Savings. *Id.* at 390. Significantly, the court found that the claims seeking plan contributions (both in arrears and going forward) were subject to FIRREA's jurisdictional bar as asserted against City Federal and City Savings Bank, because those entities were "depository institutions for which the RTC had been appointed receiver," but not as to City Savings, because City Savings, like JPMC here, was not a depository institution for which the RTC had been appointed receiver. *Id.* at 394.

The Third Circuit applied similar reasoning in its subsequent decision in *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492 (3d Cir. 1996). In *New Rock*, the RTC was appointed receiver for Far West Savings and Loan Association, which held a 95% interest in a series of loans secured by mortgages held by Preferred Entity. After the RTC was appointed receiver, Preferred Entity defaulted on its obligations, and the RTC brought a foreclosure action in federal court in New Jersey. The federal court had jurisdiction pursuant to 12 U.S.C. § 1441a(l)(1), which provides that any action to "which the [RTC] is a party shall be deemed to arise under the laws of the United States." While the foreclosure action was pending, the RTC sold "all of the RTC's right, title, and interest in the loans and mortgages" to New Rock Asset Partners, which then obtained an order substituting itself as plaintiff in the action against Preferred Entity. Preferred Entity then moved for dismissal, arguing that there was no longer a basis for federal jurisdiction, and the district court denied the motion. On appeal, the Third Circuit held that jurisdiction was no longer proper under FIRREA, reasoning that, once the RTC transferred its interests to a private entity, the "role of federal jurisdiction in assisting the RTC in its management role and in disposing of thrift assets . . . end[s] . . . . Once the RTC has successfully managed a thrift and either restored it to solvency or transferred its assets to willing buyers, the agency's role—and hence the logic of jurisdiction—no longer applies."[6] *Id.* at 1500. The same is true here—the FDIC transferred all

---

[6]     As the Third Circuit further explained,

> FIRREA was enacted to deal with a banking crises and to smooth the modalities by which rehabilitation might be accomplished. It is clear to the Court that this policy is not advanced in any significant way by retaining federal jurisdiction once the failed bank's assets have been assigned to a private company. The expanded federal jurisdiction and other procedural protections of FIRREA may tremendously increase the FDIC's ability to carry out its regulatory and enforcement responsibilities under FIRREA. While the procedural protections also allow the FDIC to effectively and aggressively protect a failed bank's interests and assets, it can no longer do so when it is no longer a party to the case and when those assets have successfully been

(footnote continued)

rights, title and interest in the Deposits to JPMC pursuant to the P&A Agreement, and any interest that the FDIC may have held in those accounts no longer applies.

As in *Rosa* and *New Rock*, the fact that Debtors' claims are asserted against a successor bank, and are not claims against a failed bank in receivership, places the Turnover Action entirely outside the jurisdictional provisions of FIRREA. *See also Henrichs v. Valley View Dev.,* 474 F.3d 609, 614 (9th Cir.), *cert. denied,* 128 S. Ct. 647 (2007) (holding that FIRREA does not prevent a state court adjudication of rights to distributed assets of a receivership bank, reasoning that "the statute does not reach assignees of assets once owned by the FDIC"); *FDIC v. McFarland,* 243 F.3d 876, 887 n.42 (5th Cir. 2001) ("The claim procedures articulated in 12 U.S.C. § 1821(d)(5)-(11) are predicated on the FDIC's possession of the property in question. When the FDIC relinquishes ownership, the procedures governing its role as a receiver no longer apply to the property."); *Team Bank v. Barfield,* 145 F.R.D. 69, 72 (N.D. Tex. 1992) (holding that FDIC had no basis to intervene in and remove state court action brought by guarantors of notes against successor bank: "FDIC has no substantial interest in this action."). In fact, that was the FDIC's position before the Supreme Court in its brief in opposition to the Petition for a Writ of Certiorari in *Henrichs.* Contrary to its current view, the FDIC was unequivocal in *Henrichs* that the jurisdictional provisions of FIRREA "do not apply to suits . . . that are brought, not against the FDIC, but against an assignee of an asset formerly held by the FDIC." (*Henrichs* Brief at 6.) The FDIC was correct, and, consistent with its

---

assigned to another. In essence, one of the goals of the statute has been achieved on a micro level once the assets have been assigned.

*Id.* at 1502 (quoting *Mill Invs. Inc. v. Brooks Woolen Co., Inc.,* 797 F. Supp. 49, 53-54 (D. Me. 1992)) (internal quotations omitted). After concluding that FIRREA provided no basis for continued jurisdiction, the Court found that the district court had the discretion to retain supplemental jurisdiction under 28 U.S.C. § 1367, because "considerable judicial resources" had already been invested in the case. *Id.* at 1504.

former position, section 1821(d)(13)(D) does not bar Debtors' suit against JPMC for deposit liabilities that it acquired from the FDIC.

While FIRREA provides the framework for asserting claims to the assets "of a [failed] depository institution," it is the Bankruptcy Code that governs the issue in this Turnover Action—namely, the determination and disposition of estate assets. *See* 28 U.S.C. § 1334(e)(1) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate . . . ."). It is of course well settled that "the bankruptcy court has exclusive jurisdiction to deal with the property of the bankrupt estate." *See Isaacs*, 282 U.S. at 737; *Rare, LLC v. Marciano (In re Rare, LLC)*, 298 B.R. 762, 764 (Bankr. D. Colo. 2003) ("[I]t lies within the exclusive province of the bankruptcy courts to determine what interests are part of the estate."); *see also In re First Assured Warranty Corp.*, 383 B.R. 502, 541 (Bankr. D. Colo. 2007) ("Generally, a dispute over whether an asset is property of a debtor's estate should and must be resolved in favor of this [c]ourt's jurisdiction."). Furthermore, this Turnover Action is specifically governed by the Bankruptcy Code, which requires that JPMC "shall pay" Debtors' deposits, 11 U.S.C. § 542. *See In re Mills*, 167 B.R. 663, 664 (Bankr. D. Kan. 1994) ("When the debtor filed his bankruptcy petition, his credit union deposit account became property of the estate pursuant to § 541(a), and the credit union became obliged to turn the account balance over to the trustee pursuant to § 542."); *see also In re Buffington*, 100 B.R. 448, 450 (N.D. Iowa 1987) ("This account must be treated like any other deposit account the Debtor may have had at a bank . . . . As property of the estate, these funds shall be turned over to the Trustee.").

There is no reason that the claims procedure under FIRREA, which applies only to claims against the FDIC for assets in receivership, should usurp the exclusive jurisdiction of this Court to

identify and distribute estate assets belonging to Debtors and being held by JPMC. In fact, the FDIC itself previously acknowledged, at least implicitly, that the Turnover Action can and should go forward. In its disallowance of claims letter, the FDIC based its decision in part on the fact that Debtors "fail to state claims against the receivership, [and] they appear to assert claims against a third party . . . ." (*See* Notice of Disallowance.)[7] Thus, Debtors' decision to pursue their Deposits in this Court against JPMC, *i.e.*, the "third party" actually refusing to pay the estate on account of such Deposits, is fully consistent with the FDIC's initial assessment that such claims did not exist as between Debtors and the FDIC as receiver and therefore are not governed by FIRREA. The FDIC's shift in position, if credited by this Court, would leave Debtors in a classic lose-lose situation— Debtors would be barred from pursuing this Turnover Action on grounds that their claim can only be pursued in the DC Action, and they would be unable to recover their Deposits in the DC Action since such relief, per the FDIC, is only available against "a third party." This sort of procedural run-around serves no useful purpose, and greatly prejudices Debtors and their creditors who should not

---

[7]       The FDIC has also entered a proof of claim in Debtors' chapter 11 cases, thereby submitting to the exclusive jurisdiction of this Court and waiving its right to invoke the jurisdictional bar of FIRREA. *See Carpenter v. FDIC*, 205 B.R. 600, 605 n.12 (9th Cir. 1997) (observing that because section 106(b) now specifies that sovereign immunity is waived where the governmental unit has filed a proof of claim, the statute "should supersede FIRREA's administrative claims process"); *see also Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) ("[B]y filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power.") (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58 (1989)); *In re Best Prods. Co., Inc.*, Nos. 93 Civ. 1115, 93 Civ. 1149, 1994 WL 141970, at *5 (S.D.N.Y. Apr. 20, 1994) ("Allowing the RTC to use § 1821(d)(13)(D) to force the withdrawal of the reference to the district court after the RTC had filed a proof of claim would be antithetical to the purpose of 28 U.S.C. § 1334 and would dramatically impair the bankruptcy court's ability to administer the debtors' estates."); *Cont'l Fin. Res., Inc. v. FDIC* (*In re Cont'l Fin. Res., Inc.*), 149 B.R. 260 (Bankr. D. Mass.), *aff'd*, 154 B.R. 385 (D. Mass. 1993) (FDIC, by filing proof of claim, had actively sought to participate in the distribution of the debtor's estate, thus the bankruptcy court could not be stripped of jurisdiction in a preference action which was the equivalent of a counterclaim to the original proof of claim filed by the FDIC).

be deprived further of prompt and meaningful recourse to recover $4 billion in Deposits that represent indisputable estate assets.

### 2. The Turnover Action Does Not Relate to the Acts of the FDIC as Receiver

The FDIC tries to salvage its position by invoking Section 1821(d)(13)(D)(ii). That provision states: "Except as otherwise provided in this subsection, no court shall have jurisdiction over . . . (ii) any claim relating to any act or omission of [a failed depository] institution or the Corporation as receiver." In *Rosa*, however, the Court of Appeals determined that this provision does not "encompass[] claims that are not susceptible of resolution through the claims procedure" set forth in FIRREA. *Rosa*, 938 F.2d at 394. In turn, that claims procedure only applies to claims "against a depository institution for which [the FDIC] is receiver." *See* 12 U.S.C. § 1821(d)(6)(A); *see also* 12 U.S.C. § 1821(d)(5)(A)(i) ("Before the end of the 180-day period beginning on the date *any claim against a depository institution* is filed with the Corporation as receiver, the Corporation shall determine whether to allow or disallow the claim and shall notify the claimant of any determination with respect to such claim.") (emphasis added). As discussed, Debtors' claim is not against WMB (*i.e.*, "a depository institution for which the Corporation is receiver"), but is instead asserted against a successor bank, JPMC. Thus, Debtors' Turnover Action is not "susceptible of resolution" under FIRREA (as the FDIC itself previously recognized in its denial of claims letter), and this action therefore is not subject to the jurisdictional limitation of section 1821(d)(13)(D)(ii).

While the FDIC now inexplicably rejects this conclusion, it took the identical position as Debtors take here in its Opposition to writ of certiorari in *Henrichs v. Valley View Dev.* As the FDIC convincingly explained:

> Section 1821(d)(13)(D) does not apply to claims that are not susceptible of resolution through the administrative process, *such as claims against a private party who holds an asset that was once held by an FDIC receivership* . . . . In that circumstance, there is no administrative claims procedure to

> exhaust, because that procedure governs only claims against the FDIC receivership.

(*Henrichs* Brief at 8 (emphasis added).) The FDIC had it right before. Its new position, whereby FIRREA would somehow serve as a bar to Debtors' claim against a successor bank for assets not in receivership, is directly at odds with the Third Circuit's holding in *Rosa*, and must be rejected. *See Rosa*, 938 F.2d at 394 (holding that claims asserted against successor depository institutions who themselves were not in receivership "do not relate to acts or omissions of [RTC or FDIC] 'as receiver,'" and are not barred under Section 1821(d)(13)(D), even where assets and liabilities were transferred to the successor institution pursuant to a purchase and assumption agreement to which the RTC was party as receiver of the failed bank).

A number of courts have recognized that it would raise "troubling" issues to apply section 1821(d)(13)(D), as the FDIC now proposes to do, as a complete bar to a claim that a party would not have been able to pursue in the first instance under Section 1821(d)(6):

> Section 1821(d)(13)(D) states in relevant part: 'Except as otherwise provided in this subsection, no court shall have jurisdiction over . . . (ii) any claim relating to any act or omission of [a failed depository institution] or the [FDIC] as receiver.' The only subsection [of section 1821(d)] that 'otherwise provides' jurisdiction is 12 U.S.C. § 1821(d)(6), which provides for administrative determination of 'any claim against a depository institution for which the Corporation is receiver' and thereafter for adjudication in district court. These two subsections would seem to set up a standard exhaustion requirement: (d)(6)(A) routes claims through an administrative review process, and (d)(13)(D) withholds judicial review unless and until claims are so routed. Their wording, however, creates a difficult interpretative problem: the jurisdiction precluding language of (d)(13)(D) can accommodate quite a broad reading – broad enough to cover contracts between private parties and the FDIC as Receiver for a failed depository institution. But (d)(6)(A) is quite narrow – it allows judicial review, after administrative determination, of 'any claim against a depository institution for which the Corporation is receiver.' Thus, for claims that are not "against a depository institution" but that do fall within (d)(13)(D), the effect of the two sections, on a plain language approach, would be not to impose an administrative exhaustion requirement but to foreclose judicial jurisdiction altogether, a result troubling from a constitutional perspective and certainly not the goal of FIRREA.

*Auction Co. v. FDIC*, 141 F.3d 1198, 1200 (D.C. Cir. 1998).[8] Thus, if Section 1821(d)(13)(D)(ii) were applied as a bar to Debtors' claim in this Turnover Action, then Debtors would potentially be left with no recourse to recover approximately $4 billion in deposits, a result that would raise constitutional concerns and that plainly was not intended by Congress in passing FIRREA.

The reason that Debtors—and the millions of other customers with funds on deposit at WMB—could not have asserted a claim to recover their Deposits through the administrative review process under Section 1821(d)(6) is straightforward: JPMC assumed the liabilities in connection with the Debtors' Deposits pursuant to the P&A Agreement and, as such, the FDIC is powerless to direct JPMC to turn over those Deposits to Debtors. Furthermore, the FDIC is wrong to suggest that Debtors presented the FDIC with a proof of claim seeking such relief. In fact, the only claim that Debtors asserted against the FDIC relating to the Deposits was purely prophylactic. Specifically, Debtors acknowledged that WMI "now is a depositor of [JPMC]" and, in furtherance of their fiduciary duties, asserted a "protective claim for the outstanding balance on each of the [Deposits]." (WMI Proof of Claim at ¶ 45.) Moreover, Debtors asserted a claim against WMB (and by extension, against the FDIC) for damages, including interest, to the extent that Debtors "were denied access to,

---

[8]     The FDIC cites to *National Union Fire Insurance Co. v. City Savings F.S.B.*, 28 F.3d 376 (3d Cir. 1994), for the proposition that the FDIC should be allowed to "focus on preserving the failed bank's assets, without the distraction and substantial cost of defending itself" against costly litigation. 28 F.3d at 388. There, the Third Circuit held that plaintiff insurance providers who sought to bring a declaratory judgment action against a depository institution in receivership were subject to FIRREA's jurisdictional bar, notwithstanding that the plaintiffs were not creditors holding claims subject to FIRREA's administrative claims procedure. *Id.* at 386. Significantly, the insurance policies at issue in *National Union* were assets of City Savings (which was by that point in time a depository institution in receivership) and the declaratory actions were brought against the RTC – and not a third party, such as JPMC. *Id.* at 384-88. Thus, *National Union* is consistent with *Rosa's* finding that claims of any nature against entities that are not failed depository institutions, for assets that are not in receivership (such as the Debtors' claims here), are beyond the scope of FIRREA's jurisdictional bar.

control, and use of the [Deposits]." (*Id.* at ¶ 46.) In other words, Debtors' claims against the FDIC

in the DC Action are not to recover the Deposits, but are limited to damages resulting from JPMC's

failure to turn over those funds. Furthermore, there can be no assurance that Debtors will be able to

secure a full recovery for any losses on their Deposits through the FIRREA claims process because

Debtors' protective claim against WMB would be paid from the funds realized from receivership.

*See* 12 U.S.C. § 1821(d)(11) ("amounts realized from the liquidation or other resolution of any

insured depository institution by any receiver appointed for such institution shall be distributed to

pay claims . . . .").[9] The only entity that can actually turn over Debtors' Deposits is JPMC, and this

Court has the authority to direct JPMC to do so. Debtors' claim in this Turnover Action is plainly

distinct from its claim in the DC Action and is not governed by FIRREA—it is governed by the

turnover provisions of the Bankruptcy Code, and Debtors are entitled to proceed with their cause of

action.

The FDIC relies heavily on the Sixth Circuit decision *Village of Oakwood v. State Bank &*

*Trust Co.*, 39 F.3d 373 (6th Cir. 2008). In *Oakwood*, the claimants conceded that they "failed to

comply with the administrative-claims process" under FIRREA. *Id.* at 386. Unlike here, the

*Oakwood* plaintiffs, uninsured depositors of the failed bank (not a chapter 11 debtor), held deposits

that were not transferred by the purchase and assumption agreement between the FDIC and the

---

[9]     Any potential claims that Debtors may bring against the FDIC in its corporate capacity are
not subject to the jurisdictional requirements of FIRREA. *See* 12 U.S.C. § 1821(d)(6)(A)(i)
("with respect to any claim against a depository institution for which the *Corporation is*
*receiver*") (emphasis added); 12 U.S.C. § 1821(d)(13)(D)(ii) ("any claim relating to any act
or omission of such institution or the *Corporation as receiver*") (emphasis added); *see also*
*Rosa*, 938 F.2d at 393 ("We agree . . . that the language of the bar [provided in §
1821(d)(13)(D)] cannot be construed to reach claims asserted against RTC in its corporate
capacity"); *U.S. v. Schroeder*, 86 F.3d 114, 117 (8th Cir. 1996) ("Under the 'separate
capacities' doctrine, it is well established that the [FDIC], when acting in one capacity, is not
liable for claims against the [FDIC] acting in one of its other capacities.").

successor bank. *Id.* at 375-76. Thus, although the plaintiffs ostensibly brought suit against the successor bank, they had no viable claim for their deposits against that successor institution and were in reality pursuing relief available only through the receivership. The court therefore applied FIRREA's jurisdictional bar and rejected plaintiffs' argument that their claims were not "claims against a depository institution for which the [FDIC] was receiver." *Id.* at 386. By contrast, Debtors in this action are not seeking payment of deposit liabilities that remain in receivership. Rather, Debtors are seeking payment of their actual Deposits directly from JPMC, the institution that assumed and now administers their Deposits and is fully responsible for those liabilities. Furthermore, the great majority of Debtors' Deposits were never in receivership—indeed, JPMC holds $3.67 billion of Debtors' funds in an account it acquired as successor to WMB fsb, not WMB. Thus, Debtors' claims are not against a depository institution in receivership, and, for the most part, those claims do not even involve funds that were ever in receivership. The Turnover Action is against JPMC for assets under its control and liabilities assumed pursuant to the P&A Agreement, and the jurisdictional bar under FIRREA, as in *Rosa*, simply does not apply.

The FDIC's effort to apply the FIRREA jurisdictional limitations to claims as to deposit liabilities held by a successor bank would also lead to absurd results, and would undermine, rather than promote, the FDIC's stated goal of efficiency and the goals inherent in the FDIC's sale of a failed bank to a successor bank. If a party's claims to its own deposits that were assumed by a successor bank were subject to the administrative process set forth in FIRREA, as the FDIC apparently maintains, it would be necessary for every bank depositor, upon seizure and receivership, to file formal proofs of claim with the FDIC to protect themselves from arbitrary denial of access to their deposits by the successor bank. This could literally entail millions of unnecessary proofs of claim. And, if an individual were to fail to file such a claim, that individual would have no recourse

at all in the event that the successor bank, seeking a windfall, ultimately refused to remit his or her deposits, despite the clear legal obligation to do so. That cannot be the intended application of FIRREA, and, more importantly, it is not the application envisioned by the Third Circuit in *Rosa*. *See* 938 F.2d at 394 (refusing to apply FIRREA's jurisdictional bar to claims against successor institution that acquired the failed bank's assets because the claims "seek neither payment from nor a determination of rights with respect to the assets of a depository institution for which RTC has been appointed receiver").[10]

### 3. This Court Should Exercise Its Exclusive Jurisdiction To Evaluate Debtors' Claim to Their Deposits

As discussed, *supra*, this is not a case in which the FDIC has any basis to argue that the funds at issue are currently in receivership. Indeed, the FDIC itself concedes that JPMC assumed all deposit liabilities pursuant to the P&A Agreement. (FDIC Mot. at 2.) Thus, under *Rosa*, Debtors' Turnover Action against JPMC must proceed. Furthermore, even if there were a basis for the FDIC to assert a claim to the Deposits—and, by its own concession, there is no such basis—it would still be necessary and appropriate for this Court to exercise its exclusive jurisdiction to decide in the first instance whether, as Debtors have maintained, the funds qualify as estate assets. *See All Season's Kitchen, Inc. v. FDIC*, 145 B.R. 391 (D. Vt. 1992); *see also Parker N. Am. Corp. v. RTC (In re Parker N. Am. Corp.)*, 24 F.3d 1145, 1154 (9th Cir. 1994) (upholding jurisdiction of bankruptcy court to adjudicate preference action against entities in receivership, and rejecting argument by the

---

[10] JPMC joins in the FDIC's Motion to Intervene and Stay this action pending resolution of the DC Action. If the FDIC's arguments are correct, however, JPMC may have no standing to pursue its claims in any jurisdiction. Indeed, JPMC purports to assert claims in its Adversary Proceeding to the Deposits, and to dozens of other assets at issue in the DC Action. But if these claims are governed by FIRREA, to the extent JPMC failed to adhere to the administrative process detailed in Section 1821(d)(6) by failing to file proofs of claim with the FDIC within 180 days of the receivership, its claims would be barred under Section 1821(d)(13).

RTC that FIRREA required that all such claims be pursued exclusively through FIRREA claims process: "[i]f the preference action [were] meritorious, the RTC [would have] no asset and FIRREA [would] not apply"); *In re Gemini Bay Corp.*, 145 B.R. 350, 352 (Bankr. M.D. Fla. 1992) ("Because the issue does not concern a claim against the assets of a failed depository, FIRREA does not affect the resolution of Register's objection and this Court has subject matter jurisdiction to determine the claim."); *In re Scott*, 157 B.R. 297, 313 (Bankr. W.D. Tex. 1993) ("Any federal court has jurisdiction to make certain threshold factual findings to determine if it has jurisdiction over a given controversy."), *vacated, op. withdrawn to facilitate settlement*, 162 B.R. 1004 (Bankr. W.D. Tex. 1994).

In *All Season's Kitchen*, the FDIC moved to dismiss a chapter 11 debtor's complaint challenging the validity of a lien held by the FDIC against the debtor's assets. The FDIC argued that the claims exhaustion requirements of FIRREA divested the bankruptcy court of subject matter jurisdiction to hear debtor's claim. *All Seasons Kitchen*, 145 B.R. at 392. The court, however, found that if it were to follow the FDIC's reasoning, the debtor would have no meaningful avenue to challenge the FDIC's lien. *Id.* at 394. Such a conclusion, the court found, could lead to "a Bankruptcy gridlock of mammoth proportions," since the lien—and, presumably, all assets as to which the FDIC might assert an interest—would effectively be placed beyond the court's jurisdiction. *Id.* The court held against the FDIC, emphasizing that the "the Bankruptcy Court has jurisdiction to determine its jurisdiction." *Id.* at 396 (quoting *In re Purcell*, 141 B.R. 480, 486 (Bankr. D. Vt. 1992)). The court explained,

> The phrase of section 1821(d)(13)(D) in question divests us of jurisdiction over 'any action seeking a determination of rights with respect to . . . the assets of any depository institution for which the [FDIC] has been appointed receiver.' Thus, we must first determine whether an asset of the FDIC is in fact at issue before we can determine whether we have jurisdiction . . . . Debtor's claim is

precisely that FDIC has no asset . . . . If Debtor is correct, then we
have jurisdiction to determine that Debtor is correct.

*Id.* at 397 (quoting *Purcell*, 141 B.R. at 486).

Likewise, the Court here should not simply defer to the FDIC's assessment as to the nature of

the Deposits or the appropriate forum for the disposition of those Deposits. Rather, the Court has

before it a claim by Debtors that those Deposits are estate assets, and it is critical that the Court

exercise its exclusive jurisdiction to make that determination. Indeed, to grant the FDIC's Motion to

Intervene, and its related Motion to Stay, would lead to a "Bankruptcy gridlock of mammoth

proportions." The district court in the DC Action is not equipped to assess Debtors' claim to estate

assets—indeed, it has no jurisdiction to do so. Thus, if this matter is stayed in favor of the DC

Action, the status of the Deposits would remain in an uncertain and indefinite limbo, and there

would be no realistic prospect for the expeditious administration of Debtors' estates. *Id.*; *see also*

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 508 (1986) (observing that the

"overriding purpose of bankruptcy liquidations" is "the expeditious reduction of the debtor's

property to money, for equitable distribution to creditors"); *In re Cont'l Airlines*, 138 B.R. 442, 447

(D. Del. 1992) ("Both the determination of the bankruptcy estate's property and the validity,

application and enforceability of the Settlement Agreement are within the expertise of the

Bankruptcy Court. It would therefore be prudent to use the expertise of the Bankruptcy Court in

resolving these issues."); *see also In re Williams*, 244 B.R. 858, 866 (Bankr. S.D. Ga. 2000) ("The

function of 1334(e) is clear—to insure that only one court administers the bankruptcy estate of a

debtor. Otherwise, the orderly distribution of the assets of the debtor to holders of claims against the

estate – one of the main functions of bankruptcy—could not be accomplished.").[11]

---

[11]     Even if this Court should find that the claims asserted in either adversary proceeding involve
        or otherwise relate to the FDIC, which they do not, FIRREA's administrative claims
(footnote continued)

**B.    The FDIC Also Fails to Meet the Remaining Requirements for Intervention as of Right**

The FDIC also fails to meet the remaining requirements for intervention as of right. With respect to the timeliness requirement, the Third Circuit looks to three factors, "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 370 (3d Cir. 1995). The Turnover Action, although filed recently, has progressed to an advanced stage. The parties have appeared before the Court; JPMC's Motion to Dismiss has been fully briefed; and Debtors have submitted a Motion for Summary Judgment supported by dozens of evidentiary exhibits establishing beyond any genuine dispute that the Deposits belong to Debtors. By contrast, the DC Action has not advanced beyond the Debtors' Complaint, the FDIC's answer and responsive motion filed only last week, and two pending intervention motions.[12]

Furthermore, Debtors will be severely prejudiced if the FDIC is permitted to intervene in this Turnover Action in order to stay the proceedings. *See Team Bank*, 145 F.R.D. at 72 (rejecting FDIC's motion to intervene, reasoning that its "presence as a party" to an action against a successor bank "accomplishes nothing other than to cause delay, to consume judicial time, to interfere with the adjudication of the rights of the other parties to the action, and to generate, unnecessarily, significant

---

procedure does not apply where a debtor in bankruptcy asserts claims against the FDIC. *See In re Parker North American Corp.*, 24 F.3d 1145, 1152 (9th Cir. 1994); *see also In re Miraj & Sons, Inc.*, 192 B.R. 297, 310 (Bankr. D. Mass. 1996); *In re Washington Bancorp.*, No. 95-1340, 1996 WL 148533, *6-7 (D.D.C. Mar. 19, 1996) ("There is 'not a scintilla of a suggestion that Congress intended that debtors . . . should have to go through the FIRREA claims determination process . . . nor of any intent to deprive the Bankruptcy Court of jurisdiction to determine issues arising from FDIC's claims against those debts.'") (quoting *All Season's*, 145 B.R. at 397).

[12]    It is troubling that the FDIC's motion in the DC Action, almost as if to highlight that the combined effect of its various positions would be to deprive Debtors of any meaningful avenue of relief, seeks to dismiss several of Debtors' claims on jurisdictional grounds.

legal expense, FDIC's part of which would be borne ultimately by the tax-paying public."). As discussed, the DC Action involves a claim for damages against the FDIC, and there is no claim for the Court to direct JPMC to restore Debtors' Deposits. A stay in this action would therefore delay Debtors indefinitely in recovering assets that are essential to the administration of the estates. Indeed, Debtors have already been prejudiced due to the FDIC's failure to file their Motions until now. The FDIC has been aware of both the DC Action and the Turnover Action since each was commenced, and, in fact, has participated in the bankruptcy proceedings by filing its own proof of claims. By contrast, rather than moving forward in the DC Action, the FDIC put off its answer date and stood by as the parties expended significant time and resources in extensive motion practice in this Court. As a result, the Court now has before it an evidentiary submission from Debtors that demonstrates that the Deposits are properly subject to turnover, and this case is ready for resolution.

The FDIC also cannot establish that its interests are at risk of being impaired as a result of the Turnover Action. Debtors have already demonstrated that the FDIC's supposed interest in ensuring uniform application of FIRREA is not actually implicated. Because the FDIC's asserted interest is not implicated, there is no risk that this interest will be impaired as a result of this action. *Liberty Mutual*, 419 F.3d at 226 ("We examine the impairment element only after the applicant for intervention as of right has shown a protectable legal interest . . . . Appellants have not established a sufficient interest to intervene as of right. Therefore, we do not proceed to the impairment inquiry."). For similar reasons, there is no genuine concern that JPMC will fail to represent the FDIC's purported interests. The FDIC's primary[13] asserted interest in this case is to ensure proper application of FIRREA, but, as discussed, FIRREA is simply not implicated.[14]

_____

[13]     The FDIC's argument that it has an interest in the Turnover Action as "potential indemnitor" pursuant to section 12.1 of the P&A Agreement is groundless. It is telling that the FDIC (footnote continued)

25

## III. THERE IS NO BASIS TO STAY THE TURNOVER ACTION

As an exhibit to its Motion to Intervene in the Turnover Action, the FDIC includes its

proposed Motion to Stay, in which it argues that the Turnover Action should be stayed pending

---

presents this argument without citing specific language from the P&A Agreement. That is because the indemnification provision, by its express terms, provides that "no indemnification will be provided under this [P&A Agreement] for any . . . claims with respect to any liability or obligation of [WMB] that is expressly assumed by [JPMC] pursuant to this [P&A Agreement] or subsequent to the execution hereof by [JPMC] . . . ." *See* P&A Agreement at §12.1(b). The P&A Agreement also provides that JPMC "expressly assumes . . . and agrees to pay, perform, and discharge, all of the liabilities of [WMB] . . . including the Assumed Deposits . . . ." *See* P&A Agreement at § 2.1. Thus, the Deposits are outside the scope of the P&A Agreement's limited indemnification provision and the FDIC's role as a potential indemnitor is a red herring. Even if this were not the case, the FDIC does not have a sufficient interest in this matter, based on its purported status as "potential indemnitor," to warrant intervention. *See Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*, 725 F.2d 871 (2d Cir. 1984) ("General liability insurer for defendant in products liability, breach of contract, and breach of warranty action could not intervene as of right to submit to the court proposed interrogatories on damages for jury to answer since its interest in amount it would have to indemnify defendant under its policy did not qualify as an interest in the subject matter of the action and, in any event, was conditioned on verdict for plaintiff and success in yet-uncommenced litigation concerning scope of its indemnity obligation."); *John R. Sand & Gravel Co. v. U.S.*, 59 Fed. Cl. 645, 653 (Fed. Cl. 2004) (finding potential intervenor's contingent interest insufficient to warrant intervention because it would only be liable to defendant if defendant loses pending case and if defendant succeeds in holding potential intervenor liable for indemnification); *Acceptance Indem. Ins. Co. v. Southeastern Forge, Inc.*, 209 F.R.D. 697, 701 (M.D. Ga. 2002) ("The Court finds that the possibility that JSL may be subject to a future claim for indemnification does not satisfy Rule 24(a)'s requirements that an intervenor of right must demonstrate a legally protectable interest in the proceedings that will be impaired if it is not allowed to intervene.").

[14] At the end of its brief, the FDIC tacks on a request for permissive intervention, under Rule 24(b), in which it again seeks to justify its participation in the Turnover Action on the basis that the case "directly implicates" FIRREA. (Mem. in Supp. Mot. to Intervene at 15.) For all of the reasons discussed in text, that is simply not true—Debtors are not asserting a claim against the FDIC or against the receivership. Rather, Debtors are asserting a claim against JPMC, and that claim, rather than being governed by FIRREA, falls within this Court's exclusive jurisdiction under the Bankruptcy Code. Thus, for the same reasons that the FDIC is not entitled to intervene as of right, this Court should exercise its broad discretion to reject the FDIC's application seeking permissive intervention. *See Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 227 (3d Cir. 2005) (affirming district court's denial of permissive intervention, noting that district court's determination is "highly discretionary").

resolution of the DC Action. The FDIC offers two arguments in support of this request. First, as in its Motion to Intervene, the FDIC argues that this action is subject to "the FIRREA jurisdictional bar," and, second, the FDIC contends that this action must be stayed pursuant to the "first-filed rule." Both arguments fail. Thus, even if the FDIC is permitted to intervene in this action, there is no basis upon which these proceedings should be stayed.

### A. The Turnover Action Is Not Subject to a Jurisdictional Bar Under FIRREA

As set forth in Section IA, *supra*, the FDIC's contention that the Turnover Action is precluded by the exhaustion requirement of Sections 1821(d)(6) and 1821(d)(13)(D) rests on the false premise that Debtors are pursuing claims for the assets of WMB in receivership. To the contrary, Debtors are exercising their right under the turnover provisions of the Bankruptcy Code in order to recover estate assets from JPMC, 11 U.S.C. § 542, and even the FDIC has acknowledged that JPMC has assumed the relevant deposit liabilities. Because Debtors' claims do not involve the assets of WMB, *i.e.*, the depository institution in receivership, those claims are not subject to the administrative review process set forth under Section 1821(d)(6) and are not subject to the exhaustion requirements of 1821(d)(13)(D). This action is thus fundamentally different from the DC Action, which seeks payment of Debtors' claims against the receivership, and there is no reason that this distinct action should not proceed.

### B. The Turnover Action Is Not "On All Fours" With the DC Action and the First-Filed Rule Therefore Does Not Apply

The FDIC invokes the "first-filed rule" as a basis to stay these proceedings. (Mem. in Supp. Mot. to Stay at 12.) (Docket No. 26.) As a threshold matter, the FDIC is invoking this rule in the wrong court. The "first-filed rule" can only be invoked "where the *first* lawsuit was commenced" as a basis to enjoin proceedings in another jurisdiction. *In re Husco, Inc.*, 268 B.R. 441, 449 (Bankr. W.D. Pa. 2001) (emphasis in original). By asking instead that this Court stay its own proceedings,

the FDIC is seeking relief that its cited rule simply does not permit. *Id.* ("The first-filed rule does not apply here because this court, the forum of the *second* lawsuit between debtor and Southern, would not seem to have 'the power' to enjoin which arises under the rule.") (emphasis in original). In any event, the first-filed rule, even if this were the correct Court to consider it, would not apply as a basis to stay the Turnover Action.

The Third Circuit has held that the first-filed rule applies only where the "later-filed case" is "truly duplicative" and "materially on all fours" with the preceding action. *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 334 n.6 (3d Cir. 2007) (rejecting "first filed rule" as basis for injunction where neither the parties nor the claims in two actions were "identical"). Even where these criteria are satisfied, moreover, district courts "have always had discretion to retain jurisdiction given appropriate circumstances justifying departure from the first-filed rule." *EEOC v. Univ. of Pa.*, 850 F.2d 969, 972 (3d Cir. 1988) (upholding district court's refusal to apply first-filed rule as basis for dismissing EEOC enforcement actions) (citing cases). For instance, "courts have rejected the rule when the second-filed action had developed further than the initial suit." *Id.* at 976 (citing authority).

This action and the DC Action are plainly not "on all fours," and the first-filed rule therefore does not apply. *Grider*, 500 F.3d at 334 n. 6. Debtors brought the DC Action as specifically prescribed by statute in order to challenge a disallowance of claims by the FDIC in connection with its receivership of WMB. Debtors have not asserted any claim in the DC Action seeking to recover their deposits, and there would be no basis to do so. Rather, the DC Action, as prescribed by statute, challenges the FDIC's disallowance of Plaintiffs' proof of claims against the receivership, and, if successful, will result in money damages against the FDIC. The Turnover Action is fundamentally

different. Debtors seek turnover of their deposits from JPMC, which now administers those accounts.

The first-filed rule does not apply for the added reason that this matter has "developed further" than the DC Action. *Univ. of Pa.,* 850 F.2d at 972. In fact, the FDIC itself emphasizes that "disputes concerning the ownership of assets and assumption of liabilities between the Debtors and JPMC have been a centerpiece of these chapter 11 cases since their filing." (Mem. in Supp. Mot. to Intervene at 1.)[15] In other words, the DC Action was "first-filed" as a technical matter only—the underlying dispute over estate assets originated in this Court. Furthermore, that dispute is far more developed in these proceedings. Indeed, the FDIC answered the complaint in the DC Action only last week. Here, by contrast, the parties have appeared before the Court multiple times (starting from before the DC Action was commenced), JPMC has entered a Motion to Dismiss that is now fully briefed, and Debtors have filed a Motion for Summary Judgment supported by overwhelming evidence demonstrating that the Deposits belong to Debtors and must be turned over. It is important that this action, in which the issues have already been developed, move forward without unnecessary delay. The $4 billion in deposits is an essential asset of Debtors' estates, and it is critical that those funds be restored so that Debtors can move forward with an estate plan for the benefit of their creditors. In light of Debtors' affirmative showing in support of their Motion for Summary Judgment, the Court is in a position to resolve this important issue now, by ordering that JPMC promptly return Debtors' Deposits as required under the turnover provisions of the bankruptcy code. 11 U.S.C. § 542. If this action is instead stayed pending resolution of the DC Action, which remains in its infancy, Debtors will be deprived of any meaningful opportunity to recover their Deposits for

---

[15] Indeed, the Deposits first appeared on this Court's calendar on October 14, 2008.

the foreseeable future and the resolution of this straightforward issue will be delayed unnecessarily and indefinitely.

Furthermore, staying the Turnover Action would threaten to delay or derail the Debtors' chapter 11 cases. The recent amendments to the Bankruptcy Code impose a hard deadline of March 10, 2010 on the Debtors' exclusivity period to file a chapter 11 plan. *See* 11 U.S.C. § 1121(d) (imposing 18-month deadline on extensions of debtor's exclusivity period). If the Debtors are paid their deposits, they will be in a position to file and confirm a plan well in advance of their exclusivity deadline. Without their deposits, however, the Debtors will not be able to construct the plan most beneficial to their creditors. In 2008, the median time from filing to the commencement of trial for civil cases commenced in the District Court for the District of Columbia was greater than three years. *See* 2008 Federal Court Management Statistics, U.S. District Court – Judicial Caseload Profile (http://www.uscourts.gov/cgi-bin/cmsd2008.pl). Thus, a stay of the Turnover Action as sought by the FDIC would very likely extend beyond the Debtors' maximum exclusivity period, threatening the Debtors' control over their chapter 11 cases as afforded them by Congress.

## IV.    THERE IS NO BASIS TO STAY THE JPMC ADVERSARY PROCEEDING

The FDIC's Motion to Stay is addressed not only to the Turnover Action, but to the JPMC Adversary Proceeding as well. In that action, JPMC seeks declaratory relief that it is entitled to retain dozens of assets that it purportedly acquired pursuant to the P&A Agreement. JPMC does not seek any affirmative recovery from the FDIC. Moreover, Debtors responded by filing numerous counterclaims asserting bankruptcy causes of action, including seeking to avoid preferential and fraudulent transfers of estate assets. These counterclaims, likewise, do not seek any affirmative recovery from the FDIC. For reasons described more fully in Sections I and II, *supra*, the jurisdictional bar of FIRREA does not apply to Debtors' Counterclaims for the fundamental reason

that those claims do not concern "the assets of [a] depository institution for which the [FDIC] has been appointed receiver." 12 U.S.C. § 1821(d)(13)(D)(i).[16]

Rather, Debtors' Counterclaims involve estate assets that were purportedly transferred to JPMC pursuant to the P&A Agreement, and, because Debtors' claims are against a successor bank rather than against the receivership, the jurisdictional provisions of FIRREA simply do not apply. *See Rosa*, 938 F.2d at 394 (refusing to apply FIRREA's jurisdictional bar to claims for monetary relief against successor institution that acquired certain of the failed bank's assets and liabilities because the claims "seek neither payment from nor a determination of rights with respect to the assets of a depository institution for which RTC [or FDIC] has been appointed receiver"); *see also Henrichs*, 474 F.3d at 614 (holding that FIRREA does not prevent a state court adjudication of rights to distributed assets of a receivership bank, reasoning that "the statute does not reach assignees of assets once owned by the FDIC"); *McFarland*, 243 F.3d at 887 n. 42 ("The claim procedures articulated in 12 U.S.C. § 1821(d)(5)-(11) are predicated on the FDIC's possession of the property in

---

[16] In their Counterclaims, Debtors seek either the return of or damages resulting from the loss of the following assets obtained by JPMC pursuant to the P&A: i) Capital Contributions from WMI to WMB that were subsequently transferred to JPMC; ii) Trust Preferred Securities; iii) Preferential Transfers; iv) Intercompany Amounts; and v) various intellectual property, trademark, and copyright claims. Even if this Court were to conclude that there are specific claims in the JPMC Adversary Proceeding that may potentially involve assets in receivership, this Court necessarily has jurisdiction to determine whether such assets are property of the bankruptcy estate or the receivership estate in the first instance. *See All Season's Kitchen*, 145 B.R. at 402 ("The plain language of the [FIRREA] statute, as we understand it, limits our jurisdiction only if the FDIC in fact has an asset. Accordingly, we believe that the bankruptcy court, in the exercise of its jurisdiction to determine jurisdiction, must determine whether the FDIC in fact has an asset."). Moreover, even if the Court were to determine that certain claims concerned assets in receivership, the appropriate result would be for only those claims to be stayed. *See Rosa*, 938 F.2d 394, 395 (finding claims concerning assets of failed bank were "subject to the jurisdictional bar" while claims against successor bank were not subject to the bar because it was not "a depository institution for which the RTC has been appointed receiver").

question. When the FDIC relinquishes ownership, the procedures governing its role as a receiver no longer apply to the property.").

Moreover, Debtors' Counterclaims fall within the distinct expertise of this Court. Debtors invoke chapter 5 of the Bankruptcy Code, for instance, to seek avoidance of several transfers made to WMB shortly before the commencement of Debtors' chapter 11 cases. Debtors allege that JPMC was aware of these voidable transfers and acquired its interest in Debtors' property in bad faith. (*See* Countercl. ¶¶ 97, 103, 109, 116, 124, 132, 145, 152.) These are bankruptcy claims that plainly fall within this Court's exclusive jurisdiction and unique expertise. It would simply make no sense to stay the proceedings here for such matters to be resolved in the DC Action. *See In re Cont'l Airlines*, 138 B.R. at 447 ("Both the determination of the bankruptcy estate's property and the validity, application and enforceability of the Settlement Agreement are within the expertise of the Bankruptcy Court. It would therefore be prudent to use the expertise of the Bankruptcy Court in resolving these issues.").

## CONCLUSION

For the reasons discussed, Debtors respectfully request that the Court deny the FDIC's Motion to Intervene in the Turnover Action, its Motion to Stay the Adversary Proceedings, and JPMC's Motion To Stay Debtors' Adversary Proceeding.

Dated: June 15, 2009
Wilmington, Delaware

**ELLIOTT GREENLEAF**

_____
Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Neil R. Lapinski (DE Bar No. 3645)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
E-mail: rxza@elliottgreenleaf.com
E-mail: nrl@elliottgreenleaf.com
E-mail: sak@elliottgreenleaf.com

-and-

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
Peter E. Calamari
Michael B. Carlinsky
Susheel Kirpalani
David Elsberg
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

_Special Litigation and Conflicts Co-Counsel to Washington Mutual, Inc. and WMI Investment Corp_