Exhibit F
Summary of Journal Entries

| Post Date | Effective Date | Co/GL/CC | Description | Dr. | Cr. |
|---|---|---|---|---|---|
| 09/24/2008 | 09/19/2008 | 70/10441/9909 | DUE FROM WFSB-MMDA-I/C | 3,674,000,000 | |
| 09/24/2008 | 09/19/2008 | 70/10450/9909 | DUE FROM WMB FA-I/C | | 3,674,000,000 |
| *Memo: WMI (Co. 70) reclassifies its deposit receivable from WMB to WMB fsb (Co. 40)* | | | | | |
| 09/24/2008 | 09/19/2008 | 02/52915/9347 | VB4/GL CLEARING | 3,674,000,000 | |
| 09/24/2008 | 09/19/2008 | 02/45798/9909 | MN PAY-I/C-FSB-040 | | 3,674,000,000 |
| *Memo: WMB (Co. 2) increases master note payable* | | | | | |
| 09/24/2008 | 09/19/2008 | 40/20601/9909 | MN REC-I/C-WMB-002 | 3,674,000,000 | |
| 09/24/2008 | 09/19/2008 | 40/28201/9331 | A/R DEPOSIT ACT-I/C-WMB-001 | | 3,674,000,000 |
| *Memo: WMB fsb (Co. 40) removes intercompany deposit receivable and increases master note receivable* | | | | | |
| 09/24/2008 | 09/19/2008 | 01/49241/9331 | A/P DEPOSIT ACT-I/C-WFSB-04 | 3,674,000,000 | |
| 09/24/2008 | 09/19/2008 | 01/52915/9347 | VB4/GL CLEARING | | 3,674,000,000 |
| *Memo: WMB (Co. 01) removes intercompany deposit liability* | | | | | |

<u>UNITED STATES BANKRUPTCY COURT</u>
<u>DISTRICT OF DELAWARE</u>

------------------------------------------------- x

*In re*                                           :    Chapter 11
                                                  :
WASHINGTON MUTUAL, INC., *et al.*,[1]              :    Case No. 08-12229 (MFW)
                                                  :
    Debtors.                    :    Jointly Administered
                                                  :
                                                  :
------------------------------------------------- x
                                                  :
WASHINGTON MUTUAL, INC. AND                       :
WMI INVESTMENT CORP.,                             :    Adversary Proceeding No. 09-50934
                                                  :    (MFW)
    Plaintiffs and Counterclaim :
    Defendants,                 :
                                                  :
       v.         :
                                                  :
JPMORGAN CHASE BANK, NATIONAL                     :    **DECLARATION OF**
ASSOCIATION,                                      :    **C. JACK READ**
                                                  :
    Defendant and Counterclaimant. :
------------------------------------------------- x
JPMORGAN CHASE BANK, NATIONAL                     :
ASSOCIATION,                                      :
                                                  :
    Cross-Claimant,             :
                                                  :
       v.         :
                                                  :
FEDERAL DEPOSIT INSURANCE                         :
CORPORATION, as Receiver of                       :
Washington Mutual Bank, Henderson,                :
Nevada,                                           :
                                                  :
    Cross-Claim Defendant.      :
                                                  x
-----------------------------------------------------

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395). The Debtors continue to share the principal offices with the employees of JPMorgan Chase located at 1301 Second Avenue, Seattle, Washington 98101.

I, C. JACK READ, hereby declare under penalty of perjury as follows:

1.      I joined Washington Mutual Bank, Henderson Nevada ("WMB"), on July 5, 2005, as the Director of State and Local Tax, Planning and Consulting. I later became Senior Vice President for Corporate Tax. From 1993 until 2004, I was with the tax group of KPMG, and was a partner at the time I left KPMG. I received my law degree from Temple University in 1993.

2.      I am currently employed by JPMorgan Chase Bank, N.A. ("JPMC") as Managing Director, Tax. I began to work for JPMC as of September 26, 2008, immediately following JPMC's purchase of WMB's assets from the Federal Deposit Insurance Corporation (the "FDIC Transaction"). I submit this declaration in support of the opposition of JPMC to Plaintiffs' motion for summary judgment.

3.      In my role with WMB, I not only worked on state and local tax issues, I also worked on federal tax planning and on transactions. As a result, I am familiar with the tax policies and accounting that were used by Washington Mutual, Inc. ("WMI"), WMB, and their respective subsidiaries and affiliates, including Washington Mutual Bank, fsb ("WMB fsb") (collectively, the "WaMu Group"). Exhibit A through Exhibit E attached hereto contain documents and information compiled from data maintained by the WaMu Group in the ordinary course of business.

4.      The WaMu Group entered a tax sharing agreement (the "Tax Sharing Agreement") on August 31, 1999. The Tax Sharing Agreement established that the WaMu Group would file a consolidated federal income tax return and consolidated or combined tax returns in various states and other local taxing authorities. The Tax Sharing Agreement also established the manner in which the group would allocate tax

-2-

liability – as if each entity had filed a separate return. As such, the tax liability of each entity was determined on a stand alone basis and was to be paid to the common paying agent. A true and accurate copy of the Tax Sharing Agreement is attached as Exhibit A.

5.    Pursuant to the Tax Sharing Agreement and regulations promulgated by the U.S. Department of the Treasury and the U.S. Internal Revenue Service (the "IRS"), the WaMu Group, with certain exceptions not herein relevant[2], filed a single, consolidated U.S. federal tax return for each taxable year prior to 2008.[3]

6.    WMI was the common parent of the consolidated group and served as the taxpaying agent for the group.[4] As agent for the WaMu Group, WMI was responsible for the preparation and filing of the group's consolidated U.S. federal tax returns, as well as making all tax payments due, and collected, from members of the WaMu Group.

7.    To the extent permissible under applicable state law, the WaMu Group also filed consolidated tax returns, unitary reports or similar, combined returns in the various states and other local taxing jurisdictions with WMI acting as agent for the WaMu Group pursuant to relevant state and local laws. Notwithstanding the provision of the Tax Sharing Agreement concerning payment of state tax liabilities, in practice (i) WMI included WMB's tax obligations in the payments it made for the tax liabilities for the WaMu Group on the consolidated, unitary or combined state tax returns and was the

---

[2] Non-consolidated entities included, but were not limited to, the real estate investment trusts (University Street, Inc., Seneca Street, Inc., and Marion Street, Inc.) and deconsolidated corporations (Rivergrade Corp. and Flower Street).

[3] WMI became the common parent in 1994.

[4] *Id.*

-3-

named entity doing so, and (ii) WMI would adjust amounts owed from WMB or its subsidiaries for state taxes paid on the general ledger. For example, WMI filed a unitary tax report for the WaMu Group in California for state tax liabilities each year prior to 2008. WMI was designated as the "key corporation", as defined under California state tax law, and acted as agent for the WaMu Group. The California amounts made up over 90% of the WaMu Group state tax liabilities and refunds.

8.    For the 2008 tax year, WMB and its subsidiaries were members of the WaMu Group for purposes of the federal and certain of the state or local consolidated, unitary or combined returns (the "consolidated returns") until at least September 25, 2008.[5]

9.    Because WMI had no material operations as a parent holding company, historically more than 90% of the tax liability incurred by the WaMu Group was attributable to the activities of WMB and its subsidiaries. In the tax year 2007, this percentage exceeded 99%.

10.    Pursuant to the Tax Sharing Agreement, federal regulations, and practice, WMB made quarterly payments to WMI for its estimated federal tax liabilities in the same manner and at the same time as if WMB and its subsidiaries were filing separate returns or separate consolidated forms. These payments were made into the account ending in 0667 held at WMB in the name of WMI. A true and accurate copy of a sample wire transfer form for federal estimated taxes reflecting the recipient account number is attached as Exhibit B.

---

[5] WMB and its subsidiaries are also filing a pro forma consolidated U.S. federal tax return for 2008 on behalf of the FDIC as receiver.

State Tax GL Payments

11.     Over a period of at least five years, a state tax accounts payable existed on the books of Washington Mutual that purported to reflect amounts that WMI estimated it would pay in state taxes on behalf of WMB. This state tax accounts payable appeared on the GL as 51830 (with varying cost centers depending upon the year at issue), due from WMB to WMI (the "State Tax GL"). The State Tax GL was not collateralized and was not backed by good funds. As of August 2008, the State Tax GL reflected approximately $1 billion dollars due from WMB and its subsidiaries to WMI.

12.     With the exception of a $174,825,844 payment from WMB to WMI in 2003, attempting to settle state tax liabilities for the years 1998 through 2001, WMB never paid any amounts due to WMI as a result of the State Tax GL.

13.     In August and September 2008, WMB paid off the State Tax GL. Specifically, WMB paid WMI $600 million in August and $322 million in September, purportedly to pay off substantially all of the State Tax GL. WMB's payments were made into the account ending in 0667 held at WMB in the name of WMI. True and accurate copies of screen shots of the Hogan deposit system, reflecting these transfers and the account into which they went, are attached as Exhibit C.

Tax Refunds Due to WMB

14.     As parent and consolidated and combined taxpaying agent for the WaMu Group, WMI received tax refunds issued by the IRS and by other taxing authorities. Pursuant to the Tax Sharing Agreement, WMI was to pay each entity any overpayment for its said tax liability for a taxable year.

-5-

15.    For example, on February 26, 2008, the WaMu Group received a federal tax refund from the IRS totaling $1.94 billion with respect to the amended federal returns for the WaMu Group for the tax years 2001 through 2004. The refund was made in three separate wires by the IRS into the account ending in 0667 held at WMB in the name of WMI. True and accurate copies of screen shots from the Hogan deposit system, reflecting these wires and the account into which they went, are attached as Exhibit D. As 99.99% of the adjustments on the amended returns related to WMB items, WMI paid the entire $1.94 billion to WMB.

16.    More recently, the WaMu Group's consolidated 2007 Federal Income Tax Return, filed in September 2008, reflected a tax overpayment of $274.5 million. Of this amount, $40 million was applied to the WaMu Group's 2008 tax return. The WaMu Group requested that the remaining $234.5 million be refunded. On September 30, 2008, the IRS wired $234.5 million into the account ending in 0667 held at WMB in the name of WMI. True and accurate copies from the Hogan deposit system reflecting the receipt of the $234.5 million in the 0667 account are attached as Exhibit E. Most or all of the $234.5 million reflects a refund attributable to WMB's operations and prior tax payments. WMI has never transferred these funds to an account in WMB's (or JPMC's) name.

17.    Prior to September 25, 2008, WMI also received state tax refund checks which were deposited into the account ending in 0667 held at WMB in the name of WMI. These checks reflected refunds attributable to WMB's operations. WMI has never transferred these funds to an account in WMB's (or JPMC's) name.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 22 day of July 2009 at Brooklyn, New York.

C. Jack Read

# Exhibit A



10.02.28 Tax Sharing Agmt Aug99.pdf

# TAX SHARING AGREEMENT

THIS TAX SHARING AGREEMENT ("Agreement") is made as of August 31, 1999 by and among Washington Mutual, Inc., a Washington corporation ("WMI"), Washington Mutual Bank fsb, a federal savings bank ("WMBfsb"), Washington Mutual Bank, a state chartered savings bank ("WMB"), New American Capital, Inc., a savings and loan holding company whose principle subsidiary is Washington Mutual Bank, FA, a federal savings association ("WMBFA") and Aristar, Inc., a Delaware corporation, on behalf of themselves, each of their current subsidiaries and all subsidiaries that any one or more of them may own in the future (together, the "Subsidiaries"). This agreement supersedes the Tax Sharing Agreement dated March 30, 1998 among WMI and subsidiaries.

WHEREAS, WMI owns 100% of the issued and outstanding capital stock of WMBfsb, WMB and NACI.

WHEREAS, WMI owns either directly or indirectly, 100% of the issued and outstanding capital stock of the Subsidiaries;

WHEREAS, NACI owns 100% of the issued and outstanding capital stock of WMBFA and Aristar, Inc.;

WHEREAS, WMI, WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., and the Subsidiaries join in the filing of a consolidated federal income tax return and combined or consolidated tax returns in various states and other local taxing jurisdictions; and

WHEREAS, it is the desire of the parties hereto to enter into a definitive written Tax Sharing Agreement, which agreement describes the manner in which the consolidated federal income tax liability is shared among the members of the consolidated group and the manner in which the combined or consolidated state or other local tax is shared among members of the combined or consolidated group;

NOW, THEREFORE, in consideration of the foregoing premises, the parties agree as follows:

1. For all taxable years during which WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., or any Subsidiary is a member of an "affiliated group" of WMI as defined in Section 1504 of the Internal Revenue Code and is required to join in the filing of a consolidated federal income tax return of WMI and its consolidated subsidiaries, the federal income tax liability of such consolidated group shall be allocated and shared among WMBfsb, WMB, NACI, Aristar, Inc., and each Subsidiary as if such entities filed a separate or consolidated return, as the case may be.

2. The federal income tax accounts between WMI, WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., and each subsidiary shall be settled in the following manner:



(a) WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., and each Subsidiary shall make payments on account of their federal income tax liability to WMI in the same manner and at the same time as if such entities were filing separate returns or separate consolidated returns with, and making payment of taxes (including estimated taxes) to the Internal Revenue Service ("IRS").

(b) WMI shall pay to WMBFA, WMBfsb, WMB, NACI, Aristar, Inc., and each Subsidiary amounts that may be due them on account of (i) any overpayment of their said tax liability for a taxable year or (ii) any credit that may result from the utilization of their net operating loss for a taxable year, such credit being determined in accordance with the provisions of item 1 above, within 30 days after the consolidated return is filed for that taxable year or, to the extent any such amount due must be recovered from the IRS, within 30 days after payment is received from the IRS, or, if the amount due represents an overpayment of estimated tax which is in excess of WMBFA's, WMBfsb's, WMB's, NACI's, Aristar, Inc.'s or a Subsidiary's estimated allocable share of the consolidated federal income tax liability for the year, then such excess shall be paid by WMI within 30 days of receipt from WMBFA, WMBfsb, WMB, NACI, Aristar, Inc., or the Subsidiary of a written explanation of the overpayment.

3. For all taxable years during which WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., or any Subsidiary is included in a combined or consolidated tax return with WMI or another of its subsidiaries, the state or other local tax liability of such combined or consolidated group shall be allocated to:

   (a) WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., and each Subsidiary as if each of WMBfsb, WMB, NACI, WMBFA, and such other Subsidiary had filed a separate, combined or consolidated tax return with each of its respective subsidiaries and

   (b) WMI to the extent the sum of the amounts determined pursuant to clause (a) is different from the liability of the combined or consolidated group.

   In no event will the foregoing allocation result in treatment less favorable to WMBfsb, WMB, WMBFA, and their subsidiaries than if they had filed separate, combined or consolidated tax returns, as the case may be.

4. The state and other local tax accounts between WMI, WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., and each Subsidiary shall be settled in the following manner:

   (a) WMBfsb, WMBFA, NACI, Aristar, Inc., and each Subsidiary shall make payments on account of their state and other local tax liability to WMB in the same manner and at the same time as if such entities were filing separate returns or separate combined returns with, and making payments of taxes (including estimated taxes) to such state or other local taxing authority. WMB shall compute its state and other local tax liability in the same manner and at the same time as if such it were filing a separate return with, and making payment of taxes (including estimated taxes) to such state or other local taxing authority.

   (b) WMI shall make payments to WMB in an amount necessary to satisfy the state and other local tax liability after considering the payments computed in (a) above.



10.02.28 Tax Sharing Agmt Aug99.pdf

(c) WMB shall pay to WMI, WMBfsb, WMBFA, NACI, Aristar, Inc., and each Subsidiary amounts that may be due them on account of (i) any overpayment of their said tax liability for a taxable year or (ii) any credit that may result from the utilization of their net operating loss for a taxable year, such credit being determined in accordance with item 3 above, within 30 days after the combined or consolidated return is filed for that taxable year or, to the extent any such amount due must be recovered from any state or other local taxing authority, within 30 days after payment is received from such state or other local taxing authority, or, if the amount due represents an overpayment of estimated tax which is in excess of WMI's, WMBfsb's, WMBFA's, NACI's, Aristar, Inc.'s, or a Subsidiary's estimated allocable share of the or combined State or local tax liability for the year by more than 10%, then such excess shall be paid by WMB within 30 days of receipt from WMI, WMBfsb, WMBFA, NACI, Aristar, Inc., or the subsidiary of a written explanation of the overpayment

5.  Deferred tax assets and liabilities of WMI, WMBfsb, WMB, NACI, WMBFA, Aristar, Inc., and each Subsidiary will be handled in a manner consistent with Statement of Financial Accounting Standards No. 109 and, as it relates to WMBfsb, WMB, and WMBFA, consistent with bank and thrift regulatory guidelines. A copy of the current regulatory guidelines is attached hereto as Exhibits A and B.

6.  This agreement shall remain in full force and effect until modified or amended by the mutual agreement of the parties hereto.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of this date first above written:

Washington Mutual, Inc.

By _____
Kerry Killinger, Chairman, President
and Chief Executive Officer

New American Capital, Inc.

By _____
Kerry Killinger, President

Washington Mutual Bank fsb

By _____
Kerry Killinger, President

Aristar, Inc.

By _____
Craig J. Chapman, President

Washington Mutual Bank

By _____
William Longbrake, Vice Chair and
Chief Financial Officer

Washington Mutual Bank, FA

By _____
William Longbrake, Vice Chair and
Chief Financial Officer

# Exhibit B

**FUNDS TRANSFER APPLICATION**

| ◯◯◯ **Washington Mutual** | 1101 2nd Avenue<br>PO box 834<br>Seattle WA 98111 | This information is confidential. If you are not the intended recipient, do not use, copy or disseminate. Contact us at 1-800-756-8000 and return to us at the address on the left. |
|---|---|---|

☐ Washington Mutual Bank
☐ Washington Mutual Bank fsb

Date: 12/15/06    TestKey Code #: _____    Recurring code: _____

Financial Center/Department name: Tax Management    Phone #: (206)461-8861

Account # to be charged: _____    GL/RC #: 51800    9422

$(Amount to be wired): 950,000,000.00    Fee: 0.00    Document #: _____

Customer Name: Washington Mutual Bank    SSN/EIN: 68-0172274

Customer Street Address
City State Zip Country _____

Customer Phone #: _____    Initiating company ABA # 321180748

Receiving Institution Routing/ABA #: 321180748    Receiving Institution WMB

Recipient name : Washington Mutual Inc.    Recipient account #: 1791650667

Recipient Address
City. State. Zip, Country _____

Additional Information: 2006 4Q Estimated Tax Payment

**FINANCIAL CENTER ONLY:**

Preparer's signature:

(Prepared by:)    Laurie Hanson    Time: 4:31 PM

Approver's signature:
(Approved by:)

Curt Brouwer    Pat Schulte    Time: 4:31 PM

Close account?: Yes ☐ No ☐

Test Key verified by: _____    Pledge placed by _____    Time pledge placed: _____

**WIRE TRANSFER ONLY:**    Confirmed by/with: _____    Time: _____

I authorize Washington Mutual Bank or Washington Mutual Bank fsb as mentioned above (the "Bank") to transfer funds as shown on this remittance order ("Transfer Order"). I am responsible for the accuracy of the above information; Bank and subsequent parties to the Transfer Order may act solely on the basis of number if name and number disagree, notwithstanding knowledge of any inconsistency. Bank will send the funds by any funds transfer payment system or intermediary bank, at its discretion. If Transfer Order requests payment in a foreign country, Bank may execute the Transfer Order in such foreign country's currency at the Bank's buying rate of exchange for U.S. dollars when the transfer is effected. Confirmation of receipt from the Recipient is not required; if requested, the Bank will request confirmation but will not be responsible for receipt. A Confirmation Request Fee may be assessed.

There is no right to cancel or amend a Transfer Order. Bank, at its option, may attempt cancellation or amendment if this Application has not been acted on, but will have no liability if cancellation or amendment are not effectuated. In any event, Bank will not credit funds until Bank confirms Recipient has not received funds and any funds transmitted have been returned. Bank has no obligation to re-execute any rejected or returned Transfer Order. Bank will credit any account following return or rejection. Any credit may not be equal to the original amount due to, for example, differences in foreign currency exchange rates, or cable fees and expenses of Bank or other banks. In addition, Bank will have no obligation to pay interest on any cancelled, returned or rejected Transfer Order.

The Bank is not responsible to any transferee, beneficiary, or other party as a result of this Transfer Order nor shall Bank be liable for insolvency, neglect, misconduct, mistake or default of another bank or person, including an originator, except as provided in this Application. Bank will be liable only to its immediate originator only for failure to credit the amount of this Transfer Order to the recipient's account solely as a result of Bank's failure to exercise ordinary care or act in good faith; liability for such failure is limited to damages attributable directly and immediately to the failure to credit, but not including consequential damages attributable to such failure, even if such consequences were foreseeable, special, punitive, or indirect loss or damages. Subject to the foregoing, Bank's responsibility for loss of interest for error or delay shall be calculated using a rate equal to the average Fed Funds rate of the Federal Reserve Bank of New York for the period involved.

If you have received this communication in error, please immediately notify us by telephone at 1-800-756-8000 and return this facsimile to us at the above address via the us postal service. Thank you.

Customer Signature: X _____    Date: _____

# Exhibit C



FUNDS TRANSFER ENTRY                           SND 08/08/19 RN 20080819 00006304
SR:CSH CALLER: KOH, ROLANDO                                            W
RPT#                          600,000,000.00
TEST                    DUE  / /  TYP FTR TPE       FUNDS RCVD BY GUY COMM CRUN
   G 518301001349/                          GRP D 1791650667/                ADV LTR
        08/08/19                            CRAD VAL  08/08/19
DBT                                         CDT
CURRENT STATE INCOME TAX PAYABLE            WASHINGTON MUTUAL INC
1201 3RD AVE                                ATTN: TREASURY ACCTG/LULU ST JOHN
SEATTLE, WA 95801                           SEATTLE                     WA
COUNTRY OF RESIDENCE                        1301 2ND AVE # WMC1411 98101
SEND BY 0004710                             COUNTRY OF RESIDENCE
TREASURY OPERATIONS                         BNK A

COUNTRY OF RESIDENCE                        COUNTRY OF RESIDENCE
INT BNK                                     BAC OF CONTAIN
DET

COUNTRY OF RESIDENCE
REF NUM





CURRENT STATE INCOME TAX PAYABLE
1201 3RD AVE
SEATTLE, WA 95801

WASHINGTON MUTUAL INC
ATTN: TREASURY ACCTG/LULU ST JOHN
SEATTLE                    WA
1301 2ND AVE # WMC1411 98101

0004710
TREASURY OPERATIONS

177,000,000.00

GA518301001349/

D1791650667/

08/09/19

08/09/19





CSR CARTER KOH, ROLANDO
145,000,000.00

G4518301001544/
08/09/19

CURRENT STATE INCOME TAX PAYABLE
400 E MAIN
STOCKTON, CA 95202

BY0004710
TREASURY OPERATIONS

D 1791650667/
08/09/19

WASHINGTON MUTUAL INC
ATTN: TREASURY ACCTG/LULU ST JOHN
SEATTLE                    WA
1301 2ND AVE # WMC1411 98101

# Exhibit D



```
002          INQUIRY FUNCTION                    SND 08/02/26 RN 20080226 00009694
SRCFED
REF#        AMT        294,208,271.36 CUR USD
TEST:                         TYP FTR MTD      FNDS S CHG DBY CDY COMN CHN
DBT A/021030046                          CDT D/1791650667/                      ADV LTR
DEBIT VAL 08/02/26                       CREDIT VAL 08/02/26
DRFT                         RIC         DRFT                       RIC
TREAS SF FIN CTR/FUNDS TRANSFER DIV      WASHINGTON MUTUAL INC
NEW YORK, NY                             ATTN: MELANIE STOCKWELL MS:CSQ0815
                                         SEATTLE                    WA
SNDR REF NUM 0000206                     PO BOX 834 98111
ORDER BNK  /20092900                     BNC  /1791650667           CBI    BNN
DEPARTMENT OF THE TREASURY               WASHINGTON MUTUAL INC
INTERNAL REVENUE SERVICE
OGDEN SUBMISSION PROCESSING CENTER
ATTN: ACCOUNTING BRANCH
REF NUM
ORI G  /
9999/20092900/000008057290AV/IRS

SIR2
REF NUM
BANK TO BANK INFO
02 200212 91
              64 INT 49,535
,724.52
```



```
002         INQUIRY FUNCTION                    SND 08/02/26 RN 20080226 00009695
SRCFED
RPT          AMT        644,401,608.37 CR USD
TEST               TYP FTR MB      FNDS S CR LY CDY COMN GBN
DBT A 021030046                    SDT D 1791650667/                      ADV LTR
DEBT VAL 08/02/26                  CREDIT VAL 08/02/26
DEPT                    RTC        DEPT                   RTC
TREAS SF FIN CTR/FUNDS TRANSFER DIV    WASHINGTON MUTUAL INC
NEW YORK, NY                          ATTN: MELANIE STOCKWELL MS:CSQ0815
                                      SEATTLE                    WA
SNDR REF NUM 0000207                  PO BOX 834 98111
ORDER BNK / 20092900                  BNF / 1791650667         CH BK N
DEPARTMENT OF THE TREASURY            WASHINGTON MUTUAL INC
INTERNAL REVENUE SERVICE
OGDEN SUBMISSION PROCESSING CENTER
ATTN: ACCOUNTING BRANCH
REF NUM
ORBI /
9999/20092900/000008057290AV/IRS

SIR2
RBE NUM
BANK TO BANK INFO
02 200312 91
                64 INT 235,74
9,189.68
```



```
002              INQUIRY FUNCTION              SND:08/02/26 TRN:20080226 00009696
SRC:FED
REF#              AMT     999,999,999.99 CUR:USD
TEST:                          TYPE:FTR MTR    FUNDS S CRG:DBY CBY:COMN GBIN
DEBIT:A 021030046                      CDT:D 1791650667/                    ADV:LTR
DEBIT VAL:08/02/26                     CREDIT VAL:08/02/26
DEBT:                       RTC:       DEPT:                       RTC:
TREAS SF FIN CTR/FUNDS TRANSFER DIV    WASHINGTON MUTUAL INC
NEW YORK, NY                           ATTN: MELANIE STOCKWELL MS:CSQ0815
                                       SEATTLE                  WA
SNDR REF NUM:0000208                   PO BOX 834 98111
ORDER BNK:  /20092900                  BNK:  /1791650667              BKN:
DEPARTMENT OF THE TREASURY             WASHINGTON MUTUAL INC
INTERNAL REVENUE SERVICE
OGDEN SUBMISSION PROCESSING CENTER
ATTN: ACCOUNTING BRANCH
REF NUM:
ORIG:  /
9999/20092900/0000008057290V/IRS

SIR2
REF NUM:
BANK TO BANK INFO:
02 200312 91
                  64
```

# Exhibit E

```
Session A - [24 x 80]
File Edit View Communication Actions Window Help

NSCPRDN        STFD 1 THF TRANSACTION STMT FORMAT      08/09/30 16.14.52
STMT       CO        2 OP              MS 50852 ACTION COMPLETE
ACTION _    COID               ACCT COND
PROD CODE   ACCT               SHORT NAME WASHINMUTUA
CURR CODE             PAGE      SEARCH FROM 108/09/02 THRU 108/09/30
ACTN  POST  EFFECTIVE  CHECK NUMBER   TRAN AMOUNT  D/C        BALANCE
SDET   TRACE ID/CARD NUMBER    DESCRIPTION
      09/23                          60,000.00    D      26,476,882.37
          04423101844-1080923 DOMESTIC OUTGOING WIRE
      09/23                           5,500.00    C      26,482,382.37
          04423101337-1080923 WIRE TRANSFER DEPOSIT
      09/24                       8,849,902.00    C      35,332,284.37
          04423101597-1080924 WIRE TRANSFER DEPOSIT
      09/24                           5,500.00    D      35,326,784.37
          04423101173-1080924 BOOK TRANSFER DEBIT
      09/25                       1,681,646.07    D      33,645,138.30
          003764600024-1080925 MISCELLANEOUS DEBIT
      09/25                       4,101,278.69    D      29,543,859.61
          003964600364-1080925 MISCELLANEOUS DEBIT
      09/26                           2,197.56    D      29,541,662.05
          10809268082700768343 WA ST D.O.R. EX   DTC   0000021262        0
      09/30                      99,999,999.00    C     129,541,661.05
        * MEMO * 10809308082745786495 SIR2 TREAS 220 MISC PAY 91165372520092        2
PF: 1-HELP 3-PLVL 6-INQ 7-SB 8-SF 9-ASUM -STSM

                                      03/009
```

PRNMWK1407 on Net02

Connected to remote server/host public using Ip00d TSG00057 and port 1023

B224

```
Session A - [24 x 80]
File  Edit  View  Communication  Actions  Window  Help

         NSCPRDE        STFD 1 THF TRANSACTION STMT FORMAT    08/09/30 15.59.50
                                MS 50852 ACTION COMPLETE
STMT       CO        2 OP
ACTION            COID          ACCT COND
PROD CODE         ACCT          SHORT NAME WASHINMUTUA
CURR CODE                PAGE        SEARCH FROM 108/09/02 THRU 108/09/30
ACTN    POST   EFFECTIVE   CHECK NUMBER    TRAN AMOUNT  D/C          BALANCE
SDET      TRACE ID/CARD NUMBER    DESCRIPTION
          09/30                            99,999,999.00  C     229,541,660.05
* MEMO * 108093080827457864497 SIR2 TREAS  220 MISC PAY  91165372520092 2
          09/30                            34,526,526.00  C     264,068,186.05
* MEMO * 108093080827457864499 SIR2 TREAS  220 MISC PAY  91165372520092 2




PF: 1-HELP 3-PLVL 6-INQ 7-SB 8-SF 9-ASUM -STSM

                                                              03/009
```

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| WASHINGTON MUTUAL, INC., *et al.* | : | Case No. 08-12229 (MFW) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |
|  | : |  |
|  | : |  |
| WASHINGTON MUTUAL, INC. AND WMI INVESTMENT CORP., | : | Adv. Pro. No. 09-50934 (MFW) |
|  | : |  |
| Plaintiffs, | : | **DECLARATION OF** |
|  | : | **CAREY M. BRENNAN** |
| v. | : |  |
|  | : |  |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | : |  |
|  | : |  |
| Defendant. | : |  |

---

I, Carey M. Brennan, declare under penalty of perjury as follows:

1.      Throughout 2008, I was the Senior Vice President, Deputy Chief Legal Officer & General Counsel of Capital Markets for Washington Mutual Bank.  I was also an officer of Washington Mutual, Inc. ("WMI").

2.      I have been informed that WMI has submitted an affidavit from Doreen Logan in support of a Motion for Summary Judgment seeking a determination that certain accounts are demand deposit accounts and that the funds in those accounts belong to WMI.  I have been further informed that Ms. Logan states, in paragraph 13 of her affidavit, that:

> On September 18, 2008, Carey Brennan. . . initiated a telephone
> conversation with Patricia Schulte, WMB's Senior Vice President,
> Treasury, Cash Management. Ms. Schulte asked me [Doreen
> Logan] to join the call. On that call, Mr. Brennan instructed that
> the maximum amount of funds possible deposited in the 0667
> demand deposit checking account at WMB immediately be moved
> to a demand deposit account at WMB fsb.

    3.     To the best of my recollection and belief, the conversation that Ms. Logan

describes did not occur. Not only do I not recall the specific conversation that Ms. Logan

describes, I do not recall having any conversation with Ms. Schulte or Ms. Logan concerning

these matters during that time period. Moreover, I do not believe I would have had a

conversation with Ms. Schulte or Ms. Logan in which I directed the transfer of funds from WMB

to Washington Mutual Bank, fsb, Utah ("WMB fsb" and collectively with WMI and WMB,

"Washington Mutual") because I did not have responsibility for directing, or the authority to

direct, such a transfer of funds. It further seems implausible that I had such a conversation with

Ms. Schulte and Ms. Logan because my knowledge of WMI's funds was limited and I was

relying upon information provided to me by senior officers of Washington Mutual's Treasury

Department to whom Ms. Schulte and Ms. Logan reported. I do not recall knowing the specific

amounts of any funds WMI had in deposits accounts at WMB or the types of such accounts; I

was not familiar with an account with the specific number "0667" and have no personal

knowledge with respect to any funds in that account; and I was unaware whether WMI had any

existing deposit accounts at WMB fsb.

    4.     I recall that efforts were made to move to WMB fsb funds of WMI that were

described to me as WMI funds in deposit accounts at WMB and I recall that these efforts

occurred during the week or so prior to the seizure of WMB by the Office of Thrift Supervision

("OTS") on September 25, 2008. I recall discussing the potential for such actions with Robert Williams, Peter Frelinger and Chad Smith, as well as with Tom Casey and with Steve Rotella.

5.      During that period of time, I was aware of the risk that the OTS might place WMB into receivership and, having been told that WMI maintained sizeable deposit balances in accounts at WMB, was concerned about the potential loss of any uninsured deposits of WMI at WMB if the OTS were to put WMB into receivership. If the regulators seized WMB, I thought it was possible that they would not seize WMB fsb because, as an operating subsidiary of WMB, its seizure would not be necessary to gain control of it. I therefore suggested that WMI consider moving any uninsured deposits from WMB to WMB fsb to protect those funds against potential loss and to mitigate potential criticism from WMI's bondholders and investors that WMI's Board of Directors had not taken appropriate steps to protect WMI's funds.

6.      I understand that, given the amount of funds that would be transferred, Steve Rotella and/or Tom Casey provided the Treasury Department the authorizations necessary to proceed with a transaction involving the transfer of WMI's funds from WMB to WMB fsb.

7.      I was not informed, and had no knowledge or understanding, that any of WMI's funds that would be transferred to WMB fsb were going to be simultaneously loaned back to WMB by WMB fsb.

8.      I was not informed, and had no knowledge or understanding, that a transfer of WMI's funds to WMB fsb would result in an increase in the principal amount of a master note between WMB (as borrower) and WMB fsb (as lender).

9.      I was not informed, and had no knowledge or understanding, of the mechanics by which a transfer of WMI's funds from WMB to WMB fsb would be effectuated, whether or not

it be by wire transfer, physical delivery of funds or book entry.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in *Kirkland*, Washington on July *21*, 2009.


_____
Carey M. Brennan

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
_____x
                                    :
In re                               :    Chapter 11
                                    :
WASHINGTON MUTUAL, INC., et al.     :    Case No. 08-12229 (MFW)
                                    :
              Debtors.              :    Jointly Administered
                                    :
                                    :
_____:
                                    :
WASHINGTON MUTUAL, INC. AND         :
WMI INVESTMENT CORP.,               :    Adv. Pro. No. 09-50934 (MFW)
                                    :
              Plaintiffs,           :
                                    :    DECLARATION OF ROSA COX
        v.                          :
                                    :
JPMORGAN CHASE BANK,                :
NATIONAL ASSOCIATION                :
                                    :
              Defendant.            :
_____x
```

I, Rosa Cox, hereby declare under penalty of perjury under the laws of the United

States as follows:

1.      I am an employee of JP Morgan Chase & Co ("JPMC"), as an accounting

manager.  Prior to being employed by JPMC, I was an employee of Washington Mutual Bank

("WMB"), with the title of Assistant Vice President, Accounting Manager, Corporate

Accounting.

2.      I have reviewed the affidavit of Doreen Logan dated May 19, 2009.  The affidavit

incorrectly reports on conversations Ms. Logan claims I had with her relating to $3.674 billion in

an account (the "Account").

3.      Ms. Logan claims that I explained to her the "proposed proposed new rules for calculating federal deposit insurance premiums." (Logan Aff. ¶ 46.) I did mention to her that there were new rules, but I did not explain to Ms. Logan or anybody else any specifics for calculating federal deposit insurance premiums. Indeed, to this day, I do not have knowledge of how those rules operate and would not be able to explain them.

4.      Ms. Logan states that I said, "JPMC federal deposit insurance premiums may increase by about 10 basis points on the 3.674 billion deposit." I never said that to Ms. Logan. I do not have knowledge of how JPMC calculates its federal deposit insurance premiums. I do not know whether JPMC intends to increase or decrease those premiums as a result of the general ledger entries referred to by Ms. Logan.

5.      I declare that the foregoing is true and correct under penalty of perjury.

Executed this 21th day of July, 2009 at Seattle, Washington.

Rosa Cox

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------ x
*In re*                                          :      Chapter 11
                                                 :
WASHINGTON MUTUAL, INC., *et al.*,               :      Case No. 08-12229 (MFW)
                                                 :
     Debtors.             :      Jointly Administered
                                                 :
------------------------------------------------------ x
WASHINGTON MUTUAL, INC. AND                      :
WMI INVESTMENT CORP.,                            :      Adversary Proceeding No. 09-50934
                                                 :      (MFW)
     Plaintiffs and Counterclaim   :
     Defendants,                   :
                                                 :      DECLARATION OF THOMAS M.
        v.       :      BLAKE
                                                 :
JPMORGAN CHASE BANK, NATIONAL                    :
ASSOCIATION,                                     :
                                                 :
     Defendant and Counterclaimant.  :
------------------------------------------------------ x
JPMORGAN CHASE BANK, NATIONAL                    :
ASSOCIATION,                                     :
                                                 :
     Cross-Claimant,               :
                                                 :
        v.       :
                                                 :
FEDERAL DEPOSIT INSURANCE                        :
CORPORATION, as Receiver of                      :
Washington Mutual Bank, Henderson,               :
Nevada,                                          :
                                                 :
     Cross-Claim Defendant.        x
------------------------------------------------------

I, Thomas M. Blake, declare as follows:

1.      I am a Vice President at Charles River Associates Incorporated ("CRA"), an

economic, financial, and management consulting organization.  At CRA, I am the Practice

Leader for Financial Accounting and Valuation.  Over the course of my career, I have led the

financial analysis for dozens of situations involving troubled companies and solvency.  In

addition, I have been admitted as an expert and testified in solvency, accounting and valuation

cases in numerous federal district and bankruptcy courts, state courts, arbitrations, and other

venues.

       2.      Prior to joining CRA, I was a partner at Ernst & Young ("E&Y").  For fourteen

years, I was the managing partner of E&Y's New England Investigative & Dispute Services

Practice, and also led the firm's Securities, Mergers & Acquisitions, and Bankruptcy Litigation

practices.   Prior to that, I was an audit partner and served such clients as American Express,

Bank of New England, Bankers Trust, PaineWebber, and Shearson Lehman Hutton.  Attached as

Exhibit A, is a copy of my Curriculum Vitae.

       3.      I have been retained by counsel for JPMorgan Chase & Co. ("JPMC") in this

matter and I have been asked to opine upon the allegations of insolvency made in Debtors'

Complaint for Turnover of Estate Property, dated April 27, 2009 (the "Complaint") and Debtors'

Motion for Summary Judgment, dated May 19, 2009 (the "Motion").

       4.      Debtors assert that setoff is unavailable to JPMC because Debtors "were insolvent

or rendered insolvent at the time of the transfer."  (Complaint ¶ 8)  They allege that the purported

transfer at issue occurred on September 25, 2008, upon the execution of the Purchase and

Assumption Agreement ("P&A").[1]  (Complaint ¶¶ 33-35)  The Debtors further allege that they

are "protected by a statutory presumption of insolvency" (Motion p. 21) for the 90-day period

preceding WMI's petition (the "90-Day Look-Back period").  I understand, however, that the

---

[1]      Purchase and Assumption Agreement among Federal Deposit Insurance Corporation,
Receiver of Washington Mutual Bank, Henderson, Nevada; JPMorgan Chase Bank,
National Association; and Federal Deposit Insurance Corporation, dated September 25,
2008.

presumption of a debtor's insolvency is rebuttable based on the facts and circumstances of that enterprise's financial state in the period preceding the filing of the petition for bankruptcy.

5.      On September 25, 2008 (the "Date of Receivership"), the Office of Thrift Supervision ("OTS") closed Washington Mutual Bank, Henderson, Nevada ("WMB") and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver.  On the same day, the P&A was executed, whereby JPMC purchased "substantially all of the assets and assume[d] all deposit and substantially all other liabilities" from WMB (P&A, p. 1).  The Debtors filed for Chapter 11 on September 26, 2008.

6.      In this affidavit, I discuss three issues:  (i) the assets subject to dispute in this matter are material to the determination of Debtors' solvency; (ii) the appointment of a receiver by the OTS is not determinative of financial insolvency as defined by the Bankruptcy Code; and (iii) there are significant indicia of solvency that call into question Debtors' presumption of insolvency as of the Date of Receivership and during the 90-Day Look-Back period. Accordingly, Debtors' insolvency cannot be presumed and can only be established by undertaking a rigorous analysis of the Debtors' assets, liabilities and capital.

*I.  The Assets Subject to Dispute in the Matters are Material to the Determination of Debtors' Solvency*

7.      I understand that Debtors have asserted ownership over certain assets, the value of which totals at least $10 billion (the "Disputed Assets").  These Disputed Assets principally include, among other things, Trust Preferred Securities with purported liquidation value of

$4 billion,[2] and certain tax refunds with a purported value of $3 billion[3].  Debtors' schedule of assets and liabilities filed with U.S. Bankruptcy Court for the District of Delaware listed $7.83 billion in liabilities and $4.48 billion in assets, exclusive of at least some of these Disputed Assets (Motion, p.21).  As such, a legal determination of the ownership of these disputed assets is material to the financial determination of the Debtors' solvency as of September 25, 2008, and during the 90-Day Look-Back period   It is not possible to reach a reliable opinion with respect to the solvency of Debtors until one first knows whether Debtors owned some, all, or none, of these assets.

## II. The Appointment of a Receiver by the OTS is not Determinative of Financial Insolvency as defined by the Bankruptcy Code

8.    Although the OTS seized WMB (the largest asset of WMI prior to receivership) on September 25, 2008, this seizure is not determinative of the financial insolvency (as defined by the Bankruptcy Code[4]) of WMI as of that date.

9.    The OTS did not conclude that WMB (or WMI) was insolvent as of the date of receivership.  Rather, it determined that:[5]

(a)    The Savings Bank is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business; and

---

[2] Debtors' Answer and Counterclaims in Response to JPMorgan Chase Bank, N.A., *JPMorgan Chase Bank, National Association* v. *Washington Mutual Inc.*, Adv. Pro. 09-50551, D.I. 23, filed 5/29/09, ¶32 ("Debtors' Answer and Counterclaim").

[3] District Court Complaint filed on 3/20/09, ¶22.

[4] 11 U.S.C. § 101(32).

[5] Letter from OTS Regional Director, Darrel Dochow to Washington Mutual Bank, dated September 25, 2008.

(b)      The Institution is in an unsafe or unsound condition to transact business.

10.      Moreover, the OTS's finding that WMB was "in an unsafe and unsound

condition" is not determinative of the insolvency of WMI or WMB during the 90-day Look-Back

period.  After experiencing increased deposit outflows due to the IndyMac failure in July 2008[6],

the pattern of deposit activity at WMB appeared to normalize until September 15, 2008.

Beginning on this date, WMB, which reported its deposit cash flows to the OTS on a daily basis,

began to experience significant cash outflows from its demand, time and other deposit accounts.

According to the OTS, "[s]ignificant deposit outflows began [on that date] and . . . [d]uring the

next eight business days, WMB deposit outflows totaled $16.7 billion."[7]  Based on the daily

deposit balances reported to the OTS, WMB's daily cash flows are shown on Exhibit B.

11.      Nevertheless, from September 15, 2008 to September 25, 2008 WMB was able to

satisfy these deposit outflows.  It was not until September 25, 2008 that the OTS seized WMB.

Importantly, the OTS stated that "adverse events in the financial markets" (OTS Fact Sheet, p. 1)

were the cause of the material deposit outflows.

12.      Based on my review to date, there is no indication that the OTS performed a

solvency analysis consistent with the test for insolvency specified in the Bankruptcy Code.

There is no indication that the OTS assessed the fair saleable value of the assets of WMB (or

WMI).  Nor is there an indication that OTS compared the fair saleable value of the assets of

WMB (or WMI) to the total amount of either company's respective liabilities.  There is no

indication that the OTS performed a comprehensive cash flow analysis of WMB (or WMI).

Instead, the OTS found that "WMB met the well-capitalized standards through the date of

---

[6] On July 11, 2008, the OTS closed IndyMac Bank and transferred operations to FDIC.

[7] OTS Fact sheet on Washington Mutual Bank, OTS 08-046A, dated 9/25/08. (OTS Fact Sheet),
    p. 3.

receivership."[8]  Thus, without a thorough analysis of the assets, liabilities and capital of WMI

and WMB, it is not possible to come to a reliable conclusion concerning the financial solvency

of either entity, whether on a consolidated or stand-alone basis.

***III.   There are Substantial Indicia of Solvency that Call Into Question Debtors' Presumption
of Insolvency Prior to the Date of Receivership***

13.    Even before considering the Disputed Assets, Debtors have not claimed or

provided a sufficient factual basis for concluding that the amount of WMI's liabilities exceeded

the value of its assets, at fair saleable value, at any date prior to the Date of Receivership.

Debtors have not claimed or provided a sufficient factual basis for concluding that WMI was, or

was rendered, unable to pay its debts as they became due on any date prior to the Date of

Receivership.  Finally, Debtors have not claimed or provided a sufficient factual basis for

concluding that WMI was, or was rendered, inadequately capitalized at any date prior to the Date

of Receivership.  Further, the contemporaneous internal (*i.e.*, company) and external (*i.e.*, market

place) financial data that I have reviewed to-date cast doubt on the presumption of WMI's

insolvency for the 90 days preceding WMI's bankruptcy.

(a)    There is significant data to suggest that WMI was able to pay its debts as they
became due prior to the Date of Receivership.  For example, based on the current record, it
appears that:

(i)    Neither WMI (as holding company) nor WMB failed to make any
scheduled interest or principal payment on third-party debt.

(ii)    WMI continued to meet its operating expenses.  For example, trade debt
and payroll continued to be paid through the Date of Receivership.

(iii)    WMI issued a press release on September 15, 2008 stating that the S&P

---

[8] OTS Fact Sheet, p. 2.

downgrade was attributable to "worsening market conditions and not to any material change in the evaluation of Washington Mutual's financial condition."[9]

> (iv)    By mid-September 2008, the rates[10] on credit default swaps for WMI investment grade debt had fallen from much higher levels in July and August 2008.  Thus, the market's perception appeared to be that of <u>decreasing</u> default risk.

> (v)    As late as September 16, 2008, WMI was anticipating the open market repurchase of $1.4 billion of senior notes and a tender offer to repurchase $1.2 billion of covered bonds.[11]

(b)    There is significant data to suggest that the value of WMI's assets, at fair saleable value, exceeded the amount of its liabilities, prior to the Date of Receivership.  In fact, based on preliminary analysis, the net asset value of WMI appeared to be stabilizing, if not improving, as of mid-September 2008.  For example:

> (i)    Some Wall Street equity analysts expressed a favorable opinion about the prospect for Washington Mutual's stock.  On September 12, 2008, Goldman Sachs's equity research department upgraded its recommendation on Washington Mutual's common stock from "sell" to "neutral".[12]  On September 19, 2008, Fox-Pitt Kelton published an equity research report stating the Washington Mutual was "significantly undervalued relative to what a likely acquirer might pay," *even after* assuming additional losses of $5.00 per share.[13]

> (ii)    As of September 19, 2008, the market capitalization of WMI (on a consolidated basis) was over $7 billion.[14]

(c)    There is significant data to suggest that WMI was adequately capitalized prior to

---

[9] "WaMu Responds to Standard & Poors Actions; Notes Bank Remains Investment Grade at All Agencies," Business Wire, September 15, 2008.

[10] Credit default swaps (CDS) are a form of insurance against the risk of default.  The higher the perceived risk of default, the higher the rate paid on the CDS.

[11] Washington Mutual internal Treasury department presentation:  Quarterly Financial Close & Governance Meeting, 3Q08, September 16, 2008.

[12] "Goldman Sachs Upgrades Washington Mutual (WM) to Neutral," StreetInsider.com, September 12, 2008, found at: http://www.streetinsider.com/Upgrades/Goldman+Sachs+Upgrades+Washington+Mutual+(WM)+to+Neutral/3984275.html

[13] Fox-Pitt Kelton Cochran Caronia Waller, "Treasury plan raises attractiveness of potential sale," Howard Shapiro, September 19, 2008.

[14] Market capitalization = share price of $4.25 (close on September 19, 2008) x 1.699 billion shares.  Source:  CapitalIQ.

the Date of Receivership.

(i)    The OTS found that "WMB met the well-capitalized standards through the receivership date."  Consistent with this finding by the U.S. Government, WMI's contemporaneous internal forecasts anticipated capital levels "strongly in excess of all regulatory 'well-capitalized' minimums" even without further capital injections.[15]

(ii)    In WMI's internal presentations (as of September 2, 2008) and its public release of 3Q08 earning guidance (on September 11, 2008[16]), the company estimated 3Q08 excess liquidity of $50 billion[17] and an additional cash balance of $12B.  Even under its internal "stress case," WMI was forecasting liquidity "significantly" in excess of its liquidity threshold.

(iii)    WMI (on a consolidated basis), reported net GAAP losses for the first and second quarters of 2008.[18]  However, these reported losses were almost entirely due to non-cash charges to the company's income statement.  For both quarters, the company generated positive operating cash flow totaling over $6.3 billion.  In both quarters, cash flow was further augmented by positive cash flows from investing activities which totaled approximately $4.4 billion through June 30, 2008.  At June 30, 2008, WMI reported $23.7 billion of tangible equity and $26.1 billion of stockholders equity.[19]

(iv)    At least one Wall Street equity analyst believed that Washington Mutual had sufficient access to capital.  On September 11, 2008 HSBC issued an equity research report stating that "as long as [Washington Mutual] has regulatory support (and we believe WaMu has regulatory support. . .), it can continue to raise money needed through the deposit market. . .and FHLB advances."[20]

14.    The seizure of WMB by the OTS was a one-time event that significantly

transformed the structure of Washington Mutual as an integrated enterprise, and the relationship

between WMI and WMB.  As a result WMI, as constituted prior to the date of receivership, was

---

[15] Treasury department presentation entitled, *Capital and Liquidity Update*, provided to the Washington Mutual Asset/Liability Management Committee, dated September 2, 2008.

[16] Company released guidance after the close of trading on Thursday, September 11, 2008.

[17] Of the $50 billion in excess funding capacity, approximately $30 billion was excess borrowing capacity from the Federal Home Loan Bank system.

[18] As of September 25, 2008, Washington Mutual had not filed its form 10Q for the third quarter of 2008.

[19] As reported in Washington Mutual's Form 10Q, for the three-months ending June 30, 2008.

[20] HSBC, "Washington Mutual:  Q3 Guidance Suggests at Least Some Staying Power," by Van Hesser, 11 September 2008.

very different from WMI, as constituted post-receivership.  Because this was a transforming event that occurred on a single date, it does not provide economic evidence to support a presumption of insolvency prior to the event, *i.e.*, for all, or part, of the 90-Day Look-Back period.

15.     Given the indicia of solvency prior to the Date of Receivership, it cannot be presumed that WMI was, in fact, insolvent during the 90-Day Look-Back period.  This question of solvency requires further investigation and analysis.

16.     My analysis is ongoing.  As a first step in forming a reliable opinion of the solvency of WMI and WMB, it will be necessary to identify the assets owned by WMI and WMB as of the petition date and during the 90-Day Look-Back period.  I will then need to identify and analyze the fair saleable value of the assets of both entities on a consolidated and stand-alone basis.  As part of this analysis, it will also be necessary to identify and quantify the realized and contingent liabilities of both entities, on both a consolidated and stand-alone basis. The solvency analysis will also require an analysis of both companies' actual and forecasted sources of capital and liquidity.  At a minimum, these analyses will need to encompass a range of dates that are reflective of the transactions identified by both Debtors and JPMC in various pleadings in this matter.  In addition to continuing a review and analysis of the voluminous documents and information already provided by counsel, I anticipate that additional work steps may include, but not be limited to:

(a)     Review and analysis of certain workpapers prepared by Washington Mutual's external auditors;

(b)     Review and analysis of various intercompany transactions as between multiple Washington Mutual entities;

(c)     Review and analysis of valuation and cashflow models and presentations prepared by TPG group in connection with the April 2008 transaction;

(d)     Review and analysis of certain other third-party bids for the all or some of the assets of WMI and/or WMB during the relevant time periods;

(e)     Review and analysis of information provided to banking regulators;

(f)     Rating agency presentations and models, including correspondence between Washington Mutual and the rating agencies; and

(g)     Interviews, including depositions, of key heritage Washington Mutual personnel.

17.     I declare under penalty of perjury that the foregoing is true and correct.

Executed in Boston, Massachusetts on July 24, 2009.


_____

                    Thomas M. Blake

Exhibit A



INTERNATIONAL

## THOMAS BLAKE
Vice President

M.B.A. Accounting,
Rutgers University, School of
Business Administration

B.A. Economics,
College of the Holy Cross

Post-graduate
studies in business,
American University

Mr. Blake leads the CRA Accounting and Valuation Practice.  While at CRA, Tom has testified on GAAP accounting and valuation matters primarily relating to M&A transactions and troubled companies.  Prior to joining CRA, Mr. Blake was a senior partner at Ernst & Young and managing partner of E&Y's New England Investigative & Dispute Services practice.  At E&Y, he had 32 years of experience, including serving as audit partner on public and private clients, including American Express, Shearson Lehman Hutton, Bank of New England, Bankers Trust, PaineWebber, and Ben & Jerry's Homemade.  Mr. Blake is a certified public accountant in Massachusetts and New York. Mr. Blake has valued over 200 companies, relating to disputed ownership, M&A, solvency and damages.

He is an accredited senior appraiser in Business Valuation with the American Society of Appraisers. He has been admitted as an expert and testified in accounting, valuation, and solvency cases in Federal District, Federal Bankruptcy, numerous state courts, arbitration, and other venues.

Mr. Blake is a certified fraud examiner.  He has investigated many business matters and has significant forensic accounting experience.  His investigative and forensic experience often provides unique inputs for his accounting, reporting, and valuation-related engagements.

## EXPERIENCE

### Bankruptcy and Solvency

*Energy*—Performed forensic analysis of a complex energy trading, pipeline, broadband, and internet company in Chapter 11 with assets in excess of $65 billion.  Performed solvency and valuation analysis of numerous business units, including balance sheet, cash flow and capital adequacy testing.  Valued derivative financial instruments with over $1 trillion of notional value.  (In re:  Enron Creditors Recovery Corp. (formerly known as Enron Corp., et al., Reorganized Debtors, v. Citicorp Inc., et al.)

*Manufacturing*—Dispute concerning solvency and capital adequacy in a leveraged buyout of a supplier of spandex and latex elastomeric fibers (In re: Dennis J. Buckley v. Goldman, Sachs & Co., et al.)

*Financial Services*—Currently performing accounting, valuation and solvency analysis for a major financial services institution.

*Software*—Analysis of failure of software and services company, including solvency and fraudulent conveyances (In re: Divine).

*Consumer Products*—Solvency and fraudulent conveyances analysis for a sports equipment manufacturer (RDM Sports Group, Inc., et al., William G. Hayes, Jr., as Trustee v. Smith Gambrell, Russell, L.L.P. et al.).

*Health Care*—Solvency and fraudulent conveyance analysis of hospital in Chapter 11 (In re: Doctors Hospital of Hyde Park, Inc., LaSalle and ORIX v. Doctors Hospital of Hyde Park, Inc.).

*Retail*—Determined the value of a fast-food chain's business enterprise and the value of companies sold in the period preceding bankruptcy for fraudulent conveyance purposes (In re: Murray Burger King).

*Retail*—Served as accountant for corporate workout and reorganization of a sportswear company. Valued the company, prepared offering book, and negotiated sale of company (In re: CB Sports).

*Consumer Products*—Solvency and zone of insolvency analysis for a holding company with auto retailing, manufacturing and furniture holdings (In re: John S. Periera, Trace Foam Sub, Inc. v. Marshall S. Cogan, et al.).

*Energy*—Analysis of representations and warranties relating to a material adverse change provision in an acquisition (In re: Coho Energy v. Hicks Muse).

*Medical Products*—Engaged by a dental products company to assist in a mergers and acquisitions dispute concerning solvency in a leveraged management buyout (In re: Healthco International, Inc. v. Hicks Muse, Inc., et al.).

*Nursing Homes/Real Estate Development*—Business valuation and solvency analysis of an individual with publicly-held nursing home and real estate development assets (In re: Joseph J. Luzinski, Chapter 7 Trustee, the Estate of Abraham D. Gosman v. Abraham D. Gosman and Lin Castre Gosman).

*Professional Services*—Advisor to the debtor pre and post filing regarding the value of the firm, partner capital, value of client list and the continuing value of on-going engagements (In re: Gaston & Snow)

*Transportation*—Assisted Trustee in operations of debtor and sale of company. Performed business valuation and damage calculation related to fraudulent conveyance issues in a railroad bankruptcy (In re:  Delaware & Hudson).

*Construction*—Analyzed an agreement to dispose of collateral arising from a construction workout in a liquidation (In re: Frank Briscoe Company, Inc. v. The Travelers Indemnity Company).

*Construction*—Engaged by a construction company to provide a forensic accounting analysis of transactions with related parties and piercing of the corporate veil (In re: Stone & Webster).

*Construction*—M&A dispute involving the sale of a $2.7 billion engineering and construction firm whose projects include worldwide electric generating plants (fossil, co-generation, and nuclear), petrochemical facilities, and infrastructure projects, such as dams and bridges (In re: Washington Group v. Raytheon Company).

*Manufacturing*—Dispute concerning solvency and capital adequacy in an LBO for a coal-mining heavy equipment manufacturer including long-term contract accounting and international operations (In re: Bucyrus-Erie Company and B-E Holdings, Inc.).

*Manufacturing*—Forensic and insolvency analysis for international constructor of paper and pulp machinery and mills, including long-term contract accounting (In re: Beloit Creditors Committee v. PricewaterhouseCoopers LLP).

*Investment Company*—Analysis of the factors causing the failure of this leveraged hedge fund (In re: Eagle Cayman).

## Securities and Mergers & Acquisitions

*Computers* and *Electronics*—Conducted financial analysis of multiple mergers in the high-speed computer printer industry in an anti-trust matter.

*Computers and Electronics*—Engaged by a high-technology company to provide expert-witness services including mediation testimony in a merger and acquisition dispute as to the accounting for the carve-out sale of a division.

*Computers* and *Electronics*—Engaged by a high-technology company to conduct a forensic accounting assignment and business valuation including arbitration testimony in a minority shareholder freeze-out.

*Computers and Electronics*—Performed a business valuation in a minority shareholder freeze out.

*Computers and Electronics*—Provided services in a merger dispute concerning the material adverse change provision in a merger agreement.

*Computers and Electronics*—Assisted in a dispute concerning valuation of options and minority shareholder stock in an acquisition.

*Computers and Electronics*—Provided services in a merger dispute concerning comfort letters and a best-efforts clause in a merger agreement.

*Computers and Electronics*—Cost allocation dispute relating to a merger earn-out provision.

*Computers and Electronics*—M&A dispute concerning the loss of a major customer immediately after an acquisition. The company manufactures high-precision metal and plastic parts for computers and for electronic and aerospace equipment.

*Computers and Electronics*—Calculation of golden parachute amounts due to corporate executives in an acquisition.

*Computers and Electronics*—M&A dispute relating to EBITDA and valuation effect of financial restatement.

*Networking Software*—Analyzed software recognition and international software sales practices in a shareholder class action and SEC investigation.

*Networking Software*—Determined damages in a shareholder class action alleging false financial reporting and disclosure.

*Networking Software* —Valued options for a terminated executive in a dispute arising from an acquisition.

*Networking Software* —Valued a minority interest in a marketing and sales subsidiary of a designer, manufacturer and distributor of network software.

*Telecommunications* —Defense of criminal action by Securities and Exchange Commission concerning bill and hold transaction.

*Networking and Telecom Software*—Calculated damages against an investment bank relating to a failed private placement.

*Software*—Assisted in a dispute concerning theft of trade secrets relating to training software.

*Software*—Calculation of damages in the termination of a joint-venture agreement for development of maritime computer simulations.

*Software*—Valued cheap stock in an SEC investigation relating to an IPO for a vision-recognition software developer.

*E-commerce*—Analyzed Internet revenue recognition, inventory and related-party transactions and their effect on M&A pricing.

*E-commerce*—Analyzed the value of investments by joint-venture partners in an acquisition and the effect on phantom stock and stock-appreciation rights.

*Professional Sports*—Testified as an expert witness for the National Football League ("NFL") on finance and valuation issues in anti-trust litigation concerning the ability of NFL teams to go public and the value of an NFL team.

*Consumer Products*—Analyzed sales practices, revenue recognition and inventory issues in a shareholder class action for a footwear manufacturer.

*Consumer Products*—Determined the value of a privately-held specialty cheese company and calculated damages caused by minority shareholder freeze-out.

*Consumer Products*—Performed a minority shareholder stock valuation of a processed meat company in an estate and gift tax matter.

*Consumer Products*—Engaged by a hygiene products company to perform valuation, litigation and expert witness services in a dispute arising from the earn-out provisions of a merger agreement.

*Consumer Products*—M&A dispute concerning valuation of assets and representations and warranties in computer accessory products company.

*Advertising*—Determined shareholder class action damages resulting from a financial reporting fraud in a publicly-held advertising agency.

*Advertising/Publishing*—Determined the business value of a stock photo agency relating to a theft of intellectual property.

*Retail*—Analyzed financial reporting fraud in a food-products company in a shareholder class action and SEC investigation.

*Retail*—Provided due diligence and accounting assistance to a supermarket chain related to an acquisition.

*Retail*—Performed forensic accounting, business valuation and expert witness testimony for a supermarket chain in a minority shareholder freeze-out, fraud and corporate opportunity matter.

*Retail*—Engaged by a supermarket chain to assist in the forensic accounting, valuation and determination of damages in a corporate takeover attempt.

*Retail*—Engaged by a drug and camera retailer to provide forensic accounting and business valuation services in an ownership dispute.

*Retail*—Analyzed the loss in market value experienced by a supermarket chain due to union picketing in an M&A dispute.

*Retail*—Engaged by a grocery wholesaler and retailer concerning overcharges on costs to franchises.

*Retail*—Put option and earn-out dispute in international retailer.

*Retail*—Calculated the earn-out and the complications arising from subsequent mergers and synergies on the earn-out provisions in an M&A dispute concerning a retail chain of drug stores.

*Retail*—Accounting analysis and business valuation relating to a put option of a major shareholder.

*Utility*—Engaged by a water company to address valuation and purchase price issues related to an acquisition.

*Utility*—Engaged by an electric company in a dispute concerning material adverse change in the $5.7 billion merger of two large regulated and deregulated utilities

*Utility*—Engaged by an electric company in an M&A dispute pertaining to changes in business prospects, as well as projections of future revenues, costs, and capital expenditures in a $2.8 billion merger.

*Energy*—Analysis of cash flow and business valuation in a call option dispute relating to a privately held wholesaler and distributor of gasoline and heating oil.

*Energy*—Analyzed damages relating to a dispute concerning assets held for sale in a hostile merger of an industrial gas production and distribution company.

*Energy*—Business valuation for a heating oil and retail gasoline company related to the purchase of a minority shareholder's interest.

*Energy*—Solvency and fraudulent conveyance analysis for an LBO.

*Environmental*—Assisted an environmental testing company in a merger and acquisition dispute concerning representations, warranties and earn-out provisions.

*Environmental*—Assisted a waste management company in analyzing the purchase accounting related to environmental liabilities in a merger transaction.

*Aerospace*—Assisted an aerospace products company in a merger and acquisition dispute involving purchase price accounting, goodwill, intercompany debt, and solvency.

*Medical Products*—Engaged by a magnetic resonance imaging firm to assist in a merger dispute concerning executive termination benefits and a securities fraud matter involving the company's revenue recognition practices.

*Medical Products*—Engaged by a magnetic resonance imaging firm to assist in a mergers and acquisitions dispute concerning a roll-up of MRI centers and fees paid to investment bankers.

*Professional Services Firm*—Analysis of and business valuation for partnership interests in a law firm break-up.

*Real Estate*—Business valuation related to the sale of a division of a property management company.

*Real Estate*—Provided trial testimony relating to a business valuation of a property management company in an ownership dispute.

*Real Estate*—Analysis of a retail mall development relating to a minority shareholder dispute.

*Construction* —Shareholder class action concerning financial reporting, long-term international construction contracts.

*Chemicals*—Determined value of a specialty chemical company and damages resulting from minority shareholder freeze out.

*Entertainment*—Provided assistance in the preparation and analysis of projections and performed valuation work related to acquisitions of television and radio stations.

*Entertainment*—Provided forensic accounting and financial feasibility services as well as hearing testimony concerning a racetrack relating to ownership issues.

*Entertainment*—Provided a videotape distributor with forensic accounting and damages analysis in a mergers and acquisitions dispute.

*Entertainment*—Provided forensic accounting and valuation of racetrack for lender liability and fraudulent conveyances.

*Manufacturing*—Revenue recognition relating to international sales terms, accounting for long-term contracts; development of "revenue at risk" model.

*Manufacturing*—Business valuation and solvency analysis of a management buyout of a farming-equipment manufacturer.

*Manufacturing*—Merger and acquisition dispute concerning working capital calculations and material adverse change provisions in the carve-out sale of a consumer appliance manufacturer.

*Manufacturing*—Mergers and acquisition dispute concerning representations and warranties relating to interim financial statements for a manufacturer of aquarium products.

*Manufacturing*—Mergers analysis relating to international railroad train constructor including long-term contract accounting.

## Financial Services

*Investment Advisor*—Analysis of services and costs for a mutual fund complex.

*Investment Advisor*— Analysis of services, costs and fees charged to a mutual fund complex.

*Investment Advisor*—Testified regarding the value of a minority interest in a closely-held investment advisory firm.

*Investment Advisor*—Forensic accounting for a securities fraud involving a ponzi scheme.

*Investment Advisor*—Valuation of mutual-fund-complex investment advisor in a minority shareholder dispute.

*Investment Advisor*—Forensic accounting on behalf of the Middlesex County District Attorney, Commonwealth of Massachusetts for a securities fraud involving a ponzi scheme at a registered investment advisor.

*Investment Company*—Securities and Exchange Commission—Appointed by the Federal District Court on behalf of the SEC as Examiner and then Receiver of an investment company. Testified as to the amount of losses incurred from a ponzi scheme and traced all monies and balances to customer accounts.

*Investment Company*—Account reconstruction and forensic accounting relating to escheatment.

*Investment Company*—Performed due diligence on the acquisition of a mutual fund.

*Broker/Dealer*—Arbitrator in a merger and acquisition dispute involving earn-out calculations in the sale of a "wirehouse" brokerage firm between two major financial institutions.

*Broker/Dealer*—Analysis of customer accounts for alleged improper broker practices. Developed database to reconstruct and "prove out" all activity and customer balances over a twenty-year period. Analyzed regulatory compliance, such as suitability and churning. (Numerous engagements.)

*Broker/Dealer*—Forensic accounting concerning an internal fraud.

*Broker/Dealer*—Business valuation of a brokerage company. Developed models to value independent broker dealers and registered investment advisors.

*Broker/Dealer*—Forensic analysis of customer accounts, including account reconstruction, suitability analysis, return calculations, and regulatory compliance.

*Broker/Dealer*—Determined the value of a broker dealer and corporate records lost in a fire.

*Broker/Dealer*—Determined the value of a branch office and the economic effect of brokers recruited by another firm.

*Broker/Dealer*—In an arbitration, determined value of a branch office and the economic effect resulting from recruitment of brokers by another firm.

*Broker/Dealer*—Analyzed lost profits relating to a contract dispute with brokers in an interest rate swap.

*Broker/Dealer*—Provided services for an energy derivatives firm in a corporate control dispute.

*Broker/Dealer*—Valued a branch of a regional broker/dealer with respect to employees raided by another firm.

*Investment Bank* —Testified concerning damages against an investment banking firm relating to a failed "best efforts" private placement.

*Commercial Bank*—Analysis of sub-prime loans and CDOs, portfolio management of propriety mutual funds, total return swaps, enterprise cash management, accounting and reporting.

*Commercial Bank*—Securities and Exchange Commission (SEC)—Expert for the SEC on the valuation of securities and amount of damages in a commercial bank securities fraud relating to mutual funds, dormant accounts and escheatment.

*Financial Services* Institution—Analyzed warehouse loans on securitized credit card accounts.

*Financial Services* Institutions—Numerous projects involving investigation of loans, collateral analysis and bankruptcy issues.

*Private Equity*—Business valuation of the general and limited partnership interests in a large private equity investment firm. Valuation of privately held portfolio companies.

*Venture Capital*—Business valuation of general and limited partnership interests in a venture capital firm.

*Insurance*—Analysis of merger of US life insurance companies relating to adequacy of underwriting procedures and resources.

*Insurance*—Determined business enterprise value of an insurance agency and calculated damages in a breach of contract by an insurance underwriter.

*Insurance/Energy*—Calculated damages in a breach of contract matter relating to an insurance broker for petroleum transportation, distribution, and retailing.

*Pension* Plan—Account analysis, portfolio reconstruction, and forensic accounting concerning prohibited real estate transactions.

*Transportation*—Analysis of acquisition of foreign railroad by a major US railroad.

## Intellectual Property

*Computers and Electronics*—Served as mediator regarding reasonable royalties and other disputes pertaining to patented technology.

*Computers and Electronics*—Determined damages caused by patent infringement.