# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
---------------------------------------------------- x
In re                                                :    Chapter 11
                                                     :
WASHINGTON MUTUAL, INC., et al.,¹                    :    Case No. 08-12229 (MFW)
                                                     :
        Debtors.                                     :    Jointly Administered
                                                     :
---------------------------------------------------- x
WASHINGTON MUTUAL, INC. AND                          :
WMI INVESTMENT CORP.,                                :
                                                          Adversary Proceeding No. 09-50934
                                                     :    (MFW)
        Plaintiffs and Counterclaim                  :
        Defendants,                                  :
                                                     :
                                                     :
               v.                                    :
                                                     :
JPMORGAN CHASE BANK, NATIONAL                        :
ASSOCIATION,                                         :
                                                     :
        Defendant and Counterclaimant.               :
---------------------------------------------------- x
```

---

¹      The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395). The Debtors continue to share the principal offices with the employees of JPMorgan Chase located at 1301 Second Avenue, Seattle, Washington 98101.

```
-------------------------------------------------- x
                                                   :
                                                   :
                                                   :
JPMORGAN CHASE BANK, NATIONAL                      :
ASSOCIATION,                                       :
                                                   :
        Cross-Claimant,                            :
                                                   :
             v.                                    :
                                                   :
                                                   :
FEDERAL DEPOSIT INSURANCE                          :
CORPORATION, as Receiver of                        :
Washington Mutual Bank, Henderson,                 :
Nevada,                                            :
                                                   :
        Cross-Claim Defendant.                     :
-------------------------------------------------- x
```

## SUPPLEMENTAL OPPOSITION OF DEFENDANT JPMORGAN CHASE BANK, NATIONAL ASSOCIATION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Adam G. Landis (I.D. 3407)
Matthew B. McGuire (I.D. 4366)
LANDIS RATH & COBB LLP
919 Market Street Suite 1800
Wilmington, Delaware 19899
Tel: (302) 467-4400

– and –

Robert A. Sacks
Hydee R. Feldstein
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Tel: (310) 712-6600

Bruce E. Clark
Stacey R. Friedman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000

*Counsel for JPMorgan Chase Bank,*
*National Association*

September 11, 2009

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT. ........................................................................................ 1

I.    MS. LOGAN'S TESTIMONY HIGHLIGHTS ISSUES OF FACT
     THAT REQUIRE DENIAL OF DEBTORS' MOTION. ....................................... 4

     A.    Disputed Issues of Material Fact Relating to Balances
         in the Disputed Accounts. ............................................................................ 4

     B.    Disputed Issues of Material Fact Relating to the
         $3.67 Billion Book Entry Transaction. ...................................................... 15

     C.    Disputed Issues of Fact Relating to the Relationship
         and Character of the Disputed Accounts. .................................................. 29

II.    SUMMARY JUDGMENT SHOULD BE DENIED AND
     THE TURNOVER CLAIM SHOULD BE DISMISSED
     BECAUSE MS. LOGAN'S TESTIMONY ESTABLISHES
     THE EXISTENCE OF DISPUTES THAT MAKE DEBTORS'
     TURNOVER CLAIM IMPROPER. ..................................................................... 31

CONCLUSION.............................................................................................................. 32

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Fontainebleau Las Vegas* v. *Bank of America*,
No. 09-21879-CIV-ASG (S.D. Fla. Aug. 26, 2009) ..........................................................31

*Griggs* v. *Provident Consumer Discount Co.*,
459 U.S. 56 (1982) ..........................................................................................................2

*In re Allegheny Health, Educ. & Research Found.*,
233 B.R. 671 (Bankr. W.D. Pa. 1999) ...........................................................................31

*In re Lexington Healthcare Group, Inc.*,
363 B.R. 713 (Bankr. D. Del. 2007) ..............................................................................31

*In re Sacred Heart Hosp. of Norristown*,
204 B.R. 132 (E.D. Pa. 1997), *aff'd* 133 F.3d 237 (3d Cir. 1998)..................................31

*In re Student Fin. Corp.*,
335 B.R. 539 (D. Del. 2005) ............................................................................................2

*United States* v. *Inslaw, Inc.*,
932 F.2d 1467 (D.C. Cir. 1991) .....................................................................................31

*United States* v. *Leppo*,
634 F.2d 101 (3rd Cir. 1980) ............................................................................................2

## STATUTES AND RULES

12 U.S.C. § 371c-1(a)(1)(A) ...............................................................................................24

12 U.S.C. § 371c(a)(2) ........................................................................................................25

Fed. R. Civ. P. 56(e)(1) .........................................................................................................2

12 C.F.R. § 223.16(a) ..........................................................................................................25

## OTHER AUTHORITIES

OFFICE OF THRIFT SUPERVISION, DEPARTMENT OF THE TREASURY,
EXAMINATION HANDBOOK 1100P.1 (2009) .......................................................................26

## PRELIMINARY STATEMENT

JPMorgan Chase Bank, N.A. ("JPMC") submits this supplemental memorandum in opposition to the motion of Washington Mutual, Inc. ("WMI") and WMI Investment Corp. (collectively, "Debtors") for summary judgment. Debtors' motion seeks to have this Court direct JPMC to pay Debtors almost $4 billion based entirely on a single affidavit from a WMI employee, Doreen Logan, prior to the commencement of discovery and notwithstanding myriad issues of fact that permeate almost every aspect of Debtors' motion.[2]

Although JPMC requested that Debtors make Ms. Logan available for a deposition *before* JPMC was required to respond to Debtors' motion, Debtors refused to do so. Consequently, on July 24, 2009, JPMC moved to strike Ms. Logan's affidavit in its entirety. JPMC also filed an extensive opposition to Debtors' motion, including two expert declarations, which demonstrates why there are legitimate disputes that make pre-discovery summary judgment inappropriate and identifies key discovery that is needed before the issues involved in this proceeding can properly be adjudicated.[3]

---

[2]     Debtors claim ownership of approximately $4 billion (the "Intercompany Amounts") purportedly on deposit in six accounts (the "Disputed Accounts") at Debtors' former subsidiaries and regulated depository institutions. Debtors contend that the six Disputed Accounts consist of five purported accounts at WMB with account numbers ending in 0667 (the "0667 Account"), 1206 (the "1206 Account"), 9626 (the "9626 Account"), 9663 (the "9663 Account"), and 4704 (the "4704 Account" and referred to collectively along with the other Disputed Accounts at WMB as the "WMB Accounts"), and one such account at WMB fsb ending in 4234 (the "FSB Account"). The FSB Account purportedly contains more than 91% of the total amount sought by Debtors. (A-3, Logan Aff. ¶ 5.)

[3]     This memorandum supplements the opposition that JPMC filed on July 24,

After reviewing JPMC's opposition and the corresponding motion to strike Ms. Logan's affidavit, representatives of the Official Committee of Unsecured Creditors intervened and persuaded the Debtors to make Ms. Logan available for a belated deposition and provide JPMC with the opportunity to supplement its opposition to the summary judgment motion following her deposition. JPMC deposed Ms. Logan on August 26, 2009.[4]

This supplemental opposition addresses the additional issues identified through Ms. Logan's deposition. Although Ms. Logan had the opportunity to study JPMC's arguments and evidence in opposition to the motion in advance of giving testimony, her testimony reinforces the many gaps in her knowledge that render her unable to provide the undisputed factual predicate needed for summary judgment or turnover. Her testimony highlights the existence of material disputed issues pervading virtually every factual assertion underlying Debtors' motion and also illustrates why additional discovery is required.

---

2009 and is without prejudice to JPMC's pending appeal and position that this Court does not have jurisdiction to rule on Debtors' motion while the very subject matter jurisdiction of the Court is being challenged on appeal. *See Griggs* v. *Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (holding that the "filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the [bankruptcy] court of its control over those aspects of the case involved in the appeal."); *United States* v. *Leppo*, 634 F.2d 101, 104 (3rd Cir. 1980) (same); *In re Sacred Heart Hosp. of Norristown*, 204 B.R. 132, 143 (E.D. Pa. 1997), *aff'd* 133 F.3d 237, 241 (3d Cir. 1998) (same).

[4]     JPMC is also submitting herewith an amended motion to strike. JPMC is withdrawing its request to have Ms. Logan's affidavit stricken in its entirety because of Debtors' failure to make her available for a deposition. The amended motion to strike requests that, absent agreement by the parties that the evidence may be considered by the Court, specific statements should be stricken as inadmissible hearsay or otherwise without a proper evidentiary basis. *See* Rule 56(e)(1).

As explained in more detail below, Ms. Logan's testimony amplifies that material issues exist as to, among other things: (i) the source or validity of amounts credited to the Disputed Accounts, to what extent they contain good funds, and who owns any funds that exist; (ii) the nature of the Disputed Accounts, including whether they are demand deposit accounts and the true character of balances in them in light of other intercompany liabilities; (iii) whether approximately $3.67 billion (or more than 91%) of the amounts claimed by Debtors was ever received in a deposit account Debtors claim they created at Washington Mutual Bank fsb ("WMB fsb"), with a backdated transfer accompanied by a roundtrip loan in the week prior to the seizure of Washington Mutual Bank, Henderson, Nevada ("WMB") by the OTS (the "$3.67 Billion Book Entry"); (iv) whether good funds were even available to be delivered to WMB fsb; (v) whether the round-trip, book-entry transaction was properly authorized or consummated; (vi) whether the round-trip, $3.67 Billion Book Entry transaction was illegal, a sham or intended to defraud regulators and bank creditors, among others; (vii) the extent to which the $3.67 Billion Book Entry was a capital contribution; and (viii) the extent of liabilities due from Debtors to WMB or WMB fsb that provide a basis for setoff and/or recoupment by JPMC.

While the clear disputed issues raised in JPMC's original opposition should make it unnecessary for the Court even to consider these additional issues prior to denying Debtors' summary judgment motion, Ms. Logan's deposition provides incremental evidence of the existence of *bona fide* material disputed issues as to Debtors' ownership and entitlement to the funds they seek in this action.

Debtors' motion is specious.  Not only should the Court deny Debtors' motion, but it should dismiss this action because "turnover" is not a proper remedy for property whose ownership is in dispute.

## I.    MS. LOGAN'S TESTIMONY HIGHLIGHTS ISSUES OF FACT THAT REQUIRE DENIAL OF DEBTORS' MOTION.

Ms. Logan's testimony touched on a broad range of topics relevant to Debtors' motion.  In numerous instances, Ms. Logan confirmed that she simply does not have the personal knowledge necessary to establish facts that are material to Debtors' motion.  Debtors cannot simply presume the existence of these facts and the absence of undisputed evidence establishing them requires denial of the motion.  In other instances, Ms. Logan's testimony demonstrates a host of unanswered questions that, alone and together with contradictory statements in documents, raise a broad range of material disputed issues that also preclude summary judgment.  These deficiencies are particularly apparent with respect to the $3.67 Billion Book Entry, where Ms. Logan admits she has no personal knowledge about key aspects of this extraordinary transaction, and her testimony about things she does know make it clear that the entire foundation of this transaction is subject to dispute and cannot properly be the subject of a summary judgment motion on the current record.

### A.    Disputed Issues of Material Fact Relating to Balances in the Disputed Accounts.

#### 1.   What is the source of funds in the Disputed Accounts?

Ms. Logan was unable to testify that all of the funds credited to the Disputed Accounts, the subject of Debtors' motion, belong to Debtors.  (B1022-B1119, Transcript of Deposition of Doreen A. Logan, August 26, 2009 ("Tr.") 69:7-

70:7.)  She had not reviewed the credits (purported deposits) to the Disputed

Accounts, could not testify from where the amounts came or the purpose of the

credits and, importantly, did not know whether they belonged to Debtors.  (Tr. 69:17-

70:7.)  Even as to large deposits made within weeks of the receivership, Ms. Logan

did not have knowledge of the source of the alleged deposits or whether they reflected

funds belonging to Debtors.  (Tr. 56:13-18; Tr. 68-70.)  Debtors' inability to

demonstrate that the approximately $4 billion they are claiming belongs to them

mandates denial of their motion.  If nothing else, Ms. Logan's inability to vouch for

the Debtors' ownership of the amounts they are seeking requires discovery into those

issues before any determination of ownership could be proper.

    **2.**   **Who owns, or has rights to, the $922 million credited to the Disputed Accounts in August and September 2008?**

        Documents upon which Debtors rely reflect that $922 million of the

amount being sought by Debtors' motion is based upon the fact that one of the

Disputed Accounts was purportedly credited with $600 million on August 19, 2008

and $322 million on September 19, 2008.  (A-25, A-54, Logan Aff. Ex. A, Ex. D.)  In

its original opposition to Debtors' motion, JPMC submitted evidence that these

amounts may have been improperly generated by Debtors, who directed that the

balance of an intercompany liability account be paid by WMB and the "funds"

generated thereby transferred into the 0667 account.  Ms. Logan was unable to

explain the purpose of these transactions or provide a basis for Debtors to

demonstrate that the $922 million properly belongs to them or that the FDIC or WMB

bondholders would not have fraudulent transfer, preference or other claims to these

purported funds.  (Tr 230:24-231-7.)  To the contrary, Ms. Logan testified that she was aware of the $322 million credit on September 19, 2008 and that it related in some way to taxes, but she had no involvement in the matter, had no knowledge of the manner in which the $322 million was generated, was unaware that the credit resulted from the reversal of an accrual in an intercompany liability account and could not explain why that occurred or why it was proper.  (Tr. 230:5-232:11.)  As to the $600 million credit in August 2008, Ms. Logan was even less knowledgeable— she did not even have access to the details of the transaction and was unaware of the circumstances of the credit or the basis on which it might properly be claimed by Debtors as their own.  (Tr. 56:13-18.)  Ms. Logan testified that both the $600 million credit in August and the $322 million credit in September were made by book transfers into the 0667 Account, presumably without the movement of good funds, which further calls into question the legitimacy of the transactions.  (Tr. 231:8-13.) The present record, at minimum, establishes a material dispute over ownership of, or claims to, this $922 million.

  **3. Does most or all of $234 million credited to the Disputed Accounts on September 30, 2008 belong to JPMC?**

   JPMC has already demonstrated that one of the Disputed Accounts, the 0667 Account, contains $234.5 million reflecting federal tax refund received from the IRS on September 30, 2008, and millions of dollars in additional state and local tax refunds received since that time.  (B205-B207, Read Decl.)[5]  Ms. Logan testified

---

[5]   Ms. Logan conceded that the $234.5 million (in tax refunds) (and any additional tax refunds credited to the Disputed Accounts) are part of the Intercompany Amounts that are the subject of Debtors' motion.  (Tr. 233:16-234:25.)

-6-

that she was not aware why these funds had been received in the Disputed Accounts and that she did not know the amount of additional tax refunds credited to the Disputed Accounts. (Tr. 233:19-23; Tr. 244:17-25.) Nonetheless, Ms. Logan did admit that a "refund from the IRS" such as the $234.5 million that was wired to the 0667 Account *would be received by [WMI], which would then parcel it out to different Washington Mutual entities that were participants in the consolidated return based upon their tax obligations.*" (Tr. 243:11-21.) Ms. Logan made the same admission in her own pre-receivership, business communications—tax refunds are due to the legal entity entitled to the refund and, generally, "[s]ince WMI is the payer for the consolidated group, we assume that WMI will receive the refund and then WMB, as the largest sub of WMI, will receive most of the refund."[6] Indeed, Ms. Logan, in other communications, noted that WMI would sometimes receive "none of the refund."[7] There are thus material issues as to whether most or all of the $234.5 million in tax refunds being claimed by Debtors in their motion belong to JPMC and how many more millions in tax refunds have been credited to the Disputed Accounts that similarly belong to JPMC.

---

WMB—far and away the single largest entity in the WaMu Group—accounted for approximately 99% of the group's overall tax liability (B205, *Id.* ¶ 9), and had the right to these refunds, an asset sold to JPMC.

[6]      B967, email from Logan to Hunt, February 13, 2008, Ex. 15 to Logan Deposition.

[7]      B969, email from Logan to Winder, February 22, 2008.

4. **What portion of the amounts credited to the Disputed Accounts being claimed by Debtors are capital contributions by WMI that belong to JPMC?**

There are billions of dollars in credits to the Disputed Accounts that appear to come from the TPG capital raise in April 2008. (A-58 (April 2008 Statement for 0667 Account); Opp. at 40-43.) Consistent with other evidence already offered by JPMC in its original opposition, Ms. Logan recognized that rating agencies relied upon these funds as liquidity for WMB.[8] However, Ms. Logan testified that she was not directly involved with the TPG capital raise in April 2008 and therefore has no knowledge of the intended use or ownership of the funds received in April 2008 from TPG. (Tr. 247:15-25.)

Ms. Logan was not privy to discussions with or decisions by the Board of Directors of Washington Mutual and, thus, could not resolve whether the TPG funds (or any other amounts credited to the Disputed Accounts) were committed to, or the property of, WMB. (Tr. 69:17-70:7.) Ms. Logan was also not part of any discussions with regulators regarding the committed uses of the TPG funds, so she could not resolve open questions as to whether there was a regulatory commitment that effectively transferred these funds to WMB. (Tr. 249:18-22.) Ms. Logan's lack of knowledge on these points leaves unanswered, and incapable of resolution on Debtors' summary judgment motion, the question of whether Debtors are seeking to recover amounts that are properly capital contributions made to WMB.

---

[8] B979-B980, email from Logan to Akre, August 5, 2008, Ex. 16 to Logan Deposition.

### 5. Was the $3.67 Billion Book Entry transfer a capital contribution to WMB fsb?

Ms. Logan's testimony highlights the existence of a factual dispute—created by the very documents on which Debtors rely for summary judgment—as to whether the $3.67 Billion Book Entry was a capital contribution made to (and owned by) WMB fsb. Those documents reflect that the transaction was recorded on the general ledger as "WMI contributes to [WMB] fsb" $3.67 billion.[9] In her affidavit, and initially in her testimony, Ms. Logan asserted that she has "personal knowledge" that this entry was an "error" on the basis of what she was told by one of her colleagues and her purported review of all of the previous transactions using these forms that were "posted specifically for [WMI]." (Tr. 159:24-160:5; A-16-A-17, Logan Aff. ¶ 40 & n.5.) In her affidavit in support of Debtors' motion, and again in her testimony, Ms. Logan asserted that this "error" was caused by the use of template general ledger entries for a previous WMI contribution to one of its subsidiaries, and the term "WMI contributes to fsb" merely carried over to the general ledger entries for the $3.67 Billion Book Entry. (A-16-A-17, Logan Aff. ¶ 40 & n.5; Tr. 160:6-8.) However, the prior journal entries do not use this template language but use different language, as Ms. Logan was forced to concede when she was presented with those prior entries during her deposition. (Tr. 164:12-16.)

Not only does this raise a significant question about Ms. Logan's credibility, but it highlights a disputed issue. The very documents on which Debtors are relying for the proposition that the $3.67 billion being claimed is in an account at

---

[9] *See* B199-B200, Ex. F to Stephen Decl.; B999, Ex. 6 to Logan Deposition.

WMB fsb that belongs to WMI themselves raise a question as to whether any such funds were contributed and belong to WMB fsb.  Although Ms. Logan's affidavit contains extensive argument (obviously drafted by counsel) that no such transfer was intended,[10] Ms. Logan's explanation for the documents being in "error" because of a template is in dispute—if not demonstrably false.  And because Ms. Logan testified that she was not involved in the decision to engage in the $3.67 Billion Book Entry transaction, she is therefore not in a position to testify as to what was intended.  (Tr. 100:4-16.)[11]  It is difficult to conceive of a clearer disputed issue of material fact than this one.

**6.  Are the Disputed Accounts demand deposit accounts?**

Debtors' motion is premised on the assertion that the six Disputed Accounts are all demand deposit accounts belonging to Debtors.  At her deposition, however, Ms. Logan acknowledged that there are no account agreements, signature cards or other documents that reflect the terms and conditions of these accounts.  (Tr. 74:11-24.)  In addition, with respect to the FSB Account, Ms. Logan explained that,

---

[10]     Ms. Logan was not permitted to testify as to the process of drafting her affidavit, including what language was hers, what language was drafted for her, what changes she made to language drafted for her, and other extant non-privileged facts. (Tr. 45:6-48:25.)  Particularly given the argumentative nature of much of Ms. Logan's affidavit, these improper instructions not to respond to questions about the process by which the affidavit was prepared and presented to the Court cast further doubt on the affidavit's credibility, particularly because it is the sole basis for granting a $4 billion summary judgment motion prior to discovery.

[11]     Q:  Were you given any information as to who had made the decision to engage in this transfer?

A:  No.

given the extraordinary rush to open the account, the account is (purportedly) improperly coded as a money market account. (Tr. 144:17-145:4.) In the absence of documents identifying the terms applicable to any of the Disputed Accounts that may be considered demand deposit accounts, Washington Mutual's standard account terms applicable to customer accounts would be applicable, or at minimum there is a material dispute as to whether those standard customer terms would be applicable. Under those standard account terms (*see* B133-B172), there are material issues as to whether WMB fsb would have been able to reject the purported $3.67 billion deposit to the FSB Account because of Debtors' failure to deliver good funds, and whether any actual funds delivered and credited were subject to full rights of setoff and recoupment. (B148, MBA Policy requiring "deposits in current funds.")

7. **Did the Debtors fail to disclose material facts to the Court concerning the nature and ownership of three of the Disputed Accounts?**

Ms. Logan's testimony reveals that Debtors were not fully candid when claiming that all of the funds purportedly credited to the Disputed Accounts belong to WMI. Ms. Logan admitted at her deposition that the funds credited to the 1206 Account, described in her affidavit as belonging to WMI, were collateral for services provided by WMB to WMI and subject to a security interest *in favor of WMB*. (Tr. 83:8-87:5.) Ms. Logan claimed not to know whether the 9663 Account is subject to a security interest in favor of WMB (Tr. 87:10-18), although, in fact, a security agreement for WMB's benefit does exist (*see* B22-B28) and even Ms. Logan ultimately conceded that the 9663 Account was credited with amounts WMI "pledge[d]" to WMB to pay for litigation expenses. (Tr. 95:3-14.) Likewise, Ms.

Logan conceded at her deposition that the 9626 Account was primarily for political donations.  (Tr. 93:14-25.)  Federal Elections Commission contribution records establish a material issue of fact as to whether those contributions were made on behalf of WMB and, therefore, whether the funds in the account were the property of WMB.[12]  These admissions, the substance of which Debtors failed to disclose in their motion, create material issues of fact as to the extent to which the Disputed Accounts were credited with funds due to WMB that are the property of JPMC.

### 8. Do other parties have claims to any amounts actually in the Disputed Accounts?

Third parties have claimed an interest in the Disputed Accounts to the extent it turns out the accounts have any actual funds in them.  This appears to derive, in part, from the transactions in August and September 2008, discussed above, whereby WMI suspiciously tried to add $922 million to its coffers by converting the $922 million from a general ledger entry at WMB to a deposit liability owed to WMI.  Ms. Logan was unable at her deposition to explain this transaction.  (Tr. 230:24-231:7.)  But there is evidence that this transaction was undertaken to manufacture "capital" that WMI could contribute back to WMB to satisfy the OTS's demands that WMI formally contribute capital to WMB.[13]  Indeed, Ms. Logan explained at a liquidity meeting she attended that "the $500 million in capital contributed from WMI

---

[12]     B1444-B1446, Federal Election Commission Individual Contribution Search Results, http://www.fec.gov/finance/disclosure/norindsea.shtml (last visited September 11, 2009); B1147-B1151, The Center for Responsive Politics Search Results, http://www.opensecret.org (last visited September 11, 2009).

[13]     B991, email from Wu to Williams, September 12, 2008; B981-B982, email from Freilinger to Casey, August 19, 2008.

to WMB is offset by $600 million moved from WMB to WMI for taxes payable."[14] Put differently, while WMI had committed to its regulators to make a free and clear capital contribution to WMB, WMI actually generated the cash for that "contribution" by forcing WMB to first pay WMI the funds necessary to cover the "contribution" and then round tripping those same funds back to WMB (minus the several hundred million WMI kept for itself). It is inconceivable that the regulators who directed the contribution to WMB meant for the funds for the contribution to come from WMB, or that WMI should have been taking any money from WMB on the eve of receivership.

As claimed by the FDIC in its opposition to the Debtors' motion, to the extent these funds are not the property of WMB, it appears that WMI stripped these funds from WMB as part of a fraudulent conveyance against the FDIC as receiver.[15] WMB bondholders have asserted similar claims. Ms. Logan's inability to explain this transaction, therefore, reinforces the material disputed issues that relate to claims by third parties to amounts in the Disputed Accounts being claimed by Debtors.

### 9. To what extent does JPMC have rights of setoff and recoupment?

Ms. Logan's testimony confirms that significant material issues of fact remain as to JPMC's right to set off against any funds credited to the Disputed Accounts. JPMC's right to setoff obligations owed to Debtors arose either at the time of the Purchase and Assumption Agreement (the "P&A Agreement") with the FDIC

---

[14] B986, WaMu Liquidity Management Working Group Committee Minutes, dated August 25, 2008.

[15] B1139-B1141, FDIC Opposition to Debtors' Motion for Summary Judgment, July 24, 2009, D.I. 97, at 14-17.

or when WMI first disputed JPMC's ownership of the disputed assets through the claims process established by the FDIC.  Although Debtors expend significant effort trying to defeat JPMC's claims of setoff based on arguments about insolvency and transfer, Ms. Logan could not dispute that JPMC has the right of setoff through the Master Business Agreement, which sets forth the terms and conditions governing all deposit accounts established at WMB and WMB fsb.  (Tr. 73:8-24.)  Furthermore, given Ms. Logan's concession that no funds were transferred from WMB to WMB fsb to support the $3.67 Billion Book Entry transaction (Tr. 126:4-6), material questions remain as to whether the nature of the $3.67 Billion Book Entry could even destroy mutuality as the depository institution would necessarily have the right to recoup for the failure to receive good funds against any amounts credited for receipt of those funds.  (*See* Opp. at 55-57.)

      **10. Do the account statements for the Disputed Accounts generated by JPMC following the receivership reflect anything more than JPMC's continuation of the computer coding programmed by Debtors, prior to the receivership, while this dispute is pending?**

      Ms. Logan's affidavit attaches account statements for the Disputed Accounts generated by JPMC post-receivership and references purported statements from present or former JPMC employees to the effect that JPMC has treated the Disputed Accounts as deposit accounts since acquiring WMB's assets from the FDIC. (*See* A-3, A-18-A-19, A-35-A-41.)[16]  Debtors argue that this evidences that the

---

[16]     JPMC has already submitted a declaration from one current JPMC employee, Rosa Cox, disputing Ms. Logan's recounting of their conversation.  (*See* B230-B231, Declaration of Rosa Cox.)  Ms. Logan acknowledged that the other individual she references, Beverly Bruce, is not presently a JPMC employee (Tr. 250:17-251:4) and therefore not within JPMC's control for purposes of responding to the present motion.

Disputed Accounts are deposit accounts owned by Debtors. During her testimony, Ms. Logan acknowledged that no one told her that JPMC had made a conscious decision that these were deposit accounts. (Tr. 254:17-23.) She could not testify that the account statements are anything other than automatically generated statements reflecting the manner in which she and others had elected to code the accounts prior to receivership, nor could she testify that the statements reflected anything other than JPMC maintaining the pre-existing coding while this dispute is pending. (Tr. 253:17-254:16.) As set forth in the attached declaration of Corrine Berger, these account statements do not reflect any substantive determination by JPMC with respect to the Disputed Accounts and merely evidence a continuation of pre-existing coding while this dispute is pending. (B1018, Burger Decl. ¶¶ 3, 4.)

**B.    Disputed Issues of Material Fact Relating to the $3.67 Billion Book Entry Transaction.**

**1.    Was the FSB Account ever properly established?**

Ms. Logan's testimony reinforces the evidence detailed in JPMC's opposition (Opp. at 17-22) that there are material issues of fact as to whether the FSB Account—which contains approximately 91% of the amount that Debtors claim in their motion—was ever properly established. Ms. Logan concedes that the FSB Account was not opened on September 19, 2008 as requested and, despite the fact that this account is central to this motion, she "*can't say for certain when the actual 4234 [FSB] account was opened.*" (Tr. 71:4-12.)

In fact, the FSB Account was not properly opened as late as September 24,

2008, if ever.[17]  Ms. Logan cavalierly admits that her attempt to open the FSB

Account required a "*workaround*" of Washington Mutual's internal policies to allow

WMI to establish a purported deposit liability at WMB fsb.  (Tr. 117:5.)[18]  Ms. Logan

testified that her "workaround" was "required" because Washington Mutual was

barred from opening an intercompany "GL [general ledger] account too close to

month end."  (Tr. 117:4-7.)  Moreover, despite Ms. Logan's effort to downplay the

extraordinary nature of these events, no intercompany deposit demand account had

*ever* existed at WMB fsb before the $3.67 Billion Book Entry.  (Tr. 119:6-8.)

Ultimately, even Ms. Logan admits there is no account documentation for the FSB

Account—or any of the Disputed Accounts—evidencing an issue of fact as to

whether any of the accounts was properly opened as a deposit account.  (Tr. 74:11-

24.)

Ms. Logan's testimony confirms one key fact—she does not even know

whether the FSB Account could have been opened and funded with $3.67 billion as

---

[17]      B1003, email from Noblezada to Plummer, September 24, 2008, Ex. 3 to
Logan Deposition.

[18]      Although, under oath, Ms. Logan asserted on several occasions that there was
nothing unusual about the $3.67 Billion Book Entry (Tr. 34:24-35:8), in email
messages, Ms. Logan's colleagues described this accounting maneuver as creating a
"drama."  (B1007, email from Noblezada to Ghasemi, September 25, 2008.)  Ms.
Logan's characterization of this transaction as normal (which she later contradicted
(Tr. 114:15-21)) is suspect (along with her credibility) given, among other things
described in this memorandum, the extraordinary efforts being made to rush this
account and this transfer into existence in derogation of procedures, the extreme
financial circumstances existing at Washington Mutual at the time of these events, the
fact that no demand deposit account for any Washington Mutual company had ever
existed at WMB fsb previously, the efforts made to facilitate the companion loan
even though WMB did not have the collateral available to support it, and the efforts
to swiftly move this money out of Washington Mutual entirely.

claimed without the companion note simultaneously loaning the same $3.67 billion back to WMB. (Tr. 127-28.) And, because there are material issues as to whether that "loan" was authorized, documented, even possible or ever occurred (see below), there are of necessity material issues as to the existence of the FSB Account, as well as any funds purportedly credited to that account.

### 2. Were any funds actually credited to the Disputed Accounts?

At her deposition, Ms. Logan admitted that no funds were actually moved from WMB to WMB fsb as part of the $3.67 Billion Book Entry transaction. (Tr. 128:5-22.) After explaining her belief that the transaction could have been effected by either "a book transfer" or a "wire transfer that would [send cash] . . . to the Fed and then come back to Washington Mutual" (Tr. 123:17-124:3),[19] Ms. Logan stated that she decided to effectuate the transaction by mere book entry. (Tr. 126:4-6.) Ms. Logan acknowledges that she contemporaneously understood that there was no economic substance behind the $3.67 Billion Book Entry that was being recorded on Washington Mutual's books because she understood that the "funds" would be simultaneously loaned back to WMB pursuant to the Master Note between WMB and WMB fsb. (Tr. 127:11-20.) She did not know whether the transaction could have been carried out without the simultaneous loan back because, given the circumstances, she did not know whether WMB could move $3.67 billion to WMB fsb. (Tr. 124:11-18; 128:5-22.) These statements, on their own, demonstrate that no

---

[19]     As explained below, it is simply untrue that Ms. Logan could have had WMB send a wire for $3.67 billion to WMB fsb because WMB did not have sufficient capacity to send a wire in that amount.

funds were credited to the FSB Account raise a material issue as to whether any actual funds were credited to any of the Disputed Accounts by virtue of the accounting book entry that Debtors directed.

### 3. Could actual funds have been moved from WMB to WMB fsb?

Ms. Logan's testimony not only establishes that WMB did not transfer any cash to WMB fsb to support the purported $3.67 billion increase in deposit liabilities at WMB fsb (Tr. 126:4-6), but also raises significant issues of fact as to (i) whether any such transfer was even possible, given WMB's strained cash resources and limitations on its ability to move funds at the time of the $3.67 Billion Book Entry, and (ii) whether such cash existed at all.

Ms. Logan states that she made no effort to establish whether funds even existed at WMB that could be credited to the new account.[20] (Tr. 130:5-22.)  The record shows that, on or about September 24, 2008, when the $3.67 Billion Book Entry (and the corresponding "loan" to WMB from WMB fsb) was recorded, WMB had approximately $1.8 billion federal funds to satisfy its cash needs, far short of the amounts that were supposed to be available to back this purported deposit liability.[21] Contemporaneous documents also establish that WMB was at times during this

---

[20]      Ms. Logan was unable even to explain how there could possibly be almost $4 billion in the Disputed Accounts being claimed by Debtors, or where it came from, given her contemporaneous email stating that the balances were $3.5 billion at the end of August, her acknowledgement that $500 million was thereafter contributed to WMB during September, and her recognition that Washington Mutual was losing money during this period of time.  (Tr. 245:5-246:25.  *See* B979-B980, email chain including August 5, 2008 email from Logan to Akre, Ex. 16 to Logan Deposition.)

[21]      B1005-B1006, email from Bjorklund to regulators, September 24, 2008.

period overdrawn such that it could not effectuate any outgoing wire transfers[22] and that WMB was stretching to borrow money from the Federal Reserve and from the FHLB to meet the withdrawal run it was experiencing from ordinary depositors.[23] Likewise, although Ms. Logan claims not to have any knowledge of discussions to move the purported $3.67 billion out of the Washington Mutual family to a third party institution (Tr. 132:3-9), contemporaneous documents indicate that such an attempt was contemplated by WMI, but was unsuccessful because the financial capacity to do so did not exist.[24]

Debtors seek to avoid the ultimate conclusion that there was no cash to support the amounts credited to the Disputed Accounts by having Ms. Logan testify that she does not have knowledge as to whether WMB had adequate liquidity to transfer funds to WMB fsb via a wire transfer through the federal wire system, as it would have done in any transaction with another federally chartered thrift or bank (Tr. 125:12-126:3) and having her claim to have been ignorant at the time she was effecting the $3.67 Billion Book Entry about the liquidity crisis from which WMB

---

[22]     B996, email from Koh to Bjorklund, September 22, 2008; B1011, email from Smallow to Schulte, September 25, 2008.

[23]     B993-B994, email from Rotella to Board of Directors, September 19, 2008; B995, email from Freilinger to regulators, September 20, 2008; B997, email from Bjorklund to regulators, September 23, 2008.  Although there was approximately $2.6 billion in cash equivalents available at WMB, Debtors have presented no evidence that these funds were available to satisfy any intercompany deposit liability when they were at WMB, could have been moved to WMB fsb to support a transfer of that amount out of WMB, or instead were committed to uses necessary to keep WMB a going concern.

[24]     B1012-B1016, email chain ending with email from Smith to Smallow, September 25, 2008.

was suffering (Tr. 106:21-23). However, this testimony is inconsistent with Ms. Logan's contemporaneous statements and, frankly, not credible given that she was a member of the Liquidity Management Working Group Committee that analyzed WMB's liquidity,[25] attended meetings with regulators where WMB liquidity issues were discussed (Tr. 248:11-249:13), and "was in the same treasury group as those who monitor liquidity and [she] had knowledge of how to find the information quickly" (Tr. 151:16-19).

Ms. Logan's testimony and the record before the Court amplifies the clear dispute as to whether funds could have been moved (or even existed) to support the claimed $3.67 billion deposit liability in the FSB Account that is the subject of more than 91% of Debtors' motion.

### 4. Whether the purported transfer is void because of Ms. Logan's admission that the $3.67 billion was immediately "loaned back" from WMB fsb to WMB to effectuate the $3.67 Billion Book Entry transaction?

Ms. Logan admitted that the $3.67 Billion Book Entry transaction would not have been accomplished without the loan back to WMB from WMB fsb so that no "funds" ever had to leave WMB (Tr. 127:16-20), thus highlighting that no real transfer of funds from WMB to WMB fsb could have taken place absent the fiction created by the simultaneous loan back. Ms. Logan also explained at her deposition that WMB did not have $3.67 billion in collateral necessary to support an increased borrowing in that amount on the secured note between WMB and WMB fsb (Tr.

---

[25]     *See* B983-B990, Liquidity Management Working Group Committee Meeting Minutes, dated August 25, 2008.

186:24-187:21), highlighting one of the many infirmities of the "loan" that effectuated the transfer.  At best, Debtors are confronted with material issues of fact, the resolution of which may lead to the conclusion that the $3.67 Billion Book Entry was never properly effected.

**5.    Was the $3.67 Billion Book Entry transaction, including the loan from WMB fsb to WMB, properly authorized?**

Ms. Logan's deposition confirms that there is a material disputed issue as to whether the loan from WMB fsb to WMB that was an integral and necessary element of the $3.67 Billion Book Entry transaction was ever properly authorized and approved by WMB fsb, or ever actually effectuated.

As Ms. Logan testified, the accounting maneuvers associated with the $3.67 Billion Book Entry—including structuring the $3.67 Billion Book Entry to purportedly transfer deposit liability to WMB fsb and simultaneously loan back those "funds" to WMB—were done at the direction, and for the benefit, of WMI.  (Tr. 59:16-60:10.)  Ms. Logan specifically explained that she (and others) were acting *"on behalf of WMI"* (Tr. 59:20-22), although she does not know the details of who precisely made the decision to engage in the $3.67 Billion Book Entry transaction.  (Tr. 100:13-101:6.)  Ms. Logan did not pretend that the purported loan from WMB fsb to WMB was an arm's-length transaction, instead asserting (wrongly) that it did not need to be, and implying in effect that WMI had the right to take advantage of WMB fsb and put it in financial peril through such a one-sided transaction.  (Tr. 208:5-9.)

With respect to WMB fsb, the loan, as explained by Ms. Logan, required

both an increase in the size of the Master Note by several billion dollars and WMB

fsb's agreement to cease requiring a pledge of collateral supporting the Master Note

despite the then-existing pledge agreement and applicable banking law. There is at

minimum a material issue as to whether the loan or the waiver of the pledge

requirement were ever properly authorized. Ms. Logan concedes that the Board of

Directors of WMB fsb was never consulted on any aspect of the $3.67 Billion Book

Entry. (Tr. 184:6-18.) Indeed, Ms. Logan could not resolve the open issue of fact as

to whether WMB fsb even had a separate functioning Board of Directors at the time

of the purported $3.67 Billion Book Entry. (Tr. 184:19-185:6.) Accordingly, Ms.

Logan could not testify, and in fact there is no evidence, that the transaction was

properly approved in accordance with WMB fsb's policy governing transactions with

WMI. The policy states, in pertinent part, that a transaction with an entity such as

WMI "will be submitted to the Board of Directors for prior approval if the magnitude

or nature of such transaction would affect the operations of [WMB fsb] so greatly as

to cause such a transaction to exceed" the authority delegated to the officers of WMB

fsb.[26]

There is also no evidence that the "loan" was ever documented, which at

minimum creates an issue of fact as to whether the "loan"—and therefore by

definition the entire $3.67 Billion Book Entry transaction—ever occurred. Ms. Logan

acknowledged that, prior to the time of this purported transaction, the Master Note

loan from WMB fsb to WMB was fully collateralized by a written asset pledge

---

[26]     B123; *see* B116-B124, Washington Mutual Bank fsb Policy on Transactions
with Affiliates and Other Related Companies.

agreement.  As explained by Ms. Logan, to make the loan, WMI needed to "increase

the size of the Master Note," which was a credit revolver "between [WMB] (as

borrower) and WMB fsb (as lender), from $15 billion to $20 billion."  (Tr. 180:22-

181:23.)[27]  However, after the $3.67 Billion Book Entry transaction was already

supposed to have occurred, she learned that WMB did not have sufficient collateral to

pledge to support the necessary increase in the loan amount.  (Tr. 187:9-13.)  Rather

than recognize that this precluded the $3.67 Billion Book Entry transaction from

occurring, Ms. Logan sought approval to temporarily eliminate the collateral

requirement entirely[28] and she obtained such approval from her boss, who was also

acting for WMI.[29]  (Tr. 198:9-16; Tr. 199:19-24.)

       Moreover, even though Ms. Logan intended to arrange for the existing

pledge agreement to be amended to relieve the collateral requirement and release the

existing collateral, there is no evidence that any such document was ever executed.

---

[27]     B6-B9, Master Note.  As noted in JPMC's opposition, the loan appears to
have been put in place at the instruction of Tom Casey and Robert Williams.  *See*
B104, email from Williams to Smith, September 21, 2008; B106-B107, email from
Smith to Casey, September 19, 2008.

[28]     Ms. Logan explained that she requested this change *"[b]ecause it was my
understanding that we would not have sufficient collateral, that the bank would not
have sufficient collateral to pledge to the fsb."*  (Tr. 187:9-13.)

[29]     The extraordinary nature of this particular acknowledgment and the issues it
alone raises cannot be overstated.  Not only did Ms. Logan and her cohorts seek to
relieve themselves of the obligation to post collateral to paper the $3.67 billion loan
that they needed to document this sham transaction, but they actually went beyond
that and purported to release all collateral already pledged by WMB supporting the
already-outstanding balance of almost $15 billion on the Master Note. (Tr. 212:16-
213:3.)  From the perspective of WMB fsb, the result of this was to strip away
protections provided by federal banking law and leave it vulnerable to self-dealing
transactions purely for WMI's benefit.

(Tr. 214:23-215:7.) Ms. Logan has never seen an amendment in fact increasing the capacity of the Master Note from $15 billion to a different amount. (Tr. 181:8-11; Tr. 183:6-10.) At minimum, this evidence highlighted by Ms. Logan's testimony at her deposition creates a material issue as to whether the loan necessary for the purported $3.67 billion transfer to have occurred was ever approved, or even happened.

### 6. Did the purported $3.67 Billion Book Entry transaction violate applicable banking laws and/or Washington Mutual policies?

JPMC's opposition raises material issues of fact as to whether the $3.67 Billion Book Entry complies with the Federal Reserve Act, violates commitments to regulators and did not comply with internal policies. (*See* Opp. at 24-28.)

To begin, Ms. Logan's testimony establishes that the $3.67 Billion Book Entry (and corresponding loan back) was for the benefit of WMI. (Tr. 59:16-22.) A transaction for the benefit of WMI (among other things) is governed by Section 23B of the Federal Reserve Act and must be executed on an arm's-length basis.[30] Ms. Logan, however, concedes that the $3.67 Billion Book Entry and corresponding loan back were not an arm's-length transaction. (Tr. 208:5-9.) Indeed, Ms. Logan could not explain how the $3.67 Billion Book Entry could ever qualify as an arm's-length transaction given that WMI was simply pawning off any credit risk it had from WMB (posed by WMB's possible seizure) onto WMB fsb. (*See* Tr. 173:3-11; B227-B228, Brennan Decl. ¶¶ 4-5.)

Ms. Logan also acknowledges that WMI did not comply with Section

---

[30]     *See* 12 U.S.C. § 371c-1(a)(1)(A).

23A of the Federal Reserve Act, which requires bank loans to affiliates to be secured by a statutorily mandated amount of collateral. (Tr. 203:21-204:24.)[31] Ms. Logan admits that no collateral was posted to support the extraordinary loan by WMB fsb to WMB under the Master Note that was made on WMI's behalf in connection with the $3.67 Billion Book Entry.[32] (Tr. 186:24-187:21.) Ms. Logan admits WMB fsb had never before loaned any funds to WMB without receiving adequate collateral (Tr. 190:18-24), yet was directed by WMI to offer this uncollateralized loan to WMB, at a time when WMB was on the precipice of failure, because WMB did not have sufficient collateral to support such a loan.[33] (Tr. 187:9-13.)

This decision not only violated federal law, but it also violated Washington Mutual's own policies, which required collateral to be posted at the time

---

[31]     Section 23A's requirements apply not only to direct transactions between a bank and its affiliates, but also to indirect transactions that may benefit a bank's affiliates pursuant to the "attribution rule." 12 U.S.C. § 371c(a)(2); *see also* 12 C.F.R. § 223.16(a).

[32]     *See also* B109, email from Logan to Freilinger, September 24, 2008; B998, email from Logan to Smith, September 23, 2008.

[33]     Ms. Logan asserts that WMB fsb's "loan" of $3.67 billion to WMB was "[i]n the normal course of business" because WMB fsb had "excess funds they . . . loaned back to the bank" by accepting WMI's purported deposit liability. (Tr. 201:24-202:2.) This makes no sense. While WMB fsb did from time to time loan back to WMB the "excess" funds generated by assets (such as pools of subprime mortgages and securities) that it held for sale or investment, no such excess "cash" was loaned here. To the extent that WMB fsb received anything through the $3.67 Billion Book Entry, it received a purported deposit liability *without* receiving *any* good funds to support this extraordinary increase in its deposit liabilities. Thus, because its funding capacity was not increased through the $3.67 Billion Book Entry, it had *nothing* "excess" to loan back to WMB—nevertheless, it was made to do so by WMI in WMI's extraordinary attempt to manufacture credit protection for its own purported exposure to WMB.

of the transaction.[34]  (Tr. 187:19-21; Tr. 197:2-7; Opp. at 24-28.)  As explained by

Ms. Logan, without changing the underlying documentation and policies, "[w]e

would have been out of compliance with our own policy."  (Tr. 187:19-21.)  In

connection with the $3.67 Billion Book Entry, Ms. Logan "requested that we

eliminate or suspend the collateral pledge."  (Tr. 186:24-187:2.)  Chad Smith, a WMI

officer, was consulted,[35] and a dual WMB and WMB fsb employee, Peter Freilinger,

agreed—purportedly on behalf of both banks—to cease posting collateral to support

the Master Note.  (Tr. 198:11-199:24.)  WMB ceased posting collateral

immediately,[36] but Ms. Logan concedes that she has never seen a signed version of

the Asset Pledge Agreement that would need to be amended to waive the internal

collateral requirements.  (Tr. 198:6-8.)

        For obvious reasons, it is important for a thrift to follow its own

internal policies.  The OTS emphasizes the importance of "[i]nternal controls that

afford ongoing monitoring to ensure transactions are executed in accordance with

program standards."[37]  In light of Ms. Logan's testimony, it is clear that intercompany

policies and practices at Washington Mutual were ignored when convenient,

---

[34]     Ms. Logan described the Master Note as *"basically a commercial loan from [WMB] fsb to WMB."*  (Tr. 175:13-16).  *See also* B962, email from Logan to Phillips, April 12, 2006, Ex. 9 to Logan Deposition.  However, no commercial lender in the ordinary course would waive collateral requirements for a borrower undergoing a financial crisis.

[35]     B108-B109, email from Logan to Freilinger, September 24, 2008.

[36]     B1000, email from Logan to Falls, September 24, 2008.

[37]     OFFICE OF THRIFT SUPERVISION, DEPARTMENT OF THE TREASURY, EXAMINATION HANDBOOK 1100P.1 (2009).

highlighting a material issue of fact as to whether the facial book entries on which Debtors rely for this motion merit any presumption of reliability.[38]

Similarly, the increase in the Master Note and the corresponding loan to WMB are directly inconsistent with the "Project Fillmore" plan by WMB fsb to reduce the size of its Master Note exposure to WMB.[39]  This plan had been presented to the Board of Directors of WMB fsb, was intended to rectify a problem with the ever-increasing size of the Master Note that Ms. Logan contemporaneously called "nuclear,"[40] and had been submitted to the OTS for approval.  (Tr. 110:18-112:10.) This entire program aimed to reduce the size of the Master Note was vitiated by the $3.67 Billion Book Entry, which even Ms. Logan conceded during her deposition would have exacerbated the Master Note problem, at least on a "short-term" basis. (Tr. 111:24-112:3.)

Ms. Logan further admits that she did not consider whether it was prudent for *WMB fsb* to loan money to WMB without the pledge of collateral.  (Tr. 193:20-194:3.)  These admissions reveal a thinly veiled attempt by WMI to shift the risk of WMB's failure from WMI to WMB fsb, and further illustrate the existing

---

[38]     Ms. Logan's testimony emphasizes the material issue of fact regarding the actual source of collateral for the $3.67 billion loan.  One obvious source for adequate collateral for the $3.67 billion increase in the Master Note necessary to make the Master Note increase lawful are any funds credited to the purported deposit account. That collateral would have been acquired by JPMC through the P&A.  (*See* A-175, P&A § 3.1.)

[39]     *See* B95-B101, Memorandum to Board of Directors of WMB fsb, dated August 14, 2008.

[40]     B970, email from Logan to Stearns, July 29, 2008.

material unresolved issues of fact involved in the $3.67 Billion Book Entry

transaction that preclude Debtors' motion for summary judgment.

### 7. Was the $3.67 Billion Book Entry transaction an effort to defraud WMB fsb?

Ms. Logan's testimony raises further material questions as to whether this

entire transaction was a sham intended to defraud regulators and bank creditors,

among others. At the direction of WMI, the FSB Account and the other

intercompany accounts that were established were not credited with good funds. For

at least the FSB Account, the funds purportedly credited to the original WMB account

(the 0667 Account) appear to have been spent, leaving WMB with insufficient funds

to establish at WMB fsb an ordinary deposit account backed by good funds.

Nonetheless, the day after the receivership, Debtors attempted to transform the newly

created intercompany FSB Account into an ordinary deposit at The Bank of New

York.[41] Had Debtors succeeded they would have, on the day before the receivership,

required WMB fsb to accept a deposit liability without good funds and then, on the

day after the receivership, required WMB fsb to wire transfer its own funds out to

create a real deposit account at The Bank of New York, in WMI's name.[42] Because

that attempt failed, Debtors have come to this Court effectively seeking the same

relief.

The Master Note that WMI used to disguise the lack of cash behind the

---

[41] B1012-B1016, email chain ending with email from Smith to Smallow, September 25, 2008.

[42] B1012-B1016, email chain ending with email from Smith to Smallow, September 25, 2008.

$3.67 Billion Book Entry is equally suspect. Not only were master notes generally used by Washington Mutual to mask transactions that had no economic substance, but the Master Note specifically used for the $3.67 Billion Book Entry transfer was materially increased (by approximately 33%) to facilitate that transaction without the corresponding commitment of legally required collateral. (*See* Tr. 187:11-13.) This evidence raises substantial issues of fact as to whether the decision to pass off an unfunded deposit liability and uncollateralized credit risk to WMB fsb was done with the intent to defraud that entity.

   **C.     Disputed Issues of Fact Relating to the Relationship and Character of the Disputed Accounts.**

   In its initial opposition to Debtors' motion, JPMC offered substantial evidence, including the declaration of an expert, Nick Kissel (B260-B271), demonstrating that because of the intermingling of transactions among Washington Mutual's intercompany accounts, one cannot simply isolate a single account and determine its character or the character of a balance in the account without further analysis of intercompany transactions. Although Mr. Kissel gave several examples of transactions where Washington Mutual's accounting treatment might not properly reflect the proper economic substance of the transaction, at her deposition Ms. Logan provided further confirmation of the need to perform a proper analysis before determining whether balances in the Disputed Accounts are in fact deposit balances, whether they reflect actual cash, and who among the different Washington Mutual entities and third parties owns them.

   At her deposition, Ms. Logan stated that it was not unusual to move

balances between loans and deposit accounts for intercompany accounts at Washington Mutual. For example, book entries with no economic substance were made to intercompany accounts (including intercompany deposit accounts) for the sole purpose of "[b]alance sheet management" of Washington Mutual on a regular basis. (Tr. 223:13.) Ms. Logan explains that on "several occasions" intercompany obligations were commingled with intercompany demand deposit accounts to allow Washington Mutual to maintain certain regulatory ratios or meet other cash management objectives. (Tr. 223:13-19.)

A review of evidence confirms Ms. Logan's testimony. Documents reflect that Washington Mutual made temporary intercompany book entries to increase the balance in intercompany deposit accounts in order to enable WMB fsb to appear to pass a month-end qualified thrift lending test, only to then reverse the entries and reclassify the same amount as a loan days later, after the measurement date for the test had passed.[43] There are other examples of such transactions devised for the sole purpose of creating the appearance of actual changes to Washington Mutual's financial statements, without any underlying economic changes.[44]

Given Ms. Logan's testimony about such intermingled transactions and other evidence that JPMC has offered, there are material questions regarding the legitimacy of Debtors' simplistic argument that they are owed $4 billion because the

---

[43] B972-B973, email from Bjorklund to Logan, July 29, 2008; B975-B977, email chain ending with email from Falls to Im, August 4, 2008; B964, email from Bjorklund to Logan, November 30, 2007.

[44] B965-B966, email chain ending with email from Ryason to Falls, December 14, 2007 (discussing the need to adjust intercompany balances on master notes).

intercompany Disputed Accounts reflected these purported balances when the accounts were frozen in time upon the receivership. Ms. Logan's testimony underscores that one needs to perform an analysis of the transactions among the accounts that led to the recording of those balances to resolve material questions as to whether the Disputed Accounts are deposit accounts or whether the funds, if any, credited to the accounts are anything other than unsecured intercompany payables, other liabilities or other accounting allocations.

II. **SUMMARY JUDGMENT SHOULD BE DENIED AND THE TURNOVER CLAIM SHOULD BE DISMISSED BECAUSE MS. LOGAN'S TESTIMONY ESTABLISHES THE EXISTENCE OF DISPUTES THAT MAKE DEBTORS' TURNOVER CLAIM IMPROPER.**

Following Ms. Logan's deposition, there is no question that numerous material disputes exist that preclude the turnover of the Disputed Amounts. Courts throughout this Circuit recognize that "[t]urnover actions cannot be used to demand assets whose title is in dispute." *In re Student Fin. Corp.*, 335 B.R. 539, 554 (D. Del. 2005) (citing *In re Allegheny Health, Educ. & Research Found.*, 233 B.R. 671, 677-78 (Bankr. W.D. Pa. 1999)); *In re Lexington Healthcare Group, Inc.*, 363 B.R. 713, 716 (Bankr. D. Del. 2007); *see also*, *e.g.*, *United States* v. *Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."). Specifically, when material issues of fact exist that warrant denial of summary judgment, turnover is improper. *Fontainebleau Las Vegas* v. *Bank of Am.*, No. 09-21879-CIV-ASG (S.D. Fla. Aug. 26, 2009). Given the existence of material disputes as to whether Debtors even own the assets that are the subject of this action,

and whether the transaction underlying the Debtors' claim was just a fraud and a sham, the same result is required here. Based on the records before the Court, Debtors' turnover claim should be dismissed.

## CONCLUSION

Ms. Logan's testimony highlights why turnover is a wholly inappropriate remedy. Rather than resolving the numerous questions raised by JPMC about the nature of, and amounts reflected in, the Disputed Accounts, the sham $3.67 Billion Book Entry and the ownership of the Disputed Amounts, Ms. Logan's inconsistent testimony confirms why this Court must deny Debtors' pre-discovery motion for summary judgment and the turnover claim should be dismissed.

Dated: September 11, 2009          Respectfully submitted,
      Wilmington, Delaware

                                      /s/ Matthew B. McGuire
                                 Adam G. Landis (I.D. 3407)
                                 Matthew B. McGuire (I.D. 4366)
                                 LANDIS RATH & COBB LLP
                                 919 Market Street Suite 1800
                                 Wilmington, Delaware 19899
                                 Tel: (302) 467-4400
                                 Fax: (302) 467-4450
                                 landis@lrclaw.com
                                 mcguire@lrclaw.com

                                 – and –

                                 Robert A. Sacks
                                 Hydee R. Feldstein
                                 SULLIVAN & CROMWELL LLP
                                 1888 Century Park East
                                 Los Angeles, California 90067
                                 Tel: (310) 712-6600
                                 Fax: (310) 712-8800
                                 sacksr@sullcrom.com
                                 feldsteinh@sullcrom.com

Bruce E. Clark
Stacey R. Friedman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
clarkb@sullcrom.com
friedmans@sullcrom.com

*Counsel for JPMorgan Chase Bank,
National Association*