Cross-claim defendant the Federal Deposit Insurance Corporation, as receiver for Washington Mutual Bank (the "FDIC-Receiver"), respectfully submits this memorandum of law in opposition to the motion of debtors and debtors-in-possession Washington Mutual, Inc. ("WMI") and WMI Investment Corp. (together, the "Debtors") for summary judgment in this adversary proceeding.

## PRELIMINARY STATEMENT

The Debtors' motion for summary judgment, seeking immediate possession of roughly $4 billion held in six disputed accounts, should be denied. The FDIC-Receiver, which is a cross-claim defendant in this adversary proceeding on a claim relating to the disputed accounts, joins in the opposition to the Debtors' motion submitted by defendant JPMorgan Chase Bank, N.A. ("JPMC") and submits this memorandum of law to supplement that joinder. Summary judgment is unwarranted for a number of different reasons.

*First,* on a motion for summary judgment it is the movant's burden to establish the absence of a genuine issue of material fact as to every element of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Failure to meet this burden, standing alone, requires that the motion be denied. *See, e.g., Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 145-46 (3d Cir. 2004).

Turnover actions under section 542 of the Bankruptcy Code, such as the Debtors' action here, "cannot be used to demand assets whose title is in dispute." *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),* 335 B.R. 539, 554 (Bankr. D. Del. 2005). In their moving papers, the Debtors have failed to demonstrate the absence of any dispute as to the ownership of the funds in the six disputed accounts. Indeed, the Debtors' own submissions establish that there are significant questions of material fact with respect to that issue. Among other things, it is clear that the 0667 account at the center of the summary judgment motion was used, among other

things, as the clearinghouse for payment of federal, state and local taxes on behalf of the entire Washington Mutual consolidated tax group, which included WMI's principal thrift subsidiary Washington Mutual Bank ("<u>WMB</u>"), and for receiving refunds from taxing authorities for WMB and the other members of that group. *See Affidavit of Doreen Logan, dated May 19, 2009* ("<u>Logan Aff.</u>"), ¶ 10. According to the Debtors' own submissions, during 2008 alone the 0667 account was credited with nearly $3.1 *billion* in "Net Tax Payments." *See* Logan Aff., Exh. L at A-109. That staggering figure may not even include the post-petition $234 million income tax refund that WMI admits was paid into the 0667 account in late September 2008.

The Debtors have made no effort – none – to establish their entitlement to such funds or to show that tax monies that are rightfully the property of WMB are not included among the roughly $4 billion that the Debtors would like to distribute swiftly and irrevocably to their creditors. In fact, there is no question that tax related assets that are the property of WMB *are* included among that $4 billion. Section 542 was not intended to accommodate, and does not permit, such obvious disregard for the property rights of others.

*Second*, the Supreme Court has recognized that section 542(b) "specifically excuses" payment "of a claim to which a defense of setoff applies." *Citizens Bank of Md. v. Stumpf*, 516 U.S. 16, 20 (1995); *see* 11 U.S.C. § 542(b) (providing for turnover "except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor"). In this case, WMB clearly has such setoff rights against WMI in an amount that is greater than the balances in the disputed deposit accounts. *See FDIC-Receiver First Amended Answer and Counterclaims, Washington Mutual, Inc. v. F.D.I.C.*, No. 1:09-cv-0533 (RMC) (D.D.C.) (attached hereto as <u>Exhibit A</u>); JPMC Answer and Counterclaims [D.I. 66]. In their effort to avoid the application of this unambiguous statutory text, the Debtors go to great, and

unsuccessful, lengths to argue that JPMC does not hold claims against WMI. Separately, in its district court action against the FDIC, WMI has asserted that the FDIC does not have setoff rights against the funds in the accounts either.

Thus, the Debtors' position appears to be that because WMI's principal thrift subsidiary was closed by federal regulators, WMI somehow achieved a special status in which it – seemingly alone among bank depositors in the United States – is exempt from setoff rights under section 553 of the Bankruptcy Code or otherwise. This position is simply wrong. There is no question that WMB holds substantial and valid claims against WMI that can be setoff against the funds in the disputed accounts. Whether or not JPMC is permitted to exercise those rights, the FDIC-Receiver has its own setoff rights, and section 9.5 of the Purchase and Assumption Agreement, Whole Bank, dated as of September 25, 2008 between JPMC and the FDIC-Receiver (the "P&A Agreement"), provides the FDIC-Receiver the right to direct JPMC to withhold the funds and deliver them to the FDIC-Receiver to prevent this sort of setoff shell game.[2]

The Debtors' own submissions undermine their argument (in other proceedings) that section 9.5 does not apply because the funds were transferred from WMB to its subsidiary thrift, Washington Mutual Bank fsb ("WMBfsb"). Their affiant Doreen Logan admits that the initial attempt to move the funds – with a WMB receivership looming – did not result in the transfer of funds out of WMB. She asserts that this mistake was corrected, *see* Logan Aff., ¶¶ 20, 22, but the account statements for the purported WMBfsb account that are attached to her affidavit reflect that those statements were issued by "Washington Mutual Bank, FA," and *not* WMBfsb,

---

[2] The P&A Agreement is incorporated by reference in the Debtors' complaint in this adversary proceeding, *see* Compl., ¶¶ 3-5, 33-35, and its publicly available at www.fdic.gov. A copy of the P&A Agreement, which is the proper subject of judicial notice on this motion, *see* Fed. R. Evid. 201, is attached hereto as Exhibit B.

*see id.*, Exh. A at A-27 (Sept. 2008), Exh. B at A-38 (Mar. 2009). Once again, at a minimum, a genuine issue of material fact is apparent from the Debtors' own motion papers.

Even if WMI had moved nearly $3.7 billion to WMBfsb in the final days before WMB was closed by federal banking regulators, the Debtors' own submissions again raise genuine issues of material fact about that maneuver. Ms. Logan's rendition of the circumstances surrounding that attempted transfer – which occurred in the midst of a ten-day run on the bank in which WMB experienced $16.7 billion in deposit outflows, ultimately resulting in its closure – suggests strongly that any such transaction would need to be unwound as a fraudulent transfer under 12 U.S.C. § 1821(d)(17) or applicable state law. *See id.*, ¶ 13. This conclusion is only underscored by the additional fact that no funds were transferred at all in the "transaction," but instead a loan back from WMBfsb to WMB was recorded to offset the supposed "deposit" liability, suggesting strongly that the entire reason for the putative transaction was to favor WMI in the event of a WMB receivership to the detriment of the FDIC and WMB's creditors. *See id.*, ¶ 41.

Nor is this the only potentially fraudulent transfer suggested by the Debtors' motion papers. Exhibit L to Ms. Logan's affidavit reflects the 0667 account being credited with over $900 million in "Net Tax Payments" during WMB's final days, in August and September 2008. *See id.*, Exh. L at A-109. We now know that these amounts "were transformed from an unsecured general ledger debt that . . . had accumulated over several years until WMI began to deliberately and improperly siphon off cash from its subsidiaries – into purported deposit funds." JPMC Answer & Counterclaims, ¶ 57. As a debt of any future WMB receivership, such amounts would only be paid a pro rata dividend in line with the recoveries of other general unsecured creditors. In now demanding immediate turnover of these funds, however, the Debtors

mistakenly claim that they are entitled to immediate recovery of 100 cents on the dollar for these amounts.

*Finally*, the Debtors' attempt to obtain summary judgment before the FDIC-Receiver or any other party has had an opportunity to engage in discovery relating to these and other genuine issues of material fact reflects a transparent attempt to obtain the funds in the disputed accounts before the Debtors' entitlement to those funds can be properly scrutinized, itself justifying denial of the motion. *See, e.g., Wanland & Assocs. v. Nortel Networks Ltd. (In re Norvergence, Inc.)*, 384 B.R. 315, 370-71 (Bankr. D.N.J. 2008). The Debtors' have made no secret of their intention, if successful on this motion, to distribute the funds so obtained immediately to their creditors, after which they undoubtedly will assert that any further review of their conduct would be moot.

Contrary to the simplistic picture painted by the Debtors' complaint and motion for summary judgment, this highly complex and multifaceted litigation is only at its outset, not at its conclusion. The Debtors' motion for summary judgment should be denied.

## NATURE AND STAGE OF THE PROCEEDINGS

Until September 25, 2008, the debtor WMI was a thrift holding company, the principal thrift subsidiary of which was WMB. In an order issued on September 25, 2008, the Director of the Office of Thrift Supervision (the "OTS") closed WMB and appointed the FDIC-Receiver as its receiver. The FDIC-Receiver and the Federal Deposit Insurance Corporation, in its corporate capacity ("FDIC-Corporate"), thereafter entered into the P&A Agreement with JPMC. On September 26, 2008, the Debtors commenced their chapter 11 cases in this Court.

The FDIC-Receiver established December 30, 2008 as the bar date for filing claims against the WMB receivership. On that date, WMI filed a proof of claim with the FDIC-Receiver asserting claims relating to a variety of WMB assets that WMI asserted it owned.

Among others, WMI asserted claims against the WMB receivership for the balances held in certain alleged demand deposit accounts that WMI claimed it had maintained with WMB or WMBfsb, which according to WMI amounted to approximately $4 billion. By letter dated January 23, 2009, the FDIC-Receiver disallowed all of the Debtors' claims because they had not been proved to the satisfaction of the receiver. *See* 12 U.S.C. § 1821(d)(5)(D)(i).

On March 20, 2009, WMI and WMI Investment Corp. filed a complaint against the FDIC-Receiver and FDIC-Corporate in the United States District Court for the District of Columbia, seeking a judicial determination of WMI's disallowed receivership claims pursuant to 12 U.S.C. § 1821(d)(6)(A) and asserting a variety of other claims. *See Washington Mutual, Inc. v. F.D.I.C.*, No. 1:09-cv-0533 (RMC) (D.D.C.) (the "D.C. Action"). On June 11, 2009, the FDIC-Receiver filed its answer with respect to Count I of the complaint and filed a motion to dismiss other claims that had been included in the complaint but had not been part of WMI's receivership claims. The FDIC-Receiver amended its answer and counterclaims on July 13, 2009 and named JPMC as an additional counterclaim defendant at that time. On July 17, 2009, the Debtors responded to the FDIC-Receiver's partial motion to dismiss and FDIC-Corporate's motion to dismiss the complaint in its entirety. That action is pending.

On March 24, 2009, JPMC commenced an adversary proceeding in this Court against the Debtors and naming the FDIC-Receiver and FDIC-Corporate as additional defendants. *See JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551 (MFW (Bankr. D. Del.) (the "JPMC Adversary Proceeding"). The Debtors filed their answer and counterclaims against JPMC in that proceeding on May 29, 2009 [D.I. 23].

On April 27, 2009, the Debtors commenced this turnover proceeding against JPMC. On May 13, 2009, JPMC filed a motion to dismiss the complaint [D.I. 8]. That motion was denied

by this Court in an order entered on July 6, 2009 [D.I. 64]. On July 6, 2009, JPMC filed its answer and counterclaims and named the FDIC-Receiver as an additional cross-claim defendant on two counts, Count Five, an interpleader claim relating to the disputed deposit accounts, and Count Seven, a declaratory judgment claim relating to JPMC's ownership of certain other assets [D.I. 66]. *See* JPMC Answer and Counterclaims, ¶¶ 100-02, 111-15. On May 19, 2009, the Debtors filed the current motion for summary judgment [D.I. 14]. By stipulation filed on July 9, 2009, responses to that motion are due on July 24, 2009 [D.I. 17].

On June 1, 2009, the FDIC-Receiver moved to stay the JPMC Adversary Proceeding until judgment is entered in the D.C. Action and moved to intervene in this adversary proceeding for the purpose of making a similar motion to stay or dismiss [D.I. 15 and 27]. The same day, JPMC moved to stay this adversary proceeding. In orders entered on July 6, 2009, the Court granted the FDIC-Receiver's motion to intervene for the purpose of making its motion to stay or dismiss this adversary proceeding and the Court denied the motions to stay the two adversary proceedings [D.I. 63, 68 and 64]. The FDIC-Receiver and JPMC have appealed the orders denying the motions to stay [D.I. 72, 71, 76, and 75].

The FDIC-Receiver reserves all of its rights and arguments with respect to the Court's jurisdiction to adjudicate the issues raised in this adversary proceeding and by the Debtors' motion for summary judgment. This memorandum of law is submitted to protect the FDIC-Receiver's interests to the extent they could be prejudiced by the Debtors' motion for summary judgment, and no waiver of any jurisdictional defense is intended or should be inferred.

## ARGUMENT

## <u>THE MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED</u>

"[A] party seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Bankruptcy Rule 7056. Failure to meet this burden as to every element of the movant's claim is alone grounds for denial of the motion. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004). "[T]he existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against the moving party.'" *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978).

## I.   There Are Genuine Issues of Material Fact as to Ownership of the Funds in the Disputed Accounts

The burden of proof in a turnover action is at all times on the debtor. *Makoroff v. Allegheny Graphics, Inc. (In re Allegheny Label, Inc.)*, 128 B.R. 947, 954 (Bankr. W.D. Pa. 1991) (quoting *Gorenz v. Ill. Dep't of Agric.*, 653 F.2d 1179, 1184 (7th Cir. 1981)). "As part of the *prima facie* case, the [debtor] must establish, *by clear and convincing evidence,* that the assets at issue are part of the bankruptcy estate." *Allegheny Label*, 128 B.R. at 955 (emphasis in original) (citing, *inter alia, Maggio v. Zeitz (In re Luma Camera Serv., Inc.)*, 333 U.S. 56, 63 (1948)). "Turnover actions cannot be used to demand assets whose title is in dispute." *Stanziale v. Hamilton (In re Student Fin. Corp.)*, 335 B.R. 539, 554 (Bankr. D. Del. 2005); *Hechinger Inv. Co. v. Allfirst Bank (In re Hechinger Inv. Co.)*, 282 B.R. 149, 161-62 (Bankr. D. Del. 2002) ("[t]urnover under 11 U.S.C. § 542 is a remedy available to debtors to obtain what is

acknowledged to be property of the bankruptcy estate."); *see also Guiliano v. Fairfield Group Health Care Centers Ltd. (In re Lexington Healthcare Group)*, 363 B.R. 713, 716 (Bankr. D. Del. 2007).

The Debtors' motion for summary judgment clearly fails these stringent requirements. In their moving papers, the Debtors do not address a fundamental issue raised with respect to the disputed accounts, namely, what were the sources of the funds in the accounts and do the funds include the commingled property of WMB? Far from demonstrating, by "clear and convincing evidence," that there are no such commingled funds, the Debtors' own submissions demonstrate the contrary.

A. **The Disputed Accounts Include Income Tax Refunds and Other Tax-Related Assets That Are Owned by WMB**

Documents submitted by the Debtors show that the disputed accounts include a tax refund of $234,526,524 that was paid into the 0667 account on September 30, 2008. *See* Logan Aff., Exh. A. at A-25. Another exhibit submitted by the Debtors establishes that in 2008 alone, the 0667 account was credited for "Net Tax Payments" of $3.1 billion. *See* Logan Aff., Exh. L, at A-109. It is unclear whether the $234 million tax refund is included in this amount.

Under applicable law, WMB is the likely owner of the substantial majority of any tax-related assets that may be commingled among the funds in the disputed accounts. When corporations file joint income tax returns as a consolidated group, tax attributes such as net operating loss carrybacks, and tax refunds arising from the application of such attributes, inure to the benefit of the entity that actually incurred the loss unless there is an express agreement to the contrary. *See, e.g., Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 210 (5th Cir. 1992) ("[t]he refund is the property of the [subsidiary], which could have generated the refund on its own had it filed with the IRS as a separate entity" and therefore the FDIC as receiver of the

subsidiary was entitled to the tax refunds attributable to the losses of the subsidiary); *Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 265 (9th Cir. 1973); *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 438 F. Supp. 185, 188-89 (E.D. Mo. 1977), *aff'd* 579 F.2d 449 (8th Cir. 1978); *see also Cal. Housing Secs., Inc. v. F.D.I.C.*, No. 99-71084, 12 F. App'x. 519, 520 (9th Cir. June 13, 2001); *F.D.I.C. v. Mercer Bancorp, Inc.*, No. 89-0849, 1990 WL 515173, at *2 (W.D. Mo. Dec. 5, 1990); *F.D.I.C. v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986, 989 (Bankr. M.D. Fla. 1990).

In the Ninth Circuit's seminal decision in *Bob Richards*, the trustee of a bankrupt subsidiary that had filed a consolidated federal income tax return with its parent corporation brought an action against the parent to obtain a tax refund that had been received by the parent. 473 F.2d at 263. The Ninth Circuit concluded that the refund belonged to the subsidiary, not the parent, because it was the result of a net operating loss incurred by the subsidiary and the "entire refund[] was due to the earnings history of the bankrupt." *Id.* In such circumstances, "[a]llowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent." *Id.* at 265.

The *Bob Richards* court also refused to permit the parent corporation to retain the tax refund as a set-off against a claim the parent had against the bankruptcy estate of the subsidiary, holding that the parent corporation had "received the tax refund from the government only in its capacity as agent for the consolidated group" and that "where the liability of one claiming a set-off arises from a fiduciary duty or is in the nature of a trust, the requisite mutuality of debts and credits does not exist, and such persons may not set-off a debt owing from the bankrupt against such liability." *Id.* (citation omitted); *see also Jump*, 438 F. Supp. at 189 (holding refund "is not

a debt owed by [parent] to [subsidiary], but rather, a fund which [parent] holds in a specific trust for [subsidiary]"). The impact of the *Bob Richards* rule is clear: a holding company that files a consolidated tax return on behalf of its subsidiaries only receives tax refunds attributable to the earnings history of those other group members as an agent and does not have a property interest in such refunds, unless the consolidated group has expressly agreed to the contrary.

In the case of WMI and other thrift holding companies for any tax years after 1998, it is not possible for a tax sharing agreement to provide for different treatment of tax related assets other than as provided under *Bob Richards*. On November 23, 1998, in an Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure (the "Policy Statement"), the Office of the Comptroller of the Currency, the OTS, the Federal Reserve System and the FDIC issued a uniform policy statement regarding intercompany tax allocation agreements for banking organizations and savings associations that file an income tax return as members of a consolidated group. *See* 63 Fed. Reg. 64757 (Nov. 23, 1998).

In the Policy Statement, the four agencies stated that tax sharing arrangements among the members of a bank's or thrift's consolidated tax group "should result in no less favorable treatment to the [insured depository] institution than if it had filed its income tax return as a separate entity." *Id.* at 64757. Consistent with pre-existing law discussed above, the Policy Statement provided that "a parent company that receives a tax refund from a taxing authority obtains these funds *as agent for the consolidated group* on behalf of the group members." *Id.* at 64759 (emphasis added). As a result, a tax sharing agreement for a bank or thrift holding company group "*should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.*" *Id.* (emphasis added).

Nine months after the Policy Statement was issued by their primary federal regulators, on or around August 31, 1999, WMI, WMB and the other signatories entered into the Tax Sharing Agreement. The Tax Sharing Agreement superseded an earlier tax sharing agreement that had predated the Policy Statement. *See* Tax Sharing Agreement, at 1.[3] In accordance with the Policy Statement, the Tax Sharing Agreement provided: that the "federal income tax liability of [the WMI] consolidated group shall be allocated and shared among WMBfsb, WMB, NACI, Aristar, Inc. and each Subsidiary as if such entities filed a separate or consolidated return, as the case may be," *id.*, § 1; that as members of a consolidated tax filing group the signatory WMI subsidiaries, including WMB, would make payments in respect of their tax liabilities "in the same manner and at the same time as if such entities were filing separate returns," *id.*, § 2(a); that WMI would promptly forward to each such subsidiary any federal tax overpayment on their account or "any credit that may result from the utilization of their net operating loss for a taxable year," *id.*, § 2(b); and that deferred tax assets and liabilities would be handled "consistent with bank and thrift regulatory guidelines," *id.*, § 5.[4]

Because the operations and losses of WMB were the principal basis for the tax liability and tax refunds of the WMI group, WMB and not WMI is the owner of the substantial majority of any tax-related assets that are or may come into the possession of WMI, which holds such funds in trust for WMB. The Debtors' motion for summary judgment improperly seeks to deny any scrutiny of this important question of fact and to distribute the funds to WMI's creditors before the relevant issues can be properly investigated.

---

[3] A copy of the Tax Sharing Agreement is attached as an exhibit to the submissions of JPMC in opposition to the Debtors' motion for summary judgment.

[4] *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd*, 182 B.R. 859 (D. Kan. 1995), and *United States v. MCorp Fin. (In re MCorp Fin.)*, 170 B.R. 899 (S.D. Tex. 1994), were both decided before the Policy Statement was issued and are inapposite for this and other reasons.

## B.    The Balances in the Disputed Accounts Are Subject to Setoff

Section 542(b) of the Bankruptcy Code expressly provides that turnover of a qualifying debt under that section is not required "to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. § 542(b); *see Citizens Bank of Md. v. Stumpf*, 516 U.S. 16, 20 (1995); *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 57-59 (3d Cir. 1990) ("An exception is made to the extent that the entity has a valid right of setoff, as recognized by section 553.") (applying exception).

There can be no real dispute that WMB has substantial claims against WMI that form the basis for a setoff right against the funds in the disputed accounts under 11 U.S.C. § 553.  Both JPMC and the FDIC-Receiver have detailed billions of dollars in claims against the Debtors, including, without limitation, claims of over $4 billion relating to tax refunds and other tax assets, claims of $4 billion relating to certain trust preferred securities and, in the case of the FDIC-Receiver, claims of at least $10.5 billion for potentially unlawful dividends.  *See* Exhibit A (FDIC-Receiver First Amended Answer and Counterclaims in D.C. Action); JPMC Answer and Counterclaims [D.I. 66].[5]

In their turnover complaint and in their motion for summary judgment, the Debtors argue that JPMC does not have a right of setoff with respect to the accounts, while in the D.C. Action they argue that the FDIC-Receiver does not have a right of setoff.  The Debtors have not explained the basis of their assertion with respect to the FDIC-Receiver's setoff rights, but their position that they are somehow immune from setoff against their accounts is both unfounded and inequitable.  However, to prevent such an argument, and for other reasons, the FDIC-Receiver

---

[5] In addition to its counterclaims in the D.C. Action, the FDIC-Receiver filed a timely proof of claim in WMI's bankruptcy case asserting the same claims and reserving all of its jurisdictional arguments.

expressly retained the right in the P&A Agreement to direct JPMC to withhold all or any portion

of any deposit balance and to return all or any portion of such deposit balance to the FDIC-

Receiver. *See* P&A Agreement, § 9.5.[6]

Even in the unlikely event that the funds in the disputed accounts were somehow not

subject to setoff against claims held by JPMC, those funds still would be subject to setoff against

claims held by the FDIC-Receiver. In either event, the Debtors' summary judgment motion must

be denied under the plain language of 11 U.S.C. § 542(b).

### C.    Issues of Fact Exist as to Debtors' Potentially Fraudulent Transfers Related to the Disputed Accounts

The Debtors' own submissions and JPMC's recent counterclaims raise significant issues

---

[6] Section 9.5 of the P&A Agreement provides:

> **9.5    Withheld Payments.** At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is in the best interest of the Receiver or the Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, setoff, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

P&A Agreement, § 9.5.

of fact as to whether the funds in the disputed accounts include the fruits of fraudulent transfers. In addition, the Debtors' submissions raise similar questions about the purported transfer of $3.67 billion from WMB to WMBfsb on the eve of the WMB receivership.

Among other powers, "[t]he FDIC is empowered to avoid fraudulent asset transfers . . . ." *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995). Under 12 U.S.C. § 1821(d)(17), the FDIC-Receiver may avoid a transfer if the defendant "voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the Corporation or other conservator, or any other appropriate Federal banking agency." 12 U.S.C. § 1821(d)(17); *see also R.T.C. v. Spagnoli*, 811 F. Supp. 1005, 1015 (3d Cir. 1993). State law fraudulent transfer statutes are also available to the FDIC-Receiver, like other creditors. The FDIC-Receiver's rights under section 1821(d)(17) are superior to any rights of a debtor-in-possession or any other party (other than any party which is a federal agency) under title 11. *See* 12 U.S.C. § 1821(d)(17).

### 1. The Improper Recharacterization of Unsecured General Ledger Debt As a Purported "Deposit" Balance

The Debtors' own submissions on their motion for summary judgment raise a genuine issue of material fact regarding the source of over $900 million that the Debtors now claim to have been "deposit" balances in the 0667 account (which were later included in the funds allegedly moved to the 4234 account). *See* Logan Aff., Exh. L (line for "Net Tax Payments" for August and September 2008).

According to JPMC's recently filed counterclaims in this action, in August and September 2008 WMI caused "nearly a billion dollars" in unsecured general ledger debt putatively owed from WMB to WMI to be transformed instead into purported deposit funds. *See* JPMC Answer and Counterclaims, ¶¶ 57, 94. JPMC's investigation of these transfers indicates

that these balances had accumulated over the course of "several years until WMI began to deliberately and improperly siphon off cash from its subsidiaries" in the weeks leading up to WMB's closure. *Id.*, ¶ 57. These hundreds of millions of dollars of transmogrified unsecured general ledger balances represent a substantial portion of the $3.67 billion that the Debtors now claim to hold as "deposit" funds in the 4234 account.

The Debtors' own submissions raise material question of fact as to whether these pre-receivership accounting maneuvers were made with the intent to advance WMI's position against the FDIC-Receiver and other creditors in any future receivership of WMB. Under the FDIC's governing statute, deposit liabilities of a failed depository institution receive priority in the receivership claims process ahead of general creditors and behind only administrative expenses of the receiver. 12 U.S.C. § 1821(d)(11). The record establishes genuine issues of material fact that will require discovery to determine whether WMI's pre-receivership conversion of these general ledger entries into purported "deposit" liabilities was intended to improve WMI's position in the event of a WMB receivership and whether that accounting maneuver deprived the WMB receivership of the underlying funds that WMI now asserts in this action it should recover immediately. The substantial questions of fact surrounding these accounting entries requires that the Debtors' motion be denied.

### 2. The $3.67 Billion Attempted Round-Trip Transaction

In their summary judgment motion, the Debtors contend that just days before WMB was closed, WMI instructed the Debtors' affiant Doreen Logan "immediately" to transfer "the maximum amount of funds possible" from the 0667 account at WMB to an account at WMB's subsidiary bank, WMBfsb. *See* Logan Aff., ¶ 13. At the time, WMB was experiencing significant deposit outflows in the wake of the failure of Lehman Brothers on September 15,

2008; in the end, WMB had deposit outflows of $16.7 billion over a ten-day period leading to the OTS order closing it and appointing the FDIC-Receiver.[7]

The Debtors claim that WMI transferred $3.67 billion from WMB to WMBfsb in a transaction that was not completed until September 22, 2008. *Id.*, ¶¶ 21-23. According to JPMC's answer and counterclaims, no funds were actually moved as the result of the transaction. Instead, a "round-trip" transaction was entered in the accounting records under which putative deposit liabilities purportedly were moved to WMBfsb, which simultaneously loaned all of those funds back to its parent WMB. *See* JPMC Answer and Counterclaims, ¶¶ 85-99; *see also* Logan Aff., ¶ 41.

As with the nearly $1 billion in recharacterized general ledger entries that are discussed in the preceding section, this attempted transaction has many hallmarks of a fraudulent transfer that would, if it had been successful, require the transaction to be unwound.[8] Significant questions of fact exist relating to *when* WMI determined to make that transfer, *who* made the decision, *why* the decision was made, *how* it was carried out, and the scope of WMI's knowledge of WMB's financial condition when the decision was made. These facts will speak directly to whether the transfer was a fraudulent attempt to position WMI to the disadvantage of the FDIC and other creditors in anticipation of a possible WMB receivership.[9]

---

[7] *See* OTS Fact Sheet on Washington Mutual Bank, Sept. 25, 2008 (publicly available at http://files.ots.treas.gov/730021.pdf).

[8] As previously discussed, a separate genuine issue of material fact exists as to whether the transfer to WMBfsb was, in fact, completed at all. The account statements attached as exhibits to the Logan Affidavit suggest that the funds never left WMB.

[9] The transaction also raises issues under federal banking law, which requires transactions between affiliates in a bank holding company structure to be on terms as favorable to a bank as those prevailing for comparable transactions among unaffiliated entities. *See* 12 U.S.C. §§ 371c, 371c-1.

## II. Summary Judgment Cannot Be Granted in this Highly Complex Litigation Before any Discovery Has Been Permitted

The Debtors' motion for summary judgment motion is premature because no discovery at all has been taken in this action notwithstanding its obvious complexity and the many disputed questions of fact that plainly exist. *See Celotex*, 477 U.S. at 322 (nonmovant must have been given an "adequate time for discovery" before summary judgment can be granted); *Wanland & Assocs. v. Nortel Networks Ltd. (In re Norvergence, Inc.)*, 384 B.R. 315, 370-71 (Bankr. D.N.J. 2008).

The FDIC-Receiver only recently became a party to the action, well after the Debtors filed their motion for summary judgment. Although the Debtors assert the same claims against the FDIC-Receiver in the D.C. Action, the Debtors have opposed the FDIC-Receiver's efforts to initiate discovery in that action and have stated their intention to seek a stay of those proceedings. To date, the parties have not agreed on the method to accomplish discovery in any of these proceedings, and no discovery has been taken in any of the three actions. The FDIC-Receiver therefore respectfully joins in, and incorporates by reference, JPMC's cross motion to allow discovery and its opposition to the Debtors' summary judgment motion on this basis.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in JPMC's submissions, the

FDIC-Receiver respectfully submits that the Debtors' motion for summary judgment should be

denied.

Dated: Wilmington, Delaware
      July 24, 2009

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP


/s/ M. Blake Cleary
M. Blake Cleary  (No. 3614)
Jaime N. Luton (No. 4936)
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6000
Facsimile:  (302) 571-1253
mbcleary@ycst.com
jluton@ycst.com

      - and -

Thomas R. Califano
John J. Clarke, Jr
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
thomas.califano@dlapiper.com
john.clarke@dlapiper.com

Attorneys for the FDIC-Receiver

# EXHIBIT C



Presented by the Federal Election Commission

# Individual Contributions Arranged By Type, Giver, Then Recipient

## Non-Federal Receipts "Exempt From Limits"

**WASHINGTON MUTUAL,**
SEATTLE, WA 98101

DSCC NON-FEDERAL CORPORATE
| 11/21/2001 | 25000.00 | 21020224716 |

**WASHINGTON MUTUAL BANK,**
SEATTLE, WA 98101

1997 REP S/H DINNER TRUST & INDIVIDUALS (NON-FEDERAL)
| 06/19/1997 | 10000.00 | 97032263654 |

1998 REP H/S DINNER BUILDING FUND
| 06/10/1998 | 20000.00 | 98033292309 |

1999 REP S/H DINNER NON-FED TRUST
| 05/13/1999 | 20000.00 | 99034710539 |

2002 PRESIDENT'S DINNER - NON-FEDERAL TRUST
| 07/11/2002 | 25000.00 | 22037892523 |

DCCCC NON-FEDERAL ACCOUNT #1
| 12/16/1999 | 5000.00 | 20035123115 |
| 02/29/2000 | 5000.00 | 20035423551 |
| 05/11/2001 | 10000.00 | 21990376011 |

DCCCE NON-FEDERAL ACCOUNT #1
| 09/25/1998 | 5000.00 | 98033794806 |
| 10/21/1998 | 2500.00 | 98034024476 |

NRCCC - NON FEDERAL #1
| 11/03/1997 | 2000.00 | 98032662704 |
| 02/18/1998 | 5000.00 | 98032954654 |
| 03/20/1998 | 250.00 | 98032954654 |

**B1145**

|  |  |  |
|---|---|---|
| 12/05/2001 | 5000.00 | 22990332391 |

NRSC - NONFEDERAL

|  |  |  |
|---|---|---|
| 11/13/1997 | 7500.00 | 97020130971 |
| 10/16/1998 | 15000.00 | 98020273479 |

WASHINGTON VICTORY COMMITTEE

|  |  |  |
|---|---|---|
| 12/16/1999 | 20000.00 | **20020080283** |

**WASHINGTON MUTUAL BANK,**
SEATTLE, WA 98101
N/A

DCCCC NON-FEDERAL ACCOUNT #1

|  |  |  |
|---|---|---|
| 11/16/2001 | 5000.00 | 22990300052 |
| 05/16/2002 | 5000.00 | 22991387473 |

## Total Soft Money:    192250.00

**TRY A:** NEW QUERY
**RETURN TO:** FEC HOME PAGE

# EXHIBIT D



# Universal Search: Top Contributor to Member

Your **Top Contributor to Member** search for 'Washington Mutual' found 30 matches. Return to search results

**2010 Cycle**

- Washington Mutual (Recipient: John F Tierney (D))

**2008 Cycle**

- Washington Mutual (Recipient: Chuck Hagel (R))
- Washington Mutual (Recipient: Mike Crapo (R))

**2006 Cycle**

- Washington Mutual (Recipient: Robert F. Bennett (R))
- Washington Mutual (Recipient: David Dreier (R))
- Washington Mutual (Recipient: Bill Thomas (R))
- Washington Mutual (Recipient: Darlene Hooley (D))
- Washington Mutual (Recipient: Paul S. Sarbanes (D))
- Washington Mutual (Recipient: Jim Bunning (R))
- Washington Mutual (Recipient: Michael G. Oxley (R))
- Washington Mutual (Recipient: Barney Frank (D))
- Washington Mutual (Recipient: Gregory W. Meeks (D))
- Washington Mutual (Recipient: Paul E. Kanjorski (D))
- Washington Mutual (Recipient: Ed Royce (R))
- Washington Mutual (Recipient: Tim Johnson (D))
- Washington Mutual (Recipient: Tom Carper (D))

**2004 Cycle**

- Washington Mutual (Recipient: Ander Crenshaw (R))
- Washington Mutual (Recipient: Walter B. Jones Jr. (R))
- Washington Mutual (Recipient: Adam Smith (D))

**2002 Cycle**

- Washington Mutual (Recipient: Jennifer Dunn (R))
- Washington Mutual (Recipient: Doug Ose (R))
- Washington Mutual (Recipient: Dave Weldon (R))
- Washington Mutual (Recipient: Luis V. Gutierrez (D))
- Washington Mutual (Recipient: Doug Bereuter (R))
- Washington Mutual (Recipient: Ken Bentsen (D))
- Washington Mutual (Recipient: Ruben Hinojosa (D))
- Washington Mutual (Recipient: Jay Inslee (D))
- Washington Mutual (Recipient: Pete King (R))

- Washington Mutual (Recipient: Marge Roukema (R))
- Washington Mutual (Recipient: Nydia M. Velazquez (D))

Feel free to distribute or cite this material, but please credit the Center for Responsive Politics. For permission to reprint for commercial uses, such as textbooks, contact the Center.

The Center for Responsive Politics
Except for the Revolving Door section, content on this site is licensed under a
Creative Commons Attribution-Noncommercial-Share Alike 3.0 United States License
by OpenSecrets.org. To request permission for commercial use, please contact us.



# Universal Search: Organization

Your *Organization* search for 'Washington Mutual' found 42 match(es).

**Top Contributor to Member** - 30 match(es) found (Show all matches):

### 2010 Cycle

- Washington Mutual (Recipient: John F Tierney (D))

### 2008 Cycle

- Washington Mutual (Recipient: Chuck Hagel (R))
- Washington Mutual (Recipient: Mike Crapo (R))

### 2006 Cycle

- Washington Mutual (Recipient: Robert F. Bennett (R))
- Washington Mutual (Recipient: David Dreier (R))

**Top Contributor to Candidate** - 8 match(es) found (Show all matches):

### 2006 Cycle

- Washington Mutual (Recipient: Tan D. Nguyen (R))
- Washington Mutual (Recipient: Jeeni Criscenzo (D))
- Washington Mutual (Recipient: Michael McGavick (R))
- Washington Mutual (Recipient: Lavar Christensen (R))

### 2004 Cycle

- Washington Mutual (Recipient: David R. Hernandez (R))

**Political Action Committee** - 3 match(es) found:

### 2008 Cycle

- Washington Mutual

### 2006 Cycle

- Washington Mutual

### 2002 Cycle

- Washington Mutual

**Lobbying Client** - 0 match(es) found:

**2008**

- Washington Mutual

Feel free to distribute or cite this material, but please credit the Center for Responsive Politics. For permission to reprint for commercial uses, such as textbooks, contact the Center.

The Center for Responsive Politics
Except for the Revolving Door section, content on this site is licensed under a
Creative Commons Attribution-Noncommercial-Share Alike 3.0 United States License
by OpenSecrets.org. To request permission for commercial use, please contact us.