# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

In re:                                                          :        Chapter 11
                                                                :
WASHINGTON MUTUAL, INC., *et al.*,[1]                           :        Case No. 08-12229 (MFW)
                                                                :
               Debtors.                :        (Jointly Administered)

---------------------------------------------------------------x

WASHINGTON MUTUAL, INC. AND                                     :
WMI INVESTMENT CORP.,                                           :        Adv. Proc. No. 09-50934
                                                                :
               Plaintiffs,             :
                                                                :
         v.                                     :
                                                                :
JPMORGAN CHASE BANK, NATIONAL                                   :
ASSOCIATION,                                                    :
                                                                :
               Defendant.              :

---------------------------------------------------------------x

JPMORGAN CHASE BANK, NATIONAL                                   :
ASSOCIATION,                                                    :
                                                                :
               Cross-Claimant,         :
                                                                :
         v.                                     :
                                                                :
FEDERAL DEPOSIT INSURANCE                                       :
CORPORATION, as Receiver of Washington                          :
Mutual Bank, Henderson, Nevada,                                 :
                                                                :
               Cross-Claim Defendant.  :        **Re: Docket No. 14**

---------------------------------------------------------------x

## REPLY BRIEF IN SUPPORT OF THE
## MOTION OF PLAINTIFFS FOR SUMMARY JUDGMENT

---

[1]      The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395). The Debtors continue to share their principal offices with the employees of JPMorgan Chase located at 1301 Second Avenue, Seattle, Washington 98101.

Plaintiffs Washington Mutual, Inc. ("WMI")[2] and WMI Investment Corp. (collectively, "Plaintiffs" or "Debtors"), submit this brief in reply to the Opposition of Defendant JPMorgan Chase Bank, National Association ("JPMC") to Plaintiffs' Motion for Summary Judgment (the "Opposition") (Docket No. 102); the Supplemental Opposition of Defendant JPMorgan Chase Bank, National Association to Plaintiffs' Motion for Summary Judgment (the "Supplemental Opposition") (Docket No. 156); the Memorandum of Law of Cross-Claim Defendant Federal Deposit Insurance Corporation, as Receiver, ("FDIC") in Opposition to Plaintiffs' Motion for Summary Judgment (the "FDIC Opposition") (Docket No. 97); the Supplemental Memorandum of Law of Cross-Claim Defendant Federal Deposit Insurance Corporation, as Receiver, in Opposition to Plaintiffs' Motion for Summary Judgment (the "FDIC Response") (Docket No. 152); the Bank Bondholders' Statement in Opposition to Debtors' Motion for Summary Judgment (the "Bondholders Opposition") (Docket No. 115); and the Amended Motion of Defendant JPMorgan Chase Bank, N.A. to Strike Affidavit of Doreen Logan (the "Amended JPMC Motion to Strike") (Docket No. 154), and in further support of the Motion of Plaintiffs Washington Mutual, Inc. and WMI Investment Corp. for Summary Judgment (the "Motion") (Docket No. 14) under Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056. For all of the following reasons, Debtors respectfully request that the Motion should be granted.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in Debtors' Motion.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................ 5

I.    JPMC Fails to Raise any Genuine Dispute as to Whether the Deposits are
      Liabilities Owing to WMI .......................................................................... 5

      A.    JPMC Cannot Create a Dispute Based on the Supposed Complexities of
            WMI's Accounting System ................................................................. 5

      B.    The Accounts Belong to Debtors Regardless of Whether those Accounts
            are Held at WMB or WMB fsb ........................................................ 13

      C.    Debtors Have Demonstrated that the Accounts Belong to Them ........................ 16

II.   JPMC Fails to Raise any Genuine Dispute as to Ownership of the Deposit
      Accounts ............................................................................................... 20

      A.    JPMC Fails to Refute Debtors' Evidence Demonstrating Ownership of the
            Accounts ........................................................................................ 20

      B.    JPMC Fails to Create a "Genuine Dispute of Material Fact" As to the
            Ownership of the Tax Funds ............................................................. 23

            1.    JPMC's Claims Regarding Intercompany State Tax Amounts Do
                  Not Give Rise to a Genuine Dispute as to Ownership ....................... 23

            2.    JPMC Does Not Own the Tax Refunds on Deposit in Debtors'
                  Accounts .................................................................................. 27

            3.    Funds Invested in WMI By TPG Are Not Property of WMB .................. 32

            4.    JPMC's Supposed Security Interest in Particular Accounts Does
                  Not Affect the Status of those Accounts as Estate Assets ................... 34

            5.    JPMC Cannot Withhold Debtors' Deposits on the Basis of
                  Supposed Third-Party Claims ...................................................... 35

III.  JPMC Has No Basis to Assert Setoff .......................................................... 37

      A.    JPMC Fails to Identify Any Claims that Would Entitle it to Withhold
            Debtors' Deposits as a Setoff ............................................................ 37

      B.    Section 553 Bars JPMC's Asserted Setoff Defense ............................... 42

i

|   | | 1. | WMI Was Indisputably Insolvent Subsequent to the Seizure of WMB | 42 |
|---|---|---|---|---|
|   | | 2. | JPMC Asks This Court to Ignore Section 553(a) of the Bankruptcy Code | 45 |
|   | C. | | JPMC Has No Recoupment Claims | 48 |
| IV. | | | JPMC's Deposition of Ms. Logan Fully Confirms its Inability to Identify Any Genuine Issue in Dispute | 49 |
|   | A. | | JPMC Fails to Identify Any Material Issues of Fact Based on its Deposition of Ms. Logan | 51 |
|   | B. | | Ms. Logan's Deposition Raises No Issues of Material Fact Relating to the Transfer of Deposits from WMB to WMB fsb | 56 |
|   | C. | | Summary Judgment is Not Premature | 57 |
| V. | | | JPMC's Remaining Arguments Are Without Merit | 61 |
| CONCLUSION | | | | 64 |

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adagio Inv. Holding Ltd. v. FDIC,*
   338 F. Supp. 2d 71 (D.D.C. 2004)......................................................................18

*In re Ades and Berg Group Investors,*
   550 F.3d 240 (2d Cir. 2008) ..........................................................................34

*In re Allegheny, Inc.,*
   68 B.R. 183 (Bankr. W.D. Pa. 1986)................................................................12

*In re Allen,*
   357 B.R. 103 (Bankr. S.D. Tex. 2006) .............................................................35

*In re Amdura Corp.,*
   75 F.3d 1447 (10th Cir. 1996) ....................................................5, 6, 21, 22, 33

*In re Beltrami,*
   324 B.R. 255 (Bankr. M.D. Pa. 2005) .............................................................36

*Betz v. FDIC,*
   99 F.3d 904 (9th Cir. 1996) ...........................................................................20

*In re Bob Richards Chrysler-Plymouth Corp.,*
   473 F.2d 262 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973) ........................30

*Branch v. FDIC,*
   825 F. Supp. 384 (D. Mass. 1993)..................................................................16

*In re Bullion Reserve of N. Am.,*
   836 F.2d 1214 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056 (1988) ....................10

*Caminetti v. U.S.,*
   242 U.S. 470 (1917) .....................................................................................47

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (U.S. 1986) ..............................................................................39

*Chiang v. Schafer,*
   2008 WL 3925260 (D.V.I. Aug. 20, 2008) ......................................................59

*Christensen v. Harris County,*
   529 U.S. 576 (2000) .....................................................................................31

*Citizens Bank of Md v. Strumpf,*
   516 U.S. 16 (1995) .......................................................................................11

*In re Colonial Realty Co.,*
   980 F.2d 125 (2d Cir. 1992)...........................................................................38

*In re Comp. of Managerial, Prof'l and Technical Employees Antitrust*,
No. 02-CV-2924 (GEB), 2008 WL 3887619 (D.N.J. 2008) ................................ 59

*Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*,
838 F.2d 612 (1st Cir. 1988) ................................................................ 10

*In re Denby Stores*,
86 B.R. 768 (Bankr. S.D.N.Y. 1988) ..................................................47, 48

*Dowling v. City of Phila.*,
855 F.2d 136 (3d Cir. 1988) ................................................................ 59

*In re Drahn*,
405 B.R. 470 (Bankr. N.D. Iowa 2009) ................................................. 35

*Emerald Int'l v. FDIC*,
190 B.R. 701 (S.D. Fla. 1995) ............................................................. 64

*FDIC v. Eur. Am. Bank & Trust Co.*,
576 F. Supp. 950 (S.D.N.Y. 1983) ....................................................... 11

*FDIC v. Fedders Air Conditioning, USA, Inc.*,
35 F.3d 18 (1st Cir. 1994) ..............................................................11, 18

*FDIC v. Philadelphia Gear Corp.*,
476 U.S. 426 (1986) .......................................................................... 20

*In re First Cent. Fin. Corp.*,
269 B.R. 481 (Bankr. E.D.N.Y. 2001) ..........................................29, 31, 32

*First Fed. of Mich. v. Barrow*,
878 F.2d 912 (6th Cir. 1989) ............................................................... 10

*In re First RepublicBank Corp.*,
No. 390-3032, 1990 Bankr. LEXIS 2964 (Bankr. N.D. Tex. Apr. 24, 1990) ..........9

*In re Flanagan Bros., Inc.*,
47 B.R. 299 (Bankr. D.N.J. 1985) ........................................................ 47

*In re Franklin Sav. Corp.*,
159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd*, 182 B.R. 859, 863 (D. Kan. 1995) ..........29, 31

*Ga. Pac. Corp v. Sigma Serv. Corp.*,
712 F.2d 962 (5th Cir. 1983) ............................................................... 36

*Galli v. New Jersey Meadowlands Comm'n*,
490 F.3d 265 (3d Cir. 2007) ................................................................. 7

*In re Garden Ridge Corp.*,
338 B.R. 627 (Bankr. D. Del. 2006) ........................................................ 2

*In re Gordons Transps. Inc.*,
51 B.R. 633 (Bankr. W.D. Tenn. 1985) .................................................. 38

*In re Gosnell Dev. Corp.*,
 221 B.R. 776 (Bankr. D. Ariz. 1998) ................................................................. 49

*Gross v. Bell Sav. Bank PA SA*,
 974 F.2d 403 (3d Cir. 1992) .............................................................................. 37

*Hall v. United States*,
 No. 1:CV-07-0736, 2008 WL 919605 (M.D. Pa. Apr. 2, 2008) ......................... 61

*In re Jamail*,
 609 F.2d 1387 (5th Cir. 1980) ........................................................................... 35

*In re Jones Truck Lines, Inc.*,
 196 B.R. 123 (Bankr. W.D. Ark. 1996) ............................................................. 47

*In re Joy Global, Inc.*,
 381 B.R. 603 (D. Del. 2007) .............................................................................. 63

*Katchen v. Landy*,
 382 U.S. 323 (1966) .......................................................................................... 64

*Krazalic v. Republic Title Co.*,
 314 F.3d 875 (7th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003) ................... 31

*In re LandAmerica Fin. Group, Inc.*,
 No. 08-35994-KRH, 2009 WL 1011647 (Bankr. E.D.Va. Apr. 15, 2009) ...5, 7, 21

*Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n*,
 869 F.2d 719 (3d Cir. 1989) .............................................................................. 31

*In re MCorp Fin.*,
 170 B.R. 899 (S.D. Tex. 1994) ..................................................................... 29, 32

*In re Mahan & Rowsey, Inc.*,
 817 F.2d 682 (10th Cir. 1987) ........................................................................... 10

*Monroe v. Beard*,
 536 F.3d 198 (3d Cir. 2008) ....................................................................... 1, 7, 22

*Nashville Lodging Co. v. Resolution Trust Corp.*,
 59 F.3d 236 (D.C. Cir. 1995) ............................................................................ 40

*In re Nobel*,
 179 B.R. 313 (Bankr. M.D. Fla. 1995) .............................................................. 35

*In re Owens Corning*,
 419 F.3d 195 (3rd Cir. 2005), *cert. denied*, 547 U.S. 1123 (2006) ................. 33

*Payne v. Sec. Sav. & Loan Assn., F.A.*,
 924 F.2d 109 (7th Cir. 1991) ............................................................................. 40

*In re RJC Indus.*,
 369 B.R. 845 (M.D. Pa. 2006) ........................................................................... 17

*In re Revco D.S., Inc.*,
   111 B.R. 631 (Bankr. N.D. Ohio 1990)............................................................30, 31

*Rice v. United States*,
   No. 06-334-SLR/MPT, 2008 WL 1821464 (D. Del. Apr. 22, 2008) ................61, 62

*In re Rocor Int'l, Inc.*,
   352 B.R. 319 (W.D. Okla. 2006)......................................................................5

*Rosa v. RTC*,
   938 F.2d 383 (3d Cir.), *cert. denied*, 502 U.S. 981 (1991)...............................63

*Rosenberg v. Collins*,
   624 F.2d 659 (5th Cir. 1980) ..........................................................................10

*In re Seidman*,
   37 F.3d 911 (3d Cir. 1994) .............................................................................31

*In re Semcrude, L.P.*,
   399 B.R. 388 (Bankr. D. Del. 2009).................................................................42

*Sonnenschein v. Reliance Ins. Co.*,
   353 F.2d 935 (2d Cir. 1965) ...........................................................................10

*Sousa v. Bank of Newport*,
   170 B.R. 492 (D.R.I. 1994) .......................................................................11, 21

*In re Southmark Corp.*,
   49 F.3d 1111 (5th Cir. 1995) ............................................................................9

*Stratton v. Equitable Bank, N.A.*,
   104 B.R. 713 (D. Md. 1989)...................................................................6, 11, 21

*In re SubMicron Sys. Corp.*,
   432 F.3d 448 (3d Cir. 2006) ...........................................................................17

*Tripoli Co. v. Wella Corp.*,
   425 F.2d 932 (3d Cir. 1970) .......................................................................8, 23

*In re U.S.A. Diversified Prods., Inc.*,
   100 F.3d 53 (7th Cir. 1996) ............................................................................21

*In re United Sciences of Am., Inc.*,
   893 F.2d 720 (5th Cir. 1990) ..........................................................................48

*In re Univ. Med. Ctr.*,
   973 F.2d 1065 (3d Cir. 1992) ..........................................................................48

*Vallies v. Sky Bank*,
   432 F.3d 493 (3rd Cir. 2006)...........................................................................48

*Vernon v. Resolution Trust Corp.*,
   907 F.2d 1101 (11th Cir. 1990) .......................................................................32

*Vietnam Veterans of Am. v. Sec'y of the Navy*,
  843 F.2d 528 (D.C. Cir. 1988)...........................................................................3

*Village South Joint Venture v. FDIC*,
  733 F. Supp. 50 (N.D. Tex. 1990)......................................................................40

*Washington Mutual, Inc. and WMI Investment Corp. v. Federal Deposit Insurance Corporation*,
  No. 1:09-cv-00533 (D.D.C.)..............................................................................26

*Weiss v. Mader*,
  525 F. Supp. 834 (E.D.Pa. 1981)........................................................................8

*In re World Access, Inc.*,
  301 B.R. 217 (Bankr. N.D. Ill. 2003)...................................................................9

*In re Xonics Photochemical, Inc.*,
  841 F.2d 198 (7th Cir. 1988)............................................................................45

## Statutes and Regulations

11 U.S.C. § 502(d)...........................................................................................42

11 U.S.C. § 542(b)...........................................................................................12

11 U.S.C. § 553(a)................................................................................42, 45, 48

11 U.S.C. § 553(a)(2)(B)...........................................................................43, 47, 48

11 U.S.C. § 553(c)............................................................................................43

12 C.F.R. § 223.11...........................................................................................15

12 C.F.R. § 223.12...........................................................................................15

12 C.F.R. § 223.14...........................................................................................15

12 C.F.R. § 223.41...........................................................................................15

12 C.F.R. § 330.5(a)(1)......................................................................................18

12 C.F.R. § 571.7(b).........................................................................................31

12 U.S.C. § 1821(d)(17)(C).................................................................................26

12 U.S.C. § 1821(d)(2)(G)(i)...............................................................................26

12 U.S.C. § 1821(j)..........................................................................................26

12 U.S.C. § 371c(b)(7).......................................................................................25

12 U.S.C. § 371c(d)(1)(A)...................................................................................15

26 C.F.R. § 1.1502-77(a)(2)(v).............................................................................28

Fed. R. Bankr. P. 7056 ................................................................................................ 2

Fed. R. Civ. P. 56 ............................................................................................... passim

Nev. Rev. Stat. § 78.191 ............................................................................................ 26

## **<u>Miscellaneous</u>**

Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure (the
     "IPS"), 63 Fed. Reg. 64,757, 64,759 .............................................................. 31

In over 97 pages of briefing, in its 12 supporting declarations, and in its 1151 page appendix, JPMC does not claim, even once, that it (or any entity other than Debtors) owns the Deposits at issue in this case. Not once. That is the essence of a dispute—competing claims of ownership between two or more parties—and it simply does not exist here. Because there is no real dispute as to the ownership of the Deposits, the most that JPMC can do is discuss the supposed complexities of WMI's accounting system, and hypothesize about what the status of the Deposits "may" be based on various "questions" that JPMC poses. But this adversary proceeding is not an academic exercise addressed to JPMC's hypotheticals. *See Monroe v. Beard*, 536 F.3d 198, 206-07 (3d Cir. 2008) (holding that a party opposing summary judgment "'must do more than simply show there is some metaphysical doubt as to material facts'") (quoting *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). It is a proceeding to resolve Debtors' claim to $4 billion in deposits, and JPMC cannot continue to unlawfully retain those amounts without at least asserting some legitimate factual basis for doing so. In this, JPMC fails, and its recent filings make it clearer than ever that Debtors are entitled to the immediate return of their Deposits and that the Motion should be granted. Indeed, the best that JPMC can do is acknowledge that there are "some individuals" who recognize that the Accounts hold Debtors' Deposits and others who merely "do not know"—that is not a dispute, it is uncontroverted evidence in Debtors' favor.

Unable to establish a lawful basis to claim that it owns the Deposits, JPMC has resorted to a massive exercise in misdirection, going to extraordinary lengths to confuse the issues in this case in the hopes of creating the appearance of a dispute where none in fact exists. The best example of this is that JPMC devotes the majority of its two opposition briefs and supporting documents to Debtors' transfer of $3.674 billion from a demand deposit account at Washington

Mutual Bank ("WMB") to a demand deposit account at WMB fsb. According to JPMC, that transfer "may" have been ineffective on the basis that it "potentially" violated various regulations and bank protocols. Even if JPMC could make such a showing (which it fails to do), it would not affect the correct outcome here. Debtors are entitled to their Deposits whether they were holding them in an account at WMB or transferred them to an account at WMB fsb, and their estates are entitled to Debtors' money either way.

Furthermore, JPMC's baseless effort to cast WMI's transfer of $3.674 billion in Deposits in a suspicious light finds no factual support. The undisputed evidence demonstrates that the transaction was entirely proper and performed consistent with the requirements of relevant policies and procedures. Even putting that aside, JPMC fails to explain how any supposed technical irregularity by Debtors would in any way render the transfer void or somehow entitle JPMC to withhold Debtors' funds. At the end of the day, JPMC seems to be operating on the false presumption that a bank is entitled to withhold a customer's deposits pending a full blown audit of the customer's internal accounting and operations. That is simply not the case.

What is perhaps most telling about JPMC's voluminous submissions is what they do not include. JPMC employs (or otherwise has access to) the substantial majority of the personnel who previously worked for WMB and WMB fsb, including people with direct responsibility for the Accounts at issue in this case, and yet JPMC is incapable of presenting a declaration from a single witness indicating any genuine dispute as to the ownership of Debtors' Accounts. Most notably, JPMC relies on the declaration of Carey Brennan, who, while quibbling as to the exact terms of a conversation with Debtors' affiant, Doreen Logan, agrees with her that the Deposits are "WMI's funds," and not, as JPMC strains to suggest elsewhere, capital contributions or something else. Furthermore, none of JPMC's other personnel steps forward to deny that the

funds are Deposits belonging to Debtors, or to claim that JPMC somehow has an ownership interest in Debtors' Accounts. JPMC's massive filing cannot mask this extraordinary omission, and JPMC cannot justify retaining $4 billion that even its own personnel recognize does not belong to it.

To the extent JPMC even hints that it might have an ownership interest in some small portion of the Deposits, its arguments are without merit. JPMC contends for instance that WMI holds approximately $234 million (approximately 5% of the total Deposits at issue) in "trust" on behalf of WMB pursuant to a tax sharing agreement. The very tax sharing agreement that JPMC relies upon, however, is clear on its face that WMB had no ownership interest in the refunds. Rather, as multiple courts have recognized in similar circumstances, the TSA expressly contemplates a debtor-creditor relationship and at most gives rise to a contractual claim on behalf of WMB against WMI. Thus, the tax refunds—and the balance of the funds with which they have been commingled—are property of WMI. JPMC's appropriate recourse, rather than cutting ahead of other creditors, is to pursue its claims, to the extent that it can even assert claims as successor to WMB, through the ordinary bankruptcy claims process after Debtors' assets have been restored to the estates.

JPMC seeks to make up for its inability to challenge Debtors' ownership of the Deposits by withholding those Deposits on the basis of purported setoff rights. But it is elementary that JPMC cannot assert setoff if it has no claims against Debtors. Based on the plain terms of the P&A Agreement, it is clear that JPMC did not acquire claims against WMI, and its setoff argument is therefore a non-starter. Indeed, the fact that the FDIC has asserted nearly identical claims as JPMC purports to assert reflects that such claims were never actually transferred pursuant to the P&A Transaction. It is telling that JPMC virtually ignores this critical issue, and

focuses instead on a series of arguments that are irrelevant in light of the indisputable fact—a fact apparent from the plain language of the very agreement that JPMC and the FDIC have relied upon for so many purposes throughout these proceedings—that JPMC acquired no claims against WMI. JPMC's last ditch effort to invoke setoff as justification for keeping Debtors' Deposits therefore fails.

The infirmity of JPMC's position is ultimately reaffirmed by the Supplemental Opposition that it filed following its deposition of Ms. Doreen Logan. In its initial Opposition, JPMC sought to excuse its failure to refute the overwhelming and undisputed evidence submitted by Debtors in support of their motion by complaining that Debtors' affiant, Ms. Logan, had not been made available for deposition. Although under no obligation to do so, Debtors stripped JPMC of this excuse, providing JPMC with what it asked for—a full day deposition in which to cross-examine Ms. Logan regarding her affidavit. This deposition has only confirmed the complete absence of any genuine dispute in this case. In its supplemental opposition, which is addressed to Ms. Logan's testimony, JPMC is still unable to identify any justification for withholding the funds on deposit, and it continues to rely entirely on the same irrelevant side issues that it advanced in its initial Opposition.

The time for delay is over. JPMC has held the Accounts for nearly a year; it possesses WMB's and WMB fsb's books and records; it employs numerous former WMB employees who had direct responsibility for the Accounts; and it has been afforded an opportunity to depose Debtors' affiant. Despite all of that, JPMC is completely incapable of refuting Debtors' ownership of the Accounts, and it continues to resort to an elaborate effort to stall the return of

Debtors' funds by obfuscating a very straightforward issue. Debtors are entitled to their

Deposits, and they respectfully request that their Motion be granted.[3]

## ARGUMENT

I.      **JPMC Fails to Raise any Genuine Dispute as to Whether the Deposits are Liabilities Owing to WMI**

      A.    **JPMC Cannot Create a Dispute Based on the Supposed Complexities of WMI's Accounting System**

JPMC begins its argument by accusing Debtors of relying on the "faulty presumption"

that they are entitled to the funds credited to the Accounts held in their name. (Opposition at 16.)

Actually, courts have repeatedly upheld that very presumption, and have routinely held in favor

of debtors, such as Debtors here, seeking to enforce deposit liabilities recorded in their name.

*See, e.g., In re Amdura Corp.*, 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits

in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is

established."); *In re LandAmerica Fin. Group, Inc.*, No. 08-35994-KRH, 2009 WL 1011647, at

*7 (Bankr. E.D.Va. Apr. 15, 2009) ("In line with the broad definition of 'property of the estate,'

money held in a bank account in the name of a debtor is presumed to be property of the

bankruptcy estate."); *In re Rocor Int'l, Inc.*, 352 B.R. 319, 328 (W.D. Okla. 2006) (citing

*Amdura* for the proposition that deposits "belong to the entity in whose name an account is

---

[3]      The Court allowed the FDIC to intervene in this Action for the sole purpose of moving for a stay, which the Court rejected. Consistent with the FDIC's stated purpose for its intervention, moreover, the Court made clear in its order that the FDIC would not be expected to file briefing on other issues. *See* Order Denying (A) Motion of Defendant JPMorgan Chase Bank, N.A. to Stay and (B) Motion of Intervenor-Defendant Federal Deposit Insurance Corporation, as Receiver, to Stay or Dismiss Adversary Proceeding at 3 (Docket No. 62) ("no further pleading or response shall be required from the FDIC-Receiver in this Adversary Proceeding"). And yet, the FDIC files a lengthy "me too" brief siding with JPMC in this dispute. In any event, both the FDIC's and the Bank Bondholders' arguments essentially mimic the arguments presented by JPMC, and for the reasons stated above, those arguments are inadequate to raise a genuine issue of fact or to defeat summary judgment.

established"); *see also* 4 Collier on Bankruptcy ¶ 541.09 (15th ed. 2009) ("Deposits in the debtor's bank account become property of the estate under section 541(a)(1)."). Moreover, Debtors have amply demonstrated that they are entitled to the benefit of this presumption by presenting the Court with account statements, *that JPMC itself has issued in Debtors' name*, for each of the Accounts that are the subject of this Motion. (Affidavit of Doreen Logan ("Logan Aff."); A22-41 & A46.)

Debtors have also done far more than merely rely on the well-settled presumption that they are entitled to enforce the deposit liabilities recorded in their name. Among other things, Debtors have demonstrated that they controlled the Accounts, and that they used the funds on deposit to pay their own liabilities.[4] (A1 at ¶¶ 10-12, 37.) These are key indicia of ownership, which courts have specifically relied upon in enforcing deposit liabilities. *See Amdura*, 75 F.3d at 1451 (affirming summary judgment on ownership of funds in debtor's account, stating: ""In this case the concentration account was not only held exclusively in Amdura's name, but Amdura also possessed all other legally cognizable indicia of ownership. None of the money in the account was ever segregated; Amdura had, at least pre-petition, the right to spend the money entirely as it saw fit without concern for 'whose money' it was spending; and Amdura in fact spent concentration account funds on its own obligations as well as those of the subsidiaries."); *see also Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 726 (D. Md. 1989) (funds deposited in an account owned and controlled by the debtor become the debtor's property); *LandAmerica*,

---

[4]     JPMC not only acknowledges Debtors' control over the Accounts, it emphasizes it. In a section of its Opposition addressed to setoff, JPMC argues that one indicia of WMI's supposed solvency during the period preceding its chapter 11 filing was the fact that it continued to pay its obligations as they came due. (Opposition at 51.) Of course, as Ms. Logan explained and as the account statements show, Debtors paid those obligations out of their accounts at WMB and WMB fsb. (A10-12 at ¶ 10-12.) The clear bottom line, which even JPMC cannot help but inadvertently acknowledge, is that the Accounts contain Debtors' Deposits.

2009 WL 1011647, at *7 ("The accounts were under the complete control of LES. Only LES had the ability to disburse or withdraw the funds.").

With Debtors having demonstrated their ownership and control of the Accounts, it is JPMC's burden to point to specific facts to justify its refusal to turn over Debtors' Deposits. *See Monroe*, 536 F.3d at 206-07 ("When a moving party satisfies its burden of proving a prima facie case for summary judgment, the opposing party 'must do more than simply show that there is some metaphysical doubt as to material facts.' . . . Instead, '[t]here must be sufficient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted.'") (citations omitted); *see also Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) ("To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial. While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.") (citations and internal quotations omitted). JPMC has not met that standard.

JPMC fails to present a single declaration from any of its employees, many of whom worked for Washington Mutual entities and had direct responsibility for the Accounts, actually denying that the Accounts reflect genuine deposit liabilities owed by JPMC to Debtors. Rather, JPMC's declarants either acknowledge Debtors' ownership of the Accounts, or sidestep the issue completely. JPMC presents the declaration of Carey Brennan, for instance, a former senior vice president at WMB who was employed by JPMC until July 2009, who, while quibbling with the exact terms of his discussions with Ms. Logan, admits repeatedly that it was his understanding that the funds transferred between the deposit accounts at WMB and WMB fsb were in fact

"WMI funds." (B226-229 at ¶ 4.) JPMC also presents the declaration of Rosa Cox, another former WMB employee with direct responsibility for the Accounts. Ms. Cox focuses entirely on a side issue, *i.e.*, whether she was aware of the specific requirements for calculating federal deposit insurance premiums (B230-231 at ¶ 3), never once denying that it is her understanding, as she conveyed to Ms. Logan, that Debtors own the Accounts and are entitled to their Deposits. (A46 at ¶ 46.) Finally, JPMC submits the declaration of Corrine Burger, in which Ms. Burger says nothing more than JPMC has preserved the status quo with respect to the Deposits. (B1017-1018 at ¶ 4.) Thus, the people at JPMC with direct knowledge of the Accounts—people who would be in a position to identify a specific factual basis for a dispute if there were such a basis—say nothing to refute Debtors' affirmative showing in support of summary judgment. *See Tripoli Co. v. Wella Corp.*, 425 F.2d 932, 935-36 (3d Cir. 1970) (upholding summary judgment where party opposing summary judgment provided affidavits that failed to demonstrate material issue of fact despite being in position to present such evidence if it existed); *Weiss v. Mader*, 525 F. Supp. 834, 837-38 (E.D.Pa. 1981) (granting summary judgment where nonmoving party had access to evidence that could demonstrate a genuine issue of material fact but failed to come forward with any such evidence).

Unable to identify specific facts giving rise to a genuine dispute, JPMC relies almost entirely on the declaration of an outside "expert," Nicholas Kissel, with no direct knowledge of the Accounts. Rather, Mr. Kissel talks generally about the complexities of Debtors' accounting system and argues that, in light of those complexities, JPMC needs additional time to analyze the Accounts. By adopting this stance, JPMC reveals its own "faulty premise"—namely, that a bank is entitled to conduct a full blown audit of its customers (and the source of their funds on deposit) before permitting them to withdraw on their accounts. Furthermore, the particular areas that Mr.

Kissel wishes to investigate simply have no bearing on whether Debtors are entitled to their Deposits. The complexities of an accounting system operating across multiple affiliated entities, for instance, plainly cannot, in itself, support a challenge to Debtors' claim to their Deposits. *See, e.g., In re World Access, Inc.*, 301 B.R. 217, 271 (Bankr. N.D. Ill. 2003) (rejecting claim by subsidiary that it was entitled to funds on deposit by parent on theory of constructive trust: "Nothing in the operation of the Cash Management System, including the daily sweeping of the zero balance accounts of the subsidiaries, amounted to breach of a confidential relationship or 'misbehavior' of any kind, much less fraud or wrongdoing"). Evidence that affiliated entities in the Washington Mutual family transacted between themselves, in and of itself, is unremarkable, insufficient, and irrelevant to counter the Debtors' showing that the Deposits are rightfully owed them by JPMC. *See In re First RepublicBank Corp.*, No. 390-3032, 1990 Bankr. LEXIS 2964, at *10 (Bankr. N.D. Tex. Apr. 24, 1990) ("Rights should not change or turn on the fact that the bank's holding company entered the safe keeping agreement with the bank, absent evidence of improper action, deception or fraud."). While JPMC and Kissel try to depict it is as somehow nefarious that Debtors accounted for transactions between and among related entities, it is a routine method of operation and, as confirmed by *World Access*, it in no way diminishes Debtors' rights to their Deposits.

JPMC's repeated refrain that transactions among the various entities were "commingled" or "intermingled" is a red herring in addition to being practically nonsensical. *See In re Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir. 1995) (finding that check paid to recipient of preferential transfer received debtor-property given that: "The check paid to [recipient] was drawn on [debtor's] Payroll Account, a general bank account containing commingled funds, to which [debtor] held complete legal title, all indicia of ownership, and unfettered discretion to pay

creditors of its own choosing, including its *own* creditors."); *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 (9th Cir. 1988) (stating that money in commingled bank accounts under debtor's control "presumptively constitutes property of the debtor's estate"), *cert. denied*, 486 U.S. 1056 (1988). The fact that "prior to the receivership, Washington Mutual engaged in significant intercompany transactions in which billions of dollars in assets and liabilities were moved among related entities" is not only completely unremarkable given the size of WMI and WMB, but irrelevant to Debtors' Motion. (Opposition at 15.) Although JPMC does not actually describe any commingling of funds in the Debtors' Deposits, deposit funds qualify as estate assets even where commingled with funds from non-debtor entities, and it is the burden of those entities to trace their funds in support of claims to be asserted against the estate. *Bullion Reserve of N. Am.*, 836 F.2d at 1217; *see also First Fed. of Mich. v. Barrow*, 878 F.2d 912 (6th Cir. 1989); *Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612 (1st Cir. 1988); *In re Mahan & Rowsey, Inc.*, 817 F.2d 682 (10th Cir. 1987); *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir. 1980); *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935 (2d Cir. 1965). Thus, JPMC is simply wrong that the complexities of Debtors' accounting system, or the supposed presence of commingled funds in their accounts, somehow renders Debtors' Accounts something other than deposit liabilities.

It is also a distraction for JPMC to state repeatedly that no funds were actually wired into WMB fsb in connection with the $3.67 billion transfer into that account. As an initial matter, JPMC, ignoring the financial industry in its present day form, cites no authority whatsoever for its faulty premise that a deposit account cannot be initiated except upon the transfer of actual or "good" funds to the depository institution. (Opposition at 14 ("If a large corporation wanted to open a deposit account at a bank, it would have to show up with good funds.").) Such a

requirement, while patently absurd, would erase decades of practice and hinder modern day banking as it has come to be known. The fact that WMB fsb did not receive bags full of cash from the back of an armored WMB truck "means nothing." *See FDIC v. Fedders Air Conditioning, USA, Inc.*, 35 F.3d 18, 21 (1st Cir. 1994) (finding that receipt by bank of an unconditional note, "readily described as 'the equivalent' of money," was sufficient to give rise to a deposit); *FDIC v. Eur. Am. Bank & Trust Co.*, 576 F. Supp. 950, 952-53 (S.D.N.Y. 1983) (holding that receivable from "Clearing House Interpayment System" was, as maintained by the FDIC, equivalent to a deposit as it represented an irrevocable and unpaid obligation to pay).[5] And the authority that JPMC does cite actually demonstrates the flaw in its position. JPMC observes that a deposit account is not "cash sitting in a vault," but is instead a debt owed by the bank to the depositor. (Opposition at 16 (citing *Citizens Bank of Md v. Strumpf*, 516 U.S. 16, 21 (1995).) That is exactly right—Debtors are not seeking to recover a pile of cash that they placed into a vault at WMB fsb (in old-fashioned money bags). Rather, they are seeking to enforce a deposit liability owed to them by WMB and WMB fsb, just as numerous other debtors have enforced deposit liabilities in turnover actions in the past. *See, e.g., Sousa v. Bank of Newport*, 170 B.R. 492, 494 (D.R.I. 1994) (the bankruptcy estate "includes funds held in a checking or savings account"); *Stratton*, 104 B.R. at 726 (funds deposited in an account owned and controlled by the debtor become the debtor's property).

---

[5]      Further demonstrating that there is no basis for JPMC's attempt to manufacture a distinction between payment of amounts due via "good funds" and via other generally accepted methods, certain transfers that JPMC refers to in other sections of its Opposition were settled in the same quite ordinary fashion. In connection with a certain payment of a tax-related liability from WMB to WMI, JPMC states that an "actual wire" of "general funds" from WMB to WMI was effectuated. (Opposition at 36.) Although irrelevant to Debtors' Motion, in fact, the payment, like millions of other transactions conducted by large corporations on a daily basis, was settled through book entries and not wire transfers.

Finally, all of JPMC's individual arguments, which merely question the nature of the liability owed to WMI and not the existence of that liability, amount to one large distraction. JPMC's position boils down to the proposition that Debtors had several methods of recording intercompany liabilities, and that it is necessary, given the complexities of accounting across subsidiaries, to investigate further in order to confirm that such liabilities were properly recorded as deposit liabilities. (Opposition at 14.) But turnover is not limited to deposit liabilities, it is available to enforce any liability that is due and owing, without limitation. *See* 11 U.S.C. § 542(b); *see also In re Allegheny, Inc.*, 68 B.R. 183, 190 (Bankr. W.D. Pa. 1986) ("[A] claim for an overdue account, specific in its terms as to amount due and date payable, constitutes a matured debt."); *In re Gordons Transps. Inc.*, 51 B.R. 633, 636 (Bankr. W.D. Tenn. 1985) ("It is this Court's reading of section 542(b) that the terms 'matured', 'payable on demand', and 'payable to order' refer to debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event."). Thus, even if JPMC were correct that its hypothesized full-blown audit of Debtors' books and records might reveal that some portion of the Deposit liabilities should have been recorded—or should even be recharacterized—as some other form of inter-company debt, the fact remains that it would be a debt nonetheless. And it would be a debt that JPMC would have assumed under the P&A Agreement.[6] However much JPMC seeks to confuse matters, the simple and unavoidable fact is

---

[6]      JPMC states in passing that the nature of the deposit liabilities is "particularly important . . . where the classification of a liability would affect the rights and obligations of the interested parties." (Opposition at 15 (citing to § 2.1 of the P&A Agreement which indicates that "senior or subordinated [WMB] debt" were not assumed by JPMC from the FDIC).) JPMC never identifies any theory, however, by which such debts could under any stretch of the imagination be recharacterized as "senior or subordinated debt." In fact the P&A Agreement is clear that JPMC assumed "all of the liabilities of [WMB]" other than "[p]referred stock and litigation pending against the Failed Bank related to liabilities retained by the receiver, [s]ubordinated debt, [s]enior debt, [a]ll employee benefit plans sponsored by the holding company of [WMB]

that JPMC owes Debtors $4 billion, irrespective of whatever label JPMC or Mr. Kissel might wish to place on that debt, and that turnover is warranted.

**B.      The Accounts Belong to Debtors Regardless of Whether those Accounts are Held at WMB or WMB fsb**

JPMC devotes a substantial portion of its Opposition to its contention that Debtors' transfer of $3.67 billion from WMI's account at WMB to its newly created account at WMB fsb "may" have been ineffective. (Opposition at 17-28.) JPMC fails to identify any facts supporting this speculation, and its position, in any event, is once again irrelevant. Indeed, the WMB account that held the funds prior to the challenged transfer was WMI's long-standing operating account (A1 ¶ 10), and there is nothing in all of JPMC's voluminous pleadings that even raises a question in that regard. Thus, even if the transfer of that deposit liability to WMB fsb was somehow ineffective, as JPMC strains to suggest, the funds would have remained on deposit, due upon demand, at Debtors' original account and Debtors would therefore still be entitled to their Deposits. JPMC's argument is a major exercise in misdirection—JPMC is asking the Court to focus on which of two Accounts holds Debtors' Deposits, all the while ignoring that, whichever of those two Accounts it is, Debtors are entitled to their funds.

JPMC's effort to attack the transfer as somehow ineffective, in addition to being irrelevant as to the nature of the liability, is not supported by the undisputed evidence. As set forth in Ms. Logan's Affidavit, and as demonstrated by the attached exhibits, the WMB fsb account was opened in accordance with Debtors' internal policies and procedures. (A1 at ¶ 11,

---

except the tax-qualified pension and 401(k) plans and employee medical plan, [and] [a]ll management, employment, change-in-control, severance, unfunded deferred compensation and individual consulting agreements or plans (i) between [WMB] and its employees or (ii) maintained by [WMB] on behalf of its employees." P&A Agreement at § 2.1, Schedule 2.1. Thus, notwithstanding Mr. Kissel's ponderings concerning "questions on whether any amounts in the Disputed Accounts should be recharacterized as unsecured debt, or something else", the outcome would be no different and turnover would remain appropriate.

A42-45.) As required pursuant to Washington Mutual's GL Administration Policy, the $3.67 billion transfer was effected through the submission of a "New Account Request Form," and the completion of a "Journal Entry Request Form" and a "Journal Entry Posting Form." (A1 at ¶ 16; A42-45; A77-81.) Furthermore, the transfer was approved, again as required by the GL Administration Policy, by senior WMB personnel, including current JPMC employee Patricia Schulte (for whom JPMC notably fails to present any declaration challenging the mechanics of the transfer or the status of the Deposits—relying instead on an outside "expert" with no direct knowledge of the transaction whatsoever). (A1 at ¶ 17.) Furthermore, once the WMB fsb account was opened, Debtors demonstrated their control over the account by twice withdrawing funds to pay a number of outstanding liabilities. (A1 at ¶ 37; A27-34.) Lastly, as discussed previously, Debtors have received regular account statements for the newly created account, including from JPMC, reflecting the $3.67 billion deposit liability.

Confronted with this extensive affirmative showing, JPMC purports to identify assorted problems with the transaction, including that it violated a requirement in the "[t]he GL Administration Policies . . . that internal demand deposit accounts be opened at least fourteen days before month-end." (Opposition at 25.) This is a misguided claim that reflects JPMC's blatant effort to confuse two separate documents (both of which are attached to Ms. Logan's affidavit). Specifically, there was a Washington Mutual GL Administration Policy governing the establishment of demand deposit accounts (A1; A42-45), and a Washington Mutual GL Administration Policy governing the establishment of GL accounts. (A1; A85-91.) As Ms. Logan noted in her affidavit, and as the pertinent written policies demonstrate by their express terms, the fourteen day requirement applies to the creation of new GL accounts, not to the creation of new deposit accounts. (A1 at ¶ 19 n.2.) Thus, JPMC is simply wrong that a fourteen

day rule applied with respect to the WMB fsb account, and a simple review of the applicable policies confirms that the supposed "violat[ion]" was no violation at all.[7]

JPMC also claims that there is a genuine issue as to whether the transfer somehow occurred in violation of the collateral requirements of sections 23A and 23B of the Federal Reserve Act ("FRA"). (Opposition at 22-24.) As with its other contentions, JPMC offers no analysis or authority in support of its vague allegation, and upon close inspection, it proves false. A review of the statutory language makes clear that *there were no applicable collateral requirements to any such transaction between commonly controlled financial institutions.* By its express terms, the FRA provides that its collateral requirements "shall not be applicable" to transactions between a member bank, such as WMB fsb, and an affiliated bank, such as WMB, that "controls 80 per centum or more of the voting shares" of the member bank. 12 U.S.C. § 371c(d)(1)(A); *see also* 12 C.F.R. § 223.41 ("The following transactions are not subject to the quantitative limits of §§ 223.11 and 223.12 or the collateral requirements of § 223.14 . . . (a) Parent institution/subsidiary institution transactions. Transactions with a depository institution if the member bank controls 80 percent or more of the voting securities of the depository institution or the depository institution controls 80 percent or more of the voting securities of the member bank."). WMB controlled 100% of WMB fsb's voting shares, and there is thus no basis for JPMC's claim that Debtors were under a statutory duty to collateralize the transfer.

Finally, JPMC offers no analysis, and presents no authority, for the proposition that any of the supposed problems that it identifies with respect to the $3.67 billion transfer would

---

[7]  JPMC also repeats its refrain, discussed *supra*, that the $3.67 billion transfer was somehow improper on the basis that no funds were actually transferred to the newly opened account at WMB fsb. (Opposition at 20.) As in previous sections of its Opposition, however, JPMC fails to identify any authority for the existence of such a requirement in modern day banking. Furthermore, there is nothing in the GL Policy governing the establishment of deposit accounts that requires any such transfer.

actually render that transaction void or ineffective. There is no authority for the notion that a loan supported by insufficient collateral is rendered void; there is no authority for the proposition that an account created in violation of internal company policies is void; and there is no authority for the proposition that an account created without the transfer of actual or "good" funds is void. It is also clear that a violation of the FRA, even had there been such a violation, would not be enforceable by JPMC. *See Branch v. FDIC*, 825 F. Supp. 384, 409 (D. Mass. 1993) ("Here, the plain language of [section 23A of the FRA] and its enforcement provisions, the legislative scheme, and the supporting legislative history all indicate a lack of Congressional intent to create a cause of action for a bank and or its shareholders against other banks or the FDIC."). In the end, JPMC's arguments lead nowhere, and reflect a strategy built with sideshows and misdirection as mortar. It is not enough for JPMC to speculate as to various hypothetical defects in the transfer without offering an explanation as to why any such defects, even had they occurred, would somehow eliminate a deposit liability for an Account that, according to JPMC's own records and employees, indisputably exists in Debtors' name.

### C. Debtors Have Demonstrated that the Accounts Belong to Them

JPMC makes an extraordinary set of admissions, all in the guise of attacking Debtors' position. In a section of its Opposition in which it contends that Debtors have failed to establish that the Accounts reflect actual deposit liabilities, JPMC acknowledges, i) that the Accounts are "labeled" Deposit Accounts, ii) that there are records that "reflect that label," iii) and that there are "some individuals" who believe that label to be accurate. (Opposition at 29.) As to this last point, JPMC can only submit feebly that there are other people who "do not know." What this means, of course, is that JPMC, for all of its bluster, acknowledges that there are multiple people who support Debtors' position, some who are neutral and *none who can deny it*. What JPMC describes is not a dispute, it is evidence in Debtors' favor. It is a monolithic record of multiple

documents and personnel who understand that the Accounts reflect deposit liabilities due and owing to Debtors, with a complete absence of evidence to the contrary, notwithstanding JPMC's unfettered access to pertinent documents and personnel for approximately one year.

Given its inability to identify evidence that supports its position, JPMC devotes much of its energy to damage control. It asks the Court to disregard the account statements in Debtors' name, and JPMC's continued issuance of those account statements in Debtors' name, because those statements reflect "how Debtors themselves chose" to characterize the accounts, and JPMC, since acquiring WMB, has "simply taken no action to change that practice." (Opposition at 30.) But this in no way undermines the recognized presumption that an account labeled as a deposit account is in fact a deposit account. *See*, Section I.A., *supra*. Moreover, while JPMC suggests that it is somehow suspect that Debtors "themselves" originally labeled the accounts as deposits, that actually speaks directly to the standard that applies for purposes of determining the existence of an enforceable debt—namely, *the intent behind the transaction. See In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006) ("[T]he determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction."); *In re RJC Indus.*, 369 B.R. 845, 852 (M.D. Pa. 2006) ("[T]he overarching inquiry" in determining whether a transaction involves the creation of debt or equity "is the intent of the parties gleaned from what they say, what they do, and the economic reality of the situation."). And as JPMC implicitly concedes, Debtors plainly intended to establish deposit liabilities when they originated their Accounts and labeled them as such. Moreover, treatment of accounts as "deposits" on a bank's books and records further supports the conclusion that the accounts are, in fact, deposits. *See* 12 C.F.R. § 330.5(a)(1) ("[T]he FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the

insured depository institution."); *Adagio Inv. Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71, 77-78 (D.D.C. 2004) (affording significant weight to the bank's ledger and balance sheet which indicated that the accounts were deposits); *see also Fedders*, 35 F.3d at 22-23 (relying on bank records as evidence to support a claim of a deposit denied by FDIC, as receiver).[8]

JPMC also seeks to limit the obvious significance of the account statements in Debtors' name by noting that the account statements reflecting the balances at WMB fsb "state that they were issued by Washington Mutual Bank, F.A." (Opposition at 31.) JPMC acknowledges, however, that this was the corporate name of WMB. Even taking JPMC's position to its logical end point, the liabilities owed to Debtors would have been held by WMB, rather than WMB fsb. This changes nothing—JPMC is still responsible for Debtors' Deposits because JPMC assumed the deposit liabilities of both WMB and WMB fsb. Furthermore, JPMC argues that the account statements are addressed "simply to 'WMI'" without stating whether the deposits were for the benefit of another entity. But that is exactly why this undisputed evidence is so compelling— *i.e.*, because the identified accountholder is WMI, and not anyone else. It turns settled law and logic on its head for JPMC to suggest that account statements in the name of WMI somehow undercuts Debtors' claim that the Accounts belong to WMI.

JPMC also resorts to an argument it has hinted at previously—namely, that the $3.67 billion transfer can be deemed a "capital contribution" by WMI to WMB fsb on the basis of a notation in certain underlying ledger entries. Ms. Logan addressed this directly in her affidavit, explaining that the language was mistakenly included, and demonstrating that every substantive

---

[8]     JPMC also reports that it has not located pre-petition deposit account agreements or signature cards. (Opposition at 29.) Once again, JPMC is seeking to invent a requirement that does not exist. Indeed, JPMC does not point to any authority that such documentation is necessary to demonstrate the existence of a deposit liability, and there is, in fact, no requirement for such documentation in the Washington Mutual GL Policy addressed to the establishment of deposit accounts.

and procedural step in the process confirms that the Account reflects a deposit liability. That is what she was directed to create (A1 at ¶13); that is what the operative paperwork is exclusively used to create (A1 at ¶¶ 16-18); that is what the entries on that paperwork in fact indicate (A1 at ¶¶ 17, 22, 24); that is what the surrounding contemporaneous email communications describe (A1 at ¶¶ 19, 21); that is what is confirmed by the fact that Debtors withdrew funds from the WMB fsb account to pay their own bills (A1 at ¶¶ 37); and that is how account statements have always been issued even after JPMC's acquisition of WMB and WMB fsb (A1 at ¶¶ 10, 12, 43). JPMC presents no evidence or testimony to refute Debtors' showing that the Deposits were recorded in the books and accounting records of all of the pertinent entities as demand deposit accounts. (A1 at ¶ 11.) In the face of all of this, it is nothing short of absurd for JPMC to continue to insist that there is some genuine question as to whether the transfer was a capital contribution relying on nothing more than a stray notation. It also speaks volumes that JPMC presents no declaration whatsoever from Patricia Schulte, who, as set forth in Ms. Logan's affidavit (and in her deposition), was directly involved in creating the WMB fsb Account. JPMC's continued suggestion that the transfer was somehow a capital contribution, in the face of overwhelming evidence to the contrary—and even without the backing of its own personnel (not a single affiant)—is inadequate as a matter of law to give rise to a genuine dispute.

Moreover, JPMC does not introduce contrary evidence to Ms. Logan's statement that JPMC has been paying FDIC deposit insurance assessments on all of the Deposits since September 2008, when it first assumed such liabilities. (A1 at ¶ 47.) This treatment of the Deposits as just that weighs in favor of finding that they are, in fact, "deposits." *See, e.g., FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 439 (1986) (considering whether the FDIC has

charged deposit insurance premiums in determining whether liabilities are deposits); *Betz v. FDIC*, 99 F.3d 904, 906 (9th Cir. 1996) (same).

## II. JPMC Fails to Raise any Genuine Dispute as to Ownership of the Deposit Accounts

After devoting most of its attention to the perceived complexities of Debtors' accounting systems, JPMC finally addresses the issue actually before the Court—*i.e.*, whether Debtors are entitled to their Deposits. First, JPMC claims that Debtors have somehow failed to establish ownership of the Accounts because they have not identified the original source for all of their funds on deposit, and, second, JPMC contends that Debtors do not own certain segments of the Deposits as to which either JPMC or various third parties purportedly hold claims. (Opposition at 33-46.) As set forth below, these arguments must be rejected. Debtors are under no obligation, just as bank depositors generally are under no obligation, to demonstrate the source of all of the funds that they hold on deposit in order to withdraw from their accounts. Also, Debtors do not lose ownership of their Accounts as a result of any purported claims either by JPMC or some third party to a portion of the funds on deposit—rather, the funds remain estate property and any such claims must be administered and resolved through the routine bankruptcy claims process before this Court.

### A. JPMC Fails to Refute Debtors' Evidence Demonstrating Ownership of the Accounts

JPMC cites no authority whatsoever for the proposition most central to its argument—*i.e.*, that Debtors are under some obligation to prove the source of all of the funds that they have on deposit. (Opposition at 33-34.) That notion is of course absurd. Bank depositors are plainly not required to demonstrate the original source of their funds in order to enter into transactions on their accounts, and it is not surprising that JPMC is unable to identify a single case or regulation imposing any such burden. What the cases do make clear, by contrast, is that Debtors

are entitled to a presumption that the accounts in their name are in fact their accounts. *See Amdura*, 75 F.3d at 1451 ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established."); *In re U.S.A. Diversified Prods., Inc.*, 100 F.3d 53, 55 (7th Cir. 1996) ("Property of the debtor is defined to include all legal or equitable interests of the debtor . . . and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account.") (internal quotations omitted); *Sousa*, 170 B.R. at 494 (holding that the bankruptcy estate "includes funds held in a checking or savings account").

As discussed in Section I.A., *supra,* moreover, Debtors have gone well beyond this presumption by demonstrating, *inter alia*, their control of the Accounts and their use of the funds on deposit to pay their obligations in the period before the chapter 11 filing. *See Amdura*, 75 F.3d at 1451; *see also Stratton*, 104 B.R. at 726 (holding that funds deposited in an account owned and controlled by the debtor become the debtor's property); *LandAmerica*, 2009 WL 1011647, at *7 ("The accounts were under the complete control of [the debtor]. Only [the debtor] had the ability to disburse or withdraw the funds. As [the debtor] maintained the exchange funds in bank accounts in its name and under its control, the money is presumably property of the [the debtor's] bankruptcy estate."). In fact, Debtors' showing here is similar to the showing that the Court deemed sufficient in *Amdura*. There, the parent company debtor had funds in its name; it exercised its right to spend the money entirely as it saw fit; and it spent account funds on its own obligations as well as those of the subsidiaries. Under these circumstances, all of which are present here, the court held that a "subsidiary debtor did not own outright any part of the concentration account." *Amdura*, 75 F.3d at 1451.

In light of Debtors' affirmative showing, JPMC cannot avoid summary judgment by inventing an additional requirement—*i.e.*, a requirement that Debtors prove where their funds "came from" (Opposition at 34)—that simply does not exist under the law and, given the fungible nature of cash, would be unworkable. Rather, JPMC must come forward with some concrete basis to actually support its position that ownership of the Deposits is somehow in doubt. *See Monroe*, 536 F.3d at 206-07. Not only does JPMC fail to make such a showing, it confirms through its declarations presented (and through the declarations that it fails to present), that Debtors own the Deposits and are due the amounts they have on deposit.

Most notably, Carey Brennan, a former senior vice president at WMB who was employed by JPMC until July 2009, admits that it was his understanding that the funds transferred between the deposit accounts at WMB and WMB fsb were in fact "WMI funds" (a characterization that Mr. Brennan uses a half dozen times). (B226-229 at ¶ 4.) Mr. Brennan goes further than that, explaining that he favored transferring WMI's funds between those accounts for the specific purpose of protecting WMI's Deposits. (B226-229 at ¶ 5.) Not once in his declaration does Mr. Brennan ever deny that WMI owns the Deposits. The same is true of Rosa Cox, another former WMB employee who had direct responsibility for the Accounts and in creating Account 4234 at WMB fsb. Ms. Cox's declaration is devoted entirely to an obvious ancillary issue, *i.e.*, whether she was aware of the specific requirements for calculating federal deposit insurance premiums, while she studiously avoids addressing the issue actually before the Court. Indeed, Ms. Cox never denies her understanding, implicit in her conversation with Ms. Logan, that Debtors own the Deposits and are entitled to be paid on demand. (A1 at ¶ 46.) That silence speaks volumes.

JPMC's failure to present declarations from other current JPMC/former WMB personnel whom Ms. Logan discusses in her affidavit is also loud and clear. Perhaps most notably, Ms.

Logan describes Patricia Schulte's direct involvement in the $3.67 billion transfer from WMI's account at WMB to its account at WMB fsb. Among other things, Ms. Schulte, Ms. Logan's former superior, instructed Ms. Logan to effectuate the transfer (Logan Tr. at 70:25-71:3), and signed and approved a new account request form, which, as Ms. Logan explains, was used by WMI for the sole purpose of opening deposit accounts. (A1 at ¶¶ 13, 17.) JPMC presents no declaration from Ms. Schulte, which suggests that she has no basis to refute Ms. Logan's account or to deny Debtors' ownership of the Deposits. *See Tripoli Co.*, 425 F.2d at 935-36. It is just as significant that JPMC fails to present declarations from any of several dozen other of its current employees who were formerly employed by WMB. JPMC tries its best to mask this failure by devoting its Opposition to numerous tangents and irrelevancies, but the inescapable fact is that it is withholding $4 billion in Deposits, payable on demand, despite its inability to present a declaration from a single employee, many of whom worked directly with the Accounts in their former positions at WMB, who can actually step forward to challenge Debtors' entitlement to the funds on deposit. In the end, the party that has failed to meet its burden here is JPMC, not Debtors.

**B.  JPMC Fails to Create a "Genuine Dispute of Material Fact" As to the Ownership of the Tax Funds**

**1.  JPMC's Claims Regarding Intercompany State Tax Amounts Do Not Give Rise to a Genuine Dispute as to Ownership**

JPMC contends that there is a genuine dispute relating to a series of transactions by which WMB paid approximately $922 million to Debtors in satisfaction of a debt arising in connection with state income taxes that Debtors had earlier paid on WMB's behalf. According to JPMC, WMI "departed from [] historic practice" when it "requir[ed] that WMB pay to WMI $600 million on August 19, 2008 and another $322 million on September 19, 2008 . . . ." (Opposition at 35-36.)  Significantly, JPMC never denies that WMB owed Debtors these

amounts or that such liabilities were due, matured, and fully payable, but it nevertheless complains that these transfers "effectively converted what until that time had been an unsecured $922 million general ledger debt that was not supported by good funds or collateral into purported deposit funds for WMI's own benefit." (*Id.* at 36.) JPMC posits that "a change in form like this is not necessarily a change in substance."[9] (*Id.*) Once again, JPMC's point is both unfounded and, more importantly, irrelevant.

JPMC cites no authority for its apparent assumption that WMB's payment of $922 million in satisfaction of debts legitimately owing to WMI was somehow rendered ineffective on the basis that the transaction was a departure from past company practice. Here, again, it is apparent that JPMC is simply inventing a requirement that does not exist under the law. JPMC makes several other apparent assumptions, none of which are supported and none of which would justify a finding in JPMC's favor. For instance, JPMC vaguely suggests that there are "material issues" as to whether the transfer violated the requirements of Section 23A and 23B of the FRA, and JPMC suggests the transaction could potentially be unwound on that basis. But JPMC does not describe any of the standards applicable under those provisions and provides no analysis whatsoever to explain its hollow contentions.

In fact, there was no violation of Sections 23A or 23B, sections of the FRA which primarily govern credit extended by a bank to an affiliate.[10] Those sections do not at all concern

---

[9] Notably, $500 million of these funds were subsequently contributed downstream to WMB in the form of a Capital Contribution on September 10, 2008. Hence, the majority of these funds are not included in the Deposits and JPMC was the ultimate recipient of the majority of these funds, in "form or substance."

[10] The Board of Governors of the Federal Reserve System summarize Sections 23A and 23B of the FRA as follows: "Sections 23A and 23B and Regulation W limit the risks to a bank from transactions between the bank and its affiliates and limit the ability of a bank to transfer to its affiliates the subsidy arising from the bank's access to the Federal safety net (*i.e.*, lower cost insured deposits, the payment system, and the discount window). The statute and rule

or restrict the payment of amounts matured and payable amongst banks and their affiliates. The payment by WMB of amounts due to WMI on account of state tax liabilities (owed to WMI because WMI had paid amounts to taxing agencies on WMB's behalf) could not have been inconsistent with those statutes simply because it was a payment of an antecedent debt, and not an extension of credit by WMB or anyone else.

In any event, JPMC would not have standing to enforce those provisions even had a violation occurred. *See Branch*, 825 F. Supp. at 409 ("Here, the plain language of [section 23A of the FRA] and its enforcement provisions, the legislative scheme, and the supporting legislative history all indicate a lack of Congressional intent to create a cause of action for a bank and or its shareholders against other banks or the FDIC."). Once again, JPMC is simply rummaging for a concept under "federal banking law"—this time, the application of specified sections of the FRA—to create the impression of an issue that impacts ownership of the Deposits, when, in fact, there is no issue at all.

Similarly, JPMC's assertion that the satisfaction of this tax-related liability could be "avoidable by the FDIC or [third parties]" is irrelevant to the Debtors' motion. First, the FDI Act does not contain provisions akin to the Bankruptcy Code's "preference" cause of action that could be applicable to this transfer. Moreover, any attempt by the FDIC to avoid the payments under a fraudulent transfer theory would be expressly barred as against WMI as the FDIC "may not recover under [fraudulent transfer theory] from . . . any transferee that takes for value,

---

accomplish these purposes by imposing quantitative and qualitative limits on the ability of a bank *to extend credit to*, or engage in certain other transactions with, an affiliate." *See* http://www.federalreserve.gov/boarddocs/SRLETTERS/2003/sr0302.htm#Footref (emphasis added); *see also* 12 U.S.C. § 371c(b)(7) (defining a "covered transaction" to include "a loan or extension of credit to the affiliate," certain purchases of assets or securities from an affiliate, accepting the securities of an affiliate as collateral and "the issuance of a guarantee, acceptance, or letter of credit, including an endorsement or standby letter of credit, on behalf of an affiliate").

*including satisfaction or securing of a present or antecedent debt,* in good faith." *See* 12 U.S.C.

§ 1821(d)(17)(C) (emphasis added). As discussed above, JPMC never disputes that this payment

settled an intercompany liability.[11] (Opposition at 35.) Second, not surprisingly, the FDIC has

not asserted such a cause of action in its proof of claim or in counterclaims asserted (in violation

of the automatic stay) against Debtors in the DC Action. Finally, any purported claim by the

Bank Bondholders seeking to avoid this payment is irrelevant to, and would not operate to stay,

the payment to the Debtors of their Deposits by JPMC. The Court specifically addressed the

Bank Bondholders' claims when it denied JPMC's Motion to Dismiss the Turnover Action,

observing that those claims, even if the allegations were credited, would not affect title to the

Deposits. (Tr. 6/24/09 at 109 ("But see, even if I go to [the bondholders' allegations], those facts

don't deal with the title which a turnover deals with. Title to property, they don't contest that the

title is in the name of the debtor. There may be claims for fraudulent conveyance, or other

improper actions by the debtor, but they don't even go to title.").) If either the bondholders or

---

[11]     For the same reason—that the payment of the tax-related liability was in satisfaction of
an antecedent debt and not a dividend issued to WMI on account of its equity interest—JPMC's
statement that the transfer could have constituted an "unlawful dividend" is similarly misplaced.
Accepting JPMC's assertions that such intercompany liabilities were, under past practice,
allowed to remain outstanding, there is no theory of law that would operate to recharacterize
such payments of valid and mature intercompany liabilities as dividends or that would strip a
creditor's right to accept such payments based upon past conduct. However, even if such a claim
was colorable, it would not give rise to an ownership interest in the Debtors' Deposits. In fact,
the FDIC has already asserted a claim for "Unlawful Dividends" in *Washington Mutual, Inc. and
WMI Investment Corp. v. Federal Deposit Insurance Corporation,* No. 1:09-cv-00533 (D.D.C.)
(the "DC Action"), Dkt. No. 26, FDIC Answer and Counterclaims ¶¶ 46-51. The FDIC's claim
is limited to purported "cash dividends", and does not extend to payments of antecedent
obligations. *See id.* But, with respect to such dividends that are the subject of the claim, the
FDIC "demands judgment" against WMI, and does not purport to assert ownership of the
Debtors' funds in connection with such claims. *See id.* While the Debtors will contest that any
such dividends were not in fact unlawful, it is clear that such claims would not give rise to
"ownership" of any of the Debtors' funds even if successful. *See* Nev. Rev. Stat. § 78.191 *et
seq.,* Stock and Other Securities; Distributions (providing no right of ownership arising out an
unlawful dividend claim).

the FDIC has claims to the Deposits, that does not make them owners of those Deposits and it does not affect this turnover action. Given the Bank Bondholders' intervention in this action, any such claim would not give rise to ownership rights and may be adjudicated after turnover is effectuated before this Court.

Finally, even if JPMC could cite any authority, or set forth some theory, to support its notion that the transfer was somehow ineffective and that the $922 million remained a general ledger debt that WMB owed to WMI, it would amount to a distinction without a difference. As discussed in Section I.A, *supra*, an intercompany payable, if matured and payable, would remain enforceable in a turnover action. By its express terms, section 542 authorizes bankruptcy debtors to enforce debts owed to their estates, and that provision is in no way limited solely to the enforcement of deposit liabilities. *See* 11 U.S.C. § 542(b). Thus, even if the transfer were ineffective such that WMB continued to owe WMI a "$922 million general ledger debt" (Opposition at 36), the fact remains that Debtors are entitled to enforce that debt—a debt that JPMC acknowledges—through these proceedings.

## 2. JPMC Does Not Own the Tax Refunds on Deposit in Debtors' Accounts

JPMC next claims that Debtors' Motion must be denied on the basis that $234.5 million in tax refunds that are now held in the Accounts that "belonged to WMB . . . [are] now owned by JPMC." (Opposition at 36.) To place JPMC's argument in context, this figure represents approximately 5% of the total Deposits, and a dispute as to these amounts, even if there were a basis for such a dispute, would not nearly justify JPMC's retention of an additional $4 billion. In any event, it is indisputable that these tax refunds, like the other 95% of the Deposits, do in fact belong to Debtors' estates. JPMC's position contradicts the plain terms of the Tax Sharing Agreement entered into on August 31, 1999 (the "TSA") (B209-212), a document that JPMC

virtually ignores, as well as directly on-point caselaw considering tax refunds received by a debtor/parent company that functioned as a filing entity for a consolidated tax group.

The TSA provided that WMB and WMB fsb would make "payments on account of their federal income tax liability to WMI," and that WMI, in turn, would file consolidated returns with the IRS on behalf of all three entities. (B209-212 at ¶¶ 1, 2(a).)[12] Nowhere in the TSA does it state that WMB or WMB fsb would "own" any tax refunds paid by the IRS to common parent WMI, or that WMI would hold any such amounts "in trust." Instead, WMI agreed, contractually, to "pay to . . . WMBfsb [and] WMB . . . amounts that may be due them on account of (i) any overpayment of their said tax liability for a taxable year or (ii) any credit that may result from the utilization of their net operating loss for a taxable year . . . within 30 days after the consolidated return is filed for that taxable year or, to the extent any such amount due must be recovered from the IRS, within 30 days after payment is received from the IRS . . . ." (B209-212 at ¶ 2(b).) Since WMI paid all taxes and received all refunds from the IRS, JPMC, on behalf of WMB, cannot state a claim for the ownership of the tax refunds. In fact the TSA at most may give rise to a debtor-creditor relationship—the quintessential business of bankruptcy—not a trustee-beneficiary relationship. JPMC's claim, to the extent it or the FDIC (but not both) has one under the TSA, is no different than any other creditor's claim to be adjudicated by, and afforded treatment under a chapter 11 plan confirmed by, this Court.

That was the holding of the Second Circuit in a situation analogous to this one. *See In re First Cent. Fin. Corp.*, 377 F.3d 209 (2d Cir. 2004). In *First Central*, the Second Circuit found that a parent company's bankruptcy estate which was holding tax refunds owed to a failed

---

[12]     This structure is consistent with regulations promulgated under the Internal Revenue Code. *See* 26 C.F.R. § 1.1502-77(a)(2)(v) ("The common parent files claims for refund, and any refund is made directly to and in the name of the common parent and discharges any liability of the Government to any member with respect to such refund.").

insurance company subsidiary, and who was a party to an agreement with the insurance company governing how taxes were to be allocated, would not be unjustly enriched by retention of the refund. *Id.* at 211, 213-16. The court found that the insurance company had "a contractual claim directly against the [parent]—arising out of the Agreement—which can be pursued in the bankruptcy proceeding." *Id.* at 216; *see also In re MCorp Fin.*, 170 B.R. 899, 902 (S.D. Tex. 1994) (interpreting similar tax sharing agreement, finding that no "part of the allocation agreement suggests that [parent of failed bank subsidiary] is a trustee to the subsidiaries, holding mere nominal claim to the refund. The contract created an account, a debtor-creditor relation, which is the quintessential business of bankruptcy . . . . The refund must be paid to the estate; then if [the failed bank] is the owner and wants to enforce its property right, it must file a claim."). *See also In re Franklin Sav. Corp.*, 159 B.R. 9, 29 (Bankr. D. Kan. 1993) (finding that language in the tax reimbursement agreement which referred to payments made from the parent to the subsidiary as "reimbursement" and "credits" made clear that that the terms indicated such payments should be treated "in the nature of a receivable" and therefore is not the property of the subsidiary institution), *aff'd*, 182 B.R. 859, 863 (D. Kan. 1995) ("The [Tax Reimbursement Agreement] speaks specifically to the allocation of any tax refunds received by the holding company. Under the terms of the agreement, the taxes were not held in trust for the benefit of the subsidiary to be automatically turned over to it. Certain amounts would be 'reimbursed' under certain conditions.").

JPMC ignores all of this authority that is well grounded in bankruptcy principles. Even its own cited cases, however, confirm that JPMC's rights must be determined by the terms of the TSA, which, in this case, establishes a debtor-creditor relationship, affording it no ownership over the funds. For example, JPMC cites *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d

262 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973), for the proposition that "[a]llowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent." (Opposition at 38 (citing *Bob Richards*, 473 F.2d at 265).) JPMC conveniently ignores, however, what the court noted earlier in the same paragraph: "Normally, where there is an explicit agreement . . . as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability." *Bob Richards*, 473 F.2d at 264. JPMC similarly truncates the finding in *In re Revco D.S., Inc.*, 111 B.R. 631 (Bankr. N.D. Ohio 1990), which it cites for the proposition that "any refund resulting from the carryback of a net operating loss of a former subsidiary against taxable income attributable to the subsidiary in a prior year when it was a member of its former parent corporation's consolidated tax group belongs to and is the property of that subsidiary." (Opposition at 38 (citing *Revco*, 111 B.R. at 639).) JPMC omits the clause immediately preceding this passage, "*absent an agreement to the contrary* . . . ." *Revco*, 111. B.R. at 639. Thus, it is apparent from all of the cited authority, by both Debtors and JPMC, that ownership of the tax refunds must be determined based on the terms of the TSA.

Here, the language of the TSA states that WMI would pay WMB or WMB fsb as a result of "overpayment" or "any credit." (*See* B209-212 at ¶ 2(b).) As the courts have recognized in analogous circumstances, if WMI and WMB intended for WMB's share of the tax refunds to be trust property of WMB, "they could have provided for its 'return' to [the subsidiary]." *Franklin*, 159 B.R. at 29; *see also Bob Richards*, 473 F.2d at 264-65 ("[W]here there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability."); *In re First Cent. Fin. Corp.*, 269 B.R. 481, 497-98, 502 (Bankr. E.D.N.Y. 2001) (holding that pursuant to tax

allocation agreement, tax refund was "property of the [] bankruptcy estate under § 541 of the

Bankruptcy Code"), *aff'd*, 377 F.3d 209 (2d Cir. 2004). The TSA does not include any such

provision evincing ownership rights of WMB.[13] Moreover, in *Bob Richards* the subsidiary

asserting ownership rights over the parent's tax refunds was the debtor in bankruptcy. Where the

recipient of the refunds is the bankrupt, the countervailing interests of bankruptcy and the

debtor's creditors make the assertion of ownership rights by a subsidiary inappropriate. *See*

*MCorp*, 170 B.R. at 902 (expressly distinguishing *Bob Richards* because "the entity receiving the

refund is in bankruptcy and the entity demanding the benefit is a solvent successor in interest to a

cluster of assets from a separate insolvency proceeding"). Thus, JPMC's recourse to recover on

any amounts allegedly due under the TSA, like every other putative creditor of the Debtors, is to

file a proof of claim in the Bankruptcy Court—a course of action it has already taken. *See id.*

---

[13]     Rather than address the numerous cases rejecting its position, JPMC relies on the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure (the "IPS"), 63 Fed. Reg. 64,757, 64,759. (Opposition at 37-38.) The IPS is not, as JPMC claims, a "[c]ontrolling federal banking regulation." *In re Seidman*, 37 F.3d 911, 931-32 (3d Cir. 1994) (holding that an OTS "Statement of Policy," set forth at 12 C.F.R. § 571.7(b), was not "regulation or law"). In fact, the IPS has even less force than the statement of policy in *Seidman* since the IPS, unlike that statement of policy, was never set forth in the Code of Federal Regulations. *See Krazalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002) ("A simple announcement is too far removed from the process by which courts interpret statutes to earn deference. A simple announcement is all we have here. One fine day the policy statement simply appeared in the Federal Register. No public process preceded it . . . ."), *cert. denied*, 539 U.S. 958 (2003); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n*, 869 F.2d 719, 736 (3d Cir. 1989) (concluding that an agency's policy statement "is entitled to no greater deference than any other policy statement, *i.e.*, none"); *Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 537 (D.C. Cir. 1988) ("A binding policy is an oxymoron."). Furthermore, the IPS plainly does not guarantee a subsidiary a direct ownership interest in its proportionate share of tax refunds collected in connection with a tax sharing agreement—indeed, a number of the cases cited in text, in which courts have rejected such claims pursuant to the terms of various tax sharing agreements, were decided subsequent to the IPS. *See, e.g., In re First Cent. Fin. Corp.*, 377 F.3d 209 (2d Cir. 2004).

3.     **Funds Invested in WMI By TPG Are Not Property of WMB**

JPMC's argument concerning the TPG Funds (as defined in the Opposition) again stretches the limits of credibility and throws to the fire any concept of corporate separateness. In essence, JPMC argues that proceeds received and retained by WMI from an equity investor who purchased WMI (not WMB) stock, may now be the property of WMB simply because the parties may have contemplated that such funds would at some point be down-streamed by WMI to WMB. JPMC ignores that the funds are indisputably the proceeds of the sale by WMI of WMI securities and that the pertinent investment agreement provided no provision or obligation that such funds be contributed to WMB.

WMI's publicly-filed 8-K report filed on April 11, 2008 included the pertinent April 7, 2008 Investment Agreement between WMI and TPG (the "Investment Agreement"). (C1-39.) The Investment Agreement is clear that it was WMI, not WMB, that entered into the transaction in question and that it was WMI equity securities that WMI sold to TPG in exchange for cash consideration to be received by WMI, not WMB. *See* Investment Agreement at *preamble, §§* 1.1, 1.2(c)(B). Significantly, the Investment Agreement contains no agreement, covenant, or requirement that the proceeds of the sale of WMI's securities become the property of WMI's subsidiary, WMB, or be contributed to WMB at any time. *See Amdura*, 75 F.3d at 1451 (rejecting competing ownership/constructive trust argument where the "record reflects no evidence that [debtor-account holder] was ever contractually or otherwise compelled to pay [competing claimant's] debts" notwithstanding past practice which was deemed "not enough to establish that its control over money from [competing claimant] was exercised *solely* for [competing claimant's] benefit").[14]

---

[14]     Moreover, WMI's public filings also indicate that the TPG proceeds were indisputably the property of WMI to be used to service its debt and preferred stock obligations. *See* WMI

Notwithstanding the foregoing facts, which leave no dispute as to the ownership of any Deposits that originated as TPG Funds, JPMC argues that such funds could perhaps be WMB property simply because they may have been "intended" to be utilized for WMB's benefit. JPMC's argument is not only groundless, but is in conflict with the respect afforded corporate separateness by the Third Circuit absent significant evidence that stakeholders treated separate entities as one. *See In re Owens Corning*, 419 F.3d 195, 210 (3rd Cir. 2005), *cert. denied*, 547 U.S. 1123 (2006). That is clearly not the case here. Both WMI and WMB were separate legal entities with separate sets of creditors who understood who they were advancing credit to. JPMC does not even attempt to proffer evidence to the contrary.

Finally, JPMC points to the legal doctrines of constructive and resulting trust to support its efforts to concoct disputes of fact in connection with the Debtors' Deposits. Such theories are disfavored in bankruptcy, however, and invoking their mere existence fails to give rise to any real dispute over the title of the Deposits. *See In re Ades and Berg Group Investors*, 550 F.3d 240 (2d Cir. 2008) ("[R]etention by the bankruptcy estate of assets that, absent bankruptcy, would go to a particular creditor is not inherently unjust."); *First Central*, 377 F.3d at 218 ("Because the Trustee does not hold property under such circumstances that in equity and good conscience he ought not to retain it, we affirm the District Court's decision not to impose a constructive trust on any portion of the refund.") (internal quotation marks and citations omitted); *MCorp.*, 170 B.R. at 902 (recognizing that "[t]he equities of unjust enrichment do not

Form 10-Q, May 12, 2008 ("On April 21, 2008, the Parent completed a significant recapitalization which resulted in the net receipt of approximately $7.0 billion, $3.0 billion of which was contributed to its principal banking subsidiary, Washington Mutual Bank. As a result of this recapitalization, sufficient cash and cash equivalents are available to meet all preferred stock and debt service obligations for the foreseeable future."). Moreover, the fact that a significant portion of the TPG Funds were in fact contributed to WMB pursuant to formal and documented transactions further makes clear that prior to, or in the absence of, such transactions, the funds were the property of WMI.

appear between a post-bankruptcy purchaser out of a receivership and the creditors" of the parent company's bankruptcy estate). In the context of these bankruptcy cases, where the Debtors have more than $7 billion in outstanding claims, the equities weigh heavily against the application of either constructive or resulting trusts over the TPG Funds. In fact, given that the TPG Funds were proceeds of a sale of WMI securities, it is hard to fathom any possible equitable argument that would support the imposition of such disfavored and extraordinary remedies for the benefit of WMB, let alone JPMC which has profited more than handsomely from the P&A Transaction.

### 4. JPMC's Supposed Security Interest in Particular Accounts Does Not Affect the Status of those Accounts as Estate Assets

JPMC next contends that it holds a security interest in two accounts—Accounts 1206 and 9663. (Opposition at 43-44.) This is another argument that is simply irrelevant.[15] It is well-settled that a security interest is distinct from and does not in and of itself give rise to a claim of ownership, and that assets that are subject to such an interest therefore remain estate property subject to the administration through the bankruptcy process. *See, e.g., In re Jamail*, 609 F.2d 1387, 1391 (5th Cir. 1980) ("In this case, however, the goods which [purported secured creditor] claims were commingled, building materials used in the construction of apartment buildings, were all owned by [the debtor]. Once [purported secured creditor] and the other materialmen delivered the materials to [the debtor] on [the debtor's] credit they retained only a security interest, not an ownership interest, in those materials."); *In re Drahn*, 405 B.R. 470, 476 (Bankr.

---

[15] JPMC tacks on the disingenuous argument that there is a genuine dispute as to whether Account 1206, which holds approximately $52 million (just over 1% of the Deposits now at issue), is owned outright by WMB on the basis that the account statement says that the account is held by WMI "FBO Washington Mutual Bank FA." (Opposition at 43.) This entry plainly references the security agreement for Account 9663, which provides that the account is held "for the benefit of Washington Mutual Bank, FA." And, as discussed in text, a security interest is distinct from, and short of, an ownership interest.

N.D. Iowa 2009) (finding creditor had security interest, not actual ownership, and therefore asset was property of the estate); *In re Allen*, 357 B.R. 103, 112-13 (Bankr. S.D. Tex. 2006) (finding creditor had a security interest, not an ownership right, in rents received by debtor); *In re Nobel*, 179 B.R. 313, 315 (Bankr. M.D. Fla. 1995) (finding that in absence of express agreement to hold deposited funds in trust, proceeds are not the property of floor plan financier who held security interest in funds).

### 5. JPMC Cannot Withhold Debtors' Deposits on the Basis of Supposed Third-Party Claims

JPMC argues that it is entitled to hold the Debtors' funds on account of various third party claims asserted by the FDIC and the WMB Bondholders. (Opposition at 45.) But, as this Court has already recognized, those claims do not affect title to the Deposits. Rather, as with JPMC's purported claims to the funds, the appropriate method for the FDIC and WMB Bondholders to assert any claims to the funds on deposit is through the ordinary bankruptcy claims process. *See Ga. Pac. Corp v. Sigma Serv. Corp.*, 712 F.2d 962, 964 (5th Cir. 1983) ("[E]ven if the debt due by Georgia Pacific to [the debtor] included funds subject to a constructive trust or other equitable claim of [third parties], nevertheless [the debtor] had legal title to the account so due and it therefore was part of the debtor's estate, that was required to be turned over to the administrator of the debtor's estate, subject to recognition in the bankruptcy court of the equitable interest of the claimants.") (internal citation omitted). Indeed, both the Bank Bondholders and the FDIC have availed themselves of that process by filing proofs of claim with the Bankruptcy Court.

Furthermore, to the extent that JPMC means to suggest that there is a genuine issue as to whether the FDIC or the WMB Bondholders might actually own some portion of the Deposits, it is plainly not enough for JPMC merely to rely on the fact that those entities have made various

allegations in assorted filings. As the Court recognized when it denied JPMC's Motion to Dismiss the Turnover Action, the mere fact that these other entities have made allegations concerning the Debtors' Deposits does not indicate a genuine dispute as to ownership. (Tr. 6/24/09 at 113 ("But putting it in a pleading and saying that this is what happened is not enough.").) Indeed, there is no basis to assume that there is evidentiary support for the allegations in any third party's pleadings. *See In re Beltrami*, 324 B.R. 255, 259 n.2 (Bankr. M.D. Pa. 2005) ("The Court's purpose in taking judicial notice of [court records in other proceedings] is 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'") (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). JPMC has done nothing to demonstrate a factual basis for any third party claims, and it cannot rely on the mere existence of those claims to avoid summary judgment here.

Separately, by referencing the specter of such third-party claims, JPMC has effectively conceded that the Debtors possess legal title to their Deposits. If it were otherwise, such claims would sound in turnover, as do the Debtors', rather than avoidance. (*See Tr. 6/24/09 at 109 ("But see, even if I go to [the bondholders' allegations], those facts don't deal with the title which a turnover deals with. Title to property, they don't contest that the title is in the name of the debtor. There may be claims for fraudulent conveyance, or other improper actions by the debtor, but they don't even go to title.").) Thus, it is inconsistent for JPMC to argue that Debtors may face the assertion of such claims, while at the same time arguing there is a question as to the ownership of the Deposits.

Finally, Section 9.5 of the P&A Agreement, which JPMC invokes in support of its argument, actually undercuts its position. To say that the FDIC "may" invoke that provision is to

say that it has not actually done so. (Opposition at 45-46.) Thus, even assuming that the FDIC would "own" the Deposits if it were to exercise any authority to direct JPMC to withhold those funds, the fact is that it has not exercised any such authority and has indicated its reluctance to do so. (*See* Tr. 6/24/09 at 44 (FDIC Counsel: "We have not asserted that 9.5 right. Because we do not want to interfere with the administration of this bankruptcy case.").)[16] The FDIC's Opposition again merely raises the specter of Section 9.5, but does not purport to assert such putative rights. Especially given that the provision in question has no term limitation, it cannot be that the mere existence of this purported FDIC right bars withdrawal of funds from deposits assumed by JPMC. If JPMC's absurd argument were accurate—that resolution of all contingent and currently unraised third party interests must be adjudicated—the multitude of former WMB depositors would be denied access to their funds by JPMC. This has not occurred, making evident that JPMC's argument is nothing more than yet another attempt at manufacturing meritless issues to continue to withhold the Debtors' Deposits.

III.    **JPMC Has No Basis to Assert Setoff**

   A.    **JPMC Fails to Identify Any Claims that Would Entitle it to Withhold Debtors' Deposits as a Setoff**

Having failed to raise any genuine dispute as to ownership of the Deposits, JPMC argues that summary judgment is unwarranted because "Debtors have failed to establish that JPMC is precluded from exercising rights it succeed [sic] to as a result of the P&A transaction."

---

[16]    Should the FDIC invoke such rights, it would be required to present to the Court a motion seeking relief from the automatic stay. *See Gross v. Bell Sav. Bank PA SA*, 974 F.2d 403, 407 (3d Cir. 1992) (noting that injunctive relief, such as bankruptcy's automatic stay, "is appropriate [with respect to the FDIC] where that remedy is imposed by statute, automatically and by operation of law, without any action by a court"); *In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992) ("We accordingly conclude that the § 1821(j) ban upon 'court . . . action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver' does not inhibit the operation of [bankruptcy's] automatic statutory stay.").

(Opposition at 46.) This is an obvious effort by JPMC to twist the burden of proof and the standards applicable for summary judgment. Setoff is an affirmative defense, and, to succeed with that defense, it is JPMC's burden to demonstrate that it holds claims against Debtors against which it is entitled to setoff the Deposits. *See In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006) ("The burden of proof is on the party asserting the right to set-off.") (quotation omitted). Accordingly, JPMC cannot defeat summary judgment merely by contending that Debtors have "failed to disprove" that JPMC has a basis to assert setoff; rather, JPMC must establish a factual basis that supports its purported defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (U.S. 1986) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file. Such a motion, whether or not accompanied by affidavits, will be made and supported as provided in this rule, and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial.") (internal quotations and citations omitted).

The only thing that JPMC has ever pointed to as a source of its supposed claims against Debtors is the P&A Agreement. Indeed, a review of the more than forty JPMC proofs of claim reflects that each claim is based on its status as successor to WMB pursuant to the terms of the P&A Agreement. Consistently, in its Opposition, JPMC again purports to invoke "the rights it succeed[ed] to as a result of the P&A transaction." (Opposition at 46.) Looking to the plain terms of that agreement, however, it is clear that JPMC *expressly acquired no claims whatsoever* as successor to WMB, and the entire basis for its setoff argument is therefore non-existent.

Section 3.1 of the P&A Agreement, which concerns the purchase of WMB's assets by JPMC, is expressly made subject to Section 3.5. (A163-205.) That provision, in turn, is captioned "Assets Not Purchased" and incorporates Schedule 3.5. (A163-205.) Significantly, Schedule 3.5 excludes from any purchased assets, among other things, "any interest, right, action, *claim*, or judgment *against . . . any shareholder or holding company of [WMB] . . . .*" (A163-205 (emphasis added).) Schedule 3.5 further clarifies that these claims which are carved out from the P&A Agreement, relate to "acts, omissions or other events" which "shall have occurred *on or before*" the closing of WMB by the OTS "*regardless of when any such claim is discovered.*" (A163-205 (emphasis added).)[17]

That the P&A Agreement operates in such a manner is not unusual. "FIRREA empowers the [FDIC] to organize thrift institutions to 'take over such assets or such liabilities as [the FDIC] may determine to be appropriate'" and courts interpret purchase and assumption agreements based on their plain language. *See Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 247 (D.C. Cir. 1995) (finding plaintiff could not setoff against successor bank because successor bank acquired asset but not liability pursuant to purchase and assumption transaction). In fact, courts have recognized that the FDI Act authorizes the FDIC to transact with successor thrift institutions so that such institutions "take over such assets or such liabilities as [the FDIC] may determine to be appropriate." *Payne v. Sec. Sav. & Loan Assn., F.A.*, 924 F.2d 109, 111-12

---

[17] The language of Schedule 3.5 is clear that included among the assets that JPMC expressly did not purchase are claims against WMI, not only that arise out of facts that occurred "before" the P&A Transaction, but "on" the P&A Transaction. This forecloses any attempt by JPMC to avoid the plain language of the P&A Agreement. Thus it makes no difference whether JPMC argues that "all of the claims that WMI and JPMC assert by and against one another arose at the time and as a result of the P&A, simultaneously with (and inseparable from) the mutual pre-petition intercompany relationships and obligations of WMI and its subsidiaries" or that "JPMC acquired the assets of WMB and its subsidiaries with all of the rights, obligations and claims against WMI embedded in the ownership of those assets." (Opposition at 52-53.) JPMC cannot now escape that it holds no claim to setoff against the Debtors' Deposits.

39

(7th Cir. 1991) (interpreting plain language of purchase and assumption agreement governing the transfer of assets to determine which liabilities were expressly assumed); *Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1109 (11th Cir. 1990) (same). *See also* 12 U.S.C. §1821(d)(2)(G)(i) ("The [FDIC] may . . . transfer any asset or liability of the institution in default . . . ."). Thus, it is not novel that the FDIC here structured a purchase and assumption transaction with JPMC in such a fashion that certain claims, such as those against WMI, were not transferred. *See, e.g., Village South Joint Venture v. FDIC,* 733 F. Supp. 50, 51 n.1 (N.D. Tex. 1990) (statutory predecessor to FDIC, the FSLIC, transferred the assets of failed bank except claims against directors and officers and other specified claims to successor bank in a purchase and assumption transaction). According to the plain terms of the P&A Agreement, JPMC did not acquire any claims against WMI, WMB's former sole shareholder and holding company, arising out of facts and occurrences that pre-dated WMB's closing. Again, each of JPMC's asserted claims fits this description squarely. Therefore, JPMC holds no claims against which to setoff the Deposits against WMI.

Notwithstanding its voluminous briefing, JPMC virtually ignores this critical provision which is dispositive of setoff, relegating it to a single paragraph of its Opposition. Without citing any authority, JPMC contends that Debtors, since they are not parties to the P&A Agreement, "have no standing to assert a claim or defense under that contract." (Opposition at 58.) But Debtors are not seeking to assert a claim or defense under the agreement. Rather, in responding to JPMC's purported affirmative defense of setoff, Debtors are demonstrating that the agreement that JPMC invokes as the supposed source of its rights actually provides that JPMC acquired no claims against Debtors whatsoever.

The filings of JPMC's counterparty to the P&A Agreement reinforce this conclusion. In its opposition, the FDIC admits that it has asserted the same "WMB" claims to "tax refunds and other tax assets, [and] claims of $4 billion relating to certain trust preferred securities." (FDIC Opposition at 13.) It cannot be that as a result of the P&A Transaction, both JPMC and the FDIC possess these purported claims. The fact is that the FDIC and JPMC contracted for JPMC to assume WMB's deposit liabilities and for the FDIC to retain any claims against WMI. The FDIC argues that if JPMC has no claims to setoff against the Deposits, "those funds would be subject to setoff against claims held by" the FDIC. (FDIC Opposition at 14.) While the FDIC correctly acknowledges that JPMC has no claims against Debtors, the FDIC's conclusion is wrong. The FDIC does not offer any explanation for how the FDIC could setoff claims against liabilities assumed by JPMC, but such setoff is clearly triangular and prohibited by the Bankruptcy Code. *In re Semcrude, L.P.,* 399 B.R. 388, 393 (Bankr. D. Del. 2009) ("Because of the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy."). Both parties to the P&A Agreement, JPMC and the FDIC, agreed to this construct, and JPMC cannot not now assert setoff rights that simply were never created under the P&A Agreement.

JPMC tries to escape the obvious force of this argument on the basis that the P&A Agreement only precludes it from asserting claims as successor to WMB and that it is still entitled to assert setoff with respect to claims that it holds directly against Debtors. In its 97 pages of briefing and in its more than 40 proofs of claim, however, JPMC has never purported to identify a single such claim. Rather, JPMC has relied entirely on its status as successor to WMB

pursuant to the P&A Agreement to assert legacy-WMB claims.[18] As it is clear that JPMC

acquired no claims against Debtors pursuant to that agreement, JPMC has no basis to assert

setoff.[19]

**B.    Section 553 Bars JPMC's Asserted Setoff Defense**

     **1.    WMI Was Indisputably Insolvent Subsequent to the Seizure of WMB**

JPMC devotes much of its discussion of setoff to the insolvency issue. As a threshold

matter, it is important to recall that WMI's insolvency is only relevant to the extent JPMC is

found to have claims against the Debtors to setoff. As discussed above, this is not the case.

Thus, the issue of whether WMI was insolvent is irrelevant to the Debtors' right to its Deposits.

Even assuming *arguendo* that JPMC procured legacy-WMB claims and possesses a right

of setoff, JPMC does not dispute that setoff is unavailable to a party asserting claims that were

transferred to it, within ninety days of the chapter 11 filing, while the debtor was insolvent. 11

U.S.C. 553(a)(2)(B). JPMC also recognizes that there is a statutorily-imposed presumption of

insolvency. Nevertheless, JPMC argues that there are numerous outstanding issues that give rise

to a genuine dispute as to whether Debtors were insolvent at any time 90 days prior to the

chapter 11 filing. (Opposition at 48-52.) The "issues" that JPMC identifies, however, are

---

[18]    To state the obvious, JPMC's assertion that the MBA Policy grants it a right of setoff is irrelevant without the existence of a claim to setoff against the Deposits. *See SemCrude, L.P.,* 399 B.R. at 393 ("Setoff allows entities that owe each other money to apply their mutual debts against each other."). Purported setoff rights are irrelevant in this instance.

[19]    Moreover, assuming *arguendo* that JPMC acquired claims against WMI pursuant to the P&A Agreement, as the recipient of avoidable fraudulent and preferential transfers (which the Debtors are seeking recovery on account of in the JPMC Adversary Proceeding), JPMC's claims would be disallowed under section 502(d) of the Bankruptcy Code. 11 U.S.C. § 502(d) ("[T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.").

distorted and do not give rise to any genuine dispute. Therefore, JPMC fails to sufficiently rebut the presumption of insolvency. 11 U.S.C. § 553(c) ("For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.").

The transfers that are pertinent here—the P&A Transaction and the subsequent merger of WMB fsb into JPMC—indisputably occurred *after* the seizure of WMB, WMI's "main operating subsidiary." (Opposition at 49.) And the entity whose insolvency is relevant here is WMI—the debtor facing the assertion of setoff. JPMC understands that under section 553(a)(2)(B) of the Bankruptcy Code, it is WMI's solvency that is relevant. (*See* B232-241 at ¶ 4 ("Debtors assert that setoff is unavailable to JPMC because Debtors 'were insolvent or rendered insolvent at the time of the transfer.' They allege that the purported transfer at issue occurred on September 25, 2008, upon the execution of the Purchase and Assumption Agreement.").) JPMC nevertheless wastes significant time and energy discussing the fact that the "OTS found that '*WMB* met the well-capitalized test standards through the date of the receivership'" (Opposition at 49), and arguing that the "appointment of a receiver for *WMB* by the OTS is not determinative of financial insolvency" of *WMB*. (Opposition at 49 (emphasis added).) Thus, JPMC continues to try and distract the Court by discussing the wrong entity's alleged solvency. Similarly, the proffered declaration of Thomas Blake discusses at length whether the OTS's seizure is determinative of the financial solvency of *WMB* and that the OTS did not make any conclusions concerning *WMB's* solvency. (*See* B232-241 at ¶¶ 8-12.) Moreover, where Mr. Blake does address WMI, he spends considerable time discussing the financial health of WMI at times "prior to the date of the receivership," rather than at the time of the pertinent transfers as the statute requires. (*See* B232-241 at ¶¶ 13-14.) The transfers at issue here—the P&A Transaction

and the subsequent merging of WMB fsb into JPMC—both occurred subsequent to the date of the receivership.

The only potentially relevant content that Mr. Blake sets forth to dispute the insolvency of WMI at the time of the transfers is that the "Debtors have asserted ownership over certain assets," (defined as the "Disputed Assets") which Mr. Blake declares must be considered. (B232-241 at ¶ 7.) Specifically, Mr. Blake states that the Debtors have asserted claims to the Trust Preferred Securities and certain tax refunds with a purported combined asset value of as much as $7 billion. (B232-241 at ¶ 7.) Mr. Blake asserts that adding this $7 billion to the Debtors' schedules, which reflect $4.48 billion in assets and $7.83 billion in liabilities, raises questions about WMI's insolvency. (B232-241 at ¶ 7.) However, Mr. Blake conveniently omits that JPMC and the FDIC have both asserted claims against the Debtors for nearly, if not more than, the total amount of such assets.[20] Thus, even if Mr. Blake is correct that such contingent assets must be considered in assessing the Debtors' assets, the inclusion of these Disputed Assets in any insolvency assessment must similarly increase the Debtors' contingent liabilities given both the FDIC's and JPMC's competing claims. Thus, JPMC has not rebutted the picture of insolvency painted by the Debtors' schedules, reflecting the Debtors' financial position subsequent to the loss of their primary operating subsidiary.[21]

JPMC has presented nothing to counter the Bankruptcy Code-imposed presumption of insolvency. Moreover, both the facts, and common sense, show that *after* the receivership, WMI—having been stripped of its primary operating asset, but left with more than $7 billion of

---

[20] *See* FDIC Proof of Claim at 3-6 (C40-72) asserting $4.3 billion Tax Refund Claim and claim to TruPS. *See also* JPMC Proofs of Claim (C73-341) asserting same.

[21] The FDIC and JPMC (in multiple forums) have asserted competing claims to both the Trust Preferred Securities and the Debtors' tax refunds and therefore the value of such assets must be discounted for the likelihood that the Debtors will prevail in asserting ownership rights. *See In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199-200 (7th Cir. 1988).

bond debt—was indisputably insolvent. Given WMI's insolvency, any claims acquired by WMI from the FDIC may not be used to setoff against the Deposits.

## 2. JPMC Asks This Court to Ignore Section 553(a) of the Bankruptcy Code

In order to escape the plain language of section 553 of the Bankruptcy Code, prohibiting the use of claims transferred to the creditors during the ninety-day period prior to the commencement of the bankruptcy case if the transfer occurred while the Debtor was insolvent, 11 U.S.C. § 553(a), JPMC contends that "[t]here was no claim against Debtors transferred to JPMC. All of the claims at issue arose because a different entity (outside the consolidated Washington Mutual family) took ownership of WMB's assets and the claims embedded in the task of separating comingled assets and liabilities." (Opposition at 52-53.) Yet a review of JPMC's proofs of claim indicate that the sole basis for the claims that JPMC has (wrongly) asserted is the P&A Agreement. Assuming *arguendo* that JPMC's claims against the Debtors are found to be valid, such claims must have been transferred to JPMC within ninety days preceding Debtors' bankruptcy (*i.e.*, pursuant to the P&A Agreement).

In each of its more than forty proofs of claim, JPMC asserts that in the JPMC Adversary Proceeding, it "plac[ed] at issue a number of the claims and assets JPMC acquired from the FDIC under the P&A Agreement." (C74; C198; & C321.) More specifically, for example, JPMC's "Trust Securities" proof of claim asserts that: "Under the express terms of the P&A Agreement, JPMCB purchases 'all right, title, and interest of the Receiver in and to all of the assets . . . of [WMB] whether or not reflected on the books of [WMB] as of Bank Closing,' which includes WMB's and the Receiver's rights to receive the Trust Securities. . . ." (C200.) Similarly, JPMC's "Tax Refunds" proof of claim describes three general categories of tax-related claims: "refunds expected to be paid by taxing authorities to WMI as agent for WMB

and/or the FDIC . . . refunds already paid by taxing authorities to WMI as agent for WMB; and . . . amounts due from WMI to WMB where WMI remitted funds to taxing authorities as agent for WMB and WMB over-reimbursed WMI for such remittances." (C322.) Nothing about either JPMC's Tax Refunds or Trust Securities claims, as pled, in any way arises out of the "task of separating comingled assets and liabilities," whatever that means. (Opposition at 53.) Each of the claims are legacy-WMB claims . Not one of the asserted claims arise out of transactions between JPMC and Debtors directly. It is clear that to the extent JPMC rightfully asserts any claims against the Debtors (which, as discussed above, they do not), they could only have been transferred pursuant to the P&A Agreement, if at all.

Acknowledging that its argument is unsupported by the facts, JPMC also argues—in direct conflict with its previous position—that it acquired the "claims against WMI embedded in the ownership" of WMB's assets. (*Id.*) This form of claim transfer, JPMC asserts, is "permitted under Section 553(a)(2)." (*Id.*) Each of the cases cited by JPMC, however, are plainly inapposite as each concern an entity acquiring a claim against the debtor as a direct result of paying a surety/guaranty obligation to a third party.[22] Moreover, the plain language of the

---

[22] In *In re Flanagan Bros., Inc.*, 47 B.R. 299 (Bankr. D.N.J. 1985), a general contractor sought to setoff an amount owed the subcontractor-debtor with an amount that it was owed by the debtor, arising solely as a result of paying, as surety, one of the debtor's suppliers amounts the debtor owed it. *Id.* at 300. The court held that "a claim is not transferred within the meaning of § 553(a)(2)(A) 'when the claim used as a setoff has been acquired as a result of a direct legal obligation.'" *Id.* at 303 (quoting *Bel Marin Driwall, Inc. v. Grover*, 470 F.2d 932, 936 (9th Cir. 1972)). The general contractor acquired the claim only as a result of paying its "legal obligation," the debtor's debt to the supplier, as surety. *Id.* at 300. Similarly, in *In re Denby Stores*, 86 B.R. 768 (Bankr. S.D.N.Y. 1988), the creditor seeking to setoff a claim against amounts owed the debtor acquired the claim only as a result of paying a third-party creditor's claim—as legally obligated to do so under a guaranty—and stepping in its shoes. *Id.* at 771. Again, the court's concern was limited to the guarantor or surety context: determining that it would be inequitable for the entity to be required to pay twice, "once when he is called upon to pay the creditor, and once when he is called upon to pay the debtor." *Id.* at 779. Finally, *In re Jones Truck Lines, Inc.*, 196 B.R. 123 (Bankr. W.D. Ark. 1996), also concerned a party seeking

Bankruptcy Code prevents the setoff of *any* claim acquired during the 90-day period while the debtor is insolvent. When interpreting statutes, the plain language of the provision controls. *See Caminetti v. U.S.*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms."); *see also Vallies v. Sky Bank*, 432 F.3d 493, 495 (3rd Cir. 2006) ("It is well-settled that where unambiguous, the plain language of a statute or regulation controls.").

In any event, JPMC cannot seriously contest that section 553(a)(2) prohibits such transfers to the extent they create mutuality that otherwise did not exist. Yet, that is exactly what JPMC has purported to do by seeking to setoff legacy-WMB claims against the lion's share of the Debtors' Deposits held at WMB fsb. The focus of section 553(a)(2)(B) is "the creditor [who is] attempting to obtain a preference or put itself in a preferred position relative to other creditors" prior to the filing of the bankruptcy proceeding. *In re United Sciences of Am., Inc.*, 893 F.2d 720, 724 (5th Cir. 1990). Congress sought to "prohibit trafficking in claims against the debtor in order to effect setoff (which would provide a windfall to both parties to the transfer at the expense of the estate)." *In re Denby Stores, Inc.*, 86 B.R. 768, 779 (Bankr. S.D.N.Y. 1988). Assuming JPMC is able to setoff legacy-WMB claim to legacy-WMB fsb Deposits, it will have effectively *created* mutuality through a prohibited transfer and earned itself (via WMB and WMB fsb) a windfall. This is exactly the result that Congress determined to prohibit.

---

to setoff a claim that arose out of a payment as guarantor of another's debt owed the debtor. *Id.* at 126. The court's holding was not broader than *Flanagan's* or *Denby's*: "Postpetition payments on a guaranty entered into prepetition are eligible for setoff . . . ." *Id.* at 127.

## C.    JPMC Has No Recoupment Claims

For all of the same reasons that its setoff claim fails—particularly the lack of any claims against the Debtors—JPMC cannot look to recoupment either. While recoupment is not subject to certain of the Bankruptcy Code's restrictions on setoff (*e.g.*, the requirement that both claims be prepetition in nature), the doctrine is similar to setoff in that it too, rather unremarkably, requires offsetting claims between two parties. *See In re Univ. Med. Ctr.*, 973 F.2d 1065, 1079-80 (3d Cir. 1992). Thus, the fact that JPMC acquired no claims against the Debtors from the FDIC prevents its assertion of recoupment.

Even more fundamentally, JPMC has twisted the recoupment doctrine in an unprecedented fashion in order to serve its interests. The "same transaction" contemplated by recoupment is, necessarily, a transaction between the debtor and a creditor—not between two creditors. *See In re Gosnell Dev. Corp.*, 221 B.R. 776, 779 (Bankr. D. Ariz. 1998) ("The language of both setoff and recoupment speak of the relationship between the debtor and creditor, and not third parties."). The doctrine of recoupment has never been applied to a transaction between two non-debtor parties. If that were the case, parties could "create" recoupment vis-à-vis a debtor by entering into an agreement that does not even involve the debtor (*e.g.*, the P&A Agreement) and, in doing so, improve their collective position with respect to other creditors and avoid section 553's restrictions on setoff pursuant to post-petition transfers by claiming recoupment.

Recoupment requires that the creditor's claim arise out of the identical transaction as the debtor's. *Id.* at 1080. Here, JPMC's purported claim arises out of the P&A Agreement. Debtors' claims arise out of deposits made with WMB. Recoupment has no place here.[23] Thus,

---

[23]    Even assuming that Debtors' claims to their WMB Deposits arose out of the P&A Transaction or that somehow recoupment could be applicable to transactions between non-debtor

48

even assuming that JPMC did acquire legacy-WMB claims under the P&A Transaction, it would be outside of recoupment's boundaries to offset such claims against Deposits formerly owed the Debtors by WMB and WMB fsb.

## IV. JPMC's Deposition of Ms. Logan Fully Confirms its Inability to Identify Any Genuine Issue in Dispute

In their Motion, Debtors presented the affidavit of Doreen Logan, a First Vice President in WMB's Treasury Department at the time of the transfer of Deposits to WMB fsb. In her affidavit, Ms. Logan described her personal familiarity and direct responsibility for the Accounts; she recounted her direct participation in WMI's transfer of $3.674 billion in deposits from its account at WMB to an account at WMB fsb; and she provided the Court with extensive records, including account statements issued by JPMC in Debtors' name, confirming Debtors' ownership of the Accounts. In sum, Ms. Logan amply demonstrated that the Accounts are in fact deposit accounts belonging to Debtors.

In its initial Opposition, JPMC was unable to refute Ms. Logan's account in any substantive way, and resorted therefore to a two-prong strategy of demeaning Ms. Logan

---

parties, it still requires that the offsetting claims arise out of the "identical transaction." *Id.* JPMC's assertion that "all claims between JPMC and Debtors accrued as a direct result of the P&A" Transaction is false. In fact, with respect to the lion's share of the deposit liabilities owed the Debtors, JPMC assumed such liabilities in a separate and subsequent merger transaction with WMB fsb. The Third Circuit has rejected a liberal interpretation of "transaction" for purposes of recoupment, choosing instead a more circumscribed, stricter definition. *See id.* at 1081 ("For the purposes of recoupment, a mere logical relationship is not enough: the fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, . . . does not mean that the two arose from the 'same transaction.' Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations. Use of this stricter standard for delineating the bounds of a transaction in the context of recoupment is in accord with the principle that this doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly construed.") (internal citation and quotation omitted). Here, the same standard should be applied. Recoupment was not intended to form a basis for a party to avoid paying its debts due to clever corporate restructuring.

personally while also complaining that she had not been made available for deposition. As for JPMC's unseemly attack on Ms. Logan as a "mid level manager of questionable credibility" (Opposition at 1), the reality is that she was directly involved in opening and/or administering each account at issue in this case, and that the accuracy of her account is confirmed by dozens of contemporaneous documents that she appended to her affidavit. All of those materials, including account opening documents, contemporaneous emails, and JPMC's own account statements, confirm the status of those Accounts as deposits, as does the glaring absence of any affidavits by current JPMC personnel actually refuting Ms. Logan's core assertion that WMI is entitled to its Deposits.

As for JPMC's complaint that Ms. Logan was not made available for deposition, it has evaporated. Although under no obligation to do so, Debtors responded to JPMC's filing by presenting Ms. Logan for deposition. And now that JPMC has been given what it asked for, it is clear that its former complaint—*i.e.*, that it was unable to formulate a full response to Debtors' motion because it had been denied an opportunity to question Ms. Logan—was pure posturing. JPMC's examination of Ms. Logan, far from revealing any material issues, has only confirmed JPMC's desire to avoid summary judgment through a barrage of side issues that have no real bearing on the ownership of the Accounts. Indeed, Ms. Logan was clear and unequivocal throughout her deposition that the Accounts hold WMI's Deposits, and JPMC was therefore reduced to quizzing Ms. Logan on a litany of irrelevant issues and complaining now that supposed "gaps" in her knowledge on ancillary issues somehow defeat summary judgment. JPMC's approach is transparent, and none of its arguments concerning Ms. Logan's testimony even begins to suggest a genuine dispute. In fact, now that JPMC has had access to Ms. Logan, it can no longer seek to avoid summary judgment by complaining about any supposed lack of

information, and its failure to identify any legitimate basis for withholding Debtors' Deposits proves fatal.[24]

### A. JPMC Fails to Identify Any Material Issues of Fact Based on its Deposition of Ms. Logan

Many of the "issues" raised by JPMC in its Supplemental Opposition continue to concern the "source" of the Debtors' Deposits and the rights to various, specific subsets of Debtors' Deposits (*e.g.*, amounts received by WMI pursuant to payments of intercompany liabilities by WMB, tax refunds received from the IRS, and proceeds received from TPG pursuant to the sale of WMI equity securities). As discussed in Section II, *supra*, there is no legal requirement that Debtors establish the source of each dollar that they have deposited in the Accounts to warrant withdrawal of funds held in their name. Thus, that Ms. Logan did not testify as to the source history of the more than $4 billion of funds on deposit is unremarkable, irrelevant, and designed only to obfuscate what is pertinent. (Supplemental Opposition at 4.)

Next, JPMC moves on to two subsets of Deposits for which JPMC concedes the "source" is not in question—$922 million received by WMI from WMB and $234 million received by WMI from the IRS—and claims a genuine dispute based on Ms. Logan's lack of familiarity with the underlying transactions. Again, JPMC's argument is contrived. Debtors' ownership of those

---

[24]  JPMC highlights its inability to formulate a coherent response to Ms. Logan's affidavit and testimony by filing an Amended Motion to Strike in which JPMC does not actually ask that anything be stricken. JPMC filed an initial Motion to Strike, on July 24, 2009, in which it insisted that Ms. Logan's affidavit should be stricken primarily "because Debtors have refused to make Ms. Logan available to be cross-examined . . ." (Brief in Support of Initial Motion to Strike at 1.) Despite being under no obligation to do so, Debtors presented Ms. Logan for deposition on August 26, 2009, and JPMC therefore withdrew its Motion to Strike. JPMC subsequently filed an Amended Motion to Strike, in which it offers that "it does not believe that rulings on the objections are necessary" and that the Court is equipped to consider all evidence, by both sides, for "what it is worth." (Brief in Support of Amended Motion to Strike at 1-2.) The only response to JPMC's filing is to observe that it is not a motion at all and that it seeks no relief.

funds is confirmed by the fact that JPMC never denies that the $922 million was due and payable to WMI when paid on account of tax liabilities. (Supplemental Opposition at 5.) Similarly, there is no question that the $234 million was received by WMI from the IRS on September 30, 2009. (Supplemental Opposition at 6.) As discussed in Section II.B.2, *supra*, such amounts are owned by Debtors pursuant to the TSA. That Ms. Logan "was not aware of why these funds had been received [and] did not know the amount of additional tax refunds" is irrelevant. (Supplemental Opposition at 7.) JPMC is again trying to establish requirements of law that simply do not exist.

For the same reasons, the fact that that Ms. Logan was not "directly involved with the TPG capital raise," would only be relevant if it was incumbent upon Debtors to trace the origin of each dollar in the Accounts. (Supplemental Opposition at 8.) Moreover, as discussed in Section II.B.3, *supra*, there is no dispute as to the nature or "source" of such funds and whether such proceeds of the sale of WMI securities are the property of WMI. JPMC's "questions" do not alter the nature of the Deposits or Debtors' possession of legal title thereto. Ms. Logan's deposition, which in no way contradicts this conclusion, does not alter the analysis.

JPMC next calls into question Ms. Logan's credibility in connection with her affidavit testimony concerning the errant "contributes to" language on certain forms reflecting WMI's transfer of its Deposits from WMB to WMB fsb. (Supplemental Opposition at 9; A1 at 17, n.5.) Ms. Logan's credibility is confirmed, however, by numerous contemporaneous documents, all demonstrating that the Accounts are in fact Debtors' Deposits. Indeed, the account statements classify the Accounts as Debtors' Deposits; the documents used to open the Accounts are used exclusively to open deposit accounts; the personnel involved in opening the Accounts described in email correspondence their intent to open deposit accounts; and WMI had control and in fact

paid its own debts from the Accounts prior to its filing of these cases. Furthermore, none of the current JPMC personnel identified in Ms. Logan's affidavit and testimony who were directly involved in the oversight of the Accounts have come forward with any testimony denying Debtors' ownership of their Deposits. In light of all of this, it borders on bad faith for JPMC to rely on four errant words as the basis to suggest that it somehow owns the Deposits, particularly when none of its own personnel is willing to stand behind such a claim.[25]

JPMC reiterates one of its baseless arguments by asserting that Ms. Logan did not know of the existence of any account agreements, signature cards, or other documents. (Supplemental Opposition at 10.) However, as discussed in footnote 8, *supra*, Debtors are faced with no such requirement to produce such documents, and the nature of the funds on deposit does not turn on the existence of a signature card. Again, rather than produce evidence from books and records it has been in possession of for nearly a year, JPMC attempts to create a "gap" out of thin air and present it to the Court as a material issue of fact.

Referencing Ms. Logan's "admission" that she believed certain of the Debtors' Deposits to have been pledged as collateral to WMB, JPMC asserts that "Debtors were not fully candid when claiming that [the Deposits] belong to WMI." (Supplemental Opposition at 11.) Incredibly, it appears that JPMC fails to grasp the legal significance of "collateral." As

---

[25] JPMC has also questioned Ms. Logan's truthfulness by asserting she was wrong in her affidavit when she offered an explanation for the errant "contributes to" language—namely, that "the template had been used previously by WMI to make a contribution to WMB." (A1 at 17, n. 5.) In fact, Logan was truthful and correct. Counsel for JPMC presented Ms. Logan with a "journal entry request form" in connection with WMI's September 2008 $500 million capital contribution and established that a different description was utilized. (Supplemental Opposition at 9; Logan Tr. at 164:12:16.) However, in making this point in her affidavit, Ms. Logan refers to a "Journal Entry Posting Form" (also attached to her affidavit). Counsel produced a form irrelevant to Ms. Logan's specific testimony. The relevant template referred to by Ms. Logan which includes the phrase "WMI contributes" was errantly included on the general ledger in connection with the transfer of the Deposits to WMB fsb. (C342-343.)

discussed in Section II.B.4, *supra*, collateral is owned by the entity that pledges it. Absent an intervening legal event, such as foreclosure proceedings, a creditor does not possess ownership interests in collateral. To the extent Debtors "failed to disclose" such issues as JPMC accuses, they were and are irrelevant to legal title and nature of the Deposits. Ms. Logan's so-called "admission" does nothing to change this legal principle.

Next, JPMC raises the red herring of third-party claims that have been or may be asserted against the Debtors. However, as explained in Section II.B.5, *supra*, such claims are specious at best, do not alter the nature of the Deposits or the Debtors' possession of legal title thereto, and are perfectly suited for resolution before this Court after turnover is awarded the Debtors. Again, that Ms. Logan was not able to supply factual detail concerning the payment by WMB of a debt owed WMI (the legitimacy of which JPMC does not question) is unremarkable and irrelevant.

JPMC utilizes Ms. Logan's testimony in supposed support of two irrelevant arguments concerning setoff. JPMC asserts that Ms. Logan "could not dispute" that JPMC has setoff *rights*. (Supp. Opp. at 14.) This does not give rise to a material issue of fact. Debtors' Motion, and the P&A Agreement, is clear that JPMC possesses no *claims* against WMI. Setoff rights alone, without claims, do not allow JPMC to withhold Debtors' Deposits. And JPMC's assertions concerning Ms. Logan's "concession" concerning the nature of the transfer from WMB to WMB fsb is irrelevant where a reversal of the transfer would simply place the Deposits at WMB and not change the fact that they were assumed by JPMC and are payable to Debtors. (Supplemental Opposition at 14.)

Finally, in response to Ms. Logan's testimony that multiple current and former JPMC employees have indicated to her that the Deposits are simply deposits and in no way a capital contribution, JPMC, in hyper-technical fashion, asserts that Ms. Logan "acknowledged that no

one told her that JPMC made a conscious decision that [the Accounts] were deposit accounts."
(Supplemental Opposition at 15.) Not only is this a blatant mischaracterization of Ms. Logan's
testimony,[26] it ignores Ms. Logan's assertion that several individuals have expressed to her that
they know the Deposits to be owned by WMI. JPMC also submits the Burger declaration in
which Ms. Burger makes the same point: "JPMC has not determined or intended to
acknowledge that the balances in these Accounts represent valid deposits." (B1017-1018 at ¶ 4.)
Notably, however, JPMC provides no statement from Beverly Bruce, a former Treasury Vice
President of WMB and JPMC Treasury Manager, or any other response to Ms. Logan's
statement that Bruce indicated to her that JPMC was accounting for the Deposits as deposit
liabilities. (A1 at ¶¶ 44-45.) Further, neither Ms. Burger nor JPMC provides any response or
rebuttal to Ms. Logan's assertion that JPMC has treated the Deposits as deposit liabilities in
dealing with the Office of the Comptroller of the Currency—or Ms. Logan's statement that
"every single person . . . with first-hand knowledge of the circumstances surrounding WMI's
decision to move its demand deposit account from WMB to WMB fsb" is, and has always been,
of the view that the Deposits at WMB fsb are a deposit liability owed WMI. (A1 at ¶¶ 47- 48.)
Rather, all JPMC can muster after a full-day deposition of Ms. Logan, is that JPMC has not
"substantively determined" (whatever that means) that the Deposits are owed to the Debtors.

In sum, despite JPMC's unsupported statements to the contrary, JPMC has raised no
material issue of fact concerning the ownership or the nature of the funds in the Accounts.
Rather, JPMC has raised a slew of tangential issues intended to convince the Court that disputed

---

[26]     JPMC badly mischaracterize Ms. Logan's testimony given in response to an inquiry that
was expressly misunderstood. See Supplemental Opposition at 15; Logan Tr. at 254:17-23 ("Q.
And she didn't tell you that anyone had made any substantive judgments with respect to that
account, did she? MR. ABENSOHN: Objection; form. A. I'm not sure I understand what that
means so I have to say no.").

issues of fact abound. However, after Ms. Logan's deposition, and a review of JPMC's Supplemental Opposition, it is more clear than ever that no such issues exist. Summary judgment is therefore appropriate.

**B.    Ms. Logan's Deposition Raises No Issues of Material Fact Relating to the Transfer of Deposits from WMB to WMB fsb**

After deposing Ms. Logan, JPMC's presentation of "issues" to this Court is also unchanged with respect to the biggest distraction of them all: the transfer of $3.67 billion in Deposits from an account at WMB to an account at WMB fsb. No matter how JPMC characterizes Ms. Logan's testimony, it cannot change the inescapable fact that even if there did exist an issue of fact concerning this transfer, JPMC assumed the deposit liabilities of both WMB and WMB fsb. None of JPMC's putative evidence concerning internal Washington Mutual policies and procedures, general ledger technicalities, the receipt of "good funds," or Ms. Logan's testimony can change this. (Supplemental Opposition at 16-17.) Because it cannot come forward with a reason why the transfer would function to alter the fundamental nature of the Deposits, JPMC resorts to raising each and every specter it can formulate to muddy the waters. For example, through a series of emails, JPMC purports to show that the fact that WMB may not have had $3.76 billion in "federal funds" indicates that it was not in a position to transfer the Deposits from WMB to WMB fsb. (Supplemental Opposition at 18.) Again, JPMC misunderstands the operation of banking institutions in the modern-day world. There is no actual cash requirement. And banks are not required to operate with more federal funds than deposit liabilities. JPMC, a banking institution itself, understands this but nonetheless has attempted to manufacture issues so as to obfuscate the only real issue before the Court—the true nature of the Deposits as matured, payable on demand liabilities.

Similarly, JPMC asserts that Ms. Logan's testimony creates a material issue as to whether the loan necessary for the $3.67 billion transfer was "ever approved, or even happened." (Supplemental Opposition at 24.) As discussed in Section I.B, *supra*, whether the loan occurred is irrelevant to the transfer of the Deposits, but even if it is not, it certainly has no bearing on the nature of the Deposits. The same reasoning holds true for JPMC's "issue" concerning whether the transfer and loan "violated applicable banking laws." (Supplemental Opposition at 24.) As discussed in Section I.B, *supra*, this is not the case as the FRA is inapplicable. Moreover, Ms. Logan's testimony concerning the fact that the loan from WMB fsb to WMB was not collateralized is neither in conflict with the FRA nor gives rise to any real issue, particularly in light of JPMC's acquisition and merger of both companies. Nothing that JPMC sets forth changes the fact that WMI was owed its Deposits prior and subsequent to the transfer at "issue." JPMC cannot escape this with its list of questions, none of which actually pertains to the dispositive issue in this case.

### C. Summary Judgment is Not Premature

JPMC demonstrates two things through all of its briefing, declarations, and exhibits: First, it possesses a massive amount of information pertaining to the Accounts (because it has controlled all of the relevant data systems for almost a year and because it employs many of the people who were involved in administering those accounts for WMI prior to the P&A Transaction). And, second, it is nevertheless incapable of identifying any grounds giving rise to a genuine dispute as to ownership of the Accounts (despite that massive amount of information at its disposal). In light of these considerations and the fact that JPMC has now deposed Ms. Logan, JPMC's feeble suggestion that it should be afforded more discovery pursuant to Rule 56(f) is a dodge that should be rejected. (Opposition at 60-61.) The fact is that JPMC remains unable to raise a genuine dispute as to ownership of the Accounts, not because it lacks sufficient

information, but because there are simply no grounds for such a dispute. JPMC does not actually require discovery, but simply seeks more time to conjure up more phantom issues.

"The Third Circuit has interpreted Rule 56(f) 'as imposing a requirement that a party seeking further discovery in response to a summary judgment motion submit an affidavit specifying, for example, what particular information is sought; how, if uncovered it would preclude summary judgment; and why it has not previously been obtained.'" *Chiang v. Schafer*, 2008 WL 3925260, at \*57 (D.V.I. Aug. 20, 2008) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 139-140 (3d Cir. 1988)); *see also In re Comp. of Managerial, Prof'l and Technical Employees Antitrust*, No. 02-CV-2924 (GEB), 2008 WL 3887619, at \*2 (D.N.J. 2008) ("To succeed under Rule 56(f), a party usually 'must identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'") (quoting *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir. 1989)). Where a party fails to make such a showing, summary judgment is available even in advance of any significant discovery. *See, e.g., id.* at \*11-12 (granting summary judgment prior to any significant discovery, and denying Rule 56(f) motion for additional discovery).

JPMC's Rule 56(f) Declaration is largely focused on JPMC's supposed need to depose Ms. Logan. That is no longer an issue, and Ms. Logan's deposition only confirms JPMC's inability to refute Debtors' ownership of the Accounts. It is also abundantly clear that JPMC cannot describe the need for any additional discovery since, as a practical matter, it already possesses—and has possessed for nearly a year—virtually all conceivable information pertaining to the Accounts. JPMC concedes as much when it acknowledges in its Opposition that, upon acquiring WMB's assets, "it obtained approximately five petabytes of historic Washington Mutual electronic data, and reams of physical documents." (Opposition at 61.) JPMC explains

elsewhere that five petabytes is the equivalent of more than 3.2 trillion pages of information—hardly a lack of data. (Opposition at 9.) JPMC also employs a large number of former WMI and WMB personnel, including many of the people with direct responsibility for the accounts at issue in this case. The fact that JPMC has so much information pertaining to the Accounts, and such extraordinary access to the people knowledgeable about those accounts, exposes how thin its supposed need for discovery is. The reality is that JPMC has had virtually all pertinent information for approximately one year , and it has nevertheless been unable to come up with any legitimate basis for retaining Debtors' Deposits.

The weakness of JPMC's position is exposed, as discussed previously, both in the declarations that it has submitted and in the declarations that it has not submitted. In her declaration in support of Debtors' Motion, Ms. Logan identified three current JPMC employees who, in various discussions, conceded to her that the accounts hold Deposits due to Debtors. JPMC has responded with a declaration from one of those employees, Carey Brennan, who, while quibbling as to the precise terms of his discussions with Ms. Logan, concedes that the funds are "WMI's funds." (B226-229 at ¶ 3.) JPMC has provided a declaration from another of those employees, Ms. Cox, who, while insisting that she never discussed the interest due for FDI insured accounts, notably fails to dispute Ms. Logan's core assertion—*i.e.*, that Ms. Cox communicated her understanding that the Accounts do in fact belong to Debtors. Subsequently, JPMC has provided a declaration from Ms. Burger which, at best, confirms that the Deposits remain unchanged Deposits since JPMC's assumption. Glaringly, JPMC has failed to present any declaration for Patricia Schulte, who was directly involved in handling the accounts and participated directly in the $3.67 billion transfer from WMI's account at WMB to its newly created account at WMB fsb. JPMC has similarly failed to produce any statement from Beverly

Bruce, whom Ms. Logan testified advised that JPMC is accounting for the Deposits as deposit liabilities. JPMC has worked hard to mask its failure of proof with a massive and complex filing, but it is inescapable that JPMC, clearly in a position to refute Ms. Logan directly if she were in fact wrong, has failed to do so.

With such clear indication that the Accounts do in fact belong to Debtors, JPMC's Rule 56(f) affidavit is plainly inadequate to demonstrate any genuine need for discovery. As discussed, virtually all of the relevant documents and knowledgeable personnel reside with JPMC, and JPMC is nevertheless glaringly incapable of casting any genuine doubt as to Debtors' ownership of their accounts. Furthermore, most of JPMC's Rule 56(f) affidavit is devoted to the supposed possibility that additional discovery might somehow reveal that there were problems with the $3.67 billion transfer by WMI of its Deposits from an account at WMB to an account at WMB fsb. (B928-9257 at ¶ 9.) As discussed, however, even if that transfer were somehow ineffective, as JPMC baldly speculates, the funds would remain in an account at WMB that is owed to Debtors. Thus, the massive audit that JPMC proposes could not change the appropriate result here, and discovery—particularly on the scale that JPMC suggests—would be pointless and would serve only as another massive burden on Debtors' estates. *See Hall v. United States*, No. 1:CV-07-0736, 2008 WL 919605, at *3 (M.D. Pa. Apr. 2, 2008) ("As indicated below, the plaintiff's claim is not a cognizable claim . . . . We conclude that no discovery would change that result. Accordingly, there is no reason to stay the defendant's motion for summary judgment on the basis of the plaintiff's Rule 56(f) affidavit."); *see also Rice v. United States*, No. 06-334-SLR/MPT, 2008 WL 1821464, at *8 (D. Del. Apr. 22, 2008) ("In opposing the Government's motion, Rice merely lists areas of potential exploration . . . . Moreover, as noted previously herein, the areas of exploration proposed by Rice are irrelevant to the court's analysis because

that analysis largely does not turn on the type of facts upon which Rice propounds to learn through discovery. Rice's proposed discovery, albeit not clearly defined nor sufficient to allow the court to properly assess the merit of his opposition, appears to focus on whether the Government exercised its discretion negligently. Even if it did, its actions would still be shielded from liability as 28 U.S.C. § 2680(a) protects discretionary acts whether or not such discretion be abused.") (internal quotation omitted). JPMC's proposed discovery is being sought with one thing in mind—delay. Delay which would entail continued retention of the Debtors' Deposits to the detriment of the Debtors' estates and creditors.

## V. JPMC's Remaining Arguments Are Without Merit

JPMC concludes its Opposition and its Supplemental Opposition by rehashing two arguments that the Court rejected previously. First, JPMC argues that there is a genuine dispute as to ownership of the Deposits, and, relying on cases addressed specifically to motions to dismiss, argues that turnover is therefore an inappropriate remedy. (Opposition at 62.) For all of the reasons discussed, however, there is no genuine dispute—Debtors have amply demonstrated their ownership of the Accounts and JPMC, despite having extensive information pertaining to those accounts, has utterly failed to identify a legitimate basis for its decision to withhold Debtors' funds. Furthermore, the cases that JPMC relies upon are addressed specifically to motions to dismiss, and hold only that dismissal is warranted in a turnover action where it is apparent from the face of the pleadings that title to the funds at issue are in dispute. The Court already determined, when it denied JPMC's motion to dismiss, that the pleadings do not indicate any such dispute, but instead describe a mature debt owing to Debtors. (6/24/09 Tr. at 117:1-3.) This proceeding is therefore moving forward, as the Court specifically contemplated, for a determination on the merits. (6/24/09 Tr. at 111 (denying motion to dismiss, and explaining that next stage in proceedings would be to "have a full evidentiary hearing, or motion for summary

61

judgment to decide if in fact, notwithstanding the four corners of the complaint, who has title to that property.").)

JPMC next claims that the FDIC has already disallowed Debtors' claims to the assorted assets at issue in this case and that this Court must defer to that agency determination. (Opposition at 63.) By even pursuing this argument, JPMC is highlighting its continued, stubborn refusal to accept this Court's ruling, when it denied JPMC's motion to stay, that Debtors' claim in this turnover action is distinct from its claims before the FDIC (which are now at issue in the DC Action). (Tr. 6/24/09 at 94-95 (finding the claims asserted in the D.C. Action "are distinct claims against distinct parties" vis-à-vis Debtors' claims asserted in the Adversary Proceedings).) JPMC understands that the Court has rejected this theory. JPMC included these assertions as issues in its Statement of Issues Presented transmitted to the District Court in connection with JPMC's appeal of the July 6 Order. (*See* JPMC Statement of Issues Presented and Designation of Record on Appeal [Docket Nos. 89, 90].)[27]; *see also In re Joy Global, Inc.*, 381 B.R. 603, 614 (D. Del. 2007) (finding that statement of the issues presented "[e]liminat[ed] any doubt" that issue was raised on appeal). The Court's reasoning is sound. Debtors did not bring this action as a challenge against the FDIC for its disallowance of claims; rather, this is an action against a successor bank seeking turnover of estate property, and such an action is not precluded by operation of the FIRREA claims process. *See Rosa v. RTC*, 938 F.2d 383, 393 (3d Cir.), *cert. denied*, 502 U.S. 981 (1991). Even where a claim is subject to the FIRREA claims process, moreover, it is well-settled that the FDIC's disallowance is entitled to no judicial deference. *See Emerald Int'l v. FDIC*, 190 B.R. 701, 703 (S.D. Fla. 1995) ("Congress instructed

---

[27]     "Does FIRREA bar these Debtors, who have availed themselves of the FIRREA claims process, whose claims have been disallowed, and when their appeal of that disallowance is pending before the D.C. District Court, from bringing separate claims, this time as against a purchaser from the FDIC, to collaterally attack in the Bankruptcy Court the disallowance of their claims?" (C344-353.)

district courts to determine claims against failed banks *de novo* rather than merely to review the receiver's initial determination for error or abuse of discretion."). JPMC's effort to invoke the FDIC's decision here as a bar to Debtors' action is meritless.

JPMC's dubious effort to invoke the FDIC's disallowance of claims as somehow precluding Debtors' distinct action against JPMC mostly goes to show that JPMC's objective is not to ensure that Debtors' Deposits are addressed in some appropriate manner, but to place Debtors in a maze without exit. The FDIC disallowed Debtors' claims, in part, for the stated reason that those claims should have been asserted against a "third party." (*See* FDIC Notice of Disallowance of Claim.) Now that Debtors are pursuing a claim against a third party (JPMC), they are being told by that third party (and the FDIC) that the FDIC's disallowance is somehow binding. This is a classic run-around, and it does nothing to change the bottom line—namely, the Accounts that Debtors opened in their own name and used at their own discretion are in fact their own accounts. Debtors are entitled to their funds, and they have therefore come before this Court for the essential purpose of promptly recovering estate assets in order to facilitate a bankruptcy plan and a distribution to creditors. *See Katchen v. Landy*, 382 U.S. 323, 328-29 (1966) ("[T]his Court has long recognized that a chief purpose of the bankruptcy laws is "to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period.") (citations omitted). JPMC should not be permitted to frustrate that important goal with a series of motions addressed to procedural points, and, now, with a summary judgment opposition that is devoted to side issues and utterly fails to demonstrate any genuine dispute as to Debtors' ownership of their Deposits.

## CONCLUSION

For the foregoing reasons, Debtors respectfully request that Court grant their Motion and direct that JPMC turnover the funds that Debtors hold on deposit.

Dated: September 18, 2009
Wilmington, Delaware

**ELLIOTT GREENLEAF**

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Neil R. Lapinski (DE Bar No. 3645)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
E-mail: rxza@elliottgreenleaf.com
E-mail: nrl@elliottgreenleaf.com
E-mail: sak@elliottgreenleaf.com

-and-

QUINN EMANUEL URQUHART OLIVER & HEDGES,
LLP
Peter E. Calamari
Michael B. Carlinsky
Susheel Kirpalani
David Elsberg
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Special Litigation and Conflicts Co-Counsel to*
*Washington Mutual, Inc. and WMI Investment Corp*