by their terms are to be performed in whole or in part after the Closing Date, shall terminate as of the Closing Date.

6.2 <u>Expenses</u>. Each of the parties will bear and pay all other costs and expenses incurred by it or on its behalf in connection with the transactions contemplated pursuant to this Agreement.

6.3 <u>Amendment</u>. No amendment or waiver of any provision of this Agreement will be effective with respect to any party unless made in writing and signed by an officer of a duly authorized representative of such party. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

6.4 <u>Waivers</u>. The conditions to each party's obligation to consummate the Closing are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law. No waiver of any party to this Agreement, as the case may be, will be effective unless it is in a writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

6.5 <u>Counterparts and Facsimile</u>. For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Agreement may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

6.6. <u>Governing Law</u>. **This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.** The parties hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, State of New York for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby.

6.7 <u>WAIVER OF JURY TRIAL</u>. **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

6.8 <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally or by telecopy or facsimile, upon confirmation of receipt, (b) on the first business day following the date of dispatch if delivered by a recognized next-day courier service, or (c) on the third business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

(a) If to any of the TPG Investors:

      such Investor
      c/o TPG Capital, L.P.
      Olympic Investment Partners, L.P.
      301 Commerce Street, Suite 3300
      Fort Worth, Texas 76102
      Attention: Clive D. Bode
            Vice President and Secretary
      Fax: (817) 871-4001

      with a copy (which copy alone shall not constitute notice):

      Cleary Gottlieb Steen & Hamilton LLP
      2000 Pennsylvania Avenue, NW
      Washington, DC 20006
      Attention: Kenneth L. Bachman, Jr.
            Derek M. Bush
      Fax: (202) 974-1999

**C36**

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention:  Michael L. Ryan
            Benet J. O'Reilly
Fax: (212) 225-3999

   (b)  If to the Company:

Washington Mutual, Inc.
Legal Department
1301 Second Avenue
Seattle, Washington 98101, WMC 3501
Attn: Charles Smith
Facsimile: (206) 377-2236

with a copy (which copy alone shall not constitute notice):

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn: Lee Meyerson
      Maripat Alpuche
Telephone: (212) 455-2000
Fax: (212) 455-2502

6.9 <u>Entire Agreement, Etc.</u> (a) This Agreement (including the Exhibits, Schedules and Disclosure Schedules hereto) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof; and (b) this Agreement will not be assignable by operation of law or otherwise (any attempted assignment in contravention hereof being null and void); *provided* that any Investor may assign its rights and obligations under this Agreement to any Affiliate under common control with such Investor's ultimate parent entity or general partner of such Investor, but in each case only if the transferee agrees in writing for the benefit of the Company (with a copy thereof to be furnished to the Company) to be bound by the terms of this Agreement (any such transferee shall be included in the term "Investor"); *provided, further,* that no such assignment shall relieve such Investor of its obligations hereunder. Without limiting the foregoing, none of the rights of any Investor hereunder shall be assigned to, or enforceable by, any person to whom an Investor may Transfer Securities (including any shares of Common Stock issued upon conversion or exercise of the Convertible Preferred Stock or Warrants).

6.10 <u>Other Definitions</u>. Wherever required by the context of this Agreement, the singular shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa, and references to any agreement, document or instrument shall be deemed to refer to such agreement, document or instrument as amended, supplemented or modified from time to time.

   (a)  the term "*Affiliate*" means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with, such other person. For purposes of this definition, "*control*"(including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") when used with respect to any person, means the possession, directly or indirectly, of the power to cause the direction of management or policies of such person, whether through the ownership of voting securities by contract or otherwise;

   (b)  the word "*or*" is not exclusive;

   (c)  the words "*including,*" "*includes,*" "*included*" and "*include*" are deemed to be followed by the words "without limitation"; and

   (d)  the terms "*herein,*" "*hereof*"and "*hereunder*" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision;

**C37**

(e) "*business day*" means any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York or in the State of Washington generally are authorized or required by law or other governmental actions to close;

(f) "*person*" has the meaning given to it in Section 3(a)(9) of the Exchange Act and as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act; and

(g) all article, section, paragraph or clause references not attributed to a particular document shall be references to such parts of this Agreement, and all exhibit, annex and schedule references not attributed to a particular document shall be references to such exhibits, annexes and schedules to this Agreement.

6.11 <u>Captions</u>. The article, section, paragraph and clause captions herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof.

6.12 <u>Severability</u>. If any provision of this Agreement or the application thereof to any person (including, the officers and directors of the Investors and the Company) or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

6.13 <u>No Third Party Beneficiaries</u>. Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the parties hereto, any benefit right or remedies, except that the provisions of Sections 4.7 and 4.9 shall inure to the benefit of the persons referred to in that Section.

6.14 <u>Time of Essence</u>. Time is of the essence in the performance of each and every term of this Agreement.

6.15 <u>Certain Adjustments</u>. If the representations and warranties set forth in Section 2.2(b) shall not be true and correct as of the Closing Date, the number of shares of Common Stock and the number of shares of Convertible Preferred Stock shall be, at the Investors' option, proportionately adjusted to provide the Investors the same economic effect as contemplated by this Agreement in the absence of such failure to be true and correct.

6.16 <u>Public Announcements</u>. Subject to each party's disclosure obligations imposed by law or regulation or the rules of any stock exchange upon which its securities are listed, each of the parties hereto will cooperate with each other in the development and distribution of all news releases and other public information disclosures with respect to this Agreement and any of the transactions contemplated by this Agreement, and no party hereto will make any such news release or public disclosure without first consulting with the other party hereto and receiving its consent (which shall not be unreasonably withheld or delayed) and each party shall coordinate with the other with respect to any such news release or public disclosure.

6.17 <u>Specific Performance</u>. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms. It is accordingly agreed that the parties shall be entitled to seek specific performance of the terms hereof, this being in addition to any other remedies to which they are entitled at law or equity.

* * *

_____

**C38**

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

WASHINGTON MUTUAL, INC.

By:_____

      Name:

      Title:

OLYMPIC INVESTMENT PARTNERS, L.P.

By:_____

      Name:

      Title:

TPG Partners VI, L.P.

By:_____

      Name:

      Title:

*[Signature Page to Investment Agreement]*

**C39**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | District of Delaware | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>Washington Mutual, Inc. | Case Number:<br>08-12229 (Jointly Administered) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Federal Deposit Insurance Corporation | ❏ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br><br>DLA Piper LLP (US), 1251 Avenue of the Americas,<br>New York, New York 10020-1104, Attn: Thomas R. Califano<br><br>Telephone number:<br>(212) 335-4500 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br>Federal Deposit Insurance Corporation,<br>1601 Bryant Street, Dallas, Texas 75201, Attn: Robert C. Schoppe, Receiver in Charge<br><br>Telephone number: | ❏ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>❏ Check this box if you are the debtor or trustee in this case. |

| 1. Amount of Claim as of Date Case Filed:      $SEE ATTACHED _____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>❏ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim.<br><br>❏ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
|---|---|

| 2. Basis for Claim:  SEE ATTACHED _____<br>(See instruction #2 on reverse side.)<br>3. Last four digits of any number by which creditor identifies debtor: _____<br><br>     3a. Debtor may have scheduled account as: _____<br>     (See instruction #3a on reverse side.)<br>4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:   ❏ Real Estate    ❏ Motor Vehicle    ❏ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate___%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br>if any: $_____     Basis for perfection: _____<br><br>Amount of Secured Claim: $_____   Amount Unsecured: $_____ | ❏ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).<br><br>❏ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>❏ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>❏ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
|---|---|

| 6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | ☑ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(9 ).<br><br>Amount entitled to priority:<br><br>$SEE ATTACHED<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |
|---|---|

| Date:<br>03/26/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Robert C. Schoppe - Federal Deposit Insurance Corporation, 1601 Bryant Street, Dallas, Texas 75201 | RECEIVED<br><br>MAR 30 2009<br><br>KURTZMANCARSONCONSULTANTS |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Addendum to Proof of Claim
The Federal Deposit Insurance Corporation, as
Receiver for Washington Mutual Bank, Henderson, Nevada

A.    Introduction

1.    This proof of claim is submitted pursuant to 11 U.S.C. § 501 and Bankruptcy Rule 3001 by the Federal Deposit Insurance Corporation, as receiver for Washington Mutual Bank, Henderson, Nevada (the "FDIC-Receiver"). The FDIC-Receiver was appointed receiver of Washington Mutual Bank ("WMB") by the Office of Thrift Supervision (the "OTS") on September 25, 2008, by order number 2008-36. On September 26, 2008, WMI and Washington Mutual Investment Corp. (together, the "Debtors") commenced these voluntary cases under chapter 11 of the Bankruptcy Code.

2.    Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC-Receiver succeeds by operation of law to the rights, titles, powers, and privileges, including legal claims, of WMB, and of any stockholder, member, accountholder, depositor, officer or director of WMB. The FDIC-Receiver is entitled to a superpriority with respect to the portion of its claims relating to the avoidance and recovery of fraudulent transfers that are subject to 12 U.S.C. § 1821(d)(17). In addition, some of the FDIC-Receiver's claims are entitled to administrative priority under 11 U.S.C. § 507, including priority under 11 U.S.C. § 507(a)(9) for commitments to a Federal depository institutions regulatory agency to maintain the capital of an insured depository institution.

3.    In its capacity as receiver, the Federal Deposit Insurance Corporation acts to protect insured depositors and creditors of failed depository institutions. The claims set forth herein arise, in part, out of WMI's actions by and through its agents to direct WMB for the benefit of WMI and at the expense of WMB. In addition to the specific bases for the FDIC-Receiver's claims discussed below, the Debtors are liable to WMB under various theories including, without limitation, subrogation, unjust enrichment and quasi contract, because WMB

C41

provided money, goods or valuable services to or on behalf of the Debtors for which WMB is entitled to be repaid.

4. Immediately after its appointment, the FDIC-Receiver sold substantially all of the assets of WMB, including the stock of WMB's thrift subsidiary, Washington Mutual Bank fsb ("WMBfsb"), to JPMorgan Chase Bank, N.A. ("JPMC") pursuant to a Purchase and Assumption Agreement Whole Bank dated as of September 25, 2008 (the "P&A Agreement").[1] Certain of the claims asserted herein may have been sold to JPMC under the P&A Agreement and, to that extent, are asserted by the FDIC-Receiver in accordance with the P&A Agreement. Nothing in this proof of claim (i) alters in any respect the terms of the P&A Agreement or the schedules or exhibits thereto or (ii) should be construed as reflecting the FDIC-Receiver's interpretation of the P&A Agreement, including without limitation the assets or rights related to claims that may have been sold, or that JPMC may claim to have been sold, pursuant to the P&A Agreement.

B. Tax-Related Claims

5. The FDIC-Receiver asserts claims arising from consolidated tax returns filed by WMI on behalf of, among others, WMB. All federal and state tax related refunds that have been paid to WMI already or that may be paid in the future based on consolidated tax returns, are due and owing in substantial part to WMB, and not WMI. A tax refund resulting from offsetting losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year inures to the benefit of that member, in this instance, WMB.

6. Any such amounts received by WMI are or will be held in trust for WMB and are not property of the Debtors' estate as a matter of law. To the extent the Debtors have received any such tax refunds, or might receive any such refunds in the future, the funds should be turned

---

[1] Publicly available at http://www.fdic.gov/about/freedom/popular.html.

2

over immediately to the FDIC-Receiver. The FDIC-Receiver reserves all rights relating to its claim for turnover of such assets.

7.     Without limiting the foregoing, based on investigation to date the FDIC-Receiver believes that the tax refunds or tax overpayments to which WMB is entitled from tax authorities, or from the Debtors to the extent that payments of such amounts have been or will be made to the Debtors, amount to no less than $4,269,507,909.00, as summarized in the following table.

| Category | Amount (all years) |
| --- | --- |
| Federal Tax Litigation Items | $228,830,412 |
| State Claims for Litig. Items | $29,081,702 |
| Federal Audit Cycle Items | $670,255,737 |
| State Claims for Fed. Audits | $275,242,708 |
| Federal Overpayments | $40,000,000 |
| State Overpayments | $89,867,260 |
| Federal Loss Carryback Claims | $1,906,654,329 |
| State Loss Carryback Claims | $2,464,064 |
| Miscellaneous | $173,825,241 |
| Federal Refunds Held by WMI | $241,798,079 |
| State Refunds Held by WMI | $94,668,862 |
| Amounts Due from WMI to WMB for Intercompany Taxes | $516,819,516 |

8.     WMI and other members of the consolidated group were parties to a Tax Sharing Agreement dated as of August 31, 1999 (the "Tax Sharing Agreement"). The provisions of the Tax Sharing Agreement do not alter WMB's entitlement to the tax refunds. To the extent that the Debtors assert that the Tax Sharing Agreement somehow empowers them to withhold tax

3

refunds that are WMB's property, the Tax Sharing Agreement would constitute an unsafe and unsound banking practice. Further, pursuant to the Internal Revenue Code, regulations promulgated thereunder, and state tax laws, as applicable, WMB has an independent right to pursue, contest, compromise, or settle any tax related adjustment or deficiency relating to WMB. To the extent that WMI attempts to interpose the Tax Sharing Agreement to prevent the FDIC-Receiver, or JPMC in accordance with the provisions of the P&A Agreement, from exercising such rights on behalf of WMB or WMBfsb, such an interpretation of the Tax Sharing Agreement would be burdensome to the receivership. The FDIC-Receiver reserves its right to repudiate the Tax Sharing Agreement pursuant to 12 U.S.C. § 1821(e) for these and any other reasons that it deems appropriate in its sole discretion as provided for under that statute.

9.      The FDIC-Receiver specifically reserves the right to litigate, prosecute, dispute, contest, compromise or settle any purported right of set off or offset claimed by the Debtors relating to tax refunds in the proper venue under title 12 of the United States Code. Such claims and defenses are not subject to the jurisdiction of the Bankruptcy Court but are, rather, independent property rights and claims that are subject to the exclusive jurisdiction provided for under title 12.

C.      Trust Preferred Securities

10.      In February 2006, Washington Mutual Preferred Funding LLC ("WMPF"), a Delaware limited liability company, was formed as an indirect subsidiary of WMB to facilitate core capital financing transactions for WMB through the issuance of "trust" preferred securities to investors by certain special purpose entities ("SPEs"). WMPF's assets were limited to direct or indirect interests in mortgages or mortgage-related assets, cash and other permitted assets. These assets were held in certain Delaware statutory trusts. WMPF issued preferred securities,

4

which were held by and were the sole asset of the SPEs and which were senior in priority to the common stock in WMPF, which was held indirectly by WMB.

11.     The following series of trust preferred securities were issued by SPE subsidiaries of WMPF using this structure. The Debtors have asserted that these series of trust preferred securities have a liquidation preference of approximately \$4 billion.

> a.    Washington Mutual Preferred (Cayman) I Ltd. 7.25% Perpetual Noncumulative Preferred Securities, Series A-1;
>
> b.    Washington Mutual Preferred (Cayman) I Ltd. 7.25% Perpetual Noncumulative Preferred Securities, Series A-2;
>
> c.    Washington Mutual Preferred Funding Trust (Delaware) Fixed-to-Floating Rated Perpetual Noncumulative Trust Securities;
>
> d.    Washington Mutual Preferred Funding Trust II (Delaware) Fixed-to-Floating Rated Perpetual Noncumulative Trust Securities;
>
> e.    Washington Mutual Preferred Funding Trust III (Delaware) Fixed-to-Floating Rated Perpetual Noncumulative Trust Securities;
>
> f.    Washington Mutual Preferred Funding Trust IV (Delaware) Fixed-to-Floating Rated Perpetual Noncumulative Trust Securities.

12.     The following series of WMPF preferred securities were issued in connection with the offerings of the trust preferred securities and were designed to include mirror-image terms for the purpose of funding payments to investors in the trust preferred securities:

> a.    Washington Mutual Preferred Funding LLC 7.25% Perpetual Noncumulative Preferred Securities, Series 2006-A;
>
> b.    Washington Mutual Preferred Funding LLC 7.25% Perpetual Noncumulative Preferred Securities, Series 2006-B;
>
> c.    Washington Mutual Preferred Funding LLC Fixed-to-Floating Rate Perpetual Noncumulative Preferred Securities, Series 2006-C;
>
> d.    Washington Mutual Preferred Funding LLC Fixed-to-Floating Rate Perpetual Noncumulative Preferred Securities, Series 2007-A;
>
> e.    Washington Mutual Preferred Funding LLC Fixed-to-Floating Rate Perpetual Noncumulative Preferred Securities, Series 2007-B.

13.     The trust preferred securities were sold to investors subject to a "conditional exchange" feature under which the trust preferred securities would be exchanged into shares of preferred stock of WMI (or depositary shares relating thereto) if certain regulatory events occurred. As a condition to authorizing WMI to treat the trust preferred securities as core capital of WMI's principal thrift subsidiary, WMB, the OTS required WMI to provide a written commitment to the OTS that if there was a "conditional exchange," any resulting interest that WMI obtained in the trust preferred securities or, indirectly, in the WMPF preferred securities that funded those securities, would be contributed to WMB. WMI provided that commitment to the OTS in a letter dated February 23, 2006. A copy of the commitment letter is attached as Exhibit 1.

14.     On September 25, 2008, WMI entered into an Assignment Agreement with WMB (the "Assignment Agreement"). A copy of the Assignment Agreement is attached as Exhibit 2. Under the Assignment Agreement, and effective upon its execution, WMI transferred to WMB, without recourse, all of its right, title and interest in and to all of the trust preferred securities, the WMPF preferred securities and the SPE subsidiaries of WMPF.

15.     Also on September 25, 2008, the OTS notified WMI that an "exchange event" occurred, triggering the "conditional exchange" feature of the trust preferred securities. Thereafter, a "conditional exchange" occurred automatically on September 26, 2008, at 8 a.m. Eastern time, when WMI issued a press release announcing the exchange event.

16.     Pursuant to 11 U.S.C. § 365(o), WMI was deemed to have assumed and was required to cure any defects under the February 23, 2006 capital maintenance commitment and the Assignment Agreement as a condition to filing its petition under chapter 11 of the Bankruptcy Code. The FDIC-Receiver demands that the Debtors immediately take all steps, or

6

authorize third parties to take such steps, that may be necessary to complete the transfer of the trust preferred securities, and any right, title or interest that the Debtors may claim in or to the WMPF preferred securities or the SPE subsidiaries of WMPF, to JPMC as purchaser of the trust preferred securities and related assets from the FDIC-Receiver under the P&A Agreement. The FDIC-Receiver reserves all of its rights in the event that WMI fails to take such immediate actions, including without limitation seeking the conversion of WMI's chapter 11 case to a liquidation under chapter 7 of the Bankruptcy Code.

17. In the alternative, and without waiving or limiting the foregoing, the FDIC-Receiver reserves its rights to effect the transfer of ownership of the trust preferred securities in the ownership registers of the SPE subsidiaries of WMPF as an action that does not affect the property of the debtors' estates and therefore is not subject to the automatic stay provided under section 362(a) of the Bankruptcy Code.

18. In the alternative, and without waiving or limiting the foregoing, the FDIC-Receiver demands that the Debtors turnover to JPMC, without recourse, all of the trust preferred securities and any right, title or interest that the Debtors may claim in or to the WMPF preferred securities or the SPE subsidiaries of WMPF, because any such interests are held by the Debtors in trust for WMB.

19. In the alternative, and without waiving or limiting the foregoing, the FDIC-Receiver asserts an administrative claim under 11 U.S.C. § 507(a)(9) for the full value of the trust preferred securities or for payment of the full amount of any liquidation preference accompanying such trust preferred securities, together with the value of any right, title or interest that the Debtors may claim in or to the WMPF preferred securities or the SPE subsidiaries of WMPF.

20.     The FDIC-Receiver specifically reserves the right to litigate, prosecute, dispute, contest, compromise or settle any purported rights with respect to the trust preferred securities, the WMPF preferred securities and the SPE subsidiaries of WMPF in the proper venue under title 12 of the United States Code.

D.     Intercompany Amounts

21.     In asserting claims against the FDIC-Receiver for certain intercompany notes and other intercompany amounts, the Debtors have not taken into account amounts that are due and payable by those entities under the system of intercompany settlement of accounts that was in place prior to the receivership. While reserving all of its rights to dispute the Debtors' intercompany claims in the appropriate forum, the FDIC-Receiver also is entitled to payment of amounts owed by the Debtors and their non-debtor subsidiaries with respect to such claims, or in the alternative, to set-off such amounts owed to the FDIC-Receiver against amounts claimed by WMI pursuant to section 553 of the Bankruptcy Code.

22.     Based on the investigation to date and subject to amendment based on further investigations, the FDIC-Receiver asserts claims against the Debtors and their non-debtor subsidiaries for intercompany amounts in the aggregate amount of $310,761,288.47. Of this total, $273,616,108 reflects a general ledger entry in WMB's favor relating to the change in accounting for pension contributions in excess of pension expenses prior to the implementation of Statement of Financial Accounting Standards No. 158. The other intercompany amounts owed by the Debtors or their non-debtor subsidiaries are:

| Obligor/Description | Amount |
|---|---|
| Ahmanson Obligation Corp. (general ledger account 49328) | $6,676.78 |
| Washington Mutual Inc. (Payroll) (general ledger account 28462) | $17,369,814.37 |

8

| Obligor/Description | Amount |
|---|---|
| Washington Mutual 1031 Exchange (Payroll) (general ledger account 28497) | $37,024.10 |
| Ahmanson Residential Development (general ledger account 28058) | $214.50 |
| Sutter Bay Corp. (general ledger account 28088) | $56.12 |
| Washington Mutual Finance Group LLC (general ledger account 28108) | $49,754.56 |
| Washington Mutual 1031 Exchange (general ledger account 28040) | $55,508.19 |
| Washington Mutual Inc. (general ledger account 28162) | $17,829.35 |
| Washington Mutual Inc. (Clearing Account) (general ledger account 28162) | $3,239,907.00 |
| Washington Mutual Inc. (Sept. Mgmt Fees) (general ledger account 28162) | $14,530,007.97 |
| Washington Mutual Inc. (Stock Option Amort.) (general ledger account 28162) | $28,557.64 |
| Washington Mutual Inc. (Rent for Admin. Bldg.) (general ledger account 28162) | $58,652.00 |
| Washington Mutual Inc. (Clearing Account) (general ledger account 49896) | $1,751,137.89 |

E.  Deposit Accounts

23.    The Debtors have asserted that as of the petition date, the Debtors and certain of
WMI's non-debtor subsidiaries had funds on deposit with WMB in the approximate amount of
$707,000,000 and that WMI had funds on deposit with WMBfsb of $3,668,000,000. Since the
petition date an additional $234,687,816 has been received in these accounts as payment of tax
refunds that are, in all or substantial part, the property of WMB, for the reasons discussed above.
Without conceding that the funds at issue are in fact deposits, the funds are collectively referred
to herein as the "Deposit Funds."

24.     Based on public filings by JPMC and the Debtors, there appear to be significant doubts as to whether satisfactory account documentation exists with respect to some or all of the funds at issue. Pending further investigation, the FDIC-Receiver therefore reserves all of its rights under 12 U.S.C. § 1823(e) and under 12 U.S.C. § 1821(d)(9) to defeat any claim asserted by the Debtors with respect to the Deposit Funds.

25.     Separately, the FDIC-Receiver expressly reserves all of its rights with respect to the Deposit Funds under section 9.5 of the P&A Agreement, under which the FDIC-Receiver may, in its discretion, determine that all or any portion of any deposit balance assumed by JPMC pursuant to the P&A Agreement does not constitute a "Deposit" or otherwise, in its discretion, determine that it is in the best interest of the FDIC-Receiver or Corporation to withhold all or any portion of any deposit, and may direct JPMC to withhold all or any portion of any such deposit balance.

26.     The FDIC-Receiver further asserts that to the extent any of the Deposit Accounts is subject to a security interest and lien in favor of WMB, the FDIC-Receiver is entitled to enforce the terms thereof with respect to funds in such an account. Upon information and belief, WMI entered into at least one specific security agreement with WMB with respect to funds in account number 177-8911206.

27.     Separately, and in the alternative, the FDIC-Receiver reserves all of its rights of setoff under 11 U.S.C. § 553, 12 U.S.C. § 1821(d) or federal or state law with respect to the Deposit Funds.

28.     The FDIC-Receiver specifically reserves the right to litigate, prosecute, dispute, contest, compromise or settle any purported rights with respect to the Deposit Funds in the proper venue under title 12 of the United States Code.

10

F.    Capital Maintenance Obligations

29.    The FDIC-Receiver's claims arise in part from WMI's obligation to maintain and guarantee the appropriate capital levels of WMB pursuant to applicable capital and liquidity requirements including, but not limited to the statutory and regulatory provisions set forth in 12 U.S.C. § 1831o, 12 U.S.C. § 1464(s) and regulations promulgated thereunder.

30.    Events since the closing of WMB have raised questions about whether WMI, WMB or their directors or officers were accounting and reserving for anticipated losses appropriately, thereby resulting in an overstatement of WMB's capital. The FDIC-Receiver has only recently begun its investigation into these facts, but it notes that in connection with its acquisition of WMB, JPMC announced that it would write down approximately $31 billion of WMB's loan portfolio based on JPMC's assessment of remaining credit losses in that portfolio. Only months earlier, WMI's chief financial officer had predicted substantially lower write-downs by WMB for non-performing assets of between $12 billion and $19 billion over the next several years.

31.    WMI's failure to sufficiently maintain the appropriate capitalization of WMB damaged WMB in an unliquidated amount. The capital maintenance claims may be subject to priority under 11 U.S.C. § 507(a)(9), if applicable.

G.    Fraudulent Transfers/Dividends

32.    Although its investigation only recently has commenced, the FDIC-Receiver may avoid and recover fraudulent transfers within five years before the receivership under federal and state law. See 12 U.S.C. § 1821(d)(17); R.C.W. §§ 19.40.011, et seq.; 6 Del. C. §§ 1301, et seq. The FDIC-Receiver reserves all rights to recover property transferred, or the value of such property from the initial transferee, the institution-affiliated party, or the person for whose

11

benefit the transfer was made, or from any immediate or mediate transferee of any such initial transferee. The FDIC-Receiver's rights under section 1821(d)(17) are superior to any rights of a trustee or any other party (other than any party which is a federal agency) under title 11 or the Debtors in these bankruptcy cases. See 12 U.S.C. § 1821(d)(17).

33.    Similarly, to the extent the FDIC-Receiver's claims relate to unlawful dividends paid, or other unlawful distributions made by WMB to its stockholders, or, as successor by merger to New American Capital, Inc. ("NACI"), by NACI to its stockholders, the FDIC-Receiver reserves the right to recover such amounts as provided for under the Washington Business Corporation Act, title 23B of the Revised Code of Washington, or in the case of NACI under the Delaware General Corporation Law, 8 Del C. §§ 101, et seq.

34.    The Debtors have asserted claims for recovery of various allegedly fraudulent transfers against the FDIC-Receiver in the amount of at least $10.5 billion. In support of those claims, the Debtors have alleged, inter alia, that "WMI or WMB may have been insolvent at the time" of the challenged transfers and that if "WMB was insolvent, had unreasonably small capital, and/or was unable to pay its own debt obligations as they matured, WMI did not receive any value in exchange" for certain transfers.

35.    If WMB or NACI was insolvent during some or all of the period within five years prior to the FDIC-Receiver's appointment on September 25, 2008, then the FDIC-Receiver may have claims for actual or constructive fraudulent transfers against WMI as the initial transferee, the institution-affiliated party, the person for whose benefit a transfer was made, or from any immediate or mediate transferee of any such initial transferee, for transfers of at least $15,041,000,000 in the form of cash dividends between September 2003 and September 2008.

12

Of these dividends, $7.2 billion were distributed to WMI in 2006 and $5.49 billion were distributed to WMI in 2007.[2]

## H.  Litigation

36.     WMB is or was a plaintiff or the successor in interest to a plaintiff in certain litigation prior to the receivership or, if it was not a named plaintiff, was the real party in interest in such litigation being prosecuted by WMI.  Without limiting the foregoing, this litigation includes American Savings Bank FA v. United States, No. 92-872C (Fed. Court of Claims), Anchor Savings Bank FSB v. United States, No. 95-39C (Federal Court of Claims) and Washington Mutual Inc. v. Internal Revenue Service (W.D. Wash.).[3]

37.     The FDIC-Receiver succeeded to WMB's interests in such litigation and is the rightful recipient of any recoveries therein.  To the extent that WMI has received or may in the future receive any proceeds from such litigation, any such payments are held in trust for WMB and are not property of the Debtors' estate.  The FDIC-Receiver demands the turnover of all such amounts by the Debtors or the right to receive such payments directly from the defendant(s).  In the alternative, the FDIC-Receiver asserts a claim for any and all recoveries in such litigation.

---

[2] WMB paid dividends on its common and preferred stock of as much as $17.1 billion during the five year period.  During that time, WMB's stock was held by NACI, a wholly-owned subsidiary of WMI that, upon information and belief, WMI dominated and controlled.  WMB succeeded by merger to assets and liabilities of NACI as the result of a reorganization that WMI caused to occur in late 2007.  The FDIC-Receiver is continuing its investigation into whether the NACI reorganization itself resulted in fraudulent transfers as to which WMI is liable to the FDIC-Receiver and reserves the right to supplement this claim to provide additional detail with respect to such claims.

[3] The last of these cases was listed in the Debtors' statement of financial affairs dated December 19, 2008 without a docket number.  It was not listed in the subsequent version of the Debtors' statement of financial affairs.  Upon information and belief, the action concerns tax issues relating to Winstar claims.

I.      Insurance Proceeds

38.     Prior to the receivership, WMI and/or WMB purchased insurance for which WMB was, at least in part, a named insured or an intended beneficiary. Such insurance includes, without limitation: the 2007/2008 Lloyd's of London Washington Mutual Financial Institution Blended Program, Policy No. 509/QA015407 and various policies of excess insurance relating thereto (the "2007/08 Blended Tower"); the 2008/09 Aon Financial Institutions Bond, Electronic and Computer Crime, Bankers Professional Liability, Employment Practices Liability and Fiduciary Liability Policy, Policy No. B0823FD0806211 and various policies of excess insurance relating thereto (the "2008/09 Blended Tower"); and the 2008/2009 XL Specialty Insurance Company Management Liability and Company Reimbursement Insurance Policy, Policy No. ELU104380-08 and National Union Policy No. 463-3347 (the "D&O Policies").

39.     To the extent that covered loss within the meaning of the relevant insurance policies has been suffered by WMB, the FDIC-Receiver is entitled to all proceeds paid under applicable insurance coverage for such loss. Without limiting the foregoing, the FDIC-Receiver claims any proceeds under the applicable insurance policies for insured wrongful acts that caused harm in any respect to WMB.

40.     To the extent that proofs of loss have been or may be filed with respect to such matters with the relevant insurer, the FDIC-Receiver hereby claims any payments in respect of such loss, which are not property of the Debtors' estate and, to the extent paid to the Debtors, are held in trust for the FDIC-Receiver as the rightful recipient thereof. This includes, without limitation, proofs of loss submitted to the insurers under the 2007/08 Blended Tower on or about July 18, 2008 (C.I.P. Mortgage Company), September 17, 2008 (Encino, California), September 18, 2008 (Campbell Pruneyard, California) and October 3, 2008 (Newport Beach,

California). The amount of loss claimed and other details are known to the Debtors; those details are omitted from this proof of claim for reasons of confidentiality.

41.     The FDIC-Receiver reserves the right to tender to the insurers any insured matter that has been or may be asserted against the receivership notwithstanding any claim that proceeds under such insurance policies are, in whole or in part, property of the Debtors' estate.

42.     The FDIC-Receiver also has succeeded to rights, claims and causes of action by WMB against directors, officers, and professionals and others who provided services to WMB. The FDIC-Receiver reserves all of its rights and remedies in and to any insurance policies potentially covering the FDIC-Receiver's claims against such persons and entities including policies pursuant to which the Debtors or WMB are insureds or additional insureds.

J.     Other Matters Subject to the P&A Agreement

43.     The FDIC-Receiver asserts a protective unliquidated claim for matters as to which (i) JPMC may assert a claim against the Debtors as the successor in interest to WMB and the FDIC-Receiver under the P&A Agreement and (ii) the Debtors may object to such a claim due to JPMC's lack of standing.

44.     Without limiting the foregoing, the matters as to which the FDIC-Receiver asserts this protective claim include:

> a.     Claims relating to employee or retiree benefit plans, trusts or insurance policies, including Rabbi trusts, BOLI/COLI policies and retirement or welfare plans, to the extent such plans, trusts or policies are or should be the property or responsibility of WMB;
>
> b.     Claims relating to litigation proceeds as to which (i) JPMC claims an entitlement as successor to WMB and (ii) the FDIC-Receiver agrees that

15

JPMC has succeeded to WMB's interests under the terms of the P&A
Agreement;

c.   Claims relating to WMB assets as to which (i) JPMC claims an
entitlement as successor to WMB and (ii) the FDIC-Receiver agrees that
JPMC has succeeded to WMB's interests under the terms of the P&A
Agreement.

## K.   Other Unliquidated Claims

45.   The FDIC-Receiver has or may have claims based upon breaches of fiduciary
duties owed by the directors and officers of WMI to WMB and the liability of WMI in
connection therewith. Such directors and officers may have failed to meet their lawful
obligations and act in the best interests of WMB including, but not limited to, directing and/or
authorizing the various upstream dividend and other avoidable transfers, failing to adequately
maintain WMB's capital or liquidity, failing to establish or maintain adequate internal controls,
failing to engage in suitable risk management, implementing substandard practices for loan
underwriting and asset purchases and sales for WMB and otherwise taking or omitting to take
actions that would serve WMB's interests.

46.   Further, according to the Debtors, before the petition date approximately sixty
WMB employees were officers of WMI. All of WMB's directors also were directors of WMI,
and the boards of directors of WMB and WMI regularly met in joint session. To the extent that
such officers or directors (or any other persons as to whom WMI owes a duty of indemnification
or advancement) assert claims against the FDIC-Receiver for indemnification or advancement,
the FDIC-Receiver asserts a claim for reimbursement of such amounts against WMI.

16

47.     The FDIC-Receiver also asserts an unliquidated claim for indemnity or contribution to the extent that WMB is entitled to assert such claims against WMI with respect to any pending or future litigation in which WMB or the FDIC-Receiver is or may be a named defendant.

48.     To the extent any governmental authority obtains or enters an order directing restitution for the criminal or otherwise wrongful acts of the officers or directors of WMB, such orders are for the benefit of the FDIC-Receiver as successor to WMB. If WMI receives any payment in respect of such an order, it shall hold such amounts in trust for WMB, and the FDIC-Receiver demands that such funds be turned over to the receivership estate.

L.      Reservation of Rights

49.     Neither this proof of claim nor any subsequent appearance, pleading, claim, document, suit, motion nor any other writing or conduct, shall constitute a waiver by the FDIC-Receiver of any: (a) right of the FDIC-Receiver to assert a defense of sovereign immunity; (b) right to have any and all final orders entered only after appropriate administrative procedures and/or de novo review by a United States district court; (c) right to elect a trial by jury in any matters so triable; (d) right to have the reference of this matter withdrawn by the United States district court in any matter or proceeding subject to mandatory or discretionary withdrawal; or (e) other rights, claims, actions, defenses, setoffs, recoupments or other matters to which the FDIC-Receiver is entitled under any agreements, at law or in equity or under the United States Constitution. All of the above rights are expressly reserved and preserved without exception and with no purpose of conceding jurisdiction in any way by this filing or by any other participation in this matter. The FDIC-Receiver expressly reserves all rights to assert the preemption of the Bankruptcy Court's jurisdiction and the exclusive jurisdiction provided under title 12.

17

50.     The identification or enumeration of the FDIC-Receiver's rights and remedies set forth in this proof of claim is not intended to be exhaustive. In addition, the FDIC-Receiver's investigation and review of the books and records of WMB is ongoing, and the FDIC-Receiver and its professional advisers have not yet had a sufficient opportunity to evaluate and determine all claims that the FDIC-Receiver may have against the Debtors. The FDIC-Receiver reserves the right to further amend, revise or supplement this proof of claim in any respect, and to file such additional claims and requests for payment. Without limiting the foregoing, the FDIC-Receiver reserves the right to assert specific claims or counterclaims for as-yet unliquidated, unmatured or contingent claims currently known or unknown, including without limitation, claims for indemnification, contribution, subrogation or reimbursement from the Debtors for any claims of third parties that may be asserted against the FDIC-Receiver or payments made by or on behalf of the FDIC-Receiver for which the Debtors are responsible.

51.     The FDIC-Receiver further reserves the right to amend or supplement this proof of claim, including, without limitation, to: cure a defect in the original claim, correct the claim amount or priority status, include additional supporting documents, describe the claim in greater detail, or add additional claims presently unknown to the FDIC-Receiver that, if known, could have affected this claim or resulted in the assertion of additional damages. In addition, nothing herein shall be deemed to waive or otherwise affect the rights of any other person, including without limitation, JPMC, to make claims similar to or parallel with this claim.

52.     The FDIC-Receiver reserves all rights to setoff against the Debtors any interests that are subject to setoff under section 553 of the Bankruptcy Code. Accordingly, the FDIC-Receiver asserts and reserves all of its rights, if any, to setoff any sums due to the Debtors against sums due the FDIC-Receiver from the Debtors or their non-debtor subsidiaries.

53.     Nothing in this proof of claim describing or in any way relating to property in which the Debtors now or hereafter may assert an interest shall be construed or deemed in any way as evidence that such assets are property of the estate or an admission that the Debtors have any rights in such property. This claim is submitted to assert and preserve the rights of the FDIC-Receiver in the Debtors' pending bankruptcy cases, and neither the submission of this proof of claim nor any provision in it shall be construed or deemed as evidence that FDIC-Receiver has waived or intends to waive any rights or claims afforded it under applicable law. Without limiting the foregoing, the FDIC-Receiver reserves any rights at law or equity that it has or may have against any other entity, person or persons, including without limitation the insiders, directors or officers of the Debtors, of WMB or of their affiliated entities, or any of their insurers or indemnitors.

54.     This proof of claim is not intended to be, and shall not be construed as: (a) an election of remedies; (b) waiver of any right to the determination or any issue or matter by a jury; (c) a waiver of any defaults; or (d) a waiver or limitation of any rights at law or equity, remedies, claims or interests of the FDIC-Receiver.

55.     Copies of various documents in support of this proof of claim are not attached because of the size of such documents and because the relevant provisions are described herein. In addition, many if not all of those documents are in the Debtors' possession or are matters of public record.

M.    Notices

56.    All notices and requests for documents to the FDIC-Receiver relating to this proof
of claim shall be served upon:

Tom Reeves
Counsel - Legal Division
Federal Deposit Insurance Company
Room VS-D-7608
3501 Fairfax Drive
Arlington, VA 22226-3500
treeves@fdic.gov

Thomas R. Califano
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
thomas.califano@dlapiper.com

57.    The claims herein include (1) claims to funds that may be held by third parties,
(2) claims to funds that are held by the Debtors or subject to express or equitable trust,
(3) general unsecured claims, and (4) administrative and priority claims. Based on the state of
the records currently available to the FDIC-Receiver, on the fact that many records were not
available to the FDIC-Receiver at the time of preparation and filing of this proof of claim, and on
information derived from various records reviewed, it is possible that certain assets which the
Debtors assert to own in their schedules or otherwise, may in fact be owned by the FDIC-
Receiver, and may not be property of the Debtors' estate. The FDIC-Receiver is investigating
the circumstances as thoroughly and expeditiously as possible. The FDIC-Receiver hereby
asserts its claim to such assets and will submit more specific claims as soon as information is
made available in order to evaluate, ascertain and determine specific ownership interests.

[INTENTIONALLY LEFT BLANK]

20

Dated: March 26, 2009

FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for Washington Mutual Bank, Henderson,
Nevada

By: _____

Robert Schoppe
Receiver-in-Charge

EXHIBIT 1

CONFIDENTIAL TREATMENT REQUESTED

John F. Robinson
Executive Vice President
Corporate Risk Management

February 23, 2006

Darrel Dochow
Deputy Regional Director, West Region
Office of Thrift Supervision
101 Stewart Street, Suite 1010
Seattle, WA 98101-1048

Re: Washington Mutual Bank (Docket Number: 08551) – Request for confirmation of capital treatment of two classes of preferred stock.

Dear Mr. Dochow:

On behalf of Washington Mutual, Inc. ("WMI"), I am writing with reference to the notice filed January 30, 2006 by Washington Mutual Bank ("WMB") to establish a new subsidiary, Washington Mutual Preferred Funding LLC ("WMPF"), for the purpose of issuing two classes of preferred securities to be eligible for inclusion in core capital of WMB (the "Notice"). You provided notice of the non-objection of the Office of Thrift Supervision ("OTS") to the establishment of WMPF by your letter dated February 9, 2006.

As you are aware, in the Notice WMB requested the OTS confirm that the sale of the Cayman Co. Preferred Securities and the Delaware Issuer Securities (as defined in the Notice) to outside investors constitutes the sale of the LLC Preferred Securities (as defined in the Notice) to outside investors and that the LLC Preferred Securities qualify for inclusion in core capital of WMB. In connection with that request, WMI hereby undertakes that if, as a result of a Supervisory Event (as defined in the Notice), WMI exchanges its Holding Company Shares (as defined in the Notice) for Cayman Co. Preferred Securities and the Delaware Issuer Securities, or if WMI subsequent to such exchange acquires the LLC Preferred Securities, WMI will contribute to WMB the Cayman Co. Preferred Securities and the Delaware Issuer Securities or, as appropriate, the LLC Preferred Securities.

If you have any questions regarding this letter, please call Robert Monheit at (212) 326-6104 or me at (206) 490-6100.

Sincerely,

John F. Robinson
Executive Vice President
Corporate Risk Management

1201 Third Avenue
WMT 1601
Seattle, WA 98101
phone    206.490.6100
fax       206.377.5318

EXHIBIT 2

**ASSIGNMENT AGREEMENT**

between

**WASHINGTON MUTUAL BANK,**
as Assignee

and

**WASHINGTON MUTUAL, INC.,**
as Assignor

**Effective as of September 25, 2008**

17535196 05129267

. THIS ASSIGNMENT AGREEMENT (as amended, modified or supplemented from time to time after the date hereof, the "Agreement") is effective as of September 25, 2008, and is made by and between WASHINGTON MUTUAL BANK, a federally-chartered savings association, as Assignee (the "Assignee"), and WASHINGTON MUTUAL, INC., a Washington corporation, as Assignor (the "Assignor").

## RECITALS

(A)     Assignor wishes to assign to Assignee certain securities, and Assignee wishes to accept such assignment, which Securities shall be assigned upon the execution of this Agreement.

## AGREEMENT

In consideration of the premises and the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignee and Assignor agree as follows:

## ARTICLE I

## DEFINITIONS; GENERAL INTERPRETIVE PRINCIPLES

Section 1.01. Definitions.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

Agreement: This Assignment Agreement, including all exhibits hereto, and all amendments hereof and supplements hereto.

Certificate: Any instrument constituting evidence of ownership of a Security.

Effective Date: September 25, 2008.

Code: The Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder and rulings issued thereunder. Section references to the Code are to the Code, as in effect as the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefore.

Assignment: The assignment to Assignee by Assignor of Securities pursuant to this Agreement.

Delivery: Is deemed to occur as of September 25, 2008.

WMB/WMI Master Securities
Assignment Agreement

17535196 05129267

C66

Person: Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Assignee: Washington Mutual Bank, a federally-chartered savings association, and its successors and assigns.

Securities: The securities listed in Exhibit A that are the subject of this Agreement. The term "Securities" includes, without limitation, such securities, any Certificates corresponding to such securities, and all other rights, benefits, proceeds and obligations of the owner of such securities arising from or in connection with such securities, whether now owned or hereafter acquired.

Assignor: Washington Mutual, Inc., a Washington corporation, and its successors and assigns.

Section 1.02. General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

a) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

c) references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

d) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

e) the words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

f) the term "include" or "including" shall mean without limitation by reason of enumeration.

## ARTICLE II

## ASSIGNMENT OF SECURITIES

Section 2.01. Assignment of Securities.

With respect to the Securities listed on Exhibit A attached hereto, Assignor hereby contributes, transfers, assigns, sets over and conveys to Assignee, without recourse, but subject to the terms of this Agreement, all of Assignor's right, title and interest, whether now owned or hereafter acquired, in and to the Securities.

Upon execution and delivery of this Agreement by Assignor and Assignee, all rights and benefits arising out of the Securities which come into the possession of Assignor, including but not limited to funds which may be received by Assignor on or in connection with the Securities, and the ownership of all records and documents with respect to the Securities which are prepared by or which come into the possession of Assignor, shall immediately vest in Assignee.

Assignee acknowledges that the assignment by Assignor to Assignee under this Agreement are intended to qualify as tax-free transactions under Section 351 of the Code.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01. Mutual Representations and Warranties.. Each party hereby represents and warrants to the other that it has all requisite power and authority to enter into and perform its obligations under this Agreement.

It is understood and agreed that the representations and warranties set forth in this Article V shall survive delivery of the respective Securities to the Assignee, and shall continue throughout the term of this Agreement.

## ARTICLE IV

## COSTS

Section 4.01. Costs.

Each party shall bear its own costs and expenses. All other costs and expenses incurred in connection with the transfer and delivery of the Securities, including without limitation recording and filing fees, shall be paid by Assignee.

Each remittance or distribution made pursuant to this Agreement shall be made in the manner agreed to by the parties. To the extent that the amount of a remittance or distribution made pursuant to this Agreement is greater than the amount that was supposed to be made, each party agrees to give prompt written notice thereof to the other party after discovery thereof, including the amount of such remittance or distribution that was paid in error, and to refund such overpayment immediately.

## ARTICLE V

## MISCELLANEOUS PROVISIONS

Section 5.01. Amendment.

This Agreement may be amended from time to time only by written agreement signed by Assignor and Assignee.

Section 5.02. Governing Law.

This Agreement shall be construed in accordance with the internal laws of the State of Washington, except to the extent preempted by federal law and without reference to the choice of law doctrine of such state, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 5.03. Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered or certified mail, postage prepaid, to (a) in the case of Assignor,

Washington Mutual, Inc.
1301 Second Avenue, WMC 1411
Seattle, Washington 98101
Attention: Corporate Secretary

or such other address as may hereafter be furnished by Assignor to Assignee in writing; and

b)      in the case of Assignee,

Washington Mutual Bank
1301 Second Avenue, WMC 1411
Seattle, Washington 98101
Attention: Corporate Secretary

or such other address as may hereafter be furnished by Assignee to Assignor in writing.

Section 5.04. Merger; Severability of Provisions.

This Agreement, and the documents and instruments referred to herein, constitute the entire agreement of and is the final and complete expression of the parties relating to the subject matter of this Agreement, and supersedes all prior or contemporaneous negotiations and agreements, whether oral or written, relating to the subject matter hereof.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants,

4

agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate in good faith to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such inability.

Section 5.05. Execution; Successors and Assigns.

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. This Agreement shall inure to the benefit of and be binding upon Assignor and Assignee and their respective successors and assigns.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized officers on the dates shown below, to be effective as of the effective date first set forth above.

WASHINGTON MUTUAL BANK

By: _____

Name: Patricia Schultz

Title: Senior Vice President


WASHINGTON MUTUAL, INC.

By: _____

Name: Todd Baker

Title: Executive Vice President

17535196 05129267

# EXHIBIT A

## SECURITIES

(i)    Washington Mutual Preferred (Cayman) I Ltd. 7.25% Perpetual Non-cumulative Preferred Securities, Series A-1

(ii)    Washington Mutual Preferred (Cayman) I Ltd. 7.25% Perpetual Non-cumulative Preferred Securities, Series A-2

(iii)    Washington Mutual Preferred Funding Trust Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities

(iv)    Washington Mutual Preferred Funding Trust II Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities

(v)    Washington Mutual Preferred Funding Trust III Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities

(vi)    Washington Mutual Preferred Funding Trust IV Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities

(vii)    Washington Mutual Preferred Funding LLC Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2006-A

(viii)    Washington Mutual Preferred Funding LLC 7.25% Perpetual Non-cumulative Preferred Securities, Series 2006-B

(ix)    Washington Mutual Preferred Funding LLC Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2006-C

(x)    Washington Mutual Preferred Funding LLC Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-A

(xi)    Washington Mutual Preferred Funding LLC Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-B

(xii)    Any and all right, title and interest of the Washington Mutual, Inc. in and to Washington Mutual Preferred (Cayman) I Ltd. ("WaMu Cayman"), Washington Mutual Preferred Funding Trust ("WaMu Delaware I"), Washington Mutual Preferred Funding Trust II ("WaMu Delaware II"), Washington Mutual Preferred Funding Trust III ("WaMu Delaware III") and Washington Mutual Preferred Funding Trust IV ("WaMu Delaware IV" and, together with WaMu Cayman, WaMu Delaware I, WaMu Delaware II and WaMu Delaware III, the "Trusts"), including any interests of the Trusts in any of the Securities