(z)    "Series J Preferred Stock" has the meaning set forth in Section 2.

(aa)    "Series K Preferred Stock" has the meaning set forth in Section 2.

(bb)    "Series L Preferred Stock" has the meaning set forth in Section 2.

(cc)    "Series M Preferred Stock" has the meaning set forth in Section 2.

(dd)    "Series N Preferred Stock" has the meaning set forth in Section 2.

(ee)    "Series O Preferred Stock" has the meaning set forth in Section 1.

(ff)    "Treasury Rate" means the rate per year equal to the quarterly equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for the relevant Redemption Date. The Treasury Rate will be calculated on the third Business Day preceding the relevant Redemption Date.

(gg)    "Voting Parity Securities" has the meaning set forth in Section 8(b).

(hh)    "WMB" means Washington Mutual Bank, a federal savings association and a subsidiary of the Company, or its successor.

Section 4    Dividends.

(a)    Holders of shares of Series O Preferred Stock shall be entitled to receive, if, when and as declared by the Board of Directors, out of the funds legally available therefor, non-cumulative cash dividends in the amount determined as set forth in Section 4(c), and no more.

(b)    Subject to Section 4(a), dividends shall be payable in arrears on March 15, June 15, September 15 and December 15 of each year commencing on the first such day after the issuance of the Series O Preferred Stock or, in each case, if any such day is not a Business Day, the next Business Day (each, a "Dividend Payment Date"). Each dividend will be payable to holders of record as they appear on the stock books of the Company on the first day of the month in which the relevant Dividend Payment Date occurs or, if such date is not a Business Day, the first Business Day of such month. Each period from and including a Dividend Payment Date (or the date of the issuance of the Series O Preferred Stock) to but excluding the following Dividend Payment Date (or the Redemption Date) is herein referred to as "Dividend Period".

(c)    After issuance of the Series O Preferred Stock, dividends, if, when and as declared by the Board of Directors, will be, for each outstanding share of Series O Preferred Stock, at an annual rate of _____% on the per share liquidation preference of the Series O Preferred Stock. Dividends payable for any Dividend Period greater or less than a full Dividend Period will be computed on the basis of twelve 30-day months, a 360-day year, and the actual number of days elapsed in the period. No interest will be paid on any dividend payment of the Series O Preferred Stock.

(d)    Dividends on the Series O Preferred Stock are non-cumulative. If the Board of Directors does not declare a dividend on the Series O Preferred Stock or declares

less than a full dividend in respect of any Dividend Period, the holders of the Series O Preferred Stock will have no right to receive any dividend or a full dividend, as the case may be, for the Dividend Period, and the Company will have no obligation to pay a dividend or to pay full dividends for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to the Series O Preferred Stock or the Common Stock or any other class or series of the Company's preferred stock.

(e)     If full dividends on all outstanding shares of the Series O Preferred Stock for any Dividend Period have not been declared and paid, the Company shall not declare or pay dividends with respect to, or redeem, purchase or acquire any of, its equity capital securities during the next succeeding Dividend Period, except dividends in connection with the Series RP Preferred Stock or other shareholders' rights plan, if any, or dividends in connection with benefit plans.

Section 5     Liquidation.

(a)     In the event the Company voluntarily or involuntarily liquidates, dissolves or winds up, the holders of Series O Preferred Stock at the time outstanding shall be entitled to receive liquidating distributions in the amount of $1,000,000 per share of Series O Preferred Stock, plus an amount equal to any declared but unpaid dividends thereon for the current Dividend Period to and including the date of such liquidation, out of assets legally available for distribution to its shareholders, before any distribution of assets is made to the holders of Common Stock or any securities ranking junior to the Series O Preferred Stock. After payment of the full amount of such liquidating distributions, the holders of Series O Preferred Stock will not be entitled to any further participation in any distribution of assets by, and shall have no right or claim to any remaining assets of, the Company.

(b)     In the event the assets of the Company available for distribution to shareholders upon any liquidation, dissolution or winding-up of the affairs of the Company, whether voluntary or involuntary, shall be insufficient to pay in full the amounts payable with respect to all outstanding shares of the Series O Preferred Stock and the corresponding amounts payable on any other Securities of equal ranking, the holders of Series O Preferred Stock and the holders of such other securities of equal ranking shall share ratably in any distribution of assets of the Company in proportion to the full respective liquidating distributions to which they would otherwise be respectively entitled.

Section 6     Maturity. The Series O Preferred Stock shall be perpetual unless redeemed by the Company in accordance with Section 7.

Section 7     Redemptions.

(a)     The Series O Preferred Stock shall not be redeemable at the option of the holders at any time.

(b)     The Series O Preferred Stock shall be redeemable at the option of the Company in any of the following circumstances:

(i)     in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in _____, [2012] upon the occurrence of a

**C299**

Regulatory Capital Event or a Rating Agency Event, at a cash redemption price equal to the sum of:

        (A)    the greater of:

              (1)    $1,000,000 per share of Series O Preferred Stock

and

              (2)    The sum of the present value of $1,000,000 per share of Series O Preferred Stock, discounted from the Dividend Payment Date in _____, to the Redemption Date, and the present values of all undeclared dividends for each Dividend Period from the Redemption Date to and including the Dividend Payment Date in _____, discounted from their applicable Dividend Payment Dates to the Redemption Date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, plus [_____%]; *plus*

        (B)    any declared but unpaid dividends to the Redemption Date;

or

        (ii)    in whole or in part, on any Dividend Payment Date on or after the Dividend Payment Date in _____, at a cash redemption price equal to $1,000,000 per share of Series O Preferred Stock, *plus* any declared and unpaid dividends to the Redemption Date;

    Section 1. In each case, without accumulation of any undeclared dividends with respect to Dividend Payment Date prior to the Redemption Date.

    (c)    Dividends will cease to accrue on the Series O Preferred Stock called for redemption on and as of the date fixed for redemption and such Series O Preferred Stock will be deemed to cease to be outstanding, *provided* that the redemption price, including any authorized and declared but unpaid dividends for the current Dividend Period, if any, to the date fixed for redemption, has been duly paid or provision has been made for such payment.

    (d)    In the case of any redemption under this Section 7, notice shall be mailed to each holder of record of the Series O Preferred Stock, not less than 30 nor more than 60 days prior to the Redemption Date specified in such notice; provided, however, that a longer minimum notice may be agreed to by the Company, including in a deposit agreement relating to depositary shares representing interests in the Series O Preferred Stock. The notice of redemption shall include a statement of (i) the Redemption Date, (ii) the redemption price, and (iii) the number of shares to be redeemed.

    (e)    Any shares of Series O Preferred Stock redeemed pursuant to this Section 7 or otherwise acquired by the Company in any manner whatsoever shall become authorized but unissued preferred shares of the Company but such preferred shares shall not under any circumstances be reissued as Series O Preferred Stock. The Company shall from time-to-time take such appropriate action as may be necessary to reduce the authorized number of shares of Series O Preferred Stock accordingly.

**C300**

Section 8    Voting Rights.

(a)    Holders of the Series O Preferred Stock will not have any voting rights, including the right to elect any directors, except (i) voting rights, if any, required by law, and (ii) voting rights, if any, described in this Section 8.

(b)    Holders of the Series O Preferred Stock will in the circumstances to the extent set forth in this Section 8(b), have the right to elect two directors.

(i)    If after the issuance of the Series O Preferred Stock the Company fails to pay, or declare and set aside for payment, full dividends on the Series O Preferred Stock or any other class or series of Parity Securities having similar voting rights ("Voting Parity Securities") for six Dividend Periods or their equivalent, the authorized number of the Company's directors will be increased by two. Subject to compliance with any requirement for regulatory approval of, or non-objection to, persons serving as directors, the holders of Series O Preferred Stock, voting together as a single and separate class with the holders of any outstanding Voting Parity Securities, will have the right to elect two directors in addition to the directors then in office at the Company's next annual meeting of shareholders. This right will continue at each subsequent annual meeting until the Company pays dividends in full on the Series O Preferred Stock and any Voting Parity Securities for three consecutive Dividend Periods or their equivalent and pays or declares and sets aside for payment dividends in full for the fourth consecutive Dividend Period or its equivalent or, if earlier, upon the redemption of all Series O Preferred Stock.

(ii)    The term of such additional directors will terminate, and the total number of directors will be decreased by two, at such time as the Company pays dividends in full on the Series O Preferred Stock and any Voting Parity Securities for three consecutive Dividend Periods or their equivalent and declares and pays or sets aside for payment dividends in full for the fourth consecutive Dividend Period or its equivalent or, if earlier, upon the redemption of all Series O Preferred Stock. After the term of such additional directors terminates, the holders of the Series O Preferred Stock will not be entitled to elect additional directors unless full dividends on the Series O Preferred Stock have again not been paid or declared and set aside for payment for six future Dividend Periods.

(iii)    Any additional director elected by the holders of the Series O Preferred Stock and the Voting Parity Securities may only be removed by the vote of the holders of record of the outstanding Series O Preferred Stock and Voting Parity Securities, voting together as a single and separate class, at a meeting of the Company shareholders called for that purpose. Any vacancy created by the removal of any such director may be filled only by the vote of the holders of the outstanding Series O Preferred Stock and Voting Parity Securities, voting together as a single and separate class.

(c)    So long as any shares of Series O Preferred Stock are outstanding, the vote or consent of the holders of at least 66 2/3% of the shares of Series O Preferred Stock at the time outstanding, voting as a class with all other classes and series of Parity Securities upon which like voting rights have been conferred and are exercisable, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for effecting or validating any of the following actions, whether or not such approval is required by Washington law:

(i) any amendment, alteration or repeal of any provision of the Company's Amended and Restated Articles of Incorporation (including the Articles of Amendment creating the Series O Preferred Stock) or the Company's bylaws that would alter or change the voting powers, preferences or special rights of the Series O Preferred Stock so as to affect them adversely;

(ii) any amendment or alteration of the Company's Amended and Restated Articles of Incorporation to authorize or create, or increase the authorized amount of, any shares of, or any securities convertible into shares of, any class or series of the Company's capital stock ranking prior to the Series O Preferred Stock in the payment of dividends or in the distribution of assets on any liquidation, dissolution or winding up of the Company; or

(iii) the consummation of a binding share exchange or reclassification involving the Series O Preferred Stock or a merger or consolidation of the Company with another entity, except that holders of Series O Preferred Stock will have no right to vote under this provision or under §23B.11.035 of the Revised Code of Washington or otherwise under Washington law if in each case (x) the Series O Preferred Stock remains outstanding or, in the case of any such merger or consolidation with respect to which the Company is not the surviving or resulting entity, is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such Series O Preferred Stock remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers of the Series O Preferred Stock, taken as a whole;

*provided, however,* that any increase in the amount of the authorized or issued Series O Preferred Stock or authorized preferred stock or the creation and issuance, or an increase in the authorized or issued amount, of other series of preferred stock ranking equally with and/or junior to the Series O Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and/or the distribution of assets upon the Company's liquidation, dissolution or winding up will not be deemed to adversely affect the voting powers, preferences or special rights of the Series O Preferred stock and, notwithstanding §23B.10.040(1)(a), (e) or (f) of the Revised Code of Washington or any other provision of Washington law, holders of Series O Preferred Stock will have no right to vote on such an increase, creation or issuance.

(d) If an amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above would adversely affect one or more but not all series of preferred stock with like voting rights (including the Series O Preferred Stock for this purpose), then only the series affected and entitled to vote shall vote as a class in lieu of all such series of preferred stock.

Section 9    Certificates.  The Company may at its option issue the Series O Preferred Stock without certificates.

RESOLVED FURTHER, that for purposes of these resolutions and the transactions contemplated hereby, each of the following shall be an "Authorized Officer": (i) the Chief Executive Officer, (ii) the Chief Operating Officer, (iii) the Chief Financial Officer, (iv) any Senior Executive Vice President, (v) the Executive Vice President – Corporate Strategy &

Development, (vi) the Senior Vice President and Treasurer, (vii) any Senior Vice President reporting directly to the Senior Vice President and Treasurer and (viii) the Senior Vice President and Controller;

RESOLVED FURTHER, that the Board hereby authorizes, and delegates the authority to, any one of the Authorized Officers to designate, finalize, determine and complete (it being understood that this authority includes without limitation making appropriate modifications of the preceding designation) the preferences, limitations, voting powers and relative rights of the Series O Preferred Stock, subject to the limits specified in these resolutions;

RESOLVED FURTHER, that the authorization and delegation in the immediately preceding resolutions shall include, without limitation, the authority to determine the number of shares of the Series O Preferred Stock to be authorized, to determine the dividend rates and whether such rates are fixed, fixed-to-floating or floating (and to make appropriate modifications in other provisions to reflect such rates), to determine the liquidation amount, to designate situations in which the Company has the option to redeem the Series O Preferred Stock with or without make-whole provisions (including without limitation the terms of such make-whole provisions), to designate circumstances involving amendments to the Company's articles of incorporation as amended or involving mergers or other combinations or similar events in which holders of Series O Preferred Stock shall have voting rights, to approve the form of any stock certificate and to prepare and authorize the filing of articles of amendment for the Series O Preferred Stock with the Secretary of State of the State of Washington; provided, however, that (i) the number of shares of Series O Preferred Stock authorized shall not exceed 2,000 and, in addition, the sum of the number of authorized shares of Series O Preferred Stock and the number of authorized shares of Series N Preferred Stock shall not exceed 2,000, (ii) the liquidation preferences shall not exceed $1,000,000 per share, (iii) the dividend rate will be at a fixed rate not to exceed 13.0% per annum from the date of the issuance and, in the case of a fixed-to-floating rate election (upon the time the floating rate applies) or a floating rate election, will be at a floating rate equal to the relevant LIBOR applicable to such period plus a spread which will not exceed 800 basis points, and (iv) the Company will have the right to redeem the Series O Preferred Stock on a date that occurs no later than the first dividend payment date which is more than 10 years after the date on which the LLC Preferred Interests and the Cayman Securities are issued;

RESOLVED FURTHER, that the Series O Preferred Stock may be issued to a depositary, which shall issue depositary shares each representing a fractional interest in the shares of a series of the Series O Preferred Stock;

RESOLVED FURTHER, that the Company is hereby authorized to enter into and perform its obligations under a deposit agreement to issue depositary shares, and any Authorized Officer is authorized to select the depositary and to negotiate, execute and deliver such deposit agreement on behalf of the Company;

RESOLVED FURTHER, that the number of shares authorized in the Designation as completed by an Authorized Officer as provided in these resolutions shall upon filing of the articles of amendment for the Series O Preferred Stock be fully reserved for issuance;

RESOLVED FURTHER, that the Authorized Officers, or any of them, are authorized

**C303**

and empowered, on behalf of the Company and in its name, with full power and authority to delegate such authority to one or more attorneys-in-fact or agents acting for such Authorized Officers, or any of them, pursuant to a power of attorney, in the event that it is deemed necessary or desirable so to do, in connection with the offering of the Preferred Stock, the LLC Preferred Interests or the Cayman Securities in a private offering and/or in an offering effected in reliance on Regulation S promulgated under the Securities Act of 1933, as amended (the "Securities Act"), to prepare, or cause to be prepared, an offering circular or offering memorandum with respect to such securities (and any supplements or amendments thereto), as the Authorized Officers, or any of them, taking such action shall approve in connection therewith in order to effect the offering of such securities in a private offering;

RESOLVED FURTHER, that after filing with the Secretary of State of the State of Washington the articles of amendment designating the terms of the Series O Preferred Stock, but prior to the issuance of the shares of the series, the authority of each of the Authorized Officer to execute and file an amendment to the articles of amendment is hereby authorized, approved and confirmed, provided that any such filing shall be made only in order to make technical, clarifying or similar corrections or modifications and provided further that such corrections or modifications are consistent with the limitations established in these board resolutions and with the description of the series in the offering circular;

RESOLVED FURTHER, that any Authorized Officer, together with other proper officers of the Company (including, without limitation, those authorized from time to time pursuant to the Company's Asset and Liability Management Policy and the standards and procedures from time to time in effect thereunder), is hereby authorized to negotiate, enter into, execute and deliver any and all additional agreements (which agreements may include, without limitation, (i) purchase agreements with Goldman Sachs & Co. or an affiliate and/or other institutional purchasers, (ii) exchange agreements relating to the exchange of the LLC Preferred Interests and the Cayman Securities into depositary shares representing interests in the Series O Preferred Stock, and (iii) declaration of covenants or other agreements, in favor of holders of Cayman Securities and/or specified indebtedness of the Company, prohibiting the issuance by the Company of preferred stock senior to the Series O Preferred Stock, restricting sources of funds used to redeem the Cayman Securities, or restricting dividends and distributions on the Company's stock if dividends are not paid on the Cayman Securities), any undertakings or other documents or supplemental agreements on behalf of the Company (including, without limitation, filings or applications with banking regulators, securities regulators or stock exchanges, domestic or foreign) and to take any other actions, in each case, as such Authorized Officer or other proper officer deems to be necessary or advisable in connection with the issuance of the Series O Preferred Stock, the LLC Preferred Interests or the Cayman Securities or to further the intent of these resolutions, subject to the limits set forth in these resolutions; and

RESOLVED FURTHER, that any actions taken by any of the Authorized Officers or any other proper officer of the Company prior to the adoption of these resolutions that is otherwise within the scope of the authority conferred by these resolutions is hereby ratified, confirmed and approved.

[remainder of the page left blank intentionally]

Error! Unknown document property name.    14    **WM: Confidential Limited Access**
APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C304**

### (Series P DRD Preferred Stock)

WHEREAS, the Board of Directors of Washington Mutual, Inc. (the "Company") desires to authorize the issuance of a new series of preferred stock, to establish substantive terms of the series, to delegate authority to appropriate officers of the Company to determine, within the limits specifically prescribed in these resolutions, the designation and preferences, limitations, voting powers and relative rights of the series and to provide for other matters relating to the preferred stock.

THEREFORE, IT IS HEREBY RESOLVED, that there is hereby created out of the authorized and unissued shares of preferred stock of the Company a series of preferred stock designated as the "Series P Perpetual Non-Cumulative Preferred Stock" (the "Series P Preferred Stock"). The number of shares constituting such series shall not exceed 2,000. The stock in such series shall have no par value.

FURTHER RESOLVED, that the Series P Preferred Stock shall have the preferences, limitations, voting powers and relative rights set forth in the designation for such series set forth below subject to completion or modification by Authorized Officers as provided herein:

## DESIGNATION

**Section 1.** **Designation.** There is hereby created out of the authorized and unissued shares of preferred stock of the Company a series of preferred stock designated as the "Series P Perpetual Non-Cumulative Floating Rate Preferred Stock" (the "Series P Preferred Stock"). The number of shares constituting such series shall be _____. The Series P Preferred Stock shall have no par value per share and the liquidation preference of the Series P Preferred Stock shall be $1,000,000.00 per share.

**Section 2.** **Ranking.** The Series P Preferred Stock will, with respect to dividend rights and rights on liquidation, winding-up and dissolution, rank (i) on a parity with the Series I Preferred Stock, the Series J Preferred Stock, the Series K Preferred Stock, the Series L Preferred Stock, the Series M Preferred Stock, the Series N Preferred Stock and the Series O Preferred Stock and with each other class or series of preferred stock established after the Effective Date by the Company the terms of which expressly provide that such class or series will rank on a parity with the Series P Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "Parity Securities") and (ii) senior to the Company's common stock (the "Common Stock"), the Company's Series RP Preferred Stock and each other class or series of capital stock outstanding or established after the Effective Date by the Company the terms of which do not expressly provide that it ranks on a parity with or senior to the Series P Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "Junior Securities"). The Company has the right to authorize and/or issue additional shares or series of Junior Securities or Parity Securities without the consent of the holders of the Series P Preferred Stock.

**Section 3. Definitions.** Unless the context or use indicates another meaning or intent, the following terms shall have the following meanings, whether used in the singular or the plural:

Error! Unknown document property name.     15     **WM: Confidential Limited Access**

APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C305**

(a)　"3-Month USD LIBOR" means, with respect to any Dividend Period, a rate determined on the basis of the offered rates for three-month U.S. dollar deposits, commencing on the first day of such Dividend Period, which appears on Reuters Screen LIBOR01 Page as of approximately 11:00 a.m., London time, on the LIBOR Determination Date for such Dividend Period. If on any LIBOR Determination Date no rate appears on Reuters Screen LIBOR01 Page as of approximately 11:00 a.m., London time, the Company or an affiliate of the Company on behalf of the Company will on such LIBOR Determination Date request four major reference banks in the London interbank market selected by the Company to provide the Company with a quotation of the rate at which three-month deposits in U.S. dollars, commencing on the first day of such Dividend Period, are offered by them to prime banks in the London interbank market as of approximately 11:00 a.m., London time, on such LIBOR Determination Date and in a principal amount equal to that which is representative for a single transaction in such market at such time. If at least two such quotations are provided, 3-Month USD LIBOR for such Dividend Period will be the arithmetic mean (rounded upward if necessary to the nearest .00001 of 1%) of such quotations as calculated by the Company. If fewer than two quotations are provided, 3-Month USD LIBOR for such Dividend Period will be the arithmetic mean (rounded upward if necessary to the nearest .00001 of 1%) of the rates quoted as of approximately 11:00 am., New York time, on the first day of such Dividend Period by three major banks in New York City, New York selected by the Company for loans in U.S. dollars to leading European banks, for a three-month period commencing on the first day of such Dividend Period and in a principal amount of not less than $1,000,000; *provided, however,* that, if the banks selected as aforesaid by the Company are not quoting as mentioned in this sentence, 3-Month USD LIBOR for such Dividend Period will be the 3-Month USD LIBOR determined with respect to the immediately preceding Dividend Period.

(b)　"Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York City, New York, or Seattle, Washington are generally required or authorized by law to be closed.

(c)　"Common Stock" has the meaning set forth in Section 2.

(d)　"Company" means Washington Mutual, Inc., a Washington corporation.

(e)　"Dividend Payment Date" has the meaning set forth in Section 4(b).

(f)　"Dividend Period" has the meaning set forth in Section 4(b).

(g)　"Effective Date" means the date on which shares of the Series P Preferred Stock are first issued.

(h)　"Junior Securities" has the meaning set forth in Section 2.

(i)　"LIBOR Business Day" means any day on which commercial banks are open for general business (including dealings in deposits in U.S. dollars) in London.

(j)　"LIBOR Determination Date" means, as to each Dividend Period, the date that is two LIBOR Business Days prior to the first day of such Dividend Period.

(k)　"Parity Securities" has the meaning set forth in Section 2.

APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C306**

(l)     "Redemption Date" means any date that is designated by the Company in a notice of redemption delivered pursuant to Section 7.

(m)     "Reuters Screen LIBOR01 Page" means the display so designated on the Reuters 3000 Xtra (or such other page as may replace that page on that service, or such other service as may be nominated as the information vendor for the purpose of displaying rates comparable to the London Interbank Offered rate for U.S. dollar deposits).

(n)     "Series I Preferred Stock" means the shares of the Company's Series I Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock reserved for issuance.

(o)     "Series J Preferred Stock" means the shares of the Company's Series J Perpetual Non-cumulative Fixed Rate Preferred Stock reserved for issuance.

(p)     "Series K Preferred Stock" means the shares of the Company's issued and outstanding Series K Perpetual Non-Cumulative Floating Rate Preferred Stock.

(q)     "Series L Preferred Stock" means the shares of the Company's Series L Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock reserved for issuance.

(r)     "Series M Preferred Stock" means the shares of the Company's Series M Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock reserved for issuance.

(s)     "Series N Preferred Stock" means the shares of the series of the Company's preferred stock containing the phrase "Series N" in its designation reserved, as of the date hereof or in the future, for issuance.

(t)     "Series O Preferred Stock" means the shares of the series of the Company's preferred stock containing the phrase "Series O" in its designation reserved, as of the date hereof or in the future, for issuance.

(u)     "Series P Preferred Stock" has the meaning set forth in Section 1.

(v)     "Voting Parity Securities" has the meaning set forth in Section 8(b).

### Section 4. Dividends.

(a)     From and after the Effective Date, holders of shares of Series P Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors, out of the funds legally available therefor, non-cumulative cash dividends in the amount determined as set forth in Section 4(c), and no more.

(b)     Subject to Section 4(a), dividends shall be payable in arrears on March 15, June 15, September 15 and December 15 of each year commencing on _____ or, in each case, if any such day is not a Business Day, the next Business Day (each, a "Dividend Payment Date"). Each dividend will be payable to holders of record as they appear on the stock books of the Company on the first day of the month in which the relevant Dividend Payment Date occurs or, if such date is not a Business Day, the first Business Day of such month. Each period from and including a Dividend Payment Date (or the date of the issuance of the Series P Preferred Stock) to but excluding the following

Error! Unknown document property name.     17     **WM: Confidential Limited Access**
APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C307**

Dividend Payment Date (or the Redemption Date) is herein referred to as a "Dividend Period."

(c)    With respect to each Dividend Period, dividends, if, when and as declared by the Board of Directors, will be, for each outstanding share of Series P Preferred Stock, at an annual rate on the $1,000,000 per share liquidation preference equal to the greater of (i) 3-Month USD LIBOR for the related Dividend Period, plus _____% or (ii) _____ percent (_____%). Dividends payable for a Dividend Period, including any Dividend Period greater or less than a full Dividend Period, will be computed on the basis of the actual number of days elapsed in the period divided by 360. No interest will be paid on any dividend payment on a Series P Preferred Stock paid later than the scheduled Dividend Payment Date.

(d)    Dividends on the Series P Preferred Stock are non-cumulative. If the Board of Directors does not declare a dividend on the Series P Preferred Stock or declares less than a full dividend in respect of any Dividend Period, the holders of the Series P Preferred Stock will have no right to receive any dividend or a full dividend, as the case may be, for the Dividend Period, and the Company will have no obligation to pay a dividend or to pay full dividends for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to the Series P Preferred Stock or the Common Stock or any other class or series of the Company's preferred stock.

(e)    If full dividends on all outstanding shares of the Series P Preferred Stock for any Dividend Period have not been declared and paid, the Company shall not declare or pay dividends with respect to, or redeem, purchase or acquire any of, its Junior Securities during the next succeeding Dividend Period, other than (i) redemptions, purchases or other acquisitions of Junior Securities in connection with any benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors or consultants or in connection with a dividend reinvestment or shareholder stock purchase plan, and (ii) any declaration of a dividend in connection with any shareholders' rights plan, including with respect to the Company's Series RP Preferred Stock, or the issuance of rights, stock or other property under any shareholders' rights plan, or the redemption or repurchase of rights pursuant thereto. If dividends for any Dividend Payment Date are not paid in full on the shares of the Series P Preferred Stock and there are issued and outstanding shares of Parity Securities with the same Dividend Payment Date, then all dividends declared on shares of the Series P Preferred Stock and such Parity Securities shall be declared pro rata so that the respective amounts of such dividends shall bear the same ratio to each other as full dividends per share on the shares of the Series P Preferred Stock and all such Parity Securities otherwise payable on such Dividend Payment Date (subject to their having been declared by the Board of Directors out of legally available funds and including, in the case of any such Parity Securities that bear cumulative dividends, all accrued but unpaid dividends) bear to each other.

### Section 5. Liquidation.

(a)    In the event the Company voluntarily or involuntarily liquidates, dissolves or winds up, the holders of Series P Preferred Stock at the time outstanding shall be entitled to receive liquidating distributions in the amount of $1,000,000 per share of Series P Preferred Stock, plus an amount equal to any declared but unpaid dividends thereon to and including the date of such liquidation, out of assets legally available for

distribution to its shareholders, before any distribution of assets is made to the holders of Common Stock or any other Junior Securities. After payment of the full amount of such liquidating distributions, the holders of Series P Preferred Stock will not be entitled to any further participation in any distribution of assets by, and shall have no right or claim to any remaining assets of, the Company.

(b) In the event the assets of the Company available for distribution to shareholders upon any liquidation, dissolution or winding-up of the affairs of the Company, whether voluntary or involuntary, shall be insufficient to pay in full the amounts payable with respect to all outstanding shares of the Series P Preferred Stock and the corresponding amounts payable on any Parity Securities, the holders of Series P Preferred Stock and the holders of such Parity Securities shall share ratably in any distribution of assets of the Company in proportion to the full respective liquidating distributions to which they would otherwise be respectively entitled.

(c) The Company's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into the Company, or the sale of all or substantially all of the Company's property or business will not constitute its liquidation, dissolution or winding up.

Section 6. **Maturity.** The Series P Preferred Stock shall be perpetual unless redeemed by the Company in accordance with Section 7.

Section 7. **Redemptions.**

(a) The Series P Preferred Stock shall not be redeemable at the option of the holders at any time.

(b) The Series P Preferred Stock shall be redeemable in whole or in part at the option of the Company at any time, or from time to time, on or after _____, _____, (or, in the event that _____, _____ is not a Business Day, the next Business Day). Such redemption shall be at a cash redemption price of $1,000,000 per share, plus any declared and unpaid dividends to the Redemption Date, without accumulation of any undeclared dividends.

(c) In the case of any redemption under this Section 7, notice shall be mailed to each holder of record of the Series P Preferred Stock, not less than 30 nor more than 60 days prior to the Redemption Date specified in such notice provided, however, that no failure to give such notice nor any defect therein shall affect the validity of the proceeding for the redemption of any shares of the Series P Preferred Stock to be redeemed except as to the holder to whom the Company has failed to mail said notice or except as to the holder whose notice was defective. The notice of redemption shall include a statement of (i) the Redemption Date, (ii) the redemption price, and (iii) the number of shares to be redeemed.

(d) Any shares of Series P Preferred Stock redeemed by the Company pursuant to this Section 7 or otherwise acquired by the Company in any manner whatsoever shall become authorized but unissued preferred shares of the Company but such preferred shares shall not under any circumstances be reissued as Series P Preferred Stock. The Company shall from time-to-time take such appropriate action as may be necessary to reduce the authorized number of shares of Series P Preferred Stock accordingly.

Error! Unknown document property name. 19 **WM: Confidential Limited Access**
APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C309**

## Section 8. **Voting Rights.**

(a)     Holders of the Series P Preferred Stock will not have any voting rights, including the right to elect any directors, except (i) voting rights, if any, required by law, and (ii) voting rights, if any, described in this Section 8.

(b)     Holders of the Series P Preferred Stock will, in the circumstances and to the extent set forth in this Section 8(b), have the right to elect two directors.

a.     If after the Effective Date the Company fails to pay, or declare and set aside for payment, full dividends on the Series P Preferred Stock or any other class or series of Parity Securities having similar voting rights ("Voting Parity Securities") for six Dividend Periods or their equivalent, the authorized number of the Company's directors will be increased by two. Subject to compliance with any requirement for regulatory approval of, or non-objection to, persons serving as directors, the holders of Series P Preferred Stock, voting together as a single and separate class with the holders of any outstanding Voting Parity Securities, will have the right to elect two directors in addition to the directors then in office at the Company's next annual meeting of shareholders. This right will continue at each subsequent annual meeting until the Company pays dividends in full on the Series P Preferred Stock and any Voting Parity Securities for three consecutive Dividend Periods or their equivalent and pays or declares and sets aside for payment dividends in full for the fourth consecutive Dividend Period or its equivalent or, if earlier, upon the redemption of all Series P Preferred Stock.

b.     The term of such additional directors will terminate, and the total number of directors will be decreased by two, at such time as the Company pays dividends in full on the Series P Preferred Stock and any Voting Parity Securities for three consecutive Dividend Periods or their equivalent and declares and pays or sets aside for payment dividends in full for the fourth consecutive Dividend Period or its equivalent or, if earlier, upon the redemption of all Series P Preferred Stock. After the term of such additional directors terminates, the holders of the Series P Preferred Stock will not be entitled to elect additional directors unless full dividends on the Series P Preferred Stock have again not been paid or declared and set aside for payment for six future Dividend Periods.

c.     Any additional director elected by the holders of the Series P Preferred Stock and the Voting Parity Securities may only be removed by the vote of the holders of record of the outstanding Series P Preferred Stock and Voting Parity Securities, voting together as a single and separate class, at a meeting of the Company shareholders called for that purpose. Any vacancy created by the removal of any such director may be filled only by the vote of the holders of the outstanding Series P Preferred Stock and Voting Parity Securities, voting together as a single and separate class.

(c)     So long as any shares of Series P Preferred Stock are outstanding, the vote or consent of the holders of at least 66 2/3% of the shares of Series P Preferred Stock at the time outstanding, voting as a class with all other classes and series of Parity Securities upon which like voting rights have been conferred and are exercisable, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for effecting or validating any of the following actions, whether or not such approval is required by Washington law:

**C310**

a.      any amendment, alteration or repeal of any provision of the Company's Amended and Restated Articles of Incorporation (including the Articles of Amendment creating the Series P Preferred Stock) or the Company's bylaws that would alter or change the voting powers, preferences or special rights of the Series P Preferred Stock so as to affect them adversely;

b.      any amendment or alteration of the Company's Amended and Restated Articles of Incorporation to authorize or create, or increase the authorized amount of, any shares of, or any securities convertible into shares of, any class or series of the Company's capital stock ranking prior to the Series P Preferred Stock in the payment of dividends or in the distribution of assets on any liquidation, dissolution or winding up of the Company; or

c.      the consummation of a binding share exchange or reclassification involving the Series P Preferred Stock or a merger or consolidation of the Company with another entity, except that holders of Series P Preferred Stock will have no right to vote under this provision or under §23B.11.035 of the Revised Code of Washington or otherwise under Washington law if in each case (x) the Series P Preferred Stock remains outstanding or, in the case of any such merger or consolidation with respect to which the Company is not the surviving or resulting entity, is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such Series P Preferred Stock remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers of the Series P Preferred Stock, taken as a whole;

*provided, however,* that any increase in the amount of the authorized or issued Series P Preferred Stock or authorized preferred stock or the creation and issuance, or an increase in the authorized or issued amount, of other series of preferred stock ranking equally with and/or junior to the Series P Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and/or the distribution of assets upon the Company's liquidation, dissolution or winding up will not be deemed to adversely affect the voting powers, preferences or special rights of the Series P Preferred Stock and, notwithstanding §23B.10.040(1)(a), (e) or (f) of the Revised Code of Washington or any other provision of Washington law, holders of Series P Preferred Stock will have no right to vote on such an increase, creation or issuance.

If an amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above would adversely affect one or more but not all series of preferred stock with like voting rights (including the Series P Preferred Stock for this purpose), then only the series affected and entitled to vote shall vote as a class in lieu of all such series of preferred stock.

**Section 9. Certificates.**   The Company may at its option issue the Series P Preferred Stock without certificates.

RESOLVED FURTHER, that for purposes of these resolutions and the transactions contemplated hereby, each of the following shall be an "Authorized Officer": (i) the Chief Executive Officer, (ii) the Chief Operating Officer, (iii) the Chief Financial Officer, (iv) any Senior Executive Vice President, (v) the Executive Vice President – Corporate Strategy &

Error! Unknown document property name.          21          **WM: Confidential Limited Access**

APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C311**

Development, (vi) the Senior Vice President and Treasurer, (vii) any Senior Vice President reporting directly to the Senior Vice President and Treasurer and (viii) the Senior Vice President and Controller.

RESOLVED FURTHER, that the Board hereby authorizes, and delegates the authority to, any one of the Authorized Officers on behalf of the Board to designate, finalize, determine and complete (it being understood that this authority includes without limitation the authority to make appropriate modifications in the preceding designation) the preferences, limitations, voting powers and relative rights of the Series P Preferred Stock, as set forth in the preceding resolutions, subject to the other limits specified in these resolutions and such final designation shall constitute a final determination of such preferences, limitations, voting powers and relative rights and shall be maintained as an official record of the Board;

RESOLVED FURTHER, that the authorization and delegation in the immediately preceding resolutions shall include, without limitation, the authority to determine the number of shares of Series P Preferred Stock to be authorized, to determine the dividend rates, the liquidation preference and the redemption prices, to determine the dividend payment dates, to add restrictions on dividend payments to parity securities in the event full dividends are not paid on the Series P Preferred Stock, to designate the dates on which and further situations (including without limitation any changes in the regulatory capital rules as applied to the Company) in which the Company has the option to redeem the Series P Preferred Stock (with or without make-whole provisions), to designate additional events or circumstances in which holders of Series P Preferred Stock shall have voting rights, to approve the form of any stock certificate and to prepare and authorize the filing of an amendment for the Series P Preferred Stock with the Secretary of State of the State of Washington which shall include the designation of the preferences, limitations, voting powers and relative rights of the Series P Preferred Stock; provided, however, that the spread over 3-month LIBOR used in determining the dividend rate for each dividend period shall not exceed 800 basis points, the minimum dividend rate for any dividend period shall not be greater than 9% per annum, the number of shares issued shall not exceed 2,000, the liquidation preference per share shall not exceed $1,000,000 and the Company shall have the right to redeem the Series P Preferred Stock no later than the first dividend payment date which is more than five years after the date one which the Series P Preferred Stock is issued (or, if not a business day, the first business day thereafter);

RESOLVED FURTHER, that the Series P Preferred Stock may be issued in either certificated or non-certificated form as determined by any Authorized Officer;

RESOLVED FURTHER, that the Series P Preferred Stock may be issued to a depositary, which shall issue depositary shares each representing a fractional interest in the shares of a series of the Series P Preferred Stock;

RESOLVED FURTHER, that the Company is hereby authorized to enter into and perform its obligations under a deposit agreement to issue depositary shares, and any Authorized Officer is authorized to select the depositary and to negotiate, execute and deliver such deposit agreement on behalf of the Company;

RESOLVED FURTHER, that any Authorized Officer is authorized to appoint from time to time one or more transfer agents, dividend and redemption price disbursement

Error! Unknown document property name.          22          **WM: Confidential Limited Access**
APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C312**

agents and registrars for shares of the Series P Preferred Stock, and any Authorized Officer is authorized to enter into agreements with such agents and registrars;

RESOLVED FURTHER, that the Authorized Officers, or any of them, are authorized and empowered, on behalf of the Company and in its name, with full power and authority to delegate such authority to one or more attorneys-in-fact or agents acting for such Authorized Officers, or any of them, pursuant to a power of attorney, in the event that it is deemed necessary or desirable so to do, in connection with the offering of the Series P Preferred Stock, (i) to prepare, or cause to be prepared, a prospectus, offering circular or offering memorandum with respect to such securities or related depositary shares (and any supplements or amendments thereto), as the Authorized Officers, or any of them, taking such action shall approve in connection therewith in order to effect the offering of such securities and (ii) to execute any notice or application required or requested by the Securities and Exchange Commission or any banking regulator with respect to the Series P Preferred Stock or related depositary shares, to procure all necessary signatures thereto and to file any such notice or application, together with such amendments or supplements as such officers shall deem necessary or appropriate or as counsel for the Company may approve;

RESOLVED FURTHER, that the Company may make application to the New York Stock Exchange (or other organization) for the registration and listing on such Exchange (or such other organization), on official notice of issuance, of the Series P Preferred Stock or related depositary shares; that each Authorized Officer be, and each hereby is, authorized and empowered, at such time as he or she shall deem advisable, in the name and on behalf of the Company, to make application for such registration and listing and, in connection therewith, to execute in the name and on behalf of the Company, and to file and deliver all such applications, statements, certificates, agreements, including indemnification agreements, and other instruments and documents as shall be necessary to accomplish such listing and that each Authorized Officer is authorized to appear on behalf of the Company before the appropriate committee or body of said Exchange (or other organization) as such appearance may be required, with authority to make such changes in any such listing application as shall be presented thereto, and in any agreements that may be made in connection therewith, as in their discretion may be necessary or proper to comply with the requirements for such listing;

RESOLVED FURTHER, that any Authorized Officer is hereby authorized to determine the jurisdictions in which appropriate action may be taken to qualify or register for sale all or such part of the Series P Preferred Stock or related depositary shares as such Authorized Officer deems necessary or advisable; that such Authorized Officer is herby authorized to perform on behalf of the Company any and all such acts as he or she may deem advisable in order to comply with the applicable laws of any such jurisdictions, and in connection therewith, to execute, deliver and file all requisite instruments and agreements, including but not limited to, applications, reports, surety bonds, irrevocable consents and appointments of agents for service of process; the execution by such Authorized Officer of any such instrument or agreement or the taking of any action in connection with the foregoing matters shall conclusively establish such Authorized Officer's authority therefore from the Company and the approval and ratification by the Company of the instruments and agreements and the actions so taken;

RESOLVED FURTHER , that the Company hereby constitutes and appoints Charles

Error! Unknown document property name.    23    **WM: Confidential Limited Access**

APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C313**

Edward Smith its agent for service in connection with any filing with the New York Stock Exchange (or other organization);

RESOLVED FURTHER, that each Authorized Officer is hereby authorized and directed in the name and on behalf of the Company to take any and all action which they may deem necessary or advisable in order to obtain a permit, register or qualify its securities for issuance and sale or to request an exemption from registration of its securities or to register or obtain a license for the Company as a dealer or broker under the securities laws of such of the states of the United States of America or other jurisdictions as such officers may deem advisable, and in connection with such registration, permits, licenses, qualifications and exemptions, to execute, acknowledge, verify, deliver, file and publish all such applications, reports, issuer's covenants, resolutions, irrevocable consents to service of process, powers of attorney and other papers and instruments as may be required under such laws or may be deemed by such officers to be useful or advisable to be filed thereunder, and that the Board hereby adopts the form of any and all resolutions required by any such applications, reports, issuer's covenants, irrevocable consents to service of process, powers of attorney and other papers and instruments if (1) in the opinion of such officer or officers of the Company so acting the adoption of such resolutions is necessary or advisable and (2) the secretary of the Company evidences such adoption by filing with these resolutions copies of such resolutions, which shall thereupon be deemed to be adopted by this Board and incorporated in the minutes as a part of this resolution and with the same force and effect as if presented herewith, and that such officer or officers of the Company take any and all further action which they may deem necessary or advisable in order to maintain such registration in effect for as long as they may deem to be in the best interest of the Company; and

RESOLVED FURTHER, that any Authorized Officer, together with other proper officers of the Company (including, without limitation, those authorized from time to time pursuant to the Company's Asset and Liability Management Policy and the standards and procedures from time to time in effect thereunder), is hereby authorized to negotiate, enter into, execute and deliver any and all additional agreements (which agreements may include, without limitation, (i) underwriting, purchase, distribution or similar agreements with underwriters or agents named therein, (ii) a replacement capital covenant or other similar agreement, in favor of holders of the specified indebtedness of the Company, restricting sources of funds used to redeem or repurchase the Series P Preferred Stock, any undertakings or other documents or supplemental agreements on behalf of the Company (including, without limitation, filings or applications with banking regulators, securities regulators or stock exchanges, domestic or foreign) and to take any other actions, in each case, as such Authorized Officer or other proper officer deems to be necessary or advisable in connection with the issuance of the Series P Preferred Stock, or to further the intent of these resolutions, subject to the limits set forth in these resolutions.

Error! Unknown document property name.      24      **WM: Confidential Limited Access**
APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

**C314**

**Minutes of October 16, 2007 meeting of WMB Board of Directors**

## WASHINGTON MUTUAL BANK
## BOARD OF DIRECTORS MINUTES

The Board of Directors of Washington Mutual Bank (the "Association") held its October meeting on Tuesday, October 16, 2007 in Seattle, Washington. Present were: Frank, Killinger, Leppert, Lillis, Montoya, Murphy, Osmer McQuade, Pugh, Reed, Smith and Stever. (Ms. Osmer McQuade participated by means of a conference telephone enabling all participants to hear one another.) Mr. Killinger presided. Also present, at the beginning of the meeting, were the Company's officers, Casey, Cathcart, Chapman, David, Rotella, and Lynch (secretary). The Board met in joint session with the Board of Directors of Washington Mutual, Inc. (the "Holding Company").

...

### Capital Raising Transaction

Ms. Pugh reported that the Finance Committee had reviewed a proposal with regard to the issuance of capital securities by a subsidiary of the Association. The Delaware limited liability company that was organized in 2006 as an indirect operating subsidiary of the Association would issue up to $2.0 billion in additional preferred securities ("Delaware Preferred Securities") to a newly formed Cayman entity or other foreign entity, which would issue certain other securities ("Entity Securities") and use the proceeds of issuance of the Entity Securities to finance the purchase of Delaware Preferred Securities. The Holding Company will serve as a source of strength for the Association, as the Entity Securities will automatically be exchanged into depositary shares representing a fractional interest in a share of a new class of preferred stock of the Holding Company upon the occurrence of certain possible events. Ms. Pugh reported that the Finance Committee recommended approval of this proposal. On motion duly made and seconded, the Board unanimously resolved to approve the Association's actions in support of the issuance of Delaware Preferred Securities. A copy of the resolutions adopted by the Board will be kept in the minute book as an appendix to these minutes. Ms. Pugh also reported that the Finance Committee had heard a report indicating that the Holding Company would widen the coupon range for another class of preferred stock of the Holding Company, for which depositary shares representing fractional interests automatically will be issued in exchange for another new category of Entity Securities. Thus, also, the Holding Company would serve as a source of strength for the Association.

...

There being no further business, the meeting was adjourned.

### Appendices:

**A – Resolutions in Response to Consent Order**

**B – Resolutions in Response to Assessment Order**

**C – Resolutions Authorizing Global Note Program**

**D – Resolutions Authorizing Preferred Securities**

**E – Schedule of Officer Elections, Promotions, Transfers and Other Changes**

### Appendix D – Resolutions Authorizing Preferred Securities

### (WMPF Preferred Securities Offering)

WHEREAS, Washington Mutual Bank (the "Bank") directly owns all of the issued and outstanding common stock of Seneca Holdings, Inc. ("Seneca Holdings"), indirectly owns all of the interests in WM Marion Holdings, LLC ("WM Marion") and indirectly owns all of the issued and outstanding common stock of University Street, Inc. ("University Street");

WHEREAS, University Street owns all of the issued and outstanding common interests in Washington Mutual Preferred Funding LLC ("WMPF LLC");

WHEREAS, at a meeting of the Board of Directors (the "Board") of the Bank duly called and held on August 21, 2007, the Board adopted resolutions (the "Original Resolutions") relating to and authorizing an equity contribution by the Bank to Seneca Holdings consisting of loans or interests therein not to exceed $3.4 billion in book value (the "Seneca Holdings Contribution") and an equity contribution by the Bank to WMPF LLC (the "LLC Contribution") of assets consisting of loans or interests therein not to exceed $1.5 billion;

WHEREAS, at the time the Original Resolutions were adopted, it was anticipated that Seneca Holdings would make an equity contribution of loans or interests contributed to it pursuant to the Seneca Holdings Contribution to WM Marion, that WM Marion in turn would make an equity contribution of such loans to University Street, and that University Street in turn would make an equity contribution of such loans to WMPF LLC;

WHEREAS, at the time the Original Resolutions were adopted it was also anticipated that WMPF LLC would issue a new class or series of preferred interests (the "LLC 2007-B Preferred Interests") to either (a) a newly formed special purpose entity (the "SPE"), (b) University Street or (c) the Bank;

WHEREAS, at the time the Original Resolutions were adopted it was also anticipated that the LLC 2007-B Preferred Interests would be sold or transferred by WMPF LLC, University Street or the Bank, as the case may be, to the SPE which, in turn, will issue substantially similar securities (the "SPE Securities") to investors;

WHEREAS, WMPF LLC now proposes to issue another class or series of preferred interests (the "LLC 2007-C Preferred Interests") to a newly formed Cayman Islands or other foreign entity (the "Cayman Entity") in addition to or in lieu of issuing LLC 2007-B Preferred Interests to the SPE, University Street or the Bank;

WHEREAS, it is currently anticipated that some or all of the LLC 2007-C Preferred Interests may be sold or transferred by WMPF LLC, University Street or the Bank, as the case may be, to the Cayman Entity which, in turn, will issue substantially similar securities (the "Cayman Securities") to investors;

WHEREAS, it is now proposed that the authorized amount of the Seneca Holdings Contribution be increased to an amount not to exceed $5.2 billion and that the authorized amount of the LLC Contribution be increased to an amount not to exceed $2.0 billion;

APPROVED BY THE BOARD OF DIRECTORS NOVEMBER 19, 2007

WHEREAS, the Bank's parent, Washington Mutual, Inc. ("WMI"), has authorized a new series of preferred stock (the "WMI Series N Preferred Stock") and under certain circumstances the SPE Securities will be automatically exchanged into depositary shares representing interests in the WMI Series N Preferred Stock;

WHEREAS, it is proposed that WMI will authorize a new series of preferred stock (the "WMI Series O Preferred Stock") and under certain circumstances the Cayman Securities will be automatically exchanged into depositary shares representing interests in the WMI Series O Preferred Stock;

WHEREAS, the Original Resolutions authorized (a) the Bank to transfer, or to cause its designee to transfer, any LLC 2007-B Preferred Interests that it may receive to the SPE in exchange for cash, (b) the Bank to execute and deliver any agreements with WMPF LLC, the SPE or any other party necessary or appropriate in connection with the transactions contemplated by the Original Resolutions, (c) the Bank to take any necessary or appropriate action in connection the transfer, sale or offering of the LLC 2007-B Preferred Interests or the SPE Securities, and (d) certain officers of the Bank to take any of the foregoing actions on behalf of the Bank; and

WHEREAS, the Bank desires to expand the authority granted in the Original Resolutions to accommodate the transactions related to the issuance of the LLC 2007-C Preferred Interests and the Cayman Securities.

THEREFORE, IT IS HEREBY RESOLVED, the Seneca Holdings Contribution in an amount not to exceed $5.2 billion in book value and the LLC Contribution in an amount not to exceed $2.0 billion are hereby authorized, and any Authorized Officer (as defined below) is hereby authorized on behalf of the Bank to negotiate, execute and deliver any agreements or documents as any Authorized Officer deems necessary or appropriate in connection with such contributions;

RESOLVED FURTHER, that the Bank is hereby authorized to transfer, or to cause its designee to transfer, any LLC 2007-C Preferred Interests that it may receive to the Cayman Entity in exchange for cash and any Authorized Officer (as defined below) is hereby authorized on behalf of the Bank to negotiate, execute and deliver any agreements or documents as such Authorized Officer deems necessary or appropriate in connection with such transfers;

RESOLVED FURTHER, that each of the Authorized Officers is hereby authorized on behalf of the Bank to negotiate, execute and deliver any agreements with WMPF LLC, the Cayman Entity or any other party as such Authorized Officer deems necessary or appropriate in connection with the transactions contemplated by these resolutions or the Original Resolutions, as well as the management, operation or administration of WMPF LLC;

RESOLVED FURTHER, that the Authorized Officers, or any of them, are authorized and empowered, on behalf of the Bank and in its name, with full power and authority to delegate such authority to one or more attorneys-in-fact or agents acting for such Authorized Officers, or any of them, in the event that it is deemed necessary or desirable so to do, in connection with the transfer, sale or offering of the LLC 2007-C Preferred Interests or the Cayman Securities, as the case may be, in a private offering and/or in an offering effected in reliance on Regulation S promulgated under the Securities Act of 1933, as amended (a "Reg S Offering"), to prepare, cause to be prepared or to participate in the preparation of, an

offering circular or offering memorandum with respect to such securities (and any supplements or amendments thereto), as the Authorized Officers, or any of them, taking such action shall approve in connection therewith in order to effect the offering of such securities in a private offering or a Reg S Offering;

RESOLVED FURTHER, that any Authorized Officer. together with other proper officers of the Bank (including, without limitation, those authorized from time to time pursuant to the Bank's Asset and Liability Management Policy and the standards and procedures from time to time in effect thereunder), is hereby authorized to negotiate, enter into, execute and deliver any and all additional agreements, any undertakings or other documents or supplemental agreements on behalf of the Bank (including, without limitation, filings or applications with banking regulators, securities regulators or stock exchanges, domestic or foreign) and to take any other actions, in each case, as such Authorized Officer or other proper officer deems to be necessary or advisable in connection with the issuance or transfers of the LLC 2007-C Preferred Interests or to further the intent of these resolutions or the Original Resolutions;

RESOLVED FURTHER, that for purposes of these resolutions and the transactions contemplated hereby, each of the following shall be an "Authorized Officer": (i) the Chief Executive Officer, (ii) the Chief Operating Officer, (iii) the Chief Financial Officer, (iv) any Senior Executive Vice President, (v) any Executive Vice President, (vi) the Senior Vice President and Treasurer, (vii) any Senior Vice President reporting directly to the Senior Vice President and Treasurer and (viii) the Senior Vice President and Controller;

RESOLVED FURTHER, that any actions taken by any of the Authorized Officers or any other proper officer of the Bank prior to the adoption of these resolutions that is otherwise within the scope of the authority conferred by these resolutions is hereby ratified, confirmed and approved; and

RESOLVED FURTHER, that, as supplemented hereby, the Original Resolutions shall remain in full force and effect and are hereby ratified and confirmed in all ways.

Name of Debtor *(check only one):*

☒ Washington Mutual, Inc. 08-12229 (MFW)  ☐ WMI Investment Corp. 08-12228 (MFW)

| Name and address of Creditor (and name and address where notices should be sent if different from Creditor): | | ☐ Check this box to indicate that this claim amends a previously filed claim. | **Your Claim Is Scheduled as Follows:** |
|---|---|---|---|

**JPMorgan Chase Bank, National Association**
c/o Hydee R. Feldstein
**Sullivan & Cromwell LLP**
1888 Century Park East
Los Angeles, California 90067-1725
310.712.6600
feldsteinh@sullcrom.com

With a copy to:

**JPMorgan Chase Bank, National Association**
c/o Kevin G. Mruk
10 South Dearborn, Mail Code IL1-0080
Chicago, Illinois 60603-2003
312.732.7105
kevin.g.mruk@jpmchase.com

Court Claim
Number: _____
*(If known)*

Filed on: _____

☒ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

Name and address where payment should be sent (if different from above):

**JPMorgan Chase Bank, National Association**
c/o Joseph A. Giampapa
1111 Polaris Parkway, 4P0265
Columbus, Ohio 43271-0152
614.248.6056
joseph.a.giampapa@jpmchase.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

You have a claim scheduled against the Debtor listed above in the amount and priority set forth above. (This scheduled amount may be an amendment to a previously scheduled amount.) If you agree that you have a claim against the Debtor listed above and in the amount and priority set forth above and you have no other claim against that Debtor, you need not to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is DISPUTED, UNLIQUIDATED or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Type of Claim:**

☒ Claim existing as of the date case was filed. **Amount of Claim as of Date Case Filed:**      $ See Attachment A.

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority (other than under 11 U.S.C. § 507(a)(2)), complete Item 5.

☐ Check this box if claim is filed by a governmental unit.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges.

**2. Basis for Claim:**      See Attachment A.
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:**      Federal Tax ID Number 3725

**3a.** Debtor may have scheduled account as:

(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.) See Attachment A.

Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:   ☐ Real Estate   ☐ Motor Vehicle   ☒ Other

Describe:      See Attachment A.

Value of Property:  $ See Attachment A.      Annual Interest Rate      %

Amount of arrearage and other charges as of time case filed included in secured claim, if any:

$ See Attachment A.      Basis for perfection:      See Attachment A.

**Amount of Secured Claim:**  $ See Attachment A.      **Amount of Unsecured:**  $ See Attachment A.

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.) DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain.

Date:
March 30, 2009

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Donald H. McCree III, Managing Director
**JPMorgan Chase Bank, National Association**
270 N. Park Ave., Floor 46
New York, New York 10017-2104; 212-270-4360

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier under 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan under 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use under 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units under 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$ _____

**FOR COURT USE ONLY**

## RECEIVED

### MAR 30 2009

**KURTZMAN CARSON CONSULTANTS**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

02 Tax
WMI original



081222909033000000000292

**C320**

<u>ATTACHMENT A</u>

*Tax Refunds*

On September 26, 2008 (the "Petition Date"), Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). References herein to the "Debtor" or "Debtors" are intended to refer to WMI and WMI Investment Corp. as debtors and debtors-in-possession in their pending Chapter 11 cases. Prior to the Petition Date, on September 25, 2008, the Director of the Office of Thrift Supervision (the "OTS") appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver (the "Receiver") for Washington Mutual Bank, Henderson, Nevada, a federal savings banking association ("WMB"), a subsidiary of the Debtors, and advised that the Receiver was immediately taking possession of WMB. On September 25, 2008, the FDIC, as Receiver and in its corporate capacity, also entered into a Purchase and Assumption Agreement Whole Bank (the "P&A Agreement") with JPMorgan Chase Bank, National Association ("JPMCB"), whereby JPMCB acquired substantially all of the assets of WMB's banking operations, including one of its subsidiaries, Washington Mutual Bank fsb ("WMBfsb" and collectively with WMB, the "Affiliated Banks"), and assumed the deposit liabilities and certain other liabilities of WMB's banking operations. The Affiliated Banks also had a number of direct and indirect subsidiaries that are now subsidiaries of or have been merged into JPMCB or one of its subsidiaries or affiliates. JPMCB asserts its claims herein on behalf of itself and its subsidiaries and affiliates. JPMCB believes that its claims are against WMI rather than WMI Investment, but because the intercompany relationships between the Debtors are not clear and because these are jointly administered cases, JPMCB files its claims against both Debtors out of an abundance of caution.

Although JPMCB purchased the assets of WMB, the Debtors have wrongfully refused to acknowledge that purchase in material respects, and have interfered with JPMCB's ability to use and enjoy the benefits of its purchase of those assets. On March 20, 2009, the Debtors jointly filed a complaint before the United States District Court for the District of Columbia (the "District Court") placing at issue a number of the claims and assets JPMCB acquired from the FDIC under the P&A Agreement (the "District Court Action"). On March 24, 2009, JPMCB filed its Complaint commencing Adversary Proceeding No. 09-50551-MFW (the "Adversary Proceeding") before the Bankruptcy Court seeking, among other things, declaratory relief regarding a number of the assets at issue in the District Court Action and to interplead any amounts that may be due from JPMCB to the Debtors. On March 30, 2009, JPMCB moved to intervene in the District Court Action.

JPMCB is submitting this and certain other proofs of claim to preserve JPMCB's right to distributions from the estate for (a) any amounts awarded as monetary damages to JPMCB in the District Court Action or the Adversary Proceeding; (b) the amounts paid or contributed by WMB or its subsidiaries on or prior to the Petition Date for the acquisition, creation or maintenance of various identified assets, including the assets at issue in the Adversary Proceeding; and (c) the amounts paid or contributed by JPMCB after the Petition Date on account of the assets at issue in the Adversary Proceeding or otherwise for costs and expenses arising on account of or relating to such estates, including without limitation, payments to or for

the benefit of participants in the pension, 401(k) and other benefit plans at issue. This claim, together with certain of the other claims of JPMCB that are filed in these Chapter 11 cases, is filed as (1) a secured claim under section 506(a) to the extent of any liabilities of JPMCB or any of its subsidiaries or affiliates to the Debtors or to the extent JPMCB or any of its subsidiaries or affiliates is secured, possesses a lien, or is entitled to a lien under contract, applicable non-bankruptcy law, or equity; (2) an administrative claim under section 503(b) for amounts paid by JPMCB or its subsidiaries, or damages to JPMCB resulting from acts or omissions of the Debtors, on or after the Petition Date; (3) a priority claim to the extent specified in each individual proof of claim; and (4) a general unsecured claim to the extent it is not deemed to be entitled to secured, priority or administrative status.

JPMCB believes that with respect to the assets at issue in the District Court Action or the Adversary Proceeding, ownership will be determined by the District Court or the Bankruptcy Court in those actions, as applicable. JPMCB hereby reserves all of its rights and remedies against the Debtors, including the right to continue the District Court Action and the Adversary Proceeding, to commence other actions or proceedings, to seek allowance and payment of administrative claims and amounts by application, motion or other appropriate proceeding before the Bankruptcy Court at any time, to request and seek adequate protection of JPMCB's interest in property, to seek relief from and request the lifting of the stay at any time, whether to permit the exercise of its rights of setoff, recoupment or other remedies or otherwise.

This proof of claim discusses JPMCB's tax-related claims against the Debtor's estate. It should be considered in conjunction with and as an explanation of the attached Excel Spreadsheet entitled "Claims Against WMI Bankruptcy".

### **Background**

The tax-related claims of JPMCB against WMI fall into three general categories:

I.   refunds expected to be paid by taxing authorities to WMI as agent for WMB and/or the FDIC (hereafter, for ease of reading of this proof of claim only, WMB and the FDIC are referred to collectively as "WMB")

II.  refunds already paid by taxing authorities to WMI as agent for WMB; and

III. amounts due from WMI to WMB where WMI remitted funds to taxing authorities as agent for WMB and WMB over-reimbursed WMI for such remittances.

As previously noted, this proof of claim should be read in conjunction with the attached Excel Spreadsheet. The Spreadsheet is broken down into the three categories discussed above. This memorandum for clarity further divides Category I claims into sub-categories: (i) refunds expected to be paid by taxing authorities to WMI as agent for WMB where such refund claims are either actively being litigated or where litigation may be pending; (ii) refunds expected to be paid by taxing authorities to WMI as agent for WMB where such refund claims are being negotiated at either IRS Appeals or at Audit; (iii) refunds expected to be paid by taxing authorities to WMI as agent for WMB where such refund claims relate to overpayments of taxes paid by WMI as agent for WMB; (iv) refunds expected to be paid by taxing authorities to WMI as agent for WMB where such refund claims relate to expected carryback of net operating and

-2-

capital losses incurred by WMB in 2008; and (v) refunds expected to be paid by taxing authorities to WMI as agent for WMB where such refund claims relate to excess credits in tax accounts, miscalculation of interest by taxing authorities, assessed penalties expected to be waived, and other similar items involving WMI's tax accounts maintained with taxing authorities as agent for WMB. Finally, each of these sub-categories of Federal refunds has associated sub-categories relating to state tax refunds.

The following document is submitted in support of this claim:

- Exhibit A. Excel Workbook "Washington Mutual Bank – Claims Against WMI Bankruptcy"

All other supporting documents, due to volume, are available upon request.

**Discussion**:

Category I claims represent refunds expected to be paid by taxing authorities to WMI, where WMI is acting as agent for WMB. They have been sub-categorized into groups depending on the nature of the claim and where such claim is currently being evaluated. The following is a description of each sub-category and of each specific tax issue within each sub-category.

*Sub-Category I – Federal Tax Litigation Claims*:

WMI and WMB are the successors in interest to numerous thrifts, banks and thrift and bank holding companies. These financial institutions include, most notably, Providian Financial, parent to Providian Bank, Dime Bancorp Inc., parent to Dime Savings Bank, HomeSide Lending, Inc. ("HomeSide"), formerly the U.S. mortgage unit of National Australia Bank Limited, H.F. Ahmanson & Company, parent to Home Savings of America ("Home"), Great Western Financial Corporation, parent to Great Western Bank, and Keystone Holdings, Inc., parent to American Savings Bank. Each of the predecessor financial institutions were themselves successors in interest to numerous financial institutions, including, most notably, Coast Savings Financial, Inc., parent to Coast Savings Bank, and the Bowery Savings Bank, among others.

The following describes refund claims that are attributable to these predecessor financial institutions where the claims are currently being litigated and/or where litigation is pending.

*1. Supervisory Goodwill Claims In Court*: In general, these cases concern whether Home, in government assisted acquisitions of various failed thrift institutions, acquired a tax basis in "Branching Rights" and "Regulatory Accounting Principals Rights" (aka "RAP Rights"). Branching Rights refer to a right to establish branch offices in states outside of a thrift's principal operating state. RAP Rights refer to a specific regulatory accounting principle that allowed goodwill recorded in acquisitions of certain troubled institutions to be included in a thrift's regulatory capital calculation.

*Washington Mutual, Inc., as Successor in Interest to H.F. Ahmanson & Co. And Subsidiaries v. The United States of America (United States District Court, Western District (October 2007)*: Case involves Home's acquisition of Missouri Branching Rights, as well as Missouri and Florida RAP Rights, both acquired as part of a 1981 transaction facilitated by the Federal Home Loan Bank Board ("FHLBB") and Federal Savings and Loan Insurance Corporation ("FSLIC"). The original complaint was filed January 12, 2006 in United States District Court, Western District of Seattle. The tax years at issue are 1990, 1992, and 1993.

WMI, as successor to Ahmanson, contends that it acquired tax basis in both the Branching Rights and RAP Rights. As outlined in the Complaint, WMI is requesting amortization deductions for RAP rights for tax years 1990, and 1992-1993. If WMI prevails, WMI should be entitled to additional amortization deductions in 1999-2005. Since both the Branching Rights and the RAP Rights were rights of Ahmanson's banking subsidiary, Home,

-4-

and since Home was merged into WMB, WMB should be entitled to any benefits resulting from the litigation. Further, since the taxes paid by Ahmanson were attributable to the activities of Home, and were therefore paid as agent for Home, any refunds of such taxes should be the property of Home's successor, WMB.

In November of 1993, Home sold its deposit taking business in Missouri. As outlined in the Complaint, HFA is requesting an abandonment deduction for tax year 1993. Again, WMB, as successor to Home, should be entitled to any refunds received by its agent, WMI.

On August 12, 2008, the Court granted the Department of Justice's Motion for Summary Judgment. One additional open issue is related to the carryback of a net operating loss Ahmanson suffered in 1996, where such loss was carried back by Ahmanson to 1993. WMI is working with outside counsel to resolve the carryback claim. Once that issue is resolved, the Court will issue a final judgment. To date, outside counsel is still completing its formal analysis of the court's decision. Based on very preliminary discussions, an appeal to the Ninth Circuit is likely.

*Washington Mutual, Inc. as Successor in Interest to H.F. Ahmanson & Co. and Subsidiaries v. The United States of America (The United States Court of Federal Claims) (March 2008)*: Case involves Home's acquisition of Illinois Branching Rights and RAP Rights as part of various transactions facilitated by the FHLBB and FSLIC.[1] The original complaint was filed March 31, 2008 in the United States Court of Federal Claims. The tax years at issue are 1991 and 1994.

WMI, as successor to Ahmanson, contends that it acquired tax basis in both the Branching Rights and RAP Rights. As outlined it the Complaint, WMI is requesting amortization deductions for RAP rights for tax years 1991 and 1994. If WMI prevails, WMI should be entitled to additional amortization deductions in 1997, and 1999-2005. Since both the Branching Rights and the RAP Rights were rights of Ahmanson's banking subsidiary, Home, and since Home was merged into WMB, WMB should be entitled to any benefits resulting from the litigation. Further, since the taxes paid by Ahmanson were attributable to the activities of Home, and were therefore paid as agent for Home, any refunds of such taxes should be the property of Home's successor, WMB.

In November of 1994, Home sold its deposit taking business in Illinois. As outlined in the Complaint, HFA is requesting an abandonment deduction for tax year 1994. Again, WMB, as successor to Home, should be entitled to any refunds received by its agent, WMI.

WMI is waiting for the Department of Justice to respond to the filed complaint. The case is required to go to Alternative Dispute Resolution after which, the parties will prepare a Joint Status Report. Based on preliminary discussions with outside counsel, it is anticipated that a Joint Status Report will ask the court to freeze the branching rights issue pending appeal.

---

[1] Case includes the amortization of RAP Rights associated with the 1981 Missouri/Florida acquisition as well as Home's acquisition of insolvent Thrift's in Illinois, Texas, New York and Ohio.

*Washington Mutual, Inc. as Successor in Interest to H.F. Ahmanson & Co. and Subsidiaries v. The United States of America (The United States Court of Federal Claims) (April 2008)*: Case involves two issues. The first issue is Home's acquisition of Florida, New York and Ohio Branching Rights and RAP Rights, acquired as part of various transactions facilitated by the FHLBB and FSLIC.[2] The second issue is discussed in greater detail below. The tax years at issue are 1995 and 1998.

WMI, as successor to Ahmanson, contends that it acquired tax basis in both the Branching Rights and RAP Rights. As outlined it the Complaint, HFA is requesting amortization deductions for RAP rights for tax years 1995 and 1998. If HFA prevails, HFA should be entitled to additional amortization deductions in 1997, and 1999-2005. Since both the Branching Rights and the RAP Rights were rights of Ahmanson's banking subsidiary, Home, and since Home was merged into WMB, WMB should be entitled to any benefits resulting from the litigation. Further, since the taxes paid by Ahmanson were attributable to the activities of Home, and were therefore paid as agent for Home, any refunds of such taxes should be the property of Home's successor, WMB.

In 1995, Home sold its deposit taking business in New York and Ohio. In 1998, Home sold its deposit taking business in Florida. As outlined in the Complaint, HFA is requesting an abandonment deduction for tax years 1995 and 1998. Again, WMB, as successor to Home, should be entitled to any refunds received by its agent, WMI.

The second issue relates to a 1995 transfer from Home of $13 billion of mortgage backed securities and deferred loan fees to its wholly-owned subsidiary, 1905 Agency. IRS required Home to recognize income on that transfer asserting that IRC § 351 does not apply to prevent the immediate recognition of all deferred fee income.

The original complaint was filed April 30, 2008 in the United States Court of Federal Claims. WMI is waiting for the Department of Justice to respond to the filed complaint. The case is required to go to Alternative Dispute Resolution, after which the parties will prepare a Joint Status Report. Based on preliminary discussions with outside counsel, it is anticipated that a Joint Status Report will ask the court to freeze the branching rights issue pending appeal and to allow the 1905 Agency issue to move forward. Based on further discussions with WMI representatives Curt Brouwer and Dora Arash, the 1905 claim has been severed from the Supervisory Goodwill claim and is the discovery phase.

*2. Supervisory Goodwill Claims Not in Court*: Claims represent the same issues discussed above, just with respect to different tax years. Subsequent to the conclusion of the three current cases discussed above, claims covering a range of tax years were to be filed in the appropriate court. The claims again represent issues associated with activities of WMB and would again result in refunds that are the property of WMB.

*3. 1905 Agency Claim (Court of Federal Claims) (April 2008)*: See discussion above.

---

[2] Case includes the amortization of RAP rights associated with the acquisition of insolvent Thrifts in New York as well as amortization of favorable financing received by Bowery, a New York Thrift.

*4. Ahmanson Obligation*: During 1997, Home Servicing of America, a subsidiary of Home, recognized a loss on the sale of preferred stock of Ahmanson Obligation Company, a subsidiary of Ahmanson. The loss was disallowed by the IRS. In addition, the IRS imposed a Section 6662 accuracy-related penalty.

On January 10, 2006, WMI paid the IRS for the loss claimed on the sale of Ahmanson Obligation Company stock.[3] In June of 2006, an amended return was filed for tax years 1995, 1997 and 1998. The amended returns included Branching Rights claims as well a claims for the tax and penalty paid with respect to the stock sale loss. On May 27, 2008, the IRS denied the claim for a second time and issued a 30-day letter. A protest was filed on June 26, 2008 and requests consideration of new developments in the law, namely; <u>Coltec Industries, Inc. vs. United States</u>, 454 F 3d 1340 (4th Cir, 2006); <u>The Black & Decker Corporation v. United States</u>, 434 F. 3rd 1340 (4th Cir. 2006). The case has not yet been assigned to an Appeal Officer.

### <u>Sub-Category I – Unitary State Claims for Federal Litigation Claims</u>:

As deductible items for federal tax purposes are generally deductible for state tax purposes, all of the items described above, except one, will generally result in state tax refunds that will be paid to WMI on behalf of WMB. The refunds will be attributable to so-called "combined return" and/or "consolidated return" states where WMI was the paying agent for WMB. The one exception is the Ahmanson Obligation Company stock sale loss; California taxes were not paid with respect to this issue. Accordingly, there is no potential refund associated with the stock sale loss. As it is unknown at this point whether additional taxes will be due for this issue, we do not reduce our state refund amounts for any potential exposure on this issue.

### <u>Sub-Category I – Federal Audit Cycle Claims</u>:

WMI/WMB had Federal Income Tax receivables representing tax refund claims for periods ending prior to and including December 31, 2005. The refunds have been claimed either on amended returns or through the audit process between WMI and its subsidiaries and the various taxing authorities. The refunds are attributable to a host of issues. Some of the issues have been resolved with the IRS and refunds have already been paid. Those issues that have not been resolved, and thus represent additional potential refunds, are discussed individually below.

### <u>WMI 2001-2003 Audit Cycle</u>:

*1. Abatement of Failure-to-Pay (File) Penalty*: For tax year 2003, WMI's federal tax return reflected an underpayment of tax. Consequently, WMI self-assessed a Failure-to-Pay Penalty. The IRS audited the 2001-2003 tax year and issued an RAR reflecting an overpayment of tax. As a result of the overpayment, the failure-to-pay penalty was erroneous. Although the IRS abated the penalty, the penalty has not been refunded. As the original tax was attributable to WMB's activities, and as WMB paid the penalty, the refund is the property of WMB.

---

[3] Generally, a complaint must be filed 2 years after payment of tax. Although not known by JPMorgan Chase at this time, it is possible that WMI filed a complaint in an appropriate jurisdiction on or before January 10, 2009. Because of the possibility of a court filing, this issue is included in the *Federal Tax Litigation Claims* section.

*Note*: Items 2 through 7, below, represent deficiencies asserted by the IRS against WMI/WMB. The IRS offset the asserted deficiencies against refunds the IRS had agreed to pay to WMI/WMB (i.e., the IRS retained the agreed upon refunds). It is presumed that items 2 through 7 will be resolved in WMI'/WMB's favor; therefore, the previously agreed upon refunds will be ultimately paid by the IRS. The vast majority of the previously agreed upon refunds are attributable to WMB and its subsidiaries. Accordingly, when or if such refunds are paid to WMI by the IRS, WMI will be collecting the refunds only as agent for WMB.

*2. Transaction Costs*: Whether pre-decisional investigatory costs incurred by Bank United, Dime, Ahmanson and Washington Mutual should be capitalized and amortized under IRC § 195, or alternatively should be deducted as ordinary and necessary business expense under IRC § 162. The IRS has contested the treatment of these costs, however, it is anticipated that such treatment will ultimately be settled substantially in Washington Mutual's favor.

*3. Ahmanson Ranch Charitable Contribution*: Charitable contribution deduction was disallowed based on the limitation which reduces deduction by amount that would have been long-term capital gain if property had been sold at fair market value. The IRS claimed that the property, know as Ahmanson Ranch, did not qualify as a capital asset at the time of sale to the State of California, but should have been classified as inventory. IRS has tentatively agreed to allow the full deduction.

*4. REMIC Income:* Washington Mutual conducted an extensive review of its REMIC tax returns filed in the 2000-2004 years. As result of the review, the company proposed various adjustments to its taxable income after the RAR had been issued. These adjustments were accepted by the IRS. Additionally, the IRS agreed to give up assessments against WMB for purported unreported REMIC income.

*5. Concord Stock Contribution*: On Appeal, the IRS has agreed that shares of Concord common stock contributed by WMB to the Washington Mutual Foundation were freely transferable on the date of contribution. Therefore the IRS has allowed a full fair market value deduction for contribution of the shares rather than a deduction limited to WMB's basis in the stock.

*6. Partnership Distributions:* Partnerships holding high value low basis assets completely or partially redeemed member interests with related party financial assets (debt securities). The effect of the transactions was to transfer the outside basis of partnership interest to the debt securities, triggering a step-up in basis in the assets in the partnerships. The debt securities were then recapitalized into equity. Question is whether the distributions lacked economic substance, were step-transactions, and/or were violations of anti-abuse regulations. IRS Exam required gain recognition on the transaction. IRS Appeals is currently examining depreciation deductions taken at the partnership level.

*7. Grant Thornton Cost Seg Studies:* Grant Thornton performed a Cost Segregation analysis of Washington Mutual's financial centers placed in service in 2000-2004. As a result of the study, Washington Mutual made a IRC § 481 adjustment and claimed additional depreciation expense from the allocation of costs from Sec 1250 to Sec 1245 property, and additional bonus

depreciation amounts. The IRS denied the accelerated depreciation reported or claimed for 2000-2004.

*Note*: Items 8 through 12, below, represent refund claims submitted by WMI/WMB to the IRS where the IRS has denied such claims. It is presumed that items 8 through 12 will be resolved in WMI'/WMB's favor; therefore, the refunds will be ultimately paid by the IRS. As the vast majority of the refund claims are attributable to the activities of WMB and its subsidiaries, when or if such refunds are paid to WMI by the IRS, WMI will be collecting the refunds only as agent for WMB.

      *8. Grant Thornton Cost Seg Studies*: See Item 7 discussion above.

      *9. Transaction Costs*: See Item 2 discussion above.

      *10. Section 9 Payments*: As a result of the Keystone Transaction, WMI and WMB are parties to an agreement with a predecessor of the FDIC (Federal Savings and Loan Insurance Corporation Resolution Fund), which generally provides that 75% of most of the federal tax savings and approximately 19.5% of most of the California tax savings attributable to American Savings Bank's utilization of certain tax loss carryovers of New West Federal Savings and Loan Association are to be paid by WMI/WMB to the FDIC.

      The issue is whether Washington Mutual is entitled to deduct these tax benefit sharing payments remitted to the FDIC. Taxpayer reached a tentative settlement with the IRS Appeals which considered the risks of litigation under IRC § 483 and therefore allowed an interest deduction equal to 20% of the "Section 9" payments. The losses were utilized by WMB to offset its tax; therefore, any deduction (and associated refund) is properly that of WMB.

      *11. IPO Costs:* The IRS disallowed full deductions claimed on an amended 2002 return for costs incurred by Dime and HomeSide in the initial public offerings of their stock. The costs had been capitalized and no portion deducted at the time Washington Mutual acquired all of the outstanding stock of Dime and HomeSide. The IRS position is that such costs do not reduce proceeds from the stock issuance but must be capitalized.

      *12. Contested Liability Trust*: The CLAS transaction generated deductions in 1999 via the contribution of assets to a trust. Washington Mutual settled the matter with the IRS during the 1998-2000 cycle at less than 100% favorable. In 2002, the trust was unwound. Washington Mutual is entitled to a deduction in 2002 of income previously taxed by virtue of the less than 100% favorable settlement. The trust was a subsidiary of, and all the assets contributed to the trust were owned by, WMB. Thus any adjustment of income is attributable to WMB.

### WMI 2004-2005 Audit Cycle

      All of the below described items represent income or deductions attributable to WMB's activities or the activities of entities merged into WMB. Accordingly, all the items represent refunds that are the property of WMB but which will be paid to WMI as agent for WMB. We note that, on an overall basis, 2004 reflects a net payable to the IRS and, thus, no refunds are expected. 2005, on an overall basis, reflects a net receivable from the IRS. Such receivable, when received by WMI as agent for WMB, is the property of WMB.

*1. Carryforward Adjustments*: This item is comprised of a number of different issues, each briefly described below. All carryforward adjustments have been accepted by Exam through the issuance of a Notice of Proposed Adjustment ("NOPA"). All of the issues related to the activities of WMB or those of entities merged into WMB.

*OID/Interest Income – Loan Sales (NOPA #1)*: In the 1993-1996 audit of Great Western, Great Western Bank (merged into WMB) agreed to the application of § 1286 to loan sales originated between 1988 and 1990. For those loans sold in 1991 or 1992, a proposed change in calculations allowed the taxpayer to reduce the net income from the sales of loans for 1988 – 1992.

*Amortization Florida 21 Branch Core Deposit (NOPA #2)*: In 1987, Great Western Bank acquired 21 branches in southern Florida. There was an issue as to the value and life of core deposits but in Appeals a settlement was reached and a deduction was allowed.

*Leasehold Improvements (NOPA#3)*: Leasehold improvement expense deductions as capital expenditures. However, even though the expenses were not deductible, they were depreciable over a period of 39 years on a straight line method.

*Core Deposit Intangible Amortization (NOPA #4)*: In the 1988-1992 audit cycle of Great Western, changes were made to the amortizable value and lives of intangible assets (called core deposit) for four bank acquisitions. In Appeals, there was a settlement with recalculations to the remaining amortization amounts - adjustments to income were necessary to reflect the agreed changes.

*Excess Mortgage Servicing Rights (NOPA#5)*: This is a carryover from 1993-1996 Great Western cycle where there was a 906 agreement resolving a dispute regarding the correct accounting for the excess servicing rights. It was concluded that the income from the mortgage servicing rights must be reduced based on the changes made and agreed for 1993-1996.

*Amortization of Core Deposit Intangibles (NOPA#6)*: Issue reflects the agreed rollover adjustments from the 1990-1993 cycle of Ahmanson. WMI is able to deduct additional amounts for the amortization of core deposits.

*Home Excess Servicing Amortization (NOPA #7)*: In the 1990-1993 cycle of Ahmanson, there was an adjustment related to the basis of the excess servicing generated in 1990. Therefore the amortization expense was adjusted as well. For the purposes of settlement, it was determined that: 1. WMI is allowed a 15% discount rate in computing the basis of the servicing and the excess servicing strip; and 2. WMI is permitted to report the remaining balance of the interest income and OID in 2004.

*Coast Savings Excess Servicing Amortization (NOPA#8)*: Ahmanson acquired Coast Financial, parent to Coast Savings Bank, in 1998. Coast Savings Bank merged into Home, and Home was subsequently merged into WMB. There was an excess servicing asset tax basis and that amount had not been incorporated into Home's M1 schedule. As agreement was reached allowing for an adjustment based on the PRM percentage, resulting in a decrease to taxable income. The remaining basis carried over to WMB.

*Home Excess Rights Amortization (NOPA#9)*: This NOPA addresses adjustments related to excess deductible basis maintained by Home (prior to merger into WMB) that had not been amortized. Additional amortization deductions were allowed.

*Inventory Reserves (NOPA#11)*: WMI acquired Ahmanson in 1998. Ahmanson had a subsidiary, Ahmanson Residential Development (ARD). Prior to the acquisition, ARD had established reserves against its real estate held for sale or investment. The book reserves were reversed for tax purposes and subsequent charges were deducted for tax purposes. The balances were transferred to Washington Mutual and netted into other property balances. In the 2001-2003 cycle, the Service agreed that tax deductions for the charge offs were allowable, but that such deductions should have been claimed when the property accounts were closed out in 2004.

*1997 REMIC Carryover (NOPA#12)*: Great Western Bank was merged into WMB in 1997. WMB transferred certain Great Western loans to a REMIC. In return, WMBFA received several classes of debt. For book purposes, WMI classified certain classes of debt using the Lower of Cost of Market (LOCOM) valuation technique. WMI originally requested a $99 million loss on a 1997 amended return but the full amount of the loss was denied. The denial of the loss resulted in an overstatement of income in subsequent years. WMI resolved the issue by proposing to amortize the balance of the LOCOM deduction (then $88 million).

*PWC – Cost Seg Study (NOPA#16)*: This is a carryover issue from 2000. In 2000, Washington Mutual filed a 3115 to change the accounting method for the depreciable lives of assets based upon costs segregation studies conducted by PWC and KPMG. The purpose of the study was to reclassify §1250 real property (with 39 yr. lives) as § 1245 tangible property (with 15, 7 or 5 yr. lives). The IRS raised issue with the studies and in Appeals, there was a resolution.

*Odd-Days Interest (NOPA#21)*: Odd-days interest is interest attributable to part of the first payment period when that period is longer than a regular payment period. It is a finance charge related to the short or long days for a loan and must be taken into account. Washington Mutual did not accurately report the correct odd-days interest from Home Savings on the originally filed returns for 2001-2003. Washington Mutual amended its 2001 return by adding an amount into income because the carryover adjustment was discovered after the return had been filed.

*Provision – Government Loan Loss (NOPA#49)*: This is a carryover adjustment resulting from the 2001-2003 cycle. In that cycle, the IRS disallowed a bad debt deduction on the federal return. Although the deduction was appropriate per GAAP, Exam determined that there was no economic performance, therefore no deduction was available for tax purposes. Exam agreed that economic performance occurred in 2004.

*2. MSR Gains and Amortization (NOPA#35)*: Washington Mutual filed an informal claim October 27, 2007, requesting an adjustment of its 2004 MSR Gains and the related Amortization, consistent with the methodology agreed upon during the 2001-2003 cycle. The claim reflects the differences in book and tax methods of allocating loan basis between the MSR retained, and the underlying mortgage sold. For tax purposes, only the "excess servicing rights" are required to be capitalized. The portion of the book gain deferred for tax purposes reverses in subsequent years as a reduction in tax amortization expense relative to book amortization.

*3. Loan Costs and Fees (NOPA#29-33)*: Washington Mutual filed an amended tax return on April 8, 2006, and a summary claim on Feb 28, 2008, regarding 2004 and 2005 Loan Fees and Loan Origination Costs. The claim was filed to make the following corrections to the tax returns as filed: (1) apply carryover adjustments from the 2001-2003 cycle, (2) revise the FAS 91 adjustments and reversals based on a review of balance sheet rather than P&L accounts.

*4. Loan Costs and Fees – Prior Years (NOPA#50)*: On a memorandum dated July 7, 2008, Washington Mutual reported additional income for 2004 and 2005. The adjustments were the result of an ongoing review of accounts by the Corporate Tax Department, and reflect the final reconciliation of balance sheet accounts as of December 31, 2006.

*5. HomeSide Built-in Loss (NOPA#22)*: Washington Mutual acquired HomeSide in 2002. In an amended return for 2002, Washington Mutual proposed an adjustment to income relating to the § 382 limitation on recognition of built-in losses. Washington Mutual assumed that the MSRs acquired in the HomeSide transaction were sold, but it was determined later that the MSR asset related to HomeSide had not sold but was rather was transferred within the consolidated group. This adjustment was calculated applying the §382(h)(7) 5 year limitation period. Since the HomeSide MSRs were not sold in 2002, the recognized built-in loss with respect to these MSRs in 2002–2006 consists of (1) the amount of amortization Washington Mutual could claim on the MSR (by stepping into the shoes of HomeSide) and (2) the purchase accounting adjustments related to the acquisition. Since it is impossible to determine the amount that any realized built-in loss exceeds the net unrealized built-in loss, only the §382 limitation amount was allowed.

*6. Section 9 Payments (NOPA#10R)*: See discussion of *Section 9 Payments* (Sub-Category I B – Federal Audit Cycle Claims).

*7. Mark-to-Market*: A memorandum was submitted to the IRS on November 30, 2007. The following claims were included in the memorandum and were accepted by the IRS:

*MSR Hedges* (NOPA#36): This adjustment is based on the IRS's review of revised computations of MSR Hedges. The adjustment is based on the IRS conclusion that Washington Mutual's method of accounting for hedging gains and losses did not clearly reflect income because the timing of the income, deduction, gain or loss from the hedges did not correspond to the period of the MSR income stream.

*Rate Locks (NOPA#37)*: For GAAP purposes, Interest Rate Lock Commitments ("Rate Locks") are subject to MTM accounting for derivatives under FAS 133. For tax purposes for these years, the Rate Locks were identified as assets held for investment and not subject to MTM. The Sch M items for the book – tax differences were calculated by comparing year-end balances to prior year-end balances for GL accounts 32911 and 52111.

*Warehouse Loans (NOPA#38)*: The warehouse loans were loans originated or purchased by Washington Mutual to be sold in the secondary market. For GAAP purposes, the loans were accounted for under FAS 65 at Lower of Cost or Market (LOCOM). For tax purposes, the loans were assets held for sale and subject to MTM. The Accounting group at Washington Mutual did not capture the 2004 tax MTM data on the warehouse, as the loans were increasing in value due to falling interest rates and no GAAP adjustment was required under LOCOM; however, for tax

-12-

Washington Mutual should have included income or MTM. The IRS accepted the revised computation.

*Hedges on Liability (NOPA#39)*: For GAAP purposes Washington Mutual did record MTM adjustments on certain of its liabilities (our borrowings); however, such adjustments were recorded net of the MTM adjustments on the hedges associated with the borrowings under FAS 133. Because the hedges were perfect during these years, no gain or loss was recorded in the income statement. For tax purposes liabilities (borrowings) are not subject to MTM under IRC Sec. 475, since borrowing are not "securities". Washington Mutual did not MTM the associated hedges for tax purposes. Accordingly, no M adjustment was necessary. The IRS accepted the revised computations.

*8. Partnership Adjustments (NOPA#34)*: Pacific Center Associates is a partnership which consists of five partners, all of which were subsidiaries of Washington Mutual. The original Form 1065 was timely filed. It was later determined that several items needed to be included or revised on the return. The partnership filed an amended return to report the following items: (1) gain on sale of Irvine property assets, (2) recapture of prior year depreciation, and (3) rental income. The audit adjustment reflects these changes.

*9. Depreciation (NOPA#13)*: This adjustment is the correction of an error reported on the 2004 return. Washington Mutual reported and deducted the cumulative depreciation of its fixed assets instead of the current depreciation amounts.

*10. General Reserves (NOPA#14)*: Washington Mutual filed an informal claim Dec 20, 2007 requesting adjustments related to several reserve accounts such as Legal Reserves, Servicing Reserves, and Inventory Reserves. The reserves represent estimates of future expenses for GAAP financial reporting purposes. These amounts were not included in any Sch M adjustments.

*11. Other Adjustments*:

*Amortization 1(NOPA#15)*: This adjustment is the correction of an error. Amortization expense for Purchase Credit Card Receivables, Alliance Contracts and Non-compete Covenants are not deductible for tax. Accordingly, Washington Mutual reported the book expense as Sch M for Amortization. Washington Mutual also reported the same amount as a Sch M for Purchase Accounting. This NOPA adjusts for double counting of the income.

*Amortization 2(NOPA#17)*: This adjustment is also the correction of an error. Washington Mutual inadvertently deducted one month of amortization for intangibles acquired in the purchase of PNC Mortgage. This NOPA allows Washington Mutual to take a full year's amount of amortization on the asset.

*Transaction Costs (NOPA#18)*: Adjustment for transaction fees paid to Morgan Stanley and Lehman Brothers. These costs were previously deducted but on audit were determined to be non-deductible as facilitative services.

*REMIC Income (NOPA#23/#24R1)*: In December 2006, Long Beach Mortgage Co filed amended REMIC forms 1066 and Sch Q for the 2001-2003 years that impacted the amount of

income to be reported in 2004 and 2005. In March 2007, Long Beach provided additional corrections for REMIC residual income for 2001-2003. These corrections also impacted the amount of income to be reported in 2004 and 2005.

*Amortization of Project Saturn Fees (NOPA#26)*: Washington Mutual acquired Providian Financial Corporation and affiliates effective Oct 1, 2005. The IRS concluded its audit of Providian for the 2000-2004 years. Item represents a carryforward adjustment from the audit allowing an additional 2005 deduction for amortization of Project Saturn structuring fees.

*Amortization of Broker Fees (NOPA#27)*: Washington Mutual acquired Providian Financial Corporation and affiliates effective Oct 1, 2005. The IRS concluded its audit of Providian for the 2000-2004 years. Item represents a carryforward adjustment from the audit allowing an additional 2005 deduction for amortization of brokers' fees.

*Transaction Costs-Keystone & Dime (NOPA#40)*: The taxpayer filed Form 3115 requesting a Change in Accounting Method for the treatment of "pre-decisional investigatory costs." The IRS granted the request and allowed a deduction for expenses incurred prior to the time decisions were made as to "whether and which" an acquisition is made.

*HomeSide Net Unrealized Built-in Losses (NOPA#41)*: In 2002, Washington Mutual acquired the assets and stock of HomeSide Lending. From Oct 1, 2002 through Nov 15, 2002 HomeSide filed a short period return. Subsequent to Nov 15, HomeSide was merged into WMBFA. After further review of the transaction, Washington Mutual determined corrections were needed and filed an amended return to reflect the changes. This adjustment reflects the Net Unrealized Built-in Loss as accepted by the IRS.

*Amortization 3(NOPA#53)*: Item represents a correction of an error in signage on the Sch M-1 item as filed.

*Partnership Income (NOPA#47)*: Various adjustments to income from Washington Mutual's interests in partnerships and LLCs. The income was not included on the original returns because the K-1's were received after the returns were filed.

*12. Credits (NOPA#42, 46, 47)*: Increase in General Business Credits as a result of interests in partnerships and LLCs. The credits were not included on the original returns because the K-1's were received after the returns were filed.

## Sub-Category I – Unitary State Claims for Federal Adjustments:

As deductible items for federal tax purposes are generally deductible for state tax purposes, all of the items described above will generally result in state tax refunds that will be paid to WMI on behalf of WMB. The refunds will be attributable to so-called "combined return" and/or "consolidated return" states where WMI was the paying agent for WMB.

## Sub-Category I – Federal Overpayment Claims:

On its 2007 Federal Income Tax Return, WMI elected to apply $40 million of its $274 million overpayment to its expected 2008 federal income tax liability. As WMI's 2008 Federal

Income Tax Return has not yet been prepared, it is possible that the $40 million applied payment will ultimately be refunded to WMI. Since all tax payments made by WMI are as agent for its subsidiaries, principally WMB, the refund is properly the property of WMB. The remaining $234 million overpayment from 2007 is discussed under Category II, below.

### Sub-Category I –Unitary State Overpayment Claims:

On its 2005 to 2007 state tax returns, WMI elected to have overpayments refunded. Since all tax payments made by WMI are as agent for its subsidiaries, principally WMB, the refunds are properly the property of WMB.

### Sub-Category I – Federal Loss Carryback Claims:

As a result of the sale of all of its assets to JPMCB, WMB will realize a significant loss on its 2008 Federal Income Tax Return. The loss will be comprised of both ordinary and capital losses, where such losses may be carried back. Additionally, due to the size of the loss carryback, WMB will have Federal tax credits that were utilized in one year available for carryback to the preceding year, since Federal tax credits generally can be carried back one year. Currently, net operating losses can be carried back two years and capital losses can be carried back three years, however, President Obama's budget proposal may permit net operating losses to be carried back beyond two years. Since all tax payments made by WMI are as agent for its subsidiaries, principally WMB, all amounts received by WMI related to loss and/or credit carrybacks are the property of WMB.

### Sub-Category I – Unitary State Carryback Claims:

As a result of the sale of all of its assets to JPMCB, WMB will realize a significant loss on its 2008 state income tax returns. The loss will be comprised of both ordinary and capital losses. Ordinary losses and capital losses can be carried back up to three years in certain jurisdictions. There are not credits significant enough to consider. As noted under Federal Loss Carryback Claims section, President Obama's budget proposal may permit net operating losses to be carried back beyond the period to which they may be carried back now. Certain jurisdictions may automatically conform to any new federal law; accordingly, certain jurisdictions' carryback periods may be extended. Since all tax payments made by WMI are as agent for its subsidiaries, principally WMB, all amounts received by WMI related to loss carrybacks are the property of WMB.

### Sub-Category I – Miscellaneous Tax-Related Claims:

Prior to WMB's closure by the Office of Thrift Supervision and the appointment of the FDIC as receiver, Washington Mutual was conducting a review of tax account transcripts (i.e., statements of account maintained by taxing authorities detailing final assessments made against taxpayers, payments made, taxes recorded as due from return and estimated tax filings, etc.). While the review was never completed, certain items had been identified which represent net refunds due to WMI as agent for WMB. The following is a brief summary of each of the identified items. Upon completion of the review, certain additional items could be identified which would change the amount of the total refund due to WMI as agent for WMB for both federal and state tax purposes.

-15-

## Federal Transcripts

*1998*: A credit balance was identified as due to WMI/WMB, with associated interest. The credit relates to taxes associated with the activities of WMB and accordingly any refund of such amount should be the property of WMB rather than WMI.

*2002*: The IRS erroneously posted an assessment to the account of WMI/WMB in advance of posting an overpayment from a prior year, thus causing interest on amounts otherwise owed by WMI/WMB to be overpaid. Additionally, an overpayment of tax was identified that, net of two amounts owed by WMI/WMB, results in a refund due to WMI/WMB. The interest and the overpayment, net of amounts identified on the transcripts as due to the IRS, represent refunds due to WMI as agent for WMB, as all items relate to taxes associated with the activities of WMB rather than WMI.

*2003*: As a result of under-estimating its Federal Income Tax liability for 2003, WMI/WMB incurred and paid an estimated tax penalty. Subsequent to the filing of the 2003 original return, numerous deductions of WMB not claimed on the original return were identified and amended returns were filed claiming such deductions. The subsequently claimed deductions are sufficient to eliminate the under-payment of estimated taxes. It is possible that the estimated tax penalty will be abated and refunded by the IRS to WMI as agent for WMB. Such refunds are properly those of WMB since all of deductions are related to WMB's activities.

## California Transcripts

*1998*: Ahmanson engaged in a series of transactions involving its real estate owned. The real estate was owned by Home, Ahmanson's banking subsidiary. Home was ultimately merged into what is now WMB. The transactions resulted in losses being claimed for both Federal and state tax purposes. The State of California initially disallowed all of the claimed losses. After paying the taxes and protesting the State's action, WMI/WMB was successful in realizing the deductions. For various reasons, WMI elected to leave the resulting refund on deposit with the State. The amount represents a refund that owed by the State to WMI as agent for WMB, as WMB owned all the properties that gave rise to the claimed deductions.

*2006*: As noted previously, Washington Mutual acquired H.F. Ahmanson, Great Western, and Keystone. The banking operations of the acquired entities were heavily concentrated in California and incurred significant California tax. The State of California asserted that the banking operations of the acquired entities were instantly unitary with the operations of WMB, causing WMB's tax liability to be significantly increased in the first year after each acquisition. WMI/WMB protested the findings of the State and ultimately reached a negotiated settlement with the State, resulting in a refund. As all of the assessed tax related to the banking operations of the acquired entities, and as all of the banking operations of the acquired entities were merged into WMB, the refund is properly that of WMB.

*2008*: WMI/WMB has a potential constitutional claim against the State of California for the State's taxation of certain income earned by WMB in past years. As WMI asserts that it is the only entity within the Washington Mutual group eligible to act as agent in California with respect to past years, WMI could attempt to file the claim and secure the associated refund of

-16-

taxes paid on such income. However, as all of the income in question was earned by WMB, any such refund would be the property of WMB.

Category II:

   For Federal Income Tax purposes, pursuant to Treasury Regulation § 1.1502-77, and for unitary and/or consolidated return states, WMI was the taxpaying agent for the rest of the Washington Mutual group of entities. As agent for the group, it is customary for WMI to be recipient of any refunds paid by taxing authorities, regardless of which entity to which the tax relates. However, WMI was not an entity with any material operations; the vast majority of taxes incurred by Washington Mutual were attributable to the activities of WMB and its subsidiaries. Accordingly, and as noted repeatedly above, any refunds received by WMI are merely received as agent on behalf of WMB.

   The amounts in Category II represent refunds, Federal and state alike, received by WMI where such refunds have been retained by WMI. Again, since WMI was merely the agent of WMB, and since the vast majority of taxes of the group were attributable to the activities of WMB and its subsidiaries, all refunds received by WMI are WMB's property.

   *Federal Refunds Received by WMI - Dime '99 to '01 Audit Cycle*: In January of 2002, Dime Bancorp Inc., which was merged into WMI, and Dime Savings Bank, which was merged into WMB, were acquired by Washington Mutual. In Dime's last stand-alone audit cycle, Dime Bancorp Inc. filed refund claims for tax years 1999-2001 related to a capital loss carryback. On audit, the IRS initially disallowed the loss carryback and also disallowed Dime Bancorp's deduction of payments made to terminate a merger agreement with Hudson United Bancorp. The termination payment was made because Dime broke-off its merger with Hudson United in order to merge with Washington Mutual. The IRS' position was that such termination payments were required to be capitalized. The Issues were settled at Appeals and a net refund was approved by Joint Committee. On September 23, 2008, the US Treasury issued refund checks. Such refund checks were received on or about September 29, 2008 and WMI took possession of the checks shortly thereafter.

   *Federal Refunds Received by WMI - 2007 Federal Tax Overpayment*: On its 2007 Federal Income Tax Return, filed in September of 2008, WMI reflected an overpayment of $274.5 million; $40 million of the overpayment was applied to WMI's 2008 tax year, and $234.5 million was requested to be refunded. On September 30, 2008, the IRS wired the $234.5 million to WMI.

   *State Tax Refunds Received by WMI*: As discussed previously, Washington Mutual under-reported its deductions on its Federal Income Tax Returns from 1998 through 2004. Correspondingly, Washington Mutual under-reported its deductions on its state income tax returns for the same period. State amended returns were filed for each of the years. Most of the state refunds reflected on those amended returns remain outstanding; however, certain of the refunds have been received by WMI as agent for WMB. Additionally, Washington Mutual reflected overpayments on certain of its state income tax returns for 2006 and 2007. Certain of these overpayments were refunded by the states to WMI as agent for WMB. Since the vast majority of the activities giving rise to the tax payments, the amended return refunds, and the

overpayments are attributable to WMB and its subsidiaries, the refunds received by WMI as paying agent are the property of WMB.

Category III:

WMI and WMB, along with most of the other entities within the Washington Mutual group, maintained tax receivable and tax payable accounts. WMI, as tax agent for the group, would pay taxes on behalf of the group for Federal Income Tax purposes and for unitary and consolidated return state tax purposes. Upon paying a taxing authority, WMI would credit its cash account and would record a debit in its Federal Income Taxes Payable account. As noted previously, the tax liability of the Washington Mutual group was almost exclusively attributable to the activities of WMB. As part of its tax provision process, WMB would record a credit to its Federal Income Taxes Payable account and a debit to its Federal Income Tax Expense. WMB would as a matter of course settle its Federal Income Tax Payable account by remitting cash to WMI in satisfaction of its tax obligation (credit cash and debit Federal Income Taxes Payable; thus, zeroing out the account). As of September 25, the day of WMB's receivership, WMI reflected a current payable in its Federal Income Tax Payable account, and WMB reflected a current receivable in its Federal Income Tax Payable account. Such balances suggest that WMB in fact overpaid WMI for taxes WMI outlaid on WMB's behalf, since WMI had no tax liability (or tax refunds) attributable to its own activities. The balance in WMI's tax account represents overpayment of taxes by WMB to WMI and, thus, represents the property of WMB, since WMI was merely the tax paying agent for the Washington Mutual group.

Assertion of this proof of claim, and any election, exercise or grant of any rights or remedies referred to, implied by or set forth in this claim does not, and is not intended to, preclude the election, exercise or grant of any other rights or remedies that may now or subsequently exist in law, in equity, by statute or otherwise. The identification or enumeration of JPMCB's rights and remedies set forth in this claim is not intended to be and should not be deemed to be exhaustive or to preclude JPMCB from asserting specific claims or counterclaims for as-yet unliquidated, unmatured or contingent claims currently known or unknown, including without limitation, indemnification, contribution, and/or reimbursement from the Debtors for any claims of third parties that may be asserted against JPMCB.

JPMCB reserves all rights to amend, augment, supplement, reduce or withdraw, in whole or in part, this proof of claim, including, without limitation, to: cure a defect in the original claim, correct the claim amount or priority status, include additional supporting documents, describe the claim in greater detail, add additional claims presently unknown to JPMCB that, if known, could have affected this claim or resulted in the assertion of additional damages. In addition, nothing herein shall be deemed to waive or otherwise affect the rights of any other person, including without limitation, the FDIC, to make claims similar to or parallel with this claim.

In some instances, supporting documents identified herein as relating to claims have not been submitted herewith because (i) the specific documents identified are voluminous and either believed to already be in the Debtors' possession, or of such quantity that their submission herewith would be administratively impracticable, (ii) such documents are subject to confidentiality restrictions or some other agreement or restriction binding on JPMCB that

-18-

prevents their lawful inclusion in a filing of this nature without additional steps being taken to assure they are provided under seal or otherwise in compliance with law and any agreements binding on JPMCB, and (iii) of JPMCB's limited familiarity at this point in time with the extensive books and records of WMB acquired from the FDIC and time constraints resulting from the claims deadline. In each such case, JPMCB includes herein a detailed reference, and in some cases a description and summary, of documents identified to date by JPMCB on which the claim is based. Any party in interest seeking additional access to or copies of such documents or other related information may contact Cecelia Rodine at JPMorgan Chase & Co., Legal & Compliance Department, 1 Chase Manhattan Plaza, 25th Floor, Mail Code: NY1-A425, New York, New York 10081 with respect thereto.

Nothing in this claim describing or in any way relating to property in which the Debtors now or hereafter may assert an interest shall be construed or deemed in any way as evidence that such assets are property of the estate or an admission that the Debtors have any rights in such property. This claim is submitted to assert and preserve this claim in the Debtors' pending bankruptcy cases, and neither the submission of this claim, nor any provision hereof or statement herein shall be construed or deemed to be evidence that JPMCB or any other person has waived or intends to waive any rights or claims afforded it under the P&A Agreement, any other agreement with persons other than the Debtors, or as may otherwise be available under applicable law, including, without limitation, the Bankruptcy Code.

# EXHIBIT A

**Journal Entry Posting Form**

**Fax completed form to  (209) 460-7043 or interoffice to BOB, Mail Stop STA5FCR**

**Effective Date:**   12/18/07

| WMB 001 | | | WMB,FA 002 | | WMB,fsb 040 | | |

Select the company based on your cost center in GL 52915.

| x | WMB,FA 002 |

| Document Number | GL Number | Cost Center | Account Number | Remit Balance and Close Acct? Y=Yes | Debit (01) | Credit (02) | Description/Comments |
|---|---|---|---|---|---|---|---|
| | | | 179-165066-7 | No | 1,000,000,000.00 | | WMI contributes to WMB equity acct |
| | | | WMI (Co 70) | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | 52915 | 9347 | | NO | | 1,000,000,000.00 | WMI contributes to WMB equity acct |
| | | | | Totals | 1,000,000,000.00 | 1,000,000,000.00 | |

Approved By: _____  UID # 18696

Department: _____ Treasury

Date: _____ 12/18/2007

# Washington Mutual

**REQUEST FOR CONTRIBUTION**
(Contributing Entity: Only WMI, WMB or WMFSB)

Approved: _____
Thomas Casey
Chief Financial Officer

Date: December 11, 2007

## General Information

| | |
|---|---|
| Contribution Recipient: | Washington Mutual Bank (WMB) |
| GL Co. No.: | 002 |
| Requester/Segment (Name/phone no.): | Jessica Jaeger / 206-554-8550 |
| Amount: | $1 billion |
| Contributing Entity (WMI, WMB or WMFSB): | Washington Mutual, Inc. |
| GL Co. No.: | 070 |
| Contribution Payment Date: | On or before December 31, 2007 |
| Proposal/Purpose: | WMI will contribute $1 billion of the $3 billion funds received from its issuance of the Series R non-comulative perpetual convertible preferred stock to WMB in exchange for equity. The contribution to WMB will be used to provide capital protection for potential credit uncertainties. |

## Approvals Required

| Department | Name | Approved By (by email) |
|---|---|---|
| Legal: | Andrea Radosevich | Email approved |
| Tax: | Tim Cleary | Email approved |
| Controllers: | Paul Stephen | Email approved |
| Treasury: | Peter Freilinger | Email approved |

### Instructions

1.   Complete the General Information as completely as possible.  Be as detailed as possible with the Proposal/Purpose description (i.e., why the contribution is being requested, what it will be used for, is it a one-time request or ongoing, etc).

2.   Present the Request for Contribution to each of the following department representatives for approval (via email):
- Legal: Andrea Radosevich or Susan Taylor and Trish Johnson
- Tax: Tim Cleary or Laurie Hanson
- Controllers: Maruk Ghadiali or Pat Fournier
- Treasury: Peter Freilinger or Patricia Schulte

3.   Upon receipt of approval from all parties, please email the fully approved request to Trish Johnson in Legal.  Please include all approvals when sending your request to Legal.

4.   Legal will prepare and circulate for execution the legal documentation required to authorize the contribution and will forward the approval to the requesting party, Entity Accounting, Tax and Treasury. Alternatively, if preferred, the requestor can present the dividend request, once all departmental approvals have been obtained, directly to the Board for approval at their regular pre-scheduled Board meeting.

C343

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| *In re* | : | Chapter 11 |
| | : | |
| WASHINGTON MUTUAL, INC., *et al.*,[1] | : | Case No. 08-12229 (MFW) |
| | : | |
| *Debtors.* | : | Jointly Administered |
| | : | |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| WASHINGTON MUTUAL, INC. AND WMI INVESTMENT CORP., | : | Adv. Proc. No. 09-50551 (MFW) |
| | : | |
| *Defendants for all claims,* | : | |
| | : | |
| -and- | : | |
| | : | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | : | |
| | : | |
| *Additional Defendant for Interpleader Claim.* | : | |
| | x | |

(Caption continued on next page)

---

[1]      Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (a) Washington Mutual, Inc. (3725); and (b) WMI Investment Corp. (5395). Debtors continue to share their principal offices with the employees of JPMorgan Chase located at 1301 Second Avenue, Seattle, Washington 98101.

{683.001-W0001394.}

0812229090717000000000004

|                                                          |     |                               |
|----------------------------------------------------------|-----|-------------------------------|
|                                                          | x   |                               |
| WASHINGTON MUTUAL, INC. AND                              | :   |                               |
| WMI INVESTMENT CORP.,                                    | :   |                               |
|                                                          | :   |                               |
| *Plaintiffs,*                                            | :   |                               |
|                                                          | :   | Adv. Proc. No. 09-50934 (MFW) |
| v.                                                       | :   |                               |
|                                                          | :   |                               |
| JPMORGAN CHASE BANK, NATIONAL                           | :   |                               |
| ASSOCIATION,                                             | :   |                               |
|                                                          | :   |                               |
| *Defendant.*                                             | :   |                               |
|                                                          | x   |                               |

## JPMORGAN CHASE BANK, NATIIONAL ASSOCIATION'S STATEMENT OF ISSUES PRESENTED AND DESIGNATION OF THE RECORD ON APPEAL

Robert A. Sacks
Hydee R. Feldstein
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telelphone: (310) 712-6600

Bruce E. Clark
Stacey R. Friedman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
LANDIS RATH & COBB LLP
919 Market Street Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400

Dated: July 17, 2009

*Counsel for JPMorgan Chase Bank,
National Association*

{683.001-W0001394.}

## JPMORGAN CHASE BANK, N.A.'S STATEMENT OF ISSUES
## PRESENTED AND DESIGNATION OF THE RECORD ON APPEAL

Pursuant to Federal Rule of Bankruptcy Procedure 8006, Appellant JPMorgan Chase Bank, N.A. ("JPMC") hereby states the following issues to be presented to the United States District Court for the District of Delaware with respect to JPMC's Notice of Appeal dated July 10, 2009 and designates the following items for inclusion in the record on appeal.

### STATEMENT OF ISSUES PRESENTED

1. Does the jurisdictional bar imposed by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"), codified in relevant part at 12 U.S.C. § 1821(d)(13)(D), preclude the Bankruptcy Court from exercising subject matter jurisdiction over claims regarding the scope, validity or avoidability of a sale by and actions of the receiver for a failed depository institution under Title 12 of the U.S. Code, as against a purchaser from the FDIC?

2. Does FIRREA bar these Debtors, who have availed themselves of the FIRREA claims process, whose claims have been disallowed, and when their appeal of that disallowance is pending before the D.C. District Court, from bringing separate claims, this time as against a purchaser from the FDIC, to collaterally attack in the Bankruptcy Court the disallowance of their claims?

{683.001-W0001394.}

## DESIGNATION OF THE RECORD

JPMC designates for inclusion in the record on appeal the following items,

including any attachments thereto, filed in *JPMorgan Chase Bank, National Association*

v. *Washington Mutual, Inc.*, Adv. Pro. No. 09-50551 (MFW):

|  | Title | Date Filed | Docket Item Number |
|---|---|---|---|
| 1. | Official Case Docket as of July 17, 2009 |  |  |
| 2. | Complaint by JPMorgan Chase Bank, National Association against Washington Mutual, Inc., WMI Investment Corp., Federal Deposit Insurance Corporation | 3/24/2009 | 1 |
| 3. | Motion to Extend Time for Asserting Counterclaims Against JPMorgan Chase Bank, N.A. Filed by WMI Investment Corp., Washington Mutual, Inc. | 5/1/2009 | 10 |
| 4. | Objection and Response to Debtors' Motions for (A) an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004.1 Directing the Examination of JPMorgan Chase, N.A. and (b) an Order Pursuant to 11 U.S.C. Section 105(a) and Federal Rules of Bankruptcy Procedure 7013 and 9006(b) Enlarging the Time for Asserting Counterclaims Against JPMorgan Chase Bank, N.A., Filed by JPMorgan Chase Bank, National Association | 5/13/2009 | 13 |
| 5. | Reply of Debtor to Objection of JPMorgan Chase Bank, N.A. to Debtors' Motion for an Order (A) Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004.1 Directing the Examination of JPMorgan Chase Bank, N.A.; and (B) Pursuant to 11 U.S.C. § 503(a) and Federal Rules of Bankruptcy Procedure 7013 and 9006(b) Enlarging the Time for Asserting Counterclaims Against JPMorgan Chase Bank, N.A. Filed by WMI Investment Corp., Washington Mutual, Inc. | 5/18/2009 | 15 |

{683.001-W0001394.}

| | | | |
|---|---|---|---|
| 6. | Brief in Support of the Motion of the Ad Hoc and Trust Committees for the Dime Savings Bank Umbrella Trust Beneficiaries to Intervene in Adversary Proceeding Pursuant to 11 U.S.C. Section 1109(a) and Fed.R.Bankr.P. 7024 Filed by Ad Hoc Committee, Trust Committee | 5/19/2009 | 18 |
| 7. | Answer to Complaint in Response to the Complaint of JPMorgan Chase Bank, N.A., Counterclaim by WMI Investment Corp., Washington Mutual, Inc. against JPMorgan Chase Bank, National Association | 5/29/2009 | 23 |
| 8. | Motion to Stay Adversary Proceeding Filed by Federal Deposit Insurance Corporation | 6/1/2009 | 25 |
| 9. | Memorandum of Law in Support of Motion to Stay Adversary Proceedings Filed by Federal Deposit Insurance Corporation | 6/1/2009 | 26 |
| 10. | Memorandum of Law in Support of the Motion for Intervention of the Official Committee of Unsecured Creditors of Washington Mutual, Inc., and WMI Investment Corp. | 6/11/2009 | 32 |
| 11. | Debtors' Opposition to (I) the Motion of the FDIC to Intervene, (II) the Motion of the FDIC to Stay Adversary Proceedings, and (III) the Motion of JPMorgan Chase Bank, National Association for Stay of Debtors' Adversary Proceeding | 6/15/2009 | 36 |
| 12. | Joinder and Brief of the Official Committee of Unsecured Creditors in Opposition to the Motion of the Federal Deposit Insurance Corporation to Stay Adversary Proceeding | 6/15/2009 | 37 |
| 13. | Response to Defendant Federal Deposit Insurance Corporation's Motion to Stay Adversary Proceedings Filed by JPMorgan Chase Bank, National Association | 6/15/2009 | 38 |
| 14. | Motion to Dismiss Adversary Proceeding/Motion to Dismiss Debtors' Counterclaims Filed by JPMorgan Chase Bank, National Association | 6/18/2009 | 41 |
| 15. | Opening Brief in Support of Motion to Dismiss Debtors' Counterclaims Filed by JPMorgan Chase Bank, National Association | 6/18/2009 | 42 |

{683.001-W0001394.}

| | | | |
|---|---|---|---|
| 16. | Appendix Filed by JPMorgan Chase Bank, National Association | 6/18/2009 | 43 |
| 17. | Reply Memorandum of the FDIC-Receiver in Support of its Motion to Stay Adversary Proceedings | 6/22/2009 | 45 |
| 18. | Motion to Determine Whether Matters are Core or Non Core and Statement with Respect to Motion to Withdraw the Reference Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 47 |
| 19. | Exhibit A to Motion to Determine Whether Matters are Core or Non Core and Statement with Respect to Motion to Withdraw the Reference Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 48 |
| 20. | Motion for Withdrawal of the Reference of the Adversary Proceedings Pursuant to 28 U.S.C. § 157(d) Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 49 |
| 21. | Memorandum of Law in Support of Motion for Withdrawal of the Reference of the Adversary Proceedings Pursuant to 28 U.S.C. § 157(d) Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 51 |
| 22. | Appendix Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 52 |
| 23. | Certification of Counsel Concerning Statements on the Record at the June 24, 2009 Hearing Filed by Federal Deposit Insurance Corporation | 6/29/2009 | 58 |
| 24. | Official Final Transcript regarding Hearing Held 6/24/2009 | 6/30/2009 | 59 |
| 25. | Order Denying Motion of Federal Deposit Insurance Corporation, as Receiver, to Stay Adversary Proceeding | 7/6/2009 | 68 |

{683.001-W0001394.}

JPMC also designates for inclusion in the record on appeal the following items, including any attachments thereto, filed in *Washington Mutual, Inc.* v. *JPMorgan Chase Bank, National Association*, Adv. Pro. No. 09-50934 (MFW):

| | Title | Date Filed | Docket Item Number |
|---|---|---|---|
| 1. | Official Case Docket as of July 17, 2009 | | |
| 2. | Complaint for Turnover of Estate Property by Washington Mutual, Inc., WMI Investment Corp. against JPMorgan Chase Bank, N.A. | 4/27/2009 | 1 |
| 3. | Motion to Dismiss Adversary Proceeding Filed by JPMorgan Chase Bank, National Association | 5/13/2009 | 8 |
| 4. | Opening Brief in Support of Motion to Dismiss Adversary Proceeding Filed by JPMorgan Chase Bank, N.A. | 5/13/2009 | 9 |
| 5. | Appendix Filed by JPMorgan Chase Bank, N.A. | 5/13/2009 | 10 |
| 6. | Motion of Plaintiffs Washington Mutual, Inc. and WMI Investment Corp. for Summary Judgment Filed by WMI Investment Corp., Washington Mutual, Inc. | 5/19/2009 | 14 |
| 7. | Brief in Support of the Motion of Plaintiffs for Summary Judgment Filed by WMI Investment Corp., Washington Mutual, Inc. | 5/19/2009 | 15 |
| 8. | Appendix to the Brief in Support of the Motion of Plaintiffs for Summary Judgment | 5/19/2009 | 16 |
| 9. | Motion to Allow/Expedited Motion for Additional Time to Respond to Debtors' Summary Judgment Motion Filed by JPMorgan Chase Bank, N.A. | 5/27/2009 | 21 |
| 10. | Response to JPMorgan Chase Bank, N.A.'s Motion to Dismiss Filed by WMI Investment Corp., Washington Mutual, Inc. | 5/27/2009 | 22 |
| 11. | Memorandum of Law in Support of Motion to Intervene Filed by Federal Deposit Insurance Corporation | 6/1/2009 | 28 |
| 12. | Motion to Intervene Filed by Federal Deposit Insurance Corporation | 6/1/2009 | 29 |

{683.001-W0001394.}

| 13. | Motion to Stay Debtors' Adversary Proceeding Filed by JPMorgan Chase Bank, N.A. | 6/1/2009 | 31 |
|---|---|---|---|
| 14. | Reply Brief of Defendant JPMorgan Chase Bank, National Association in Further Support of Its Motion to Dismiss | 6/3/2009 | 33 |
| 15. | Statement of the Washington Mutual, Inc. Noteholders Group in Opposition to (A) the Motion of Intervenor-Defendant Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank, to Stay or Dismiss the Adversary Complaint, and (B) the Motion of Defendant JPMorgan Chase Bank, National Association for Stay of Debtors' Adversary Proceeding | 6/15/2009 | 38 |
| 16. | Debtors' Opposition to (I) the Motion of the Federal Deposit Insurance Corporation ("FDIC") to Intervene, (II) the Motion of the FDIC to Stay Adversary Proceedings, and (III) the Motion of JPMorgan Chase Bank, National Association for Stay of Debtors' Adversary Proceeding | 6/15/2009 | 39 |
| 17. | Joinder and Brief of the Official Committee of Unsecured Creditors in Opposition to (A) the Motion of the Federal Deposit Insurance Corporation to Intervene in the Turnover Action and to Stay Adversary Proceedings; and (B) the Motion of Defendant JPMorgan Chase Bank, National Association, to Stay | 6/15/2009 | 40 |
| 18. | Reply Memorandum of the FDIC-Receiver in Support of Its Motion to Stay Adversary Proceedings and to Intervene | 6/22/2009 | 43 |
| 19. | Reply Brief in Further Support of Motion for Stay of Debtors' Adversary Proceeding Filed by JPMorgan Chase Bank, N.A. | 6/22/2009 | 44 |
| 20. | Appendix Filed by JPMorgan Chase Bank, National Association | 6/22/2009 | 45 |
| 21. | Motion to Determine Whether Matters are Core or Non Core and Statement with Respect to Motion to Withdraw the Reference Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 47 |

| 22. | Motion for Withdrawal of the Reference of the Adversary Proceedings Pursuant to 28 U.S.C. § 157(d) Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 48 |
|---|---|---|---|
| 23. | Memorandum of Law in Support of Motion for Withdrawal of the Reference of the Adversary Proceedings Pursuant to 28 U.S.C. § 157(d) Filed by JPMorgan Chase Bank, National Association | 6/23/2009 | 50 |
| 24. | Appendix Filed by JPMorgan Chase Bank, N.A. | 6/23/2009 | 51 |
| 25. | Response to Statement of the Washington Mutual, Inc. Noteholders Group in Opposition to (A) the Motion of Intervenor-Defendant Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank, to Stay or Dismiss the Adversary Complaint, and (B) the Motion of Defendant JPMorgan Chase Bank, National Association for Stay of Debtors' Adversary Proceeding Filed by JPMorgan Chase Bank, N.A. | 6/24/2009 | 52 |
| 26. | Certification of Counsel Concerning Statements on the Record at the June 24, 2009 Hearing Filed by Federal Deposit Insurance Corporation | 6/29/2009 | 57 |
| 27. | Official Final Transcript regarding Hearing Held 6/24/2009 | 6/30/2009 | 58 |
| 28. | Order Denying (A) Motion of Defendant JPMorgan Chase Bank, N.A. to Stay and (B) Motion of Intervenor-Defendant Federal Deposit Insurance Corporation, as Receiver, to Stay or Dismiss Adversary Proceeding | 7/6/2009 | 62 |
| 29. | Order Granting Motion of Federal Deposit Insurance Corporation, as Receiver, to Intervene | 7/6/2009 | 63 |
| 30. | Order Denying Motion to Dismiss Adversary Proceeding Filed by JPMorgan Chase Bank, National Association | 7/6/2009 | 64 |

Dated: July 17, 2009
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street Suite 1800
Wilmington, Delaware 19801
Telephone:    (302) 467-4400
Facsimile:    (302) 467-4450

– and –

Robert A. Sacks
Hydee R. Feldstein
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:    (310) 712-6600
Facsimile:    (310) 712-8800

Bruce E. Clark
Stacey R. Friedman
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, New York 10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588

_Counsel for JPMorgan Chase Bank,_
_National Association_